IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

| | |
|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION** | **MDL DOCKET NO. 1586** |
| **In re: Alliance, Franklin Templeton, Bank of America, Pilgrim Baxter** | **Case No. 04-md-15862** |
| | **(Hon. Andre M. Davis)** |
| **This Document Relates To** | |
| **BANK OF AMERICA SUB-TRACK** | |
| **Finnell v. Bank of America Corp.** ***et al.*** | **No. 04-00-624** |

## CONSOLIDATED AMENDED FUND DERIVATIVE COMPLAINT

Plaintiff Robert K. Finnell, derivatively on behalf of the mutual funds comprising the NATIONS family of mutual funds (the "Funds"), hereby complain against the defendants as follows:

## I.    SUMMARY OF THE ACTION

1.    This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.      This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others, and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care. This Complaint also seeks redress for the harm caused by the Trustees of the Funds who failed or refused to perform their fiduciary duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

3.      Market timing and late trading have been extremely harmful to the Funds.  Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds.  Market timing also causes serious, known disruptions to mutual funds and their operations.  Market timing forces portfolio managers to keep excess quantities of cash available in the funds to redeem market timers' shares when they sell out a position – cash that otherwise should be used to invest.  Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strategies for the funds.  The effect of this is to reduce the returns earned by the funds.

4.      Market timing and late trading have harmed each and every Fund in the Nations family of mutual funds, whether or not the particular fund was the direct victim of market timing or late trading.  This is so because some expenses, such as service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and late trading, may be shared among all funds in the Nations family, including timed-funds and non-timed funds alike.  This is also so because investors have fled all the Funds in the Nations

family of mutual funds, not just the timed funds, following the public disclosure of the market timing and late trading scandal.

5.      Because of these and other problems caused by market timers, fund managers for years have had in place policies and practices designed to monitor and deter market timing, including redemption penalties.

6.      Conversely, market timing and late trading have been extremely profitable for market timers, and, moreover, impose little risk. Because the price movement of the underlying securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet. Market timers exploit price inefficiencies inherent in the forward pricing structure of mutual funds.

7.      Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves. Thus, for example, a one day trade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off on the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

8.      Market timers and late traders could not reap these profits simply by investing in the securities held in the funds' portfolios, because (a) the timers would bear significant transaction costs and tax consequences if they bought and sold individual securities costs, which are foisted upon the funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the

inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

9.      In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they permitted, facilitated, encouraged or participated in the improper activity.  At a minimum, the advisers failed to detect and/or prevent, market timing and late trading in the Funds – the types of abusive transactions they were obligated to prevent.  Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

10.      Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds.  As William H. Donaldson, Chairman of the SEC, recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

> The relationship between an investment Adviser and its clients is supposed to rest on a bedrock foundation of fiduciary principles.  It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment Advisers and their advised funds.  As fiduciaries, Advisers owe their clients more than mere honesty and good faith.  Recent experience suggests that all too many Advisers were delivering much less.[1]

11.      The market timing and late trading scandal results from the substantial and unresolved conflicts of interest between mutual funds and the investment advisers who create and manage the funds.  Those conflicts of interest have manifested themselves in widespread

---

[1]      Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

instances of improper market timing and late trading in the mutual funds, all to the detriment of the Funds.

12.     The nature and extent of those conflicts of interest, the market timing they led to, and the adverse impact they caused to the Funds were known by certain of the Trustees of the Funds, who nonetheless approved or ratified the Fund Advisers' management agreements each year, and were not adequately disclosed to or understood by the Trustees of the Funds, who approved or ratified the Fund Advisers' management agreements each year despite the harm the Advisers caused or permitted to the Funds and who approved or ratified plans permitting the Advisers to charge and collect marketing and distribution fees under Rule 12b-1 of the SEC promulgated under the ICA in violation of the Trustees' own duties to the Funds.  As part of the settlements it reached with the regulators, Bank of America ("BOA") BOA agreed that eight members of the Nations Funds Board of Trustees would be replaced within the year because they approved a market timing arrangement.[2]  This is the only settlement with any mutual fund family that provides for the ouster of board members.

13.     This action is brought by shareholders of the Funds on behalf of the Funds to recover damages for the Funds from those who are responsible for the wrongdoing and from those who profited, directly or indirectly, from the wrongdoing.  These damages include, but are not limited to:

        (a)     forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment Adviser and its affiliates during the period of market timing and late trading;

---

[2] Six months after the settlement, the independent board Trustees remain the same.

(b)      damages to the Funds for profits earned by the Fund Adviser and its affiliates (including officers and employees of the Fund Adviser) from market timing or late trading arrangements;

(c)      damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)      damages to the Funds for 12b-1 fees paid to the Fund Adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.      This action is also brought by shareholders on behalf of the Funds to obtain injunctive relief for the Funds, including but not limited to:

(a)      rescission of the Adviser's management and other agreements with the Funds;

(b)      rescission of the 12b-1 Plans adopted by the Funds;

(c)      removal of the Fund Adviser and its affiliates that manage and perform other services for the Funds; and

(d)      removal of each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees.

## II.      <u>JURISDICTION AND VENUE</u>

15.      This Court has jurisdiction over this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.      This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein because they arise out of and are part of the same case or controversy as plaintiffs' federal claims.

17.     Venue is proper in the transferor districts because some or all of the Defendants are incorporated or conduct business in and/or some of the wrongful acts alleged herein took place or originated in those judicial districts.  Venue is also proper in this District of Maryland because some of the wrongful acts alleged herein took place or originated in this judicial district.

18.     In connection with the acts and practices alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

19.     This is a consolidated amended complaint filed pursuant to an Order of the Judicial Panel on Multidistrict Litigation, captioned *In re Mutual Fund Investment Litigation*, MDL Docket No. 1586, centralizing pretrial proceedings in these actions in this Court.  To preserve the filing dates of the original complaints for purposes of any applicable statutes of limitation and all other defenses based upon the passage of time, the plaintiffs herein expressly reserve the right to seek transfer of these actions back to the transferor courts at the conclusion of pretrial proceedings.

## III.    **PARTIES**

20.     The Plaintiff is as follows:

(a)     Plaintiff Robert K. Finnell, a resident of Floyd County, Georgia, purchased shares of the Marisco Fund on March 20, 2002 and continues to hold such shares.

**The Bank of America Defendants**

21.     The Bank of America Defendants are the entities which manage and advise the Nations Funds:

(a)     Defendant Bank of America Corporation ("BOA"); a Delaware corporation, is a financial services holding company with its headquarters at Bank of America

Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.  BOA is a bank holding company and a financial holding company that provides a diversified range of banking and non-banking financial services and products.  Among its financial service offerings is the Nations Funds mutual fund family.  On its website, the Nations Funds describes itself as "a nonbank affiliate of Bank of America" that "within a single fund family . . . offers a spectrum of choices to help investors pursue a lifetime of financial goals."

(b)      Defendant Bank of America, N.A. ("BOA N.A.") is a wholly owned banking subsidiary of BOA, with its principal place of business located at One Bank of America Plaza, Charlotte, North Carolina.

(c)      Defendant Banc of America Advisers, LLC ("BOAA") is a North Carolina limited liability company with its principal place of business located at One Bank of America Plaza, Charlotte, North Carolina.  BOAA managed and advised the Nations Funds until January 1, 2003.  Until that same date, BOAA was also the co-administrator of the Fund with Stephens Inc.[3]

(d)      Defendant Banc of America Capital Management LLC ("BACAP") is a wholly-owned subsidiary of BOA and has been the investment adviser and manager for the Nations Funds since January 1, 2003.  BACAP is the investment adviser to over 70 mutual fund portfolios in the Nations Funds family.  BACAP and its affiliates manage more than $196 billion in the Nations Funds family.  BACAP, as investment adviser to the Funds, is responsible for the overall management and supervision of the investment management of each fund and it selects and manages the investments of the Funds for which no sub-adviser is employed.  BOAA and BACAP are referred to as the "Adviser Defendants".

---

[3] Stephens Inc. is named as a defendant at ¶31(a)

(e)     Defendant BACAP Distributors, LLC ("BACAPD") is a limited liability company with its principal place of business located at One Bank of America Plaza, Charlotte, North Carolina.  BACAPD is a wholly owned subsidiary of BOA N.A.  BACAPD is a registered broker/dealer and is a member of the National Association of Securities Dealers and Securities Investors Protection Corporation.  Since January 3, 2003, BACAPD has served as the distributor and administrator to the Nations Funds.  As the Nations Funds' administrator, it is responsible for overseeing the administrative operations of the Nations Funds.  Its responsibilities include processing purchases, sales and exchanges, calculating and paying distributions, keeping shareholder records, preparing account statements and providing customer service.  Prior to January 1, 2003, BACAPD was known as Bank of America Advisers, LCC ("BOAA").  BACAPD and Stephens, Inc. are referred to as the "Distributor Defendants".

(f)     Defendant Banc of America Securities LLC ("BAS"), a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings Corporation.  NB Holdings Corporation is wholly owned by BOA.  BAS, a registered broker-dealer, is a full-service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina.  BAS is also registered as an investment Adviser pursuant to the Investment Advisers Act of 1940.  In its capacity as broker-dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.

**The Officer Defendants**

22.     The Individual Defendants are as follows:

(a)      Defendant Robert H. Gordon ("Gordon"), a resident of Scarsdale, New York, was at all relevant times the President and Chairman of BACAP.  Defendant Gordon resigned or was fired from BOA on or about September 12, 2003 and was replaced as President and Chairman of BACAP and Nations Funds by Richard D. Martini.

(b)      Defendant Richard D. Martini ("Martini"), a resident of Park Ridge, Illinois, was, since 2001, President of Asset Management.  On or about September 12, 2003, Martini replaced Gordon as President and Chairman of BACAP and Nations Funds. Martini retired on or about April 1, 2004.

(c)      Defendant Theodore C. Sihpol ("Sihpol"), a resident of New Canaan, Connecticut, was a broker at BAS.  During the relevant time period, Sihpol was a registered investment adviser and broker-dealer at BAS' high-net worth group located in New York.  On or about September 16, 2003, Sihpol was fired.

(d)      Defendant Charles D. Bryceland ("Bryceland"), a resident of Bronxville, New York, was the Branch Manager of BAS and Theodore Sihpol's immediate boss.  On or about September 12, 2003, Bryceland was fired.

**The Trustee Defendants**

(e)      Defendant William P. Carmichael ("Carmichael") is the Chairman of the Board of Trustees.  He is 60 years of age and has served as a Trustee since 1999.  Prior to that, starting in 1998, Carmichael was the Senior Managing Director of the Suceession Fund, a company formed to advise and buy family owned companies.  He retired from that position in April 2001 and remains retired.  During the fiscal year ended March 31, 2002, he received $38,032 for his services as a Trustee.

(f)      Defendant William H. Grigg ("Grigg") is 71 years of age and has served as a Trustee since 1999.  Grigg was previously employed as the Chairman and Chief Executive

Officer of Duke Power Co.  Grigg has been retired since 1997.  During the fiscal year ended March 31, 2002, he received $120,950 for his services as a Trustee.

(g)    Defendant Thomas F. Keller ("Keller") is 72 years of age and has served as a Trustee since 1999.  Since 1974, Keller has been a Professor of Business Administration at Fuqua School of Business at Duke University and was Dean of the School from July 1999 through June 2001.  He is currently retired.  During the fiscal year ended March 31, 2002, he received $120,950 for his services as a Trustee.

(h)    Defendant Carl E. Mundy, Jr. ("Mundy") is 68 years of age and has served as a Trustee since 1999.  From May 1996 to May 2000, Mundy was employed as President and Chief Executive Officer of Worldwide USO.  Prior to that, Mundy was a commandant in the United States Marine Corps, from July 1991 to July 1995.  During the fiscal year ended March 31, 2002, he received $94,500 for his services as a Trustee.

(i)    Defendant Dr. Cornelius J. Pings ("Pings") is 75 years of age and has served as a Trustee since 1999.  Pings is retired. Prior to that, Pings was the President of the Association of American Universities from Feb. 1993 through June 1998.  During the fiscal year ended March 31, 2002, he received $94,500 for his services as a Trustee.

(j)    Defendant Minor M. Shaw ("Shaw") is 56 years of age and has served as a Trustee since 2003.   Shaw is employed as the President of Micco Corporation and Mickel Investment Group.

(k)    Defendant Charles B. Walker ("Walker") is 65 years of age and has served as a Trustee since 1999.  Walker was the Vice Chairman and Chief Financial Officer at Albermale Corporation until February 2003 when he retired from that position.  During the fiscal year ended March 31, 2002, he received $94,500 for his services as a Trustee.

11

(l)      Defendant Edmund L. Benson, III ("Benson") is 67 years of age and has served as a trustee since 1999. He is the employed as the President and Treasurer of Saunders & Benson, Inc.

(m)      Defendant James B. Sommers, ("Sommers") is 65 years of age and has served as a trustee since 1999. He is otherwise retired.

(n)      Defendant Thomas S. Word, Jr. is 65 years of age and has served as a trustee since 1999. He is a Partner at the Law Firm of McGuire, Woods, Battle & Boothe LLP.

(o)      Defendant Gerald Murphy, ("Murphy") is 44 years of age and has served as the Fund's Treasurer since 2003. He also serves as a Senior Officer for other Bank of America-affiliated entities, including various registered and unregistered funds.

(p)      Defendant Robert B. Carroll, ("Carroll") is 44 years of age and has served as the Fund's Secretary since 2003. He also serves as a Senior Officer for other Bank of America-affiliated entities, including various registered and unregistered funds.

23.      The Trustees are appointed by the other members of the Board of Trustees, either in response to or in anticipation of a vacancy on the Board, and serve an indefinite term.

24.      The Trustees hold legal title to the assets of the Nations Funds and are responsible for protecting the interests of Nations shareholders, for general oversight of each Nations Fund's business, and for assuring that the funds are managed in the best interest of shareholders.  The Trustees have to work with the Trust Officers from BOAC and BACAP to establish policies and oversee the activities of the Fund.  *See e.g.,* the Bank of America Corporation Annual Report, for the fiscal year ending December 21, 2003 and filed on March 1, 2004.

25.      Although all members of the Board of Trustees are charged with the Fiduciary duty of protecting shareholders' interests when supervising and overseeing the management and

operations of the Trust, the Trustee Defendants, because they are independent Trustees, have particular responsibilities for assuring that the Trust's Funds are managed in the best interest of shareholders.  *See, e.g.*, the Bank of America Corporation Annual Report, for the fiscal year ending December 21, 2003 and filed on March 1, 2004.

26.     Each of the Bank of America Defendants and the Trustee Defendants owed to the Nations Funds and their shareholders the fiduciary duties of loyalty, candor and fair dealing, and, under the Investment Company Act, owed the duty to refrain from charging or collecting excess compensation or other payments for services in order to preserve the Funds' property and assets, the duty not to place their own financial interests above those of the Nations Funds and their shareholders, and the duty of full and candid disclosure of all material facts thereto.

27.     Each of the Bank of America Defendants owed to the Nations Funds and their shareholders the fiduciary duty not to engage in deceptive contrivances or schemes, acts or transactions or courses of business that operate as a fraud on the Nations Funds and their shareholders.  The acts of the Bank of America Defendants alleged in the Complaint constitute willful malfeasance, bad faith or gross negligence and reckless disregard to their duties to the Funds.

**[¶¶28 THROUGH 30 ARE INTENTIONALLY LEFT BLANK]**

31.     Additional defendants are as follows:

(a)     Canary Capital Partners, LLC ("Canary"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds.  Canary Capital Partners, Ltd. ("CCP Ltd."), is a Bermuda limited liability company.  At all relevant times, CCP Ltd. was also a hedge fund engaged in the business of timing mutual funds.  Canary Investment

Management, LLC ("CIM"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, CIM managed the assets of Canary and CCP Ltd. in exchange for a fee equal to 1.5 percent of the assets of Canary plus 25 percent of the profits above a certain threshold.  As of July 2003, CIM had received approximately $40 million in Canary management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund.

(b)     Edward J. Stern ("Stern") is a resident of New York County, New York and at all relevant times was the Managing Principal of Canary, CCP Ltd. and CIM.  Non-party Noah Lerner ("Lerner") was at all relevant times an employee of Canary.  Non-party Andrew Goodwin ("Goodwin") was at all relevant times up to 2001 an employee of Canary.

(c)     Canary, CCP Ltd., CIM, and Stern are collectively referred to herein sometimes as "Canary."   In September 2003, Canary reached a settlement of charges filed against it by the Attorney General of the State of New York.

(d)     Pritchard Capital Partners LLC ("Pritchard"), a Louisiana limited liability company, is a registered investment adviser and broker-dealer headquartered at 2001 Lakeshore Drive, Mandeville, Louisiana.  Pritchard was an active participant in the unlawful scheme alleged herein.

(e)     Stephens Inc. ("Stephens") is a full service, privately owned Investment Bank with its headquarters in Little Rock, Arkansas.  From September 1, 1993 until January 3, 2003, Stephens was the Nations Funds' sole distributor.  From December 1, 1998 and until January 3, 2003, Stephens was the distributor and co-administrator of the Nations Fund with BOAA.  Stephens and BACAPD are referred to as the "Distributor Defendants".

(f)     Defendant Trautman Wasserman & Company, Inc. ("Trautman"), a Delaware corporation, is a registered investment adviser and broker-dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York.   Trautman was an active participant in the unlawful scheme alleged herein.

32.     Nominal defendants are as follows:

(a)     The Nominal Defendant is the Nations Fund Trust, a Delaware Statutory Trust, the Registrant and issuer of the shares of the more than 70 mutual funds in the Nations family of funds.   The Nations Funds invest in equity and debt securities allowing the smaller investor to diversify his or her investment portfolio through the selection of assets by the Adviser Defendants.

## IV.     STATEMENT OF FACTS

### A.     General Factual Allegations

#### (1)     Introduction

33.     Mutual funds enable small investors to invest long-term capital in the stock and bond markets.   Specifically, mutual funds were intended to enable small investors to (a) accumulate diversified stock portfolios for retirement or other long-term investing with smaller amounts of capital than otherwise would be required for such investing, (b) avoid the transaction costs that ordinarily accompany stock and bond trades, and (c) utilize the services of professional investment Advisers whose services otherwise would not be available at affordable prices.

34.     Investors contribute cash, buying shares in the mutual fund, the number of which is directly proportionate to the amount of the investment.   Mutual fund shares are issued pursuant to prospectuses that must comply with the Securities Act of 1933 and the Investment Company Act.   The investor's cash is then used by the mutual fund to purchase such securities as are consistent with the stated investment goals and objectives of the mutual fund in the Prospectus.

35.     Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.     Mutual funds typically have no employees.  Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.  The adviser "sponsors" the funds and as a practical matter is responsible for the initial creation of the funds and the creation of new funds in the series.

37.     Whether corporation or trust, typically all of the Trustees are the same individuals and have the same responsibilities, the only difference between Trustees being the form of entity they serve.  Trustees have ultimate responsibility for the funds.

38.     Each of the funds is created and sponsored by the adviser and is managed under the supervision of approximately 12 trustees.  The same trustees have supervised all the funds at all times relevant hereto, and their meetings for all the Funds occur at or about the same time. Each of the funds has the same adviser, who in turn appoints the same trustees, the same distributor, the same custodian, and the same transfer agent for all the funds, all of whom serve indefinite terms.  The agreements between the funds and each of these entities are substantially identical form agreements, with only minor differences in fee percentages.  In many instances, the funds share costs among themselves.  In substance, all the funds are operated as a single *de facto* entity.  Plaintiffs therefore bring this action as a derivative action on behalf of the entire Nations family of funds, as well as on behalf of the particular Funds in which they invested.

39.     The trust or corporation contracts with an adviser or manager to handle the day-to-day operations of the fund including making investment decisions, although the trustees retain ultimate responsibility for the fund.  The adviser or the trust will enter into contracts with other entities, which in almost all instances are affiliates of the adviser, for investment advisory

servicing (adviser, sub-adviser), selling or underwriting (distributors), shareholder relations and other back-office services (administrator).  Each of these affiliates typically will be paid a percentage of the adviser's fee, a percentage of the assets under management, or a transaction fee from the Net Asset Value of the fund.

40.     Mutual fund advisers charge and collect substantial management, administration, marketing and distribution, and other fees and compensation from the funds as a percentage of assets under management.  Mutual fund advisers have a direct economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

### (2)     NAV Pricing

41.     Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time.  The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day.  Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day.  Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00 p.m. are priced at the next day's NAV.  This practice is known as "forward pricing" and has been required by law since 1968.

42.     Because NAV is set just once at 4:00 p.m. every day under the forward pricing rule, each day's NAV is inefficient.  This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or

17

securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

43.     Forward pricing gives rise to a number of manipulative practices, all of which may be characterized as "market timing."  These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and redemptions of mutual fund shares that are "timed" to precede small movements in the market prices of the securities in which a fund invests before the NAV reacts to the price changes.

### (3)     Market Timing Transactions

44.     Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the foreign markets have not yet incorporated movements in the United States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds – where the price inefficiency lasts longer because the information that causes the security to be re-valued takes longer to be disseminated by the financial markets – the duration of the round trip will be slightly longer.

45.     Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

46.     Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

47.     Many market timers purchase mutual funds when trading models analyzing performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the trader acquires small cap mutual fund shares in order to capture the benefit of the price rise.  The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

48.     By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and sale of stock, costs that are borne by the fund itself.

49.     Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio.  These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

50.     One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices.  A typical example is a U.S. mutual fund that invests in Japanese securities. Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time. When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old.  If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low.  A trader who buys the

Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

51.     Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day.  By the time a trader can buy the securities, the market price has risen to reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes available while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

52.     Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge profits with little or no corresponding risk.

53.     Yet another market timing scheme is "liquidity arbitrage."  Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies.  The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

(4)     **Late Trading**

54.     Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading."  Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares *after* 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

55.     Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively.  "Late trading can be analogized to betting today on yesterday's horse races."[4]  The manipulative device virtually eliminates investment risk.

56.     The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys or redeems.  When the late trader redeems his shares and claims his profit, the mutual fund manager has to either sell stock or use cash on hand – stock and cash that belong to the fund and its shareholders and would otherwise remain invested – to give the late trader his gain.  The late trader's profit is revenue withheld from the mutual fund.  The forward pricing rule was enacted to prevent precisely this kind of abuse.  *See* 17 C.F.R. §270.22c-1(a).

57.     Late trading can be accomplished in at least two different ways.  The first way market timers are able to trade late is by making arrangements with a mutual fund adviser or a third-party intermediary who has made arrangements with a mutual fund adviser to have access to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS provided trading terminals to at least three broker-dealers that engaged in market timing and Canary– in

---

[4]  *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

effect, making them branch offices of BAS, but unencumbered by BAS's obligation to adhere to the forward pricing rule – giving them the ability to place orders for mutual fund shares as late as 6:30 p.m. Pacific Time, more than five hours after the financial markets closed in New York each day.

58.     Market timers are also able to trade late by making arrangements with intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine the market timers' trades with other mutual fund purchases or redemptions each day, which are processed as batch orders.  These intermediaries net purchases against redemptions, and submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement, Entry and Verification Service ("FundSERV"), an automated system operated by the National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

59.     Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. Eastern Time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.   Often intermediaries process orders in the early evening.  The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

60.     Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.  For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents.  These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading.  In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00

p.m.  Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m.

Finally, some late traders were given trading platforms, integrated hardware-software systems

that allowed them to trade mutual fund shares directly without using an intermediary to submit

orders to FundSERV.  In some cases fund managers themselves permitted and aided late trading

by fund investors.

61.     Late traders were not necessarily restricted to trading in any single fund family

through these schemes.  Often intermediary broker-dealers sell shares of many different fund

families through "Supermarkets."  It is not unusual for a single Supermarket to offer thousands

of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market

timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late

trade many different mutual funds through agreements with broker-dealers who operate a fund

Supermarket.

62.     Market timing was not limited to third parties who acted either alone or in

complicity with intermediaries to time mutual funds.  Fund insiders, like advisers, managers, and

portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing

provided for quick profits at the expense of the mutual funds.

### (5)     Mutual Fund "Short Selling" Strategy

63.     A corollary to market timing used by some investors pursuing market timing

strategies involved shorting the underlying securities that make up a fund portfolio.  Using this

technique timers were able to profit in both rising and falling markets.  Generally, fund managers

do not disclose the portfolio holding information of the funds they manage.  Although this

information is disclosed in semi-annual and annual reports, the information is not current when it

becomes publicly available.  In fact, portfolio managers are generally protective of this

information and will not disclose it to individual investors and fund trackers like Morningstar.

However, some fund insiders provided detailed information regarding the portfolio holdings of funds to market timers.  The market timers could then buy the fund and simultaneously sell short[5] a basket of stocks that mirrored the fund's holdings, leaving the timer overall market neutral.  If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit.  When the value of the underlying securities decreased the timer would close out the short position, again earning a quick profit.  By working with derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.  Often the derivative dealers who assisted timers in creating short baskets were affiliates of banks that were loaning money to timers for timing purposes.

**(6)      Market Timing Is Easy to Detect and Has Been Well-Known Since 1997**

64.     Market timing in mutual funds has occurred at least since the late 1980s.  During the 1980s and 1990s, a number of papers and reports were published by the media, by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the Putnam International Equities Fund, SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

---

[5]   Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

65.     Prior to September 3, 2003, market timing and late trading had become common practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

66.     In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI") held a conference in Chicago attended by brokers and capacity consultants who secured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds.  The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

67.     Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance.  Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

68.     Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer.  The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers.  These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

69.     However, mutual fund managers, including investment advisers and portfolio managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market timing and late trading on mutual funds and fund performance, and

despite the measures they adopted ostensibly to prevent or deter market timing and late trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

70.     Market timing is easy to detect through shareholder turnover data.  A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds.  Because timers make frequent "round trips," when a timer is active in the fund, the number of shares redeemed greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

71.     A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of redemptions-to-shares outstanding.  Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

72.     Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

73.     By 1997, market timing in mutual funds was well-known and well-documented.  During October 1997, Asian markets were experiencing severe volatility.  On Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market.  Later on Tuesday the 28th, the New York markets rallied.  Knowing that the Hong Kong market would rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV

26

based on another method.  Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternate method to calculate NAV.  Some investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

74.     On November 5, 1997, the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil.  *See Mutual Funds Fight the 'Market Timers,'* Wall St. J., 11/5/97, C1.  For example, the article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

75.     The SEC's investigation of fund companies' responses to the October, 1997, turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations.  Further, the number of investors who attempted to take advantage of the arbitrage opportunity was "fairly large."  *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years,* 1997 ICI Securities Law Procedures Conference (Dec. 4, 1997).

76.     By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors.  *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, Journal of Financial Economics 131 (July 2002).

77.     One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers. *See* Eric Zitzewitz, *Who Cares About Shareholders?  Arbitrage-Proofing Mutual Funds*, Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280.

78.     By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds.  These firms provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated.  One firm, ITG, now offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S."  *See* http://www.itginc.com/research/fvm.html.

### (7)     Market Timing Arrangements

79.     Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families.  The authority to time mutual funds is known as "capacity."  Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

80.     Timers, the intermediaries, and the funds' managers and advisers entered into *specific negotiated agreements* to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades.  Through the misuse of sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which *guarantees* profits.

81.     Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

28

82.     Market timers frequently offered mutual fund advisers, distributors, and their affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time.  In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

83.     As Stephen M. Cutler, the Director of the SEC's Division of Enforcement, testified on November 3, 2003 before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Government Affairs:[6]

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders:** 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing - *i.e.*, these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with the groups' policies, and in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations.  We are aggressively following up on these arrangements.

> **Quid pro quo arrangements:** Although the information provided in this area is limited, it appears that many of the person proposing special arrangements to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex.  In most of the situations where sticky assets were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the persons involved in the arrangement.

---

[6]  Testimony Concerning Recent Commission Activity To Combat Misconduct Relating to Mutual Funds: Hearing Before the Senate Subcommittee on Financial Management, the Budget, *and International Security, Committee on Governmental Affairs*, 108th Cong. (Nov. 3, 2003) (testimony of Stephen M. Cutler, Director, Division of Enforcement, U.S. Securities & Exchange Commission).  Mr. Cutler offered the same testimony on Nov. 4, 2003 before the *House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services*.

84.     Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through broker-dealers or other timers.  Many fund families had "Anchor Brokers" or "Anchor Timers," who were designated broker-dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

85.     Negotiated market timing arrangements often involved other financial institutions as participants in the timing schemes, and those financial institutions (such as banks and brokerage firms) had other business relationships with the mutual funds that encouraged the funds to accommodate the financial institutions as well as the market timers.

86.     Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.  The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.  The financing consisted of loans for market timing and late trading, and swaps for shorting.  The collateral for the loans were mutual fund shares, so the banks followed trading closely to ensure that their loans were fully secured.  Under swap arrangements, the swaps are in the bank's name as account holder, in which event the market timer manages the money, pays interest to the bank, and keeps the profit.

87.     Broker-dealers and other intermediaries who offered timing capacity received remuneration from both the mutual funds themselves and the market timers to whom they allocated capacity.

88.     Distributors and other service agents who permitted timing also benefited by receiving increased fees based on the money deposited into the mutual funds for market timing purposes.  Distributors often receive fees based on assets under management and may earn

commissions on sales of fund shares.  Such fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under the ICA for marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds.  17 C.F.R. ¶ 240.12b-1.

89.    Intermediaries who facilitated market timing also received "wrap fees" from market timers.  Wrap fees are customarily charged to investors as a single fee for a variety of investment services, such as commission trading costs and fees of an outside money manager. Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis.  The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee which usually varies from 1 to 3 percent of assets.  Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

90.    Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's primary distributor, usually an affiliate of the adviser.  Distributors usually pay a portion of those 12b-1 Fees to the broker-dealers who sell fund shares.  The broker-dealers continue to receive 12b-1 Fees for as long as their client's money is invested in the funds.  However, broker-dealers who offered timing capacity often received 12b-1 Fees directly from the funds themselves, which were paid in addition to the 12b-1 Fees paid to the mutual fund distributors.

91.    Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes.  For example, market timers frequently traded

through third parties, *i.e.*, broker-dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to mutual fund companies *en masse*.  By trading this way, market timers evaded detection of their activity amid the other trades in the omnibus accounts.  This is one example of market timing "under the radar."

92.     Timing under the radar is intended to avoid the "market timing police," a colloquial term used by market participants to describe persons employed by mutual funds ostensibly to detect and prevent market timing.  Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors were exempt from the restrictions.

93.     Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity.  These tactics included: (a) using multiple account numbers, registered representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated broker dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families.  Some market timers employed these tactics directly, without relying on an intermediary broker.

**Banc of America Securities LLC (BAS)**

94.     Some time prior to late 1999, in order to facilitate late trading and timing of mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers.

32

95.     RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem.  In effect, those who had the box became branches of BAS.

96.     Those market timers and broker-dealers who received the box could enter mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m. closing price up to 3-1/2 hours later.  BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

97.     The box allowed broker-dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

98.     In addition, broker-dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades *en masse* after the 4:00 p.m. deadline at that day's prices.

99.     Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and a broker-dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

100.    BAS installed the box in the offices of three broker-dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  Two of those broker-dealers used the box to time the Nations Funds, defendants Trautman and Pritchard.  BAS gave

the box to defendant Trautman in or about early 2001, and to defendant Pritchard in early 2003. Each of these broker-dealers was charged $10 for each trade that was entered through the box.

101.    BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws. By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the broker-dealers.

102.    BAS also installed the box in Canary's offices in or around the summer of 2001, but did not charge any fee to Canary for orders placed through the box.  Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a broker-dealer, as part of a special arrangement negotiated between Stern and Sihpol of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

103.    On September 16, 2003, the SEC instituted an administrative proceeding against Sihpol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies.  The SEC charged Sihpol[7] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

*"Manual" Late Trading at BAS*

---

[7]   Sihpol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

15.     In or around May 2001, Canary began to late trade the Nations Funds.   At first, Canary conducted its late trading "manually."   In the manual stage, Canary was able to engage in late trading primarily because Sihpol and his team falsified BAS' books and records.   Prior to 4:00 p.m. ET, a Canary trader would send Sihpol or a member of his team a series of "proposed" mutual fund trades by e-mail or facsimile.   Upon receipt, Sihpol, or a member of his team acting upon his instructions, would fill out an order ticket, time stamp it, and set it to one side until that evening. Thus, Sihpol created false order tickets that made it appear as if the orders had been received prior to 4:00 p.m. ET.

16.     Sometime after 4:00 p.m. ET, a Canary trader would telephone Sihpol or a member of his team, and would either confirm or cancel the "proposed" trades.   If confirmed, Sihpol's team would fax the order (with its pre-4:00 p.m. time stamp and no post-4:00 p.m. time stamp) to the clearing department for processing.   As a result, Canary would receive that day's NAV.   If Canary cancelled the "order," Sihpol or a member of his team would discard the ticket.

*Late Trading Through BAS' Electronic System*

17.     In the summer of 2001, BAS technicians installed the direct access system in Canary's offices.   Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.

18.     After a Canary trader entered the trades directly into the system, the trader would print out a document confirming the trades and the time (after 4 p.m.) that the trades had been entered. The trader then faxed the document to Sihpol or a member of his team.   The following day, Sihpol or a member of his team would use this document to reconcile Canary's trades.   Once the trades were reconciled, Sihpol or a member of his team discarded the document.

19.     From the summer of 2001 until the summer of 2003, Canary used the electronic system to late trade.   Canary also late traded "manually" whenever there were technical problems with the electronic system.   BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.     The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.   By using the electronic system, Canary was able to send orders directly to BAS' clearing

function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

21.    Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link.  Sihpol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

104.    In recognition of BAS's misconduct in facilitating late trading through the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

105.    Defendant BAS, by providing the box to Trautman and Pritchard, facilitated their late trading and timing in the Funds, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Nations Intl Equity Pr A | 22,464,667 | 226,234,071 | 228,384,930 |
| Nations Small Co Prim A | 3,980,522 | 42,984,704 | 43,570,366 |
| Nations Intl Value Inv A | 6,193,091 | 100,127,710 | 100,372,301 |
| Nations Govt Secs Inv A | 11,142,811 | 111,330,958 | 111,562,721 |
| Nations Intl Value Prim A | 2,114,967 | 34,374,564 | 34,407,176 |
| Nations Intl Equity Inv A | 866,300 | 7,699,414 | 7,722,787 |
| Nations Bond Prim A | 155,107 | 1,501,941 | 1,502,859 |
| Nations Sh-Term Inc Pr A | 30,364 | 300,000 | 300,886 |
| TOTAL | 46,947,830 | $524,553,362 | $527,824,027 |

106.    Defendant BAS allowed a broker and/or timer, Trans Sierra, to late trade and/or time the Funds, as follows:

| Fund Name | Dollar Value of Purchases |
|---|---|
|  |  |

| Municipal Income – PRM A | |
|---|---|
| | 100,782,041 |
| Municipal Income – INV A | |
| | 103,956,532 |
| Intermediate Municipal Bond – INV A | |
| | 51,744,010 |
| California Municipal | |
| | 26,825,248 |
| Intermediate Municipal Bond _ PRM A | |
| | $6,610,675 |

**<u>Canary</u>**

107.    In or about the summer of 2001, as part of a package deal with BAS that included

late trading and timing capacity in the Nations Funds, financing for late trading and timing trades

in Nations Funds and other mutual funds, and unlimited capacity to late trade and time hundreds

of other mutual funds, defendant BAS installed the "box," free of charge, at Canary's offices in

Secaucus, New Jersey.  The deal is memorialized in a letter dated May 1, 2001 by Stern to

Sihpol of BAS, in which, among other things, Stern writes:

> We plan on transacting our trades manually at first (via Fax), at a
> time of day that is a little bit earlier than Matt [Augliero, a mutual
> fund clearing specialist at BAS] specified in our first meeting.  As
> soon as we can work out our lending arrangement with the bank
> and begin transacting electronically via ADP [i.e., the box], we
> will draw down leverage against the capital we have deployed in
> the Nations funds, effectively increasing our trading capital with
> your firm to $32 million. If all goes well, this capital should grow
> larger as we get a sense of what trades can and cannot be done via
> the Banc of America Securities Platform.  We really would like to
> get going with ADP and begin trading electronically as soon as
> possible.

108.    Canary executed a total of $3,173,736,964 in late trading and timing trades in the

Funds through its own BAS box and a BAS box provided to Trautman.

**Trautman and Pritchard**

109.     As set forth above, Trautman and Pritchard were brokers/timers that had agreements with BAS that enabled them to late trade and time mutual funds through the BAS box.  These defendants late traded and timed mutual funds both for their clients, who bought and sold hundreds of millions dollars worth of mutual funds, and for their own accounts.

110.     Trautman, which had the box since about early 2001, late traded and timed the Funds as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Nations Intl Equity Pr A | 22,352,035 | 225,032,856 | 227,180,625 |
| Nations Small Co. Prim A | 3,980,522 | 42,984,704 | 43,570,366 |
| Nations Intl Value Inv. A | 3,572,135 | 57,734,743 | 57,893,690 |
| Nations Govt Secs Inv A | 5,945,510 | 59,161,576 | 59,249,471 |
| Nations Intl Val Prim A | 2,114,967 | 34,374,564 | 34,407,176 |
| Nations Bond Prim A | 155,107 | 1,501,941 | 1,502,859 |
| **TOTAL** | 38,120,276 | $420,790,385 | $423,804,187 |

111.     Trautman also late traded and timed the Funds on behalf of Canary, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Nations Intl Equity Pr A | 533,685 | 5,340,000 | 5,388,714 |
| Nations Intl Value Inv A | 379,907 | 6,050,288 | 6,087,823 |
| Nations Intl Equity Inv A | 414,488 | 3,857,356 | 3,867,622 |
| **TOTAL** | 1,328,080 | $15,247,644 | $15,344,159 |

112.    Pritchard, which had the box since about early 2003, late traded and timed the Funds, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Nations Govt Secs Inv A | 5,197,300 | 52,169,381 | 52,313,251 |
| Nations Intl Value Inv A | 2,620,956 | 42,392,967 | 42,478,611 |
| Nations Intl Equity Inv A | 866,300 | 7,699,414 | 7,722,787 |
| Nations Intl Equity Pr A | 112,632 | 1,201,215 | 1,204,306 |
| Nations St-Term Inc. Pr A | 30,364 | 300,000 | 300,886 |
| **TOTAL** | 8,827,554 | $103,762,977 | $104,019,840 |

113.    The late trading and timing orders that were processed through the box consisted of both "under the radar" late trading and timing, and late trading and timing arranged between Trautman and Pritchard, or their intermediaries, on the one hand, and mutual fund advisers, on the other hand.  Upon information and belief, these defendants, or their intermediaries, received wrap fees for providing under the radar or negotiated late trading/timing capacity in mutual funds.

114.    Even where late trading and timing was "under the radar," mutual fund advisers knew that funds were being timed by the sheer volume of asset turnover in the funds.  One advantage to the brokers and timers that late traded and/or timed "under the radar" – as Trautman and Pritchard sometimes did – was that they avoided paying wrap fees to the mutual fund

families.   Where there was a negotiated timing arrangement with a mutual fund family, the defendants often shared wrap fees they received with the mutual fund family advisers.

**[¶¶ 115 THROUGH 250 ARE INTENTIONALLY LEFT BLANK]**

### (8)   Impact of Market Timing

251.   Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments.  Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts.  Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.   Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways.  The types of adverse impact caused to mutual funds from market timing generally can be grouped into three categories: (a) Dead Weight; (b) Dilution; and (c) Concentration.

253.   Dead Weight losses result from frequent transactions in mutual fund shares by market timers.  Dead Weight harms not just the funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.   Dead Weight includes, but is not limited to, the following:

(a)   increased service agent fees, such as transfer agent, compliance administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)   statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

(c)     higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who flee the fund after learning of the late trading and timing scandal;

(d)     lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)     inefficient trading in the funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (*e.g.*, buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)     transaction costs for transactions in the funds' underlying portfolio securities that result from market timing (as well as from the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

(g)     interest on borrowing to maintain the mutual funds' position in the underlying portfolio securities; and

(h)     increased expenses for fixed costs (including trustee or director expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.    Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio

41

managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to invest, the net return on all fund assets (including the transient cash deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.    Dead Weight harms not only the funds that are timed, but can also harm non-timed funds.  Non-timed funds are harmed by market timing when timing increases costs that are shared by timed and non-timed funds within the same fund family.  Certain costs, for example custodian fees, are shared by all funds in a mutual fund family.  Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family.  This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds.  If fees are calculated on a transactional basis, the costs are increased directly. If fees are calculated as a percentage of assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions.   Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257.    Non-timed funds were also harmed by increased expense ratios resulting from market timing when large numbers of innocent investors redeemed their shares in the wake of the scandal.  Fixed costs, such as director's fees, are shared among funds and are accrued daily. When large numbers of investors redeemed their shares after discovering that the funds were implicated in the market timing scandal, the assets of the funds shrank and the fixed costs became a greater burden.

258.    Dead Weight is exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259.    In addition to exposing mutual funds to Dead Weight, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets.  When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises.  The timer therefore pays less than the true value of the fund share.  When the underlying securities increase in price (as anticipated), the fund's NAV increases and the timer participates in this "unearned appreciation."  The timer's unearned appreciation results in dilution of the fund's NAV dollar for dollar.

260.    Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old.  Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.    Late trading in particular dilutes the assets of a mutual fund.  When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV.  However, late traders are able to purchase the fund shares at the current day's lower NAV, thus reducing the purchase price for the shares and depriving the funds of the NAV appreciation between the two days.  Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

43

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated.  In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed.  The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the underlying securities increased.  Since the timer's money is either invested at a non-stale price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities.  The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution.  The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices.  Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

**B.      Timing in the Nations Funds**

**(1)      The Trustees, Advisers and Distributors**

264.    At all relevant times, the Adviser Defendants and their agents or affiliates, managed the Nations Funds and controlled and were responsible for the day-to-day operations of the Funds.

265.    The Adviser Defendants and their agents and affiliates, made profits from fees charged to each of the Funds for advisory and other services they provided.  These fees are typically a percentage of the assets in the Fund, so the more assets that are in the family of funds,

the more money the investment advisers make.  Timers provide the investment adviser with more assets, and often, wrap fees or other payments, in exchange for the right to time.  The Adviser Defendants succumbed to temptation and allowed innocent investors in Funds to be harmed in exchange for additional money in their own pockets in the form of higher management fees and other illicit payments or benefits.

266.    As fund managers, the Adviser Defendants were aware of the damaging effect that timers were having on the Funds, and had the power simply to reject timing trades, or to charge or enforce early redemption fees, which often wipe out or reduce the arbitrage that timers exploit.  Generally, redemption fees go directly into the Funds to reimburse them for the costs of short term trading.

267.    Instead, beginning in 2001, the BOA Defendants and the Trustee Defendants conspired with one another, for their mutual benefit, and improperly permitted certain large hedge funds and other investment entities to make illicit profits through late trading and market timing of certain pre-approved upon Nations Funds.  This was done in complete disregard for the well-being of the Funds and in blatant violation of the Funds' Prospectuses.  The Prospectuses created the misleading impression that shareholders were protected from the negative effects of the arrangements entered into between the Bank of America Defendants and large investors.

268.    The actions and failures to act of the Trustee Defendants alleged herein constitute willful misfeasance, bad faith, or gross negligence in the performance of their duties to the Trusts and were in reckless disregard of their obligations and duties to the Trusts.

269.    The actions and failures to act of the Advisers and the Sub-Advisers alleged herein constitute willful misfeasance, bad faith, or gross negligence in the performance of their

45

obligations under the Advisory Agreements or Portfolio Management Agreements and were in reckless disregard of their investment advisory obligations and duties thereunder.

270.     The actions and failures to act of the Distributor Defendants alleged herein constitute willful misfeasance, bad faith, or gross negligence in the performance of its obligations under the Distribution Contract and were in reckless disregard of their obligations and duties thereunder.

### (2)     BACAP's Timing Agreement with Canary

271.     Going further than any other Investment Adviser who allowed timers in their Funds, the Adviser Defendants awarded Canary, a most avid timer, with a written agreement confirming his ability to time Nations Funds. This was the only written agreement Canary ever obtained while timing hundreds of Funds.

272.     In complete disregard for their obligations to the Fund's shareholders, the Adviser Defendants and the clearing broker, Defendant BAS, entered into a timing agreement with Canary by which Nations Funds could be timed up to $16.8 million with a maximum of 1½ round trips per week in the international and small caps funds, and 1 round trip per week in certain other funds. Timing in the Nations Funds peaked at $50-60 million.

273.     On May 1, 2001, Canary sent Sihpol a letter confirming the Nations Funds he hoped to time. This letter formed the only written agreement Canary entered into to time mutual funds. Pursuant to this written agreement, Canary timed four funds – Nations Convertible, Nations International Equity, Nations Emerging Markets and Nations Small Cap. By July 2003, Canary had also timed the Nations Prime Fund.

274.     As confirmed in the May 1, 2001 letter, in return for the ability to market time the Nations Funds and execute late trades in them, Canary made a sticky asset investment of the same amount of money in some Nations Funds thereby providing defendant BACAP with

increased commission fees, calculated as a percentage of the total Funds Assets. Canary's letter notes:

> "It is also our intention to commit "permanent" capital to Nations funds in an amount equal to the dollars that...[a special purpose mutual fund timing vehicle affiliated with Canary] trades. For the time being, we have chosen to invest in Nations Short to Intermediate Government and Nations Short Term Income Fund...."

275.   Adviser Defendant BACAP, through then co-President Gordon, was aware of the ongoing negotiations with Canary and had provided an initial list of Nations Funds available for timing from which Canary made its selection. After agreeing on the timing arrangement with Canary, Sihpol sent Gordon an e-mail, apparently attaching a copy of Canary's May 1, 2001 letter, in which he advised Gordon of the names of the trading vehicles Canary would be using for its timing trades and that a Canary affiliate would be "making the dollar for dollar investment in the two short-term government funds."

276.   BACAP did not object to the timing arrangement and to the contrary, in an email to various BACAP personnel, Gordon confirmed that Canary was "an approved timer". This same email was later forwarded to defendant BACAP's timing police, the body responsible for protecting the Nations Funds from market timers.

277.   The Canary Timing Arrangement proved extremely profitable to the BOA Defendants. In early 2002, roughly 7 months after Canary was given permission to time certain Nations funds, an email from Sihpol quantifying the past and future Canary relationship was forwarded to the senior members of the BOA Defendants, including Defendant Martini, head of all of Defendant BOA's asset management businesses. In relevant part, the email read:

> "The commission generated as of 12/31/01 has totaled over $655,000 (not including any revenue generated from the LIBOR + 125 [basis points] $100MM line of credit from the bank- of which $70 MM is currently drawn). This means the revenues for AMG

would total over $2,250,000 on an annualized basis. This number assumes zero growth over the next year and does not include the one time fees (initial mutual funds charges, loan closings, etc.) the account experienced this year."

(3)   **BOA's Financing Agreement with Canary**

278.   Defendant BOA's private banking group also benefited from the timing arrangement by providing additional financing for Canary's trading strategies with full knowledge that the money would be used to time the Bank's own funds. BOA initially approved a $75 million line of credit, and later increased it to $100 and then $200 million. Because the collateral for these loans was Canary's mutual fund positions, the bank's credit division tracked Canary's trading closely to ensure the bank was fully secured. Canary paid the bank a generous interest rate of LIBOR plus 1.25% for this loan. BOA also provided financing for Canary's and BOA's "swap deal".

279.   Canary created a limited liability company, "Cockatiel," which had four subsidiaries, and opened accounts at BOA under their names to effectuate the timing and short selling transactions funded by BOA.

280.   On July 26, 2001, BOA and Canary executed a "Credit Agreement," which gave Canary a revolving credit facility of $70 million. Canary used a portion of this financing to time the Funds.

281.   In an October 26, 2001 e-mail from Andrew Goodwin of Canary to Ian Reisner of BOA, Goodwin, discussing certain swap transactions between Canary and BOA, writes that "[h]opefully, Noah [Lerner of Canary], can work with Frank Drury [BOA Private Banking] to get an ISDA [swap agreement] executed and discuss the need for additional capital to support a line for me to trade these products with Cockatiel [Canary]."

282.    On February 21, 2002, BOA and Canary amended the Credit Agreement to increase Canary's revolving credit facility to $75 million.

283.    A BOA document dated June 13, 2002, entitled "Cockatiel Capital Associates, LLC et al, CAR Comments" states that a loan agreement between Canary and BOA "renew[s] for an additional year the existing $125MM revolving line of credit" extended by BOA to Canary for the purpose of "invest[ing] in open-ended mutual funds and if availability allows, cover interest payments."   A second loan facility, "to renew the existing equity derivative facility," would "remain unchanged at $166.7MM."

284.    BOA charged Canary LIBOR + 150 bps interest for providing 2:1 leverage on straight late trading and timing transactions.   Swap transactions required higher leverage, sometimes as high as 6:1.  With swap transactions, BOA generally was the account holder, with a security interest in the assets of the account, which, until the closing of the swap transaction, would consist of Canary's mutual fund shares.   BOA would lend Canary funds and, at the appropriate time, Canary would use the funds to execute the swap transaction, and deposit the proceeds in BOA's account.   Canary would pay BOA a set commission for the necessary purchases and sales, and BOA would return to Canary the profit on the transaction minus a 2% fee for providing the financing.

285.    Canary's timing assets in the Funds were used as collateral for the BOA financings.  The proposed loan facility of June 13, 2002 notes that "[r]epresentatives from BAS and Nationsfunds have confirmed that our [BOA] collateral can be liquidated in one day.  Since the loan's inception, full positions in various mutual fund investments have been liquidated in one day [ . . .]".

286.    BOA's financing of Canary's wrongful late trading and timing not only dramatically increased Canary's ability to late trade and time the Funds, and thereby caused greater harm to the Funds, but resulted in handsome profits for BOA for its known wrongful conduct.

### (4)    Canary's Timing of the Nations Funds

287.    At first, Canary conducted its late trading with the BAS "manually." Prior to 4:00 p.m. New York time, Canary sent Sihpol or a member of his team a series of "proposed" mutual fund trades by e-mail or fax. Upon receipt, Sihpol or a member of his team filled out an order ticket, time stamped it, and set it to one side until that evening. Sometime after 4 p.m. New York time, Canary telephoned Sihpol or a member of his team to either confirm or cancel the "proposed" order. If confirmed, the order (with its pre-close time stamp) was sent by fax to Bank of America's mutual funds clearing department for processing, and received that day's NAV. If the order was cancelled, Sihpol or a member of his team would destroy the ticket.

288.    Canary soon began using RJE, the "direct link."  After BAS technicians installed it in Canary's offices in June 2001, the link became the preferred route for Canary's late trading (although the manual procedure was still followed occasionally for certain orders and when Canary experienced technical problems).  The link enabled Canary to trade late not just in the Nations Funds where it had negotiated capacity, but in the many other mutual fund families with which the bank had clearing agreements.  When there was a significant market event after 4:00 p.m. EST but before the RJE trading window closed at 6:30 p.m., the NAVs of many of these funds would be stale and potentially ripe for arbitrage trading by Canary.

### (5)    Policies against Timing in the Nations Prospectuses

289.    These arrangements were never disclosed to mutual fund investors. At no time did the Nations Funds disclose to shareholders (1) the agreements with Canary, (2) Canary's

extensive market timing activities pursuant to these agreements, (3) the "sticky asset" deals, (4) the fact that Canary had access to a BAS trading platform that enabled Canary to trade late, or (5) the other financial services the BOA had provided Canary (and the revenues the BOA derived therefrom) in connection with Canary receiving timing capacity in the Nations Funds.

290.    To the contrary, the Nations Funds' prospectuses contained materially misleading statements assuring investors that the Fund discouraged, and worked to prevent, market timing. In fact, the Prospectus indicate a knowledge on the part of the Board of Trustees, and Fund managers of the negative effects market timing can have on the Funds. Specifically, the prospectus for each of the Nations Funds provides:

> The interest of a Fund's long-term shareholders and its ability to manage its investments may be adversely affected when its shares are repeatedly bought and sold in response to short-term market fluctuations—also known as "market timing." The exchange privilege is not intended as a vehicle for market timing. Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders. When BA Advisers believe frequent trading would have a disruptive effect on a Fund's ability to manage its investments, a Fund may reject purchase orders and exchanges into a Fund by any person, group or account that is believed to be a market timer.

291.    While the Market Timing Agreement between Canary and BOA Defendants was still in effect, the Nations Fund Board approved a 2 percent redemption fee on sales of its International and Global Stock Funds held for less than 90 days.  This redemption fee was designed to deter market timers and to reimburse the other fund shareholders for the costs imposed on long term investors by market timers.  The language in the Prospectus disclosed the harmful effect of market timing and reassured shareholders that Nations Funds are protected from such activities.  For example, the August 1, 2004 Nations  Funds prospectus for the International/Global Stock Funds provides:

The International/Global Stock Funds assess, subject to limited exceptions, a 2.00% redemption fee on the proceeds of Fund shares that are redeemed (either by selling shares or exchanging into another Fund) within 60 days of their purchase.  The redemption fee is paid to the Fund from which you are redeeming shares (including redemptions by exchange).

292.    The Prospectuses expressly linked the imposition of the redemption fee to the prohibition of market timing.  For example, the August 1, 2003 Nations Funds Prospectus for the International/Global Stock Funds included the following in the redemption fees section:

For a discussion of the effects of market timing please see the section **Buying, selling and exchanging shares – Short-term trading activity and market timing.**

293.    In blatant violation of their stated policy prohibiting market timing and the newly imposed redemption fee announced in the Prospectuses, the Adviser Defendants arranged for Canary to be exempted from the application of the policy. In an e-mail dated July 12, 2002, and a follow-up email dated July 16, 2002 Thomas P. Duffy at BACAP asked Sihpol, BACAP, to provide him with the Canary account numbers in order to ensure that the redemption fee would not apply to them:

On August 1, the Nations international and global equity funds will begin to assess a 2% redemption fee on all redemptions made within 90 days of purchase. The Stern family accounts will be exempt from this fee, provided they continue to adhere to the guidelines that we have established with them. Please provide us with a list of all the accounts numbers that fall under that relationship. [July 12, 2002]

Ted- We'll need these account numbers by tomorrow to ensure that the Stern family does not get clipped for the redemption fee when it goes live in 2 weeks. Please let me know if there is any reason why we cannot have the information by then. Once we have all the information, we'll draft letters to them specifically exempting them for the redemption fee. [July 16, 2002]

294.     Canary subsequently conducted extensive timing in the International and Global Stocks Funds on which the 2% redemption fee had been implemented to discourage market timing.

295.     Canary also obtained capacity in two additional Nations Funds as late as March 18, 2003, more than a year after Nations Funds investors were reassured the funds were protected from Market Timers. As one of Defendant BACAP's timing police stated in an internal email discussing a time, other than Canary's, request for capacity in the Nations funds:

> Our stated policy for the funds, and our representations to the Board, is that we do not allow market timing activity.

296.     Ultimately, even BACAP's own employees questioned whether Canary's timing was detrimental to long-term shareholders.   In a May 12, 2003 e-mail, a BACAP employee complained vigorously to the "timing police" about the damage a timer – apparently Canary – was doing to one of the Nations Funds:

> the PB has a client who trades $9 million in and out of the madcap index fund all the time. It wasn't so bad when he held his positions for a while, but now he's trading extremely short swings, sometimes with holding periods of only a day. The impact of this has been lessened since we have been getting notification in time to hedge at the close, but there is still a cost that's being borne by other fund shareholders. We would be happy to set up a futures trading account for this guy and handle his futures trades for him, but a mutual fund is not the right vehicle for this kind of trading.

297.     Despite these concerns, Canary continued to time the Nations Funds until early July, 2003, when Canary received a subpoena from the New York Attorney General's Office. Thereafter, Canary's timing of Nations Funds ceased.

298.     The BACAP "timing police" noticed right away that Canary's "sticky assets" had left the bank. On July 3, 2003, a member of the BACAP "timing police" force sent the following e-mail to his colleague:

This [attachment] is the [Canary] account in Small Company that came in on June 11 through Bear Stearns that Ted Sihpol indicated would be "sticky" money. They placed a full liquidation yesterday.

**(6)    The BOA Defendants' failure to
supervise and enforce the Nations Funds' Policies**

299.    In the face of the Nations Funds' stated policies and their fiduciary duties, the Bank of America Defendants knowingly, deceptively permitted, actively facilitated timing in the Funds or failed to enforce the Funds' policies against timing.  The Bank of America Defendants allowed or facilitated Defendant Sihpol in entering into agreement with Canary, Trautman and Pritchard to allow them to conduct late trading and market timing on more than 15 Nations Funds.

300.    As set forth above, Defendant Theodore C. Sihpol was indicted on 40 counts for his key role in enabling Canary to engage in late trading of shares of Nations fund and other mutual funds in violation of state and federal law.  Sihpol was terminated by BAS on or about September 16, 2003.

301.    On or about September 11, 2003, Gordon, and Bryceland, Sihpol's superior at BAS, were either fired or resigned as the details of the Bank of America Defendants' complicity with Canary's market timing scheme became public.

302.    As set forth above, as part of the SEC/NYAG settlement, BOAC agreed that eight members of the Nations Funds Board of Trustees would be replaced within the year because they approved Canary's market timing agreement.  Six months after the settlement, the independent members of the board remain the same except for the death of Max Walker..

### (7)    Fees Collected from the Nations Fund

303.    While allowing market timers and late traders to fleece the Funds, the Adviser Defendants and the Distributor Defendants, and their affiliates, earned outrageous fees from the Funds.

304.    The Adviser Defendants and Distributor Defendants, and their affiliates, as well as the Officer Defendants, permitted market timing for their own gain, at the cost of the Funds and their buy and hold shareholder.

305.    The bulk of the investment advisory fees to the Adviser Defendants accrue daily and are based on the annual rate of each portfolio fund's average net assets as follows. By way of example, the form BACAP Advisory Agreement provides:

> The Adviser Defendants receive an advisory fee for each fund, computed daily at annual rates ranging from 0.10% to 0.90% of the average daily net assets of Nations Fund.

306.    In addition to investment advisory fees, the Adviser Defendants receive substantial transfer fees calculated on an annual per shareholder account basis, or, for certain omnibus accounts, on a per participant per year basis.  While some of these fees were paid to third parties or affiliates, some of the omnibus account-related fees were retained by the Adviser Defendants.

307.    The Distributor Defendants also receive distribution fees from the Funds.  The distribution fees are paid pursuant to Rule 12b-1 for compensation related to marketing, advertising, promotional, and sales expenditures incurred by the distributor and are calculated as a percentage of the average annual net assets with the fees allocated by classes of stock and a portfolio fund status as open or closed.

308.    The Adviser Defendants and the Distributor Defendants, and their affiliates, received approximately the following fees for 54 out of approximately 80 funds per year (from

the figures in the fiscal year ending March 31, 2003, for which there is complete data for the most number of funds).  On the basis of this data, the table below also estimates the approximate fees received by these Defendants, per year, for the entire Nations Family assuming that fees do not substantially differ per fund:

| Nations Fees<br><br>Type of Fee | Fiscal Year with Complete Data for Most Funds (54 funds) | Estimate of Total Fees for a Single Year for Entire Nations Family |
|---|---|---|
| Advisory | $77,193,000 | $102,924,000 |
| Administrative | $49,023,000 | $65,364,000 |
| 12b-1 | $33,157,000 | $44,209,333 |
| **Total Nations Fees** | **$159,373,000** | **$212,497,333** |

### (8)   Breach of contract by the Adviser Defendants, the Distributor Defendants and certain Broker Dealers

309.   The Nations Funds have a common form Investment Management Agreement or Advisory Agreement ("Advisory Agreement") with BOAA and BACAP ("Adviser Defendants") by which BOAA and BACAP each served as adviser at different times to the Nations Funds. The Advisory Agreements are in standard form with substantially similar terms.  Each of these Advisory Agreements is for an initial term of two year and is renewable annually through a majority vote of a majority of the "disinterested" members of the board of directors thereafter.

310.   The Adviser Defendants entered into the Advisory Agreements to manage and advise the Nations Funds and thereafter breached their contractual obligations and fiduciary duties to the Fund and are therefore in breach of their respective Advisory Agreements.

311.   Each of the Advisory Agreements requires the Adviser to fulfill its Advisory functions in full compliance with state and federal law, corporate governance documents, and Fund policies and procedures with all reasonable effort and diligence.  By way of example, the form BACAP Advisory Agreement for Nations Funds provides that the Adviser agrees to:

(c) Comply with all applicable law, including but not limited to the 1940 Act and the Advisers Act, the rules and regulations of the Commission [Securities and Exchange Commission] thereunder, and the conditions of any order affecting the Trust or a Fund issued thereunder;

(d) Use the same skill and care in providing such services as it uses in providing services to other fiduciary accounts for which it has investment responsibilities.

312.   Each of the form Advisory Agreements also requires the Adviser to act in accordance with the stated policies in the Prospectuses.  By way of example, the form BACAP Advisory Agreement for Nations Funds provides that in carrying out its obligations under the agreement:

The Adviser agreed that it will:

(e) Adhere to the investment objective, strategies and policies and procedures of the Trust adopted on behalf of each Fund;

The prospectuses prohibit the purchase of fund shares if done as part of a market timing strategy.   The Adviser Defendants breached their contractual obligations set forth in the Advisory agreement when it engaged in market timing and excessive exchange activities.

313.   The Adviser Defendants perpetrated a manipulative scheme on the funds in violation of their fiduciary duties.   In addition, the Adviser Defendants failed to materially comply with the applicable rules and regulations of the Securities and Exchange Commission.[8] The Adviser Defendants failed to meet their contractual obligations to the funds set forth in the Advisory agreements when they engaged in these activities.   Further, the conduct of the Advisory Defendants was in violation of § 36(b) of the investment company act relating to breaches of fiduciary duty regard to compensation for services.

---

[8]  *See* http://www.sec.gov/litigation/admin/ia-2254.htm (last viewed July 21, 2004).

314.    The Nations Funds also have a common form Distribution Agreement with Stephens and BACAPD ("Distributor Defendants") by which Stephens and BACAPD each served as Distributor at different times to the Nations Funds and as such were the exclusive agent for the sale of shares of the Nations Funds.  The Distribution Agreements are in standard form with substantially similar terms.  Each of these Distribution Agreements is for an initial term of two year and is renewable annually through a majority vote of a majority of the "disinterested" members of the board of directors thereafter.

315.    The Distributor Defendants contracted to market and sell shares in the Nations Funds and to do so in accordance with the requirements of Rule 12b-1 under the Investment Company Act of 1940.  By way of example, the form BACAPD Distribution Agreement for Nations Funds provides:

> Services as Distributor.
>
> 1.4 In connection with all matters relating to this Agreement, the Distributor agrees to comply with all applicable laws, rules and regulations, including without limitation, all rules and regulations made or adopted pursuant to the 1933 Act, the 1934 Act, the 1940 Act, the regulations of the NASD and all other applicable federal and state laws, rules and regulations.
>
> 1.8 The Distributor may be reimbursed for all or a portion of the expenses described above and/or compensated for services rendered hereunder, to the extent permitted by a distribution plan adopted by the Company on behalf of a Fund pursuant to Rule 12b-1 under the 1940 Act.

Rule 12b-1, which authorizes mutual funds to use their assets to pay for marketing and distribution expenses, restricts the implementation of such plans to those which benefit the fund company and its shareholders.  Stephens and BCAPD breached their contractual obligations set forth in the Distribution Agreement when they permitted the Funds to be timed, which harmed the Funds.

316.    Each of the Broker-Dealer Defendants (Arum, Pritchard and Trautman Wasserman) are parties to contracts with clearing houses that contain clauses that obligate the parties to act in conformity to the Rules and Regulations of the SEC.

317.    The Bank of America Defendants realized tens of millions of dollars in profits as a result of these timing arrangements. The relationship between Canary and the Banc of America Defendants ended when Canary was served in July of 2003.

**[¶¶318 THROUGH 500 ARE INTENTIONALLY LEFT BLANK]**

**V.      DEMAND FUTILITY ALLEGATIONS**

501.    As an Action brought on behalf and for the benefit of the Funds, the issue arises as to whether a demand must first be made by plaintiffs on the Fund Trustees before this suit can be pursued and prosecuted.  If this Action were a garden variety derivative suit, such an inquiry would be standard operating procedure.   Under normal circumstances, demand is required, unless it is excused, because directors of a corporation are elected by its shareholders and are deemed to be capable (unless shown to be disabled) of objectively considering whether to pursue claims on behalf of the corporate entity.   This Action, however, is unique and no demand is required, as alleged more fully below, because (a) by statute, there is no demand requirement for claims brought under the Section 36(b) of the ICA; (b) a principal predicate of the demand requirement – the identification and alignment of interests between the fund Trustees and the fund shareholders – is wholly absent here; (c) the legitimacy of the Fund Trustees' authority to act on behalf of the Funds and the Funds' shareholders is wholly absent; and (d) the management defendants were actively complicit in the wrongdoing alleged herein and participated in and encouraged the harm caused the funds.

502.    Plaintiff has not made a demand upon the Trustees of the Fund to bring action against the Adviser, the Officer Defendants, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

(a)    By statute, no demand is required with respect to Plaintiff's claims under Section 36(b) of the ICA, for breach of fiduciary duty in connection with compensation and other payments received by the Adviser.

(b)    The Trustees, as a practical matter, are put into office by the Adviser and the Officer Defendants, and are there indefinitely. As such, they are not accountable to the fund shareholders.  The Trustees effectively serve at the pleasure of the Adviser and, by virtue of the absence of meaningful selection and election procedure, lack the legitimate authority to represent the interests of the Funds and Fund shareholders.

(c)    The Trustees serve on the boards of all of the Funds of the fund family, here more than 70 Funds, thereby rendering the Trustees incapable of properly and simultaneously serving on so many boards of Funds that held and invested billions of dollars of investor capital.  Under such circumstances, the Trustees' conduct on the boards could only be characterized by one or a combination of the following conditions:

i.      they rubber-stamped whatever the Adviser presented to them with respect to each of the Funds;

ii.     they failed to make meaningful and independent inquiry of the Management defendants' decisions and actions with respect to each of the Funds;

iii.    they had inadequate time, commitment and resources to carry out their duties to protect each of the Funds and each of the Funds' investors; and

iv.     they treated the numerous Fund board positions they held as a homogeneous group rather than as separate Fund entities requiring separate commitment and attention.

(d)     The Trustees are paid for their service to the Funds, both with Trustees' fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of management of the Fund or the Adviser when the interests of such management may conflict with the interests of the Fund's shareholders.

(e)     The Trustees were fully aware of the type of wrongful conduct that involved the timing and late trading of mutual funds.  Despite that knowledge, the Trustees failed adequately to assure that the Management defendants adequately monitored, investigated, discouraged, impeded and prohibited such improper activities in the Funds.  Such dereliction of their duties excuses demand on the directors/Trustees.  More specifically:

(f)     Market timing is a phenomenon that has been common knowledge in the mutual fund industry for at least 15 to 20 years.  As early as 1989, the high-profile mutual fund company, Fidelity Investments, began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares.  In 1992, a well-publicized book entitled "The Market Wizards" focused attention on market timing.

(ii)     Since at least as early as November of 1997, when an article appeared in The Wall Street Journal entitled "Mutual Funds Fight the 'Market Timers,'" the existence of the unlawful practices complained of in this action have been well-known to persons in the mutual fund industry, including the directors/Trustees of the Fund.  That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual Funds and their shareholders, and the types of measures that some mutual Funds had taken and were taking in order to discourage or prevent such market timing altogether.

(iii)     As pointed out in an article that appeared in Fortune Magazine on April 19, 2004, "Clearly, by 2001 everyone connected with the fund industry had to know how crooked the business had become." See The Secrets of Eddie Stern, Fortune, April 14, 2004.  The Fortune article also notes that after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25% allowed late trading.

(iv)     Even though the Trustees thus have had knowledge of the existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual Funds and Fund shareholders, the directors/Trustees have either failed despite their knowledge to take action with respect to such practices in connection with the Fund, or they have failed to put in place the proper supervision and control mechanisms that would have brought to their attention the existence of such unlawful practices in the Fund.

(v)     Indeed, under Section 15(c) of the Investment Company Act, the Trustees have a specific duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment Advisory contract with respect to the Fund.  In this case, the directors/Trustees had a duty to obtain all information regarding all arrangements of the Fund's Investment Adviser that related to such Adviser's contract, including all terms and conditions applicable to the Adviser's performance of its duties.  Any terms, conditions, or arrangements whereby an Investment Adviser allowed market timing or late trading or was allowed to effectuate market timing in shares of the Fund are, in fact, part of the Investment Adviser's contract.  Alternatively, any such arrangements are, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Adviser's contract, within the meaning of Section 15(c) of the Investment Company Act.  Consequently, the Trustees either knew about and approved such arrangements with respect to the Funds, or they failed to request all of the "reasonably necessary" information needed to evaluate the Investment Adviser's contract.  Indeed, given the Trustees' knowledge of the prevalence and commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon the directors/Trustees to take the obvious, prudent measure of implementing an audit-type system or program that would enable them to discover and report back to them all aspects and all components of the investment Advisory contract with respect to the Fund.  Had Trustees done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such Funds.  However, the Trustees failed to put any such necessary system or program in place, thus subjecting themselves to a substantial risk of personal liability for breach of their fiduciary duty because of recklessness, and rendering themselves incapable of being able to impartially consider a shareholder demand, thereby compromising their independence.

(g)     The Trustees have failed to take definitive action to recover damages caused to the Fund by such late trading and market timing activities.  Indeed, despite the Trustees' awareness of investigations by state and federal law enforcement authorities, and of the

62

legal actions that have been brought by such authorities, the directors/Trustees have failed to take any action to meaningfully investigate and have failed to take any action to recover for the Funds the damages cause to each Fund by such unlawful activity.  On September 3, 2003, the NYAG commenced the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world.  Before and after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading.  Since the NYAG Complaint was filed, state and federal regulators have entered into consent enforcement actions with at least six different mutual fund families, representing recoveries of civil penalties and recoveries in excess of $2 billion. The regulators' investigation, the filing of the NYAG Complaint, and the subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Director or Trustee could claim to be ignorant of the market timing and late trading scandal since September 3, 2003.

(h)     The Trustees' duties required them independently to act without a demand from a shareholder under the circumstances of this Action. Their duties do not come into play only when "kick-started" by a shareholder demand. The Trustees' fiduciary duties apply automatically at all times to require them to act in the best interest of the Funds and to protect the Funds from harm and to recover for harm to the Funds. The purpose of a demand requirement is to enable a matter to be brought to the attention of Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees are already aware of the matters as to which they should take action to recover for harm to the Funds caused by market timing and late trading.  Since the Trustees are already aware of the matter requiring their action, and of their duty to act, any demand under these circumstances

would be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

(i)     The Bank Of America Defendants and the Trustee Defendants knew for more than two year about special arrangements that some shareholders had with BOAC and BACAP employees allowing them to time the Nations Funds. The Bank of America Defendants did nothing to discipline the managers involved until a criminal action was announced against Defendant Sihpol on September 16, 2003, even after the NYAG filed and simultaneously settled a complaint against Canary on September 3, 2003. Further, as part of the SEC/NYAG settlement, BOAC agreed that eight members of the Nations Funds board of directors would be replaced because they approved a market timing arrangement.

(j)     The extent of the Defendant Trustees' inaction while they knew that market timing was a problem is reported in the Wall Street Journal on March 16, 2004:

> According to investigators, in May 2002, EXECUTIVES FROM Nations Funds asked the fund Trustees to approve the establishment of a 2% penalty to be levied on investors who redeem fund shares within 90 days of purchase. Such redemption fees are designed to reimburse other fund shareholders for the costs imposed on long-term investors by market timers, as well as to deter market timers.
>
> However, the board was also told bank officials planned to make an exemption in the redemption-fee rule for the unidentified market timer. The board, according to a person familiar with the investigation, didn't question the exemption and approved the redemption fee knowing it wouldn't apply to all shareholder. Regulators said repeatedly during the fund-scandal investigations that funds are obliged to treat all shareholders equally.

(k)     Moreover, the Trustees renewed the Advisory Agreements even as they knew that the Adviser Defendants were perpetrating market timing and late trading in the Nations Funds.  The form Advisory Agreements provide that to be renewed after the original two-year term, the Agreement requires the specific yearly approval of the majority of

independent Trustees of the Nations Funds.  By way of example, the form BACAP Advisory

Agreement for Nations provides:

> 12. TERM AND APPROVAL. This Agreement will become effective as of the date set forth herein above, and shall continue on effect until the second anniversary of its effective date. This Agreement will become effective with respect to each additional Fund as of the date set forth on Schedule I when each such Fund is added thereto. The Agreement shall continue in effect for a Fund after the second anniversary of the effective date for successive annual periods ending on each anniversary of such date, provided that the continuation of the Agreement is specifically approved for the Fund at least annually:
>
> > (a)(i)by the Board of (ii) by the vote of a "majority of the outstanding voting securities" of the Fund (as defined in Section 2(a) (42) of the 1940 Act): and
> >
> > (b) by the affirmative vote of a majority of the Trustees of the Trust who are not parties to this Agreement or "interested persons" (as defined in the 1940 Act) of a party to this Agreement (other than as Trustees of the Trust), by votes cast in person at a meeting specifically called for such purpose.

(l)     Given the Trustees' awareness of the foregoing facts, and their

demonstrated failure to act in the face of their knowledge of those facts, it is highly unlikely that

they would be independent and disinterested in responding to a demand.  Moreover, given the

egregiousness of the Trustees' failure of oversight as outlined above, there is, at minimum, a

substantial likelihood that the Trustees will be subject to personal liability for inadequate

oversight of the Funds' officers and employees. This exposure to a substantial likelihood of

personal liability prevents the Trustees from being able to impartially consider a demand, if one

had been made. The likelihood of personal liability is even more pronounced in the case of those

Trustees who served on the audit committee of the Fund, since those members had easy access to

the internal documents that revealed the market timing and late trading that harmed the fund yet

they took no steps to prevent such activity or to recover damages that the fund suffered on account of such activity.

**[¶¶ 503 THROUGH 600 ARE INTENTIONALLY LEFT BLANK]**

<u>**COUNT I**</u>

**VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT**
<u>**(Against The Adviser Defendants, Distributor Defendants and BOA N.A.)**</u>

601.    Plaintiff incorporates by reference paragraphs 1 through 500 above, but not paragraphs 501 through 600 relating to demand, as if set forth herein.

602.    The Nations Funds Trust, each of the Funds Trusts, and the Nations Funds are registered investment companies within the meaning of the ICA.

603.    The Adviser Defendants are each investment Advisers for the Funds as that term is defined in Section 2 of the ICA.

604.    The Distributor Defendants are affiliates of the Adviser Defendants for purposes of Section 36(b) of the ICA.

605.    BOA N.A. is an affiliate of the Adviser Defendants for purposes of Section 36(b) of the ICA.

606.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment Adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment Adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the Advisory fee agreements, but also to the manner in which Advisers seek approval of such agreements.

607.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to its receipt

of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person. Those fiduciary duties include, but are not limited to, the duty of the Adviser to seek approval of any Advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

608.   Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment Adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment Adviser of such [mutual fund] company."

609.   Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any Advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the Adviser's compensation. Information concerning conflicts of interest, the nature and extent of market timing and late trading in the Funds, the nature and extent of capacity arrangements for market timing and late trading in the Funds, and the Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in the Funds, are particularly important to the Funds and to their independent Trustees.

610.   After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that, for any of the Funds, the Adviser Defendants and their affiliates did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under Advisory and/or other agreements, including in

particular the Adviser Defendants' permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

611. Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the Trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment Adviser of such [mutual fund] company."

612. After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that, for any of the Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate Advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

613. Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholder may bring a civil action against an investment Adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

614. Each of the Adviser Defendants and the Distributor Defendants, as their affiliates, breached his, her, or its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, market timing and late trading, all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

615.     By agreeing and/or conspiring with the market timers to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, market timing and late trading, the Adviser Defendants and the Distributor Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

616.     As alleged herein, the Adviser Defendants breached their fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

617.     By virtue of the foregoing, the Adviser Defendants have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

618.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the Advisory agreements, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT II

### VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT
### (Against BOA, BOA N.A., the Individual Defendants, the Trustee Defendants, the Adviser Defendants, and the Distributor Defendants)

619.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

620.     The Nations Funds Trust, each of the Funds Trusts, and the Nations Funds are registered investment companies.

621.     The Adviser Defendants are investment Advisers under Section 36(a) as that term is defined in Section 2 of the ICA.

622.     The Distributor Defendants act as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

623.     The Trustee Defendants are directors under Section 36(a) as that term is defined in Section 2 of the ICA.

624.     Defendants BOA, BOA N.A., Gordon, Martini and Bryceland, by virtue of their ownership and position and responsibilities for managing and directing the activities of the Adviser Defendants, the Distributor Defendants, are liable for the actions of those entities.

625.     Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendants, the Distributor Defendants, and the Trustee Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty of the Advisers to seek approval of any Advisory agreement with full disclosure of information material to the board's decision regarding their compensation and the duty of the Trustees to request and evaluate such information as may reasonably be necessary to evaluate Advisory agreements.

626.     Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment Adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment Adviser of such [mutual fund] company."

627.     After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendants did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and distribution compensation under advisory and distribution agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

628.     Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the Trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment Adviser of such [mutual fund] company."

629.     After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and distribution agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

630.     Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment Advisory agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party."  Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), any Advisory agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

631.     Each of the Adviser Defendants, the Distributor Defendants, and the Trustee Defendants breached his, her, or its fiduciary duty to the Funds by the other acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

632.     By agreeing and/or conspiring with the Timer Defendants to permit and/or encourage the Timer Defendants to time the Funds, the Adviser Defendants and the Distributor Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

633.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the Advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT III

### VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT
### (Against the Adviser Defendants and Distributor Defendants)

634.     Plaintiff incorporates by reference all paragraphs 1 through 600 and above as if set forth herein.

635.     Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), any contract made in violation, or the performance of which results in a violation, of the ICA is declared unenforceable.

636.     For the reasons alleged herein, the agreements between or among the Adviser, the Distributor, and the Funds and the 12b-1 Plans were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

637.     Under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), the Advisory agreements and the 12b-1 Plans may be voided and the Adviser Defendants and the Distributor Defendants are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

## COUNT IV

**VIOLATION OF SECTIONS 206 AND 215 OF THE INVESTMENT ADVISERS ACT
(Against The Adviser Defendants and the Distributor Defendants)**

638.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

639.    The Adviser Defendants and the Distributor Defendants are investment Advisers within the meaning of the IAA.

640.    The Funds are clients of the Adviser Defendants and the Distributor Defendants within the meaning of Section 206 of the IAA.

641.    Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment Advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

642.    The Adviser Defendants and the Distributor Defendants have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendants facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading for their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and distribution compensation under advisory and distribution agreements, including in particular their facilitation, permission or encouragement of

and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

643.    Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment Adviser agreement made or approved in violation of any provision of the IAA, including the investment Adviser agreements between the Adviser Defendants or the Distributor Defendants and the Funds and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

644.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the Advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

**COUNT V**

**CONTROL PERSON LIABILITY UNDER SECTION 48 OF
THE INVESTMENT COMPANY ACT
(Against Gordon, Martini and Bryceland )**

645.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

646.    Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

647.    Gordon, Martini and Bryceland ("Control Person Defendants"), directly or indirectly, caused the Adviser Defendants and the Distributor Defendants to engage in the unlawful conduct alleged herein.

648.    Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Control Person Defendants are liable for causing, directly or indirectly, the Adviser Defendants and the Distributor Defendants to engage in the unlawful conduct alleged herein.

649.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the Advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

**COUNT VI**

**COMMON LAW BREACH OF FIDUCIARY DUTY**
**(Against The Adviser Defendants, The Distributor Defendants**
**And The Trustee Defendants)**

650.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

651.     The Adviser Defendants, the Distributor Defendants, and the Trustee Defendants (the "Fiduciary Defendants"), and each of them, owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, said defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

652.     To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

653.     As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the timing and late trading schemes and other manipulative devices as alleged in this Complaint.

654.    As alleged above, each of the Fiduciary Defendants also breached his, her, or its fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the market timing and late trading scheme.

655.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the Advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VII

## BREACH OF CONTRACT
### (Against the Adviser Defendants and Distributor Defendants)

656.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

657.    The Funds and the Adviser Defendants have entered into Advisory Contracts which are renewed annually.

658.    The Funds have fully performed their obligations under the Advisory Agreement.

659.    The Advisory Agreements required and require the Adviser Defendants to comply with the requirements of the ICA and all rules and regulations of the SEC promulgated thereunder.

660.    The Advisory Agreements required and require the Adviser Defendants to comply with the rules and regulations of the Trusts and the Funds, as set forth in the Prospectuses, the SAIs, and otherwise.

661.    The Funds and the Distributor Defendants have entered into Distribution Agreements which are renewed annually.

662.    The Funds have fully performed their obligations under the Distribution Agreements.

663.    Rule 12b-1, which authorizes mutual funds to use their assets to pay for marketing and distribution expenses, restricts the implementation of such plans to those which benefit the Funds.

664.    The Distributor Defendants breached the Distribution Agreements by permitting market timing in the Funds, which does not benefit the Funds.

665.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the Advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which the Adviser Defendants and Distributor Defendants are liable.

## COUNT VIII

### BREACH OF CONTRACT
### (Against BAS)

666.    Plaintiffs incorporate by reference paragraphs 1 through 600 above as if set forth herein.

667.    Upon information and belief, throughout the relevant period, BAS and the Defendant Advisers, (BOAA and BACAP) were parties to written or oral sales agreements governing BAS's duties as broker-dealer in selling and processing trades of Fund shares (the "Dealer Agreements").

668.    The Funds, for whose benefit the Adviser entered into the Dealer Agreements, are intended third-party beneficiaries of the Dealer Agreements.

669.    There is implied in all agreements an obligation of good faith and fair dealing pursuant to which neither party make take any action that will deliberately frustrate the other party's purpose in entering into the contract.

670.    Upon information and belief, under the Dealer Agreements, BAS expressly agreed to clear mutual fund orders through the NSCC's Fund SERV system and to transmit orders that are received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a certain time the next business day ("Day 2").  Under the Dealer Agreements, BAS and the Adviser Defendants agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades would be priced at the Day 2 NAV.

671.    BAS had an express or implied obligation to comply with the federal securities laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the forward pricing rule.

672.    In breach of the express or implied terms of the Sales Agreements, and in violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers and timers, including defendants Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1 NAV), in violation of the forward pricing rule, and permitted the Funds to be late traded and timed to the detriment of the funds.

673.    Accordingly, BAS has breached its Dealer Agreements with the Adviser Defendants.

674.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT IX

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against BAS, Canary, Trautman and Pritchard)

675.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

676.    Canary, Trautman and Pritchard ("The Timer Defendants") and BAS knew of the existence and extent of the fiduciary duties owed by the Fiduciary Defendants to the Funds.  The Timer Defendants and BAS knew that market timing and late trading the Funds were manipulative devices and knew that these acts were a breach of the fiduciary duties owed to the Funds by the Fiduciary Defendants.

677.    BAS allowed for the use of its instrumentalities, including the BAS box, for purposes of market timing and late trading.

678.    The Timer Defendants and BAS maliciously, without justification and through unlawful means, aided and abetted and conspired with the Fiduciary Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

679.    The Timer Defendants and BAS are jointly and severally liable with the Fiduciary Defendants to the Funds for damages proximately caused by their aiding and abetting as alleged herein.

680.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT X

### UNJUST ENRICHMENT
### (Against All Defendants)

681.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

682.    All Defendants ("Defendants") received a benefit in the profits they earned as a result of their unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

683.    Justice and equity require that Defendants not be allowed to retain those profits.

684.    Justice and equity require that Defendants unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

## COUNT XI

### COMMON LAW INTERFERENCE WITH CONTRACT
### (Against BAS, Canary, Trautman and Pritchard)

685.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

686.    The Defendant Advisers, (BOAA and BACAP) and the Nations Funds are parties to the Investment Advisory Agreement.

687.    The Defendant Advisers breached the Investment Advisory Agreement in the manner and by the actions described in this Complaint.

688.    BAS, Canary, Trautman and Pritchard knew of the existence of the Investment Advisory Agreement between the Defendant Advisers and the Nations Funds and knew its terms.

689.    BAS, Canary, Trautman and Pritchard knowingly and intentionally induced the Defendant Advisers to breach that contract and interfered with the Defendant Advisers' present and future performance of the Investment Advisory Agreement by its acts of wrongdoing as

described in this Complaint, intending to and proximately causing the described breaches of the Investment Advisory Agreement.

690.    BAS, Canary, Trautman and Pritchard carried out this wrongful conduct with knowledge that this conduct would interfere with the Investment Advisory Agreements and cause such  breaches of the Investment Advisory Contract and did in fact cause breaches of such contract.

691.    The conduct of BAS, Canary, Trautman and Pritchard was improper and without justification or privilege.

692.    As a direct and proximate result of BAS, Canary, Trautman and Pritchard's wrongful conduct, BAS, Canary, Trautman and Pritchard each are jointly and severally liable to the Funds with the Defendant Advisers, (BOAA and BACAP) for injuries and damages the Funds have suffered and which they will continue to suffer and is liable for actual and punitive damages.

## COUNT XII

### CIVIL CONSPIRACY
### (Against All Defendants)

693.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

694.    The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

695.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

696.    The Trustee Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their office.

697.    The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to the Funds for which they are jointly and severally liable.

698.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.    Removing the Adviser Defendants and the Distributor Defendant;

C.    Rescinding the management and other contracts for the Funds with the Adviser, Distributor and other Defendants;

D.    Rescinding the 12b-1 Plans adopted by the Funds;

E.    Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser and all profits earned on unlawful trading and all management and other fees earned during the period of such trading,

F.    Awarding monetary damages against all of the Defendants, individually, jointly, or severally, in favor of the Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

G.       Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.       Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated:  September 29, 2004                            WOLF HALDENSTEIN ADLER
                                                       FREEMAN & HERZ LLP

                                        By:      _____/s/_____
                                                 Daniel W. Krasner
                                                 Mark C. Rifkin
                                                 Demet Basar
                                                 Robert Abrams
                                                 270 Madison Avenue
                                                 New York, NY  10016
                                                 (212) 545-4600

                                                 CHIMICLES & TIKELLIS, LLP

                                                 Nicholas E. Chimicles
                                                 Michael D. Gottsch
                                                 Denise Davis Schwartzman
                                                 Timothy N. Mathews
                                                 100 Haverford Centre
                                                 Haverford, PA  19085
                                                 (610) 642-8500

                                                 POMERANTZ, HAUDEK, BLOCK,
                                                  GROSSMAN & GROSS, LLP

                                                 Stanley M. Grossman
                                                 H. Adam Prussin
                                                 100 Park Avenue
                                                 New York, NY  10017
                                                 (212) 661-1100

                                                 *Fund Derivative Executive Committee*

CHITWOOD & HARLEY LLP

Martin D. Chitwood
Edward H. Nicholson, Jr.
David J. Worley
Tamera M. Woodard
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
 (404) 873-3900

*Fund Derivative Plaintiffs'*
*Steering Committee*

FARUQI & FARUQI LLP

Nadeem Faruqi
Shane Rowley
David H. Leventhal
320 East 39th Street
New York, NY 10016
(212) 983 - 9330

*Fund Derivative Plaintiffs' Counsel*

/376650

## Exhibit A

**New Plaintiffs**
None

**New Defendants**
Bank of America, N.A.
Banc of America Advisers, LLC
BACAP Distributors, LLC
Banc of America Securities LLC
Richard D. Martini
Theodore C. Sihpol
Charles D. Bryceland
William P. Carmichael
William H. Grigg
Thomas F. Keller
Carl E. Mundy, Jr.
Dr. Cornelius J. Pings
Minor M. Shaw
Charles B. Walker
Edmund L. Benson, III
James B. Sommers
Thomas S. Word, Jr.
Gerald Murphy
Robert B. Carroll
Edward J. Stern
Pritchard Capital Partners LLC
Stephens Inc.
Trautman Wasserman & Company, Inc.

**Dropped Plaintiffs**
None

**Dropped Defendants**
Kenneth D. Lewis
Edward D. Bedard
A. Max Walker