**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION**<br>_____ | : <br> : <br> : <br> : | **MDL DOCKET 1586** |
| **IN RE ALLIANCE, TEMPLETON, BANK OF AMERICA/NATIONS FUNDS, AND PILGRIM BAXTER** | : <br> : <br> : <br> : | **Case No. 04-md-15862 (AMD)** |
| **This Document Relates To:** | : <br> : | |
| **IN RE ALLIANCE MUTUAL FUNDS DERIVATIVE LITIGATION** | : <br> : <br> : | |
| **Bernstein V. Alliance Capital Management Holdings, L.P., et al.** | : <br> : <br> : | **Case No. 04-md-00578** |

<u>**CONSOLIDATED AMENDED FUND DERIVATIVE COMPLAINT**</u>

Plaintiffs, derivatively on behalf of the mutual funds comprising the AllianceBernstein family of mutual funds (the "Alliance Funds" or the "Funds"), hereby complain against the defendants as follows:

## I. <u>SUMMARY OF THE ACTION</u>

1.     This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice

commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.     This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others, and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care.  This Complaint also seeks redress for the harm caused by the trustees of the Funds who failed or refused to perform their fiduciary duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

3.     Market timing and late trading have been extremely harmful to the Funds. Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds.  Market timing also causes serious, known disruptions to mutual funds and their operations.  Market timing forces portfolio managers to keep excess quantities of cash available in the funds to redeem market timers' shares when they sell out a position - cash that otherwise should be used to invest.  Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strategies for the Fund.  The effect of this is to reduce the returns earned by the Funds.

4.     Market timing and late trading have harmed each and every Fund in the AllianceBernstein family of mutual funds, whether or not the particular Fund was the direct

victim of market timing or late trading.  This is so because some expenses, such service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and late trading may be shared among all Funds in the AllianceBernstein family, including timed-funds and non-timed funds alike.  Also, because investors have fled all the Funds in the AllianceBernstein family of mutual funds, not just the timed funds, following the public disclosure of the market timing and late trading scandal.

5.      Because of these and other problems caused by market timers, fund managers, including the defendants herein, for years have had in place policies and practices designed to monitor and deter market timing, including redemption penalties.

6.      Conversely, market timing and late trading have been extremely profitable for market timers, and, moreover, impose little risk.  Because the price movement of the underlying securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet.  Market timers exploit price inefficiencies inherent in the forward pricing structure of mutual funds.

7.      Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions or waive the commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves.  Thus, for example, a one day trade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off on the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

3

8.      Market timers and late traders could not reap these profits simply by investing in the securities held in the Funds' portfolios, because (a) the timers would bear significant transaction costs and tax consequences if they bought and sold individual securities, which are foisted upon the Funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

9.      In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they permitted, facilitated, encouraged, or participated in the improper activity.  At a minimum, the advisors failed to detect and/or prevent, market timing and late trading in the Funds – the types of abusive transactions they were obligated to prevent.  Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

10.      Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds.   As William H. Donaldson, Chairman of the SEC, recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

The relationship between an investment adviser and its clients

is supposed to rest on a bedrock foundation of fiduciary principles.  It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment advisers and their advised funds.  As fiduciaries, advisers owe their clients more than mere honesty and good faith.  Recent experience suggests that all too many advisers were delivering much less.[1]

11.     The market timing and late trading scandal results from the substantial and unresolved conflicts of interest between mutual funds and the investment advisers who create and manage the funds.  Those conflicts of interest have manifested themselves in widespread instances of improper market timing and late trading in the mutual funds, all to the detriment of the Funds.

12.     The nature and extent of those conflicts of interest, the market timing they led to, and the adverse impact they caused to the Funds were not adequately disclosed to or understood by the trustees of the Funds, who approved or ratified the Fund adviser's management agreements each year despite the harm the adviser caused or permitted to the Funds and who approved or ratified plans permitting the adviser to charge and collect marketing and distribution fees under Rule 12b-1 of the SEC promulgated under the ICA in violation of the trustees' and directors' own duties to the Funds.

13.     This action is brought by shareholders of the Funds on behalf of the Funds to recover damages for the Funds from those who are responsible for the wrongdoing and from those who profited, directly or indirectly, from the wrongdoing.  These damages include, but

---

[1]     Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

are not limited to:

(a)     forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment adviser and its affiliates during the period of market timing and late trading;

(b)     damages to the Funds for profits earned by the Fund Adviser and its affiliates (including officers and employees of the Fund Adviser) from market timing or late trading arrangements;

(c)     damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)     damages to the Funds for 12b-1 fees paid to the Fund adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.     This action is also brought by shareholders on behalf of the Funds to obtain injunctive relief for the Funds, including but not limited to:

(a)     rescission of the adviser's management and other agreements with the Funds;

(b)     rescission of the 12b-1 plans adopted by the Funds;

(c)     removal of the Fund adviser and its affiliates that manage and perform other services for the Funds; and

(d)     removal of each of the trustees of the Funds named in this Complaint

and replacing them with independent trustees and directors.

## II. JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 44 of the ICA,

15 U.S.C. § 80a-43, Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a),

over the state law claims asserted herein because they arise out of and are part of the same

case or controversy as plaintiffs' federal claims.

17.     Venue is proper in the transferor district(s) because some or all of the

defendants are incorporated or conduct business in and/or some of the wrongful acts alleged

herein took place or originated in those judicial districts.  Venue is also proper in this District

of Maryland because some of the wrongful acts alleged herein took place or originated in this

judicial district.

18.     In connection with the acts and practices alleged herein, defendants directly or

indirectly used the instrumentalities of interstate commerce, including, but not limited to, the

mails, interstate telephone communications, and the facilities of the national securities

markets and national securities exchanges.

19.     This is a consolidated amended complaint filed pursuant to an Order of the

Judicial Panel on Multidistrict Litigation, captioned *In re Mutual Fund Investment Litigation*,

MDL Docket No. 1586, centralizing pretrial proceedings in these actions in this Court.  To

preserve the filing dates of the original complaints for purposes of any applicable statutes of

limitation and all other defenses based upon the passage of time, the plaintiffs herein express-

ly reserve the right to seek transfer of these actions back to the transferor courts at the conclusion of pretrial proceedings.

## III. PARTIES

### A.   Plaintiffs

20.   The plaintiffs are currently investors in the Alliance Funds specified below, and maintained their investments during the transactions complained of herein:

(a)   Plaintiff Ira Newman invested in AllianceBernstein Growth & Income Fund, AllianceBernstein Premier Growth Fund, Inc., AllianceBernstein Growth Fund, a series of the AllianceBernstein Portfolios, and AllianceBernstein Technology Fund, Inc.

(b)   Plaintiff Jean L. Taylor and Jennifer Taylor invested in AllianceBernstein Balanced Shares, Inc.

(c)   Plaintiff Robert J. Saelens invested in AllianceBernstein Premier Growth Fund, Inc.

(d)   Plaintiff Anthony Antoniello and Nancy Ann Antoniello invested in AllianceBernstein Premier Growth Fund, Inc.

(e)   Plaintiff James W. Burns and Thomas C. Burns invested in AllianceBernstein Premier Growth Fund, Inc.

(f)   Plaintiff Jean Iezza and Pat Iezza invested in Alliance World Dollar Government Fund II, Inc.

(g)   Plaintiff Linda D. Ames-Weiner invested in AllianceBernstein Capital Reserves Fund, a series of AllianceBernstein Capital Reserves.

8

(h)     Plaintiff Felicia Bernstein, custodian for Danielle Brooke Bernstein, invested in AllianceBernstein Technology Fund, Inc.

(i)     Plaintiff Mun Hung invested in AllianceBernstein Growth and Income Fund, Inc.

(j)     Plaintiff Martin Goldberg invested in AllianceBernstein All Asia Investment Fund, Inc.

(k)     Plaintiff Robert K. Finnell invested in AllianceBernstein Growth and Income Fund, Inc.

(l)     Plaintiff Simon J. Denenberg, Trustee for the Beverly Kaufman Trust, invested in AllianceBernstein Growth and Income Fund, Inc.,  AllianceBernstein Global Strategic Income Fund, Inc., AllianceBernstein North American Government Fund, and AllianceBernstein Americas Government Income Trust, Inc.

(m)     Plaintiff Rena Jarolawicz invested in Alliance Bernstein Aggressive Growth, Alliance Bernstein Aggressive Growth Emphasis, Alliance Bernstein Technology Fund, AllianceBernstein Balanced, AllianceBerstein Exchange Reserves, Alliance Bernstein Small Cap Value Fund, AllianceBernstein Growth Fund, a series of AllianceBernstein Portfolios, AllianceBernstein Growth and Income Fund, Inc., AllianceBernstein U.S. Government Portfolio, AllianceBernstein International Value Fund, a series of AllianceBernstein Trust, AllianceBernstein Premier Growth Fund, Inc., AllianceBernstein AllianceBernstein Quality Bond Portfolio, AllianceBernstein Principal Protection Income, AllianceBernstein Real Estate Investment Fund, AllianceBernstein High Yield Fund, Inc.,

and AllianceBerstein Value Fund, a series of AllianceBerstein Trust.

(n)     Plaintiff Dr. Seigel Morton invested in AllianceBernstein Select Investors Series, Inc., Technology Portfolio series.

(o)     Plaintiffs Gail Craven and Richard Busch invested in AllianceBernstein Technology Fund, Inc.

(p)     Plaintiff Steve Burda invested in AllianceBernstein Disciplined Value Fund, Inc.

(q)     Plaintiff Virginia Wilcox invested in AllianceBernstein Growth and Income Fund, Inc., AllianceBernstein Premier Growth, and Alliance Bernstein Technology.

(r)     Plaintiff JoAnne Schneider invested in AllianceBernstein Value Fund, a series of AllianceBerstein Trust.

(s)     Plaintiff Elaine F. Platt invested in AllianceBernstein Mid Cap Growth Fund.

(t)     Plaintiff Harry Schipper invested in Alliance Select Biotech Portfolio.

(u)     Plaintiff Jose Diaz invested in AllianceBernstein Technology Fund.

21.   **The Alliance Corporate Defendants**

(a)     Defendant **Alliance Capital Management, L.P.** ("Alliance Management" or "Adviser")  is a Delaware limited partnership with its primary place of business at 1345 Avenue of the Americas, New York, NY 10105.   It is registered as an investment adviser under the Investment Advisers Act and manages and advises the Alliance Funds.  It promotes itself as a leading international investment adviser, supervising client

10

accounts with assets, as of December 31, 2003, totaling approximately $475 billion (of which approximately $165 billion represented assets of investment companies). During the relevant period, Alliance had ultimate responsibility for overseeing the day-to-day management of the Alliance Funds.

(b)     Defendant **Alliance Capital Management Holding L.P.** ("Alliance Holding"), is a Delaware limited partnership, with its principal place of business in New York City.  Equity interests in Alliance Holding are traded on the NYSE in the form of units. Until October 29, 1999, Alliance Holding served as the investment adviser to the Alliance Funds.  On that date, Alliance Holding reorganized by transferring its business to Alliance Management.  Prior thereto, Alliance Management had no material business operations.  One result of the reorganization was that the Advisory Agreements, then in place between the Alliance Funds and Alliance Holding, were transferred to the Alliance by means of a technical assignment, and ownership of Alliance Fund Distributors, Inc. and Alliance Fund Services, Inc., each of the Alliance Funds' principal underwriter and transfer agent, respectively, also was transferred to Alliance Management.

(c)     Defendant **Alliance Capital Management Corporation** ("ACMC") is the sole general partner of Alliance Management and Alliance Holding and an indirect wholly-owned subsidiary of AXA Financial, Inc. ("AXA Financial"), a Delaware corporation whose shares are traded on the New York Stock Exchange ("NYSE").

(d)     Alliance Management, Alliance Holdings and ACMC will collectively be referred to as the "Adviser Defendants."

11

(e)     Defendant **Alliance Global Investors Services, Inc. ("AGIS"),** formerly known as Alliance Fund Services, Inc., a Delaware corporation, is a wholly-owned subsidiary of Alliance Management, which has entered into Transfer Agency Agreements for providing personnel and facilities to perform transfer agency services for each of the Alliance Funds.  As the transfer agent for each of the Alliance Funds, AGIS is responsible for the timely and accurate pricing of the Net Asset Value ("NAV") of each of the funds and for recording and effectuating the transfer of shares in each of the Alliance Funds in accordance with the policies and provisions of the transfer agency agreement with each of the Alliance Funds.

(f)     Defendant **AllianceBernstein Investment Research and Management, Inc. ("ABIRM")**, formerly known as Alliance Fund Distributors, Inc., a Delaware corporation, is a wholly-owned subsidiary of  Alliance Management, and serves as the principal underwriter and sole distributor of each of the Alliance Funds' shares under Distributorship Agreements with each respective Fund.[2]  As the principal underwriter and sole distributor of each of the Alliance Funds, ABIRM was responsible for the distribution of shares in each of the Alliance Funds in accordance with the terms of the respective distribution agreements and the policies established by Alliance and each of the Alliance Funds.

(g)     Collectively, Alliance Management, Alliance Holding, ACMC, AGIS

---

[2]  On March 31, 2003, the mutual fund distribution unit was renamed from Alliance Fund Distributors, Inc., to AllianceBernstein Investment Research and Management Inc.  All of the Funds then managed by Alliance Management were renamed to take on the "AllianceBernstein" name.

and ABIRM are referred to as the "Alliance Corporate Defendants".

(h)     The ultimate parent corporation of all the Alliance corporate defendants is Defendant AXA Financial Inc., a Delaware corporation with headquarters in New York. AXA is a diversified financial services company with total assets under management, including the Alliance Funds of $508 billion.   AXA will be referred to as the "Parent Defendant".

22.     **The Alliance  Officer Defendants**

(a)     Defendant **John D. Carifa ("Carifa")**, at all relevant times, was the President, Chief Operating Officer and a director of ACMC, an affiliate and sole general partner of Alliance Management.  Carifa was also the Chairman and president of each of the Alliance Funds.  At all relevant times, Carifa was an interested person as defined by the Investment Company Act of 1940.   In January of 2004, Carifa was asked by the Alliance Defendants to resign because he oversaw the mutual fund unit that "allowed inappropriate market-timing transactions".

(b)     Defendant **Marc. O. Mayer ("Mayer")**, has been executive vice president of ACMC since 2001. Prior to that, he was Chief Executive officer of Sanford C. Bernstein & Co., which merged into Alliance to form AllianceBernstein. After the merger he was a director of 43 of the Alliance Funds,  managing 68 investment portfolios.

(c)     Defendant **Gerald Malone ("Malone")** was at all relevant times a Senior Vice President of Alliance Management and/or certain of the affiliated Alliance Corporate Defendants named herein, and in that capacity acted as a portfolio manager of

13

several Alliance Funds, including the AllianceBernstein Technology Fund (formerly known as the Alliance Technology Fund), and certain Alliance hedge funds, and was an active participant in the unlawful scheme alleged herein. Malone was suspended and subsequently resigned at the Alliance Corporate Defendant's request.

(d)     Defendant **Charles Schaffran ("Schaffran")** was at all relevant times a marketing executive at Alliance  Management and/or certain of the affiliated Alliance Corporate Defendants named herein, and in that capacity sold Alliance hedge funds to investors, and was an active participant in the unlawful scheme.  Schaffran was suspended and subsequently resigned at the Alliance Corporate Defendant's request.

(e)     Defendant **Michael Laughlin ("Laughlin")** was at all relevant times chairman of mutual fund distribution at Alliance Management,  ABIRM  and/or certain of the affiliated Alliance Corporate Defendants named herein, and in that capacity was an active participant in the unlawful scheme.  In January, 2004, Laughlin was asked by the Alliance Corporate Defendants to resign because he oversaw a the distribution of mutual fund units that "allowed inappropriate market-timing transactions."

(f)     Malone, Schaffran, Laughlin,  Carifa and Mayer are referred to as the "Alliance Officer Defendants."   Collectively the Alliance Corporate Defendants and the Alliance Officer Defendants are referred to as the "Alliance Defendants."

## B.     The Trustee Defendants

23.     Each of the Alliance Funds has a board of trustees which is responsible for governing each respective fund.  The trustees serve for an indefinite term.  Each board has

14

two committees: Audit Committee, which is responsible for oversight of the Funds' financial reporting process; and the Nominating Committee, which is responsible for nominating persons to fill any vacancies of the trustees. During the relevant time, the Nominating Committee of each trust or corporation had a policy that they did not for nomination any candidates proposed by shareholders for election as trustee or director.  For each board, each of the trustees named below, except for Carifa, is a member of both committees.

24.     Together with Alliance Officer Defendant Carifa, at relevant times, each of the following were trustees and/or directors of trusts, master trusts, or corporations which issued the Alliance Funds. Carifa and/or Mayer served as the Alliance Corporate Defendants' representative on the board of, and chairman of the board and president for, each of the Alliance Fund trusts, master trusts and corporations.  The following other Trustees will be referred to as the "Trustee Defendants"  or "Trustees:"

(a)     Defendant Ruth Block ("Block") at relevant times was a member of the Board of 43 investment companies in the Alliance Funds, managing 93 portfolios of securities on behalf of the various Alliance Funds, and was a member of the audit committee and nominating committees of each of those funds.

(b)     Defendant David H. Dievler ("Dievler") at relevant times was a member of the Board of 48  Alliance Funds, managing 100 portfolios of securities on behalf of the various Alliance Funds, and was a member of the audit committee and nominating committees of each of those funds.

(c)     Defendant John H. Dobkin ("Dobkin") at relevant times was a member

of the Board of 41Alliance Funds, managing 98 portfolios of securities on behalf of the various Alliance Funds, and was a member of the audit committee and nominating committees of each of those funds.

(d)      Defendant William H. Foulk, Jr. ("Foulk"), at all relevant times was a member of the Board of 50  Alliance Funds, managing 116 portfolios of securities on behalf of the various Alliance Funds, and was a member of the audit committee and nominating committees of each of those funds.  After Defendant Carifa was asked to resign as Chairman and President of each of the Alliance Funds in 2004, Foulk replaced Carifa as Chairman and President of each of the Alliance Funds for which he was a Board member.

(e)      Defendant Clifford L. Michel ("Michel"), at relevant times was a member of the Board of 44 Alliance Funds, managing 96 portfolios of securities on behalf of the various Alliance Funds, and was a member of the audit committee and nominating committees of each of those funds.

(f)      Defendant Donald J. Robinson ("Robinson"), at all relevant times was a member of the Board of  46 Alliance Funds, managing 103 portfolios of securities on behalf of the various Alliance Funds, and was a member of the audit committee and nominating committees of each of those funds.

(g)      Defendant Robert C. Alexander ("Alexander"), at all relevant times was a director of the AllianceBernstein Technology Fund (the "Tech Fund")and was a member of the audit and nominating committee of that fund.

(h)      Defendant D. James Guzy ("Guzy"), at relevant times was a director of

the Tech Fund and was a member of the audit and nominating committee of that fund.

(i)     Defendant Marshall C. Turner, Jr. (Turner), at relevant times was a director of the Tech Fund and was a member of the audit and nominating committee of that fund.

(j)     Defendant Charles H.P. Duell ("Duell"), at relevant times was a member of the Board of Trustees of 3 investment companies in the Alliance Complex of Funds representing not less than 15 portfolios within the Alliance Complex of Funds.

(k)     Defendant Shelby White ("White"), at all relevant times was a member of the Board of Trustees of 3 investment companies in the Alliance Complex of Funds representing not less than 15 portfolios within the Alliance Complex of Funds.

(l)     Defendant David K. Storrs ("Storrs"), at all relevant times was a member of the Board of Directors or Trustees of 2 investment companies representing not less than 2 portfolios within the Alliance Complex of Funds.

(m)     Defendant W. H. Henderson ("Henderson"), at all relevant times was a member of the Board of Directors to 2 investment companies representing not less than 2 portfolios within the Alliance Complex of Funds.

(n)     Defendant Stig Host ("Host"), at all relevant times was a member of the Board of Directors of 2 investment companies representing not less than 2 portfolios within the Alliance Complex of Funds.

(o)     Defendant Alan Stoga ("Stoga"), at all relevant times was a member of the Board of Directors of 2 investment companies representing not less than 2 portfolios

within the Alliance Complex of Funds.

(p)     Defendant Tak-Lung Tsim ("Tsim"), at all relevant times was a member of the Board of Trustees of the AllianceBernstein Greater China '97 Fund, Inc., and is admitted by the Alliance Defendants to be an interested Trustee by virtue of the fact that he is a Principal of T.L. Tsim & Associates Limited, a consulting company which he established in August, 1994.

(q)     Defendant Roger Hertog ("Herzog"), at all relevant times was a member of the Board of Directors of the Sanford C. Bernstein Fund, Inc.  During the relevant period, Herzog served as trustee to 12 portfolios within the Alliance Complex of Funds.  Herzog was also an affiliate of Alliance management and was therefore, as admitted by the Alliance defendants, an interested director.

(r)     Defendant Irwin Engelmann ("Engelmann"), at all relevant times was a member of the Board of Trustees of the Sanford C. Bernstein Fund, Inc.  During the relevant period, Engelmann served as trustee to 12 portfolios within the Alliance Complex of Funds.

(s)     Defendant Peter W. Huber ("Huber"), at all relevant times was a member of the Board of Trustees of the Sanford C. Bernstein Fund, Inc.  During the relevant period, Huber served as trustee to 12 portfolios within the Alliance Complex of Funds.

(t)     Defendant William Kristol ("Kristol") at all relevant times was a member of the Board of Trustees of the Sanford C. Bernstein Fund, Inc.  During the relevant period, Kristol served as trustee to 12 portfolios within the Alliance Complex of Funds.

(u)     Defendant Thomas B. Stiles ("Stiles") at all relevant times was a member of the Board of Trustees of the Sanford C. Bernstein Fund, Inc.  During the relevant period, Stiles served as trustee to 12 portfolios within the Alliance Complex of Funds.

(v)     Defendant Rosalie J. Wolf ("Wolf") at all relevant times was a member of the Board of Trustees of the Sanford C. Bernstein Fund, Inc.  During the relevant period, Wolf served as trustee to 12 portfolios within the Alliance Complex of Funds.

23-30.  [Intentionally Omitted]

## C.     Additional Defendants

31.     Various financial institutions, which are not affiliates of the Alliance Corporate Defendants, were active participants in late trading and market timing schemes that injured the Funds. These "Additional Defendants" are:

(a)     **Defendant Bank of America Corp. ("BOA"),** a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.[3]  BOA is a bank holding company and a financial holding company that provides a diversified range of banking and non-banking financial services and products. BOA is the indirect parent of Banc of America Securities LLC.

(b)     **Defendant Banc of America Securities LLC ("BAS")**, a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings

---

[3] Effective April 1, 2004, FleetBoston Financial Corporation ("Fleet"), a Rhode Island corporation, merged with and into BOA pursuant to an Agreement and Plan of Merger, dated as of October 27, 2003.

Corporation. NB Holdings Corporation is wholly owned by BOA. BAS, a registered broker-dealer, is a full-service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina. BAS is also registered as an investment adviser pursuant to the Investment Advisers Act of 1940.  In its capacity as broker-dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.

(c)    **Defendant Bank of America, N.A. ("BOA N.A.")** is a wholly-owned subsidiary of defendant BOA headquartered at 100 North Tryou Street, Charlotte, North Carolina.

(d)    Defendant **Canary Capital Partners, LLC ("Canary")**, is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds.  Defendant **Canary Capital Partners, Ltd." ("CCP Ltd.")**, is a Bermuda limited liability company.  At all relevant times, CCP Ltd. was also a hedge fund engaged in the business of timing mutual funds. Defendant **Canary Investment Management, LLC ("CIM")**, is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, CIM managed the assets of Canary and CCP ltd. in exchange for a fee equal to 1.5 percent of the assets of Canary plus 25 percent of the profits above a certain threshold.  As of July 2003, CIM had received approximately $40 million in Canary management and incentive fees.  The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was

able to gather in the fund.

(e)     **Defendant Aurum Securities Corp. ("Aurum")**, a California corporation, is a registered investment advisor and Broker-Dealer, with offices at 120 Montgomery Street, San Francisco, California.  Aurum was an active participant in the unlawful scheme alleged herein.

(f)     **Defendant Aurum Capital Management Corp. ("Aurum Capital")**, a California corporation, is a registered investment advisory firm headquartered at 84 West Santa Clara Street, Suite 690, San Jose, California. Aurum Capital is an affiliate of Aurum. Aurum Capital was an active participant in the unlawful scheme alleged herein.

(g)     **Defendant Edward J. Stern ("Stern")** is a resident of New York County, New York and at all relevant times was the Managing Principal of Canary, CCP Ltd.

(h)     **Defendant Trautman Wasserman & Company, Inc. ("Trautman")**, a Delaware corporation, is a registered investment advisor and Broker-Dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York.  Trautman was an active participant in the unlawful scheme alleged herein.

(i)     **Defendant Pritchard Capital Partners LLC ("Pritchard")**, a Louisiana limited liability company, is a registered investment adviser and broker dealer headquartered at 2001 Lakeshore Drive, Mandeville, LA 70448.  Among other things, Pritchard is a retailer of mutual funds and variable life insurance or annuities.  Pritchard introduced timers, including Canary, to various mutual fund complexes, including Alliance, for the purpose of establishing market timing arrangements, including those that permitted

21

Canary's market timing activity in the Funds.  Pritchard further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.   In addition, Pritchard sold "under the radar" timing to various brokers and hedge funds involved in market timing.

(j)      **Defendant Security Brokerage, Inc., ("Security Brokerage")**is a registered broker-dealer headquartered in Las Vegas, Nevada. Security Brokerage was an active participant in the unlawful scheme alleged herein.

(k)      **Defendant Daniel Calugar, a resident of Las Vegas, Nevada, ("Calugar")** is an individual who was engaged in market-timing the Funds at relevant times. Calugar is the owner and president of defendant **Security Brokerage**,  and is a registered broker-dealer headquartered in Las Vegas, Nevada. At the height of his timed trading practices in 2003, Calugar and Security Brokerage had $220 million in timing capacity in Alliance mutual funds.  The Securities and Exchange Commission ("SEC") charged Calugar and Security Brokerage in December 2003 with securities fraud involving late trading and market timing in mutual funds in exchange for "sticky asset"  investments in the hedge funds of mutual fund companies.

(l)      **Defendant Salomon Smith Barney Inc. ("Salomon")**, a New York corporation, is a division of Citigroup Global Markets, Inc. and a wholly owned subsidiary of Citigroup, is a registered investment advisor and broker-dealer headquartered at 333 West 34th Street, 7th Floor, New York, New York.  Among other things, Salomon is a retailer of mutual funds and variable life insurance or annuities.  Salomon introduced timers, including

Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds.  Salomon further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.

(m)     **Defendant Kaplan & Co. Securities, Inc. ("Kaplan")**, a Florida corporation, is a registered investment adviser and broker-dealer headquartered at 150 East Palmetto Park Road, Suite 150, Boca Raton, Florida, 33432.  Among other things, Kaplan is a retailer of mutual funds and variable life insurance or annuities.  Kaplan introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds.  Kaplan further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.  In addition, Kaplan sold "under the radar" timing to various brokers and hedge funds involved in market timing.  In addition, Kaplan offered, through its various clearers, late trading capacity both for negotiated and "under the radar timing."

(n)     **Defendant Northeast Securities Inc. ("Northeast Securities")**, a New York corporation, is a registered investment adviser and broker-dealer headquartered at 333 Earl Ovington Blvd., Mitchelfeld, New York.  Among other things, Northeast Securities is a retailer of mutual funds and variable life insurance or annuities.  Northeast Securities introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted

Canary's market timing activity in the Funds.  Northeast Securities further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.

## D.    Nominal Defendants

32.    Plaintiffs bring this action on behalf of the entire family of Alliance Funds, as well as on behalf of the specific funds in which they invested, which are trusts, master trusts and corporations organized  under the laws of Delaware, Maryland, Massachusetts, New Jersey and New York.

(a)    Each of the Alliance Funds was created and sponsored by Alliance Management and ACMC, and was managed under the supervision of a board of Trustees with essentially uniform composition throughout the period covered by this complaint: Carifa, subsequently replaced by Mayer, was the management designee; and Block, Dievler, Dobkin, Foulk, Michel and Robinson were the usual "outside" trustees.[4] The Trustees of all the Funds are designated by the adviser and serve indefinite terms.  Because the board composition of the Funds is essentially the same, trustee meetings for the funds occur en masse.

(b)    Each of the Funds also has the same adviser, the same distributor, the

---

[4]   The only exceptions to this uniform board composition were for the Tech Fund, on which Alexander, Guzy and Turner served as directors in lieu of Robinson, Michel and Dobkin; the Capital Reserves Fund, Government Reserves, and Municipal Trust, on which Cross, Duell, Storrs and White served; the AllianceBernstein Greater China '97 Fund, Inc., on which Tsim served as a second management designee with Carifa, together with Foulk, Dievler and Dobkin; the Sanford C. Bernstein Fund, Inc., on which Hertog was the management designee, together with outsiders Engelman, Huber, Kristol, Stiles, and Wolf; the AllianceBernstein New Europe Fund, Inc., on which Dievler, Dobkin, Henderson, Stoga served as trustees; and the AllianceBernstein All Asia Investment Fund, Inc., on which Carifa served as the management designee, together with Dievler, Dobkin, Henderson, Host, Stoga.

same custodian, the same transfer agent, and the same shareholder service provider. The agreements between the Funds and each of these entities are identical form agreements, with differences only in the fee percentages; and in many instances the funds share costs among themselves. In substance, then, all the Alliance Funds are, de facto, operated as a single entity. Plaintiffs therefore ring this action on behalf of this unified entity, the entire Alliance Fund Complex, as well as on behalf of the particular funds in which they invested.

(c)     In some instances plaintiffs invested in funds that were actually "portfolios" of investments issued by a single master trust, in which case plaintiffs sue on behalf of the entire master trust.  The funds and portfolios in the Alliance family are listed in the Appendix.

## IV.  <u>STATEMENT OF FACTS</u>

### A.     <u>General Factual Allegations</u>

#### 1.     <u>Introduction</u>

33.    Mutual funds enable small investors to invest long-term capital in the stock and bond markets.  Specifically, mutual funds were intended to enable small investors to (a) accumulate diversified stock portfolios for retirement or other long-term investing with smaller amounts of capital than otherwise would be required for such investing, (b) avoid the transaction costs that ordinarily accompany stock and bond trades, and ©) utilize the services of professional investment advisers whose services otherwise would not be available at affordable prices.

34.    Investors contribute cash, buying shares in the mutual fund, the number of

which is directly proportionate to the amount of the investment.  Mutual fund shares are issued pursuant to prospectuses that must comply with the Securities Act of 1933 and the Investment Company Act.  The investor's cash is then used by the mutual fund to purchase such securities as are consistent with the stated investment goals and objectives of the mutual fund in the Prospectus.

35.     Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.     Mutual funds typically have no employees.  Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.  The adviser "sponsors" the Funds and as a practical matter is responsible for the initial creation of the funds and creating new funds in the series.

37.     Whether corporation or trust, typically all of the trustees of the trusts are substantially the same individuals, or there is a substantial overlap of common trustees with regard to the trusts or corporations and the trustees and directors all have the same responsibilities and serve on the same committees: the only difference being the form of entity they serve.  The trustees or directors, depending on the form of the entity, have ultimate responsibility for the funds.

38.     Each of the funds is created and sponsored by the adviser and is managed under the supervision of its trustees.  The same trustees have supervised all the Funds at all times relevant hereto, and their meetings for all the Funds occur at or about the same time.  Each

of the Funds has the same adviser, who in turn appoints the same trustees, the same distributor, the same custodian, and the same transfer agent for all the Funds, all of whom serve indefinite terms. The agreements between the Funds and each of these entities are substantially identical form agreements, with only minor differences only in fee percentages. In many instances, the funds share costs among themselves. In substance, all the Funds are operated as a single *de facto* entity. Plaintiffs therefore bring this action as a derivative action on behalf of the entire AllianceBernstein family of funds, as well as on behalf of the particular Funds in which they invested.

39.     The trust or corporation contracts with an adviser or manager to handle the day-to-day operations of the fund including making investment decisions, although the Trustees retain ultimate responsibility for the fund. The adviser or the Fund will enter into contracts with other entities, which in almost all instances are affiliates of the adviser, for investment advisory servicing (adviser, sub-adviser), selling or underwriting (distributors, shareholder relations and other back-office services (administrator). Each of these affiliates typically will be paid a percentage of the assets under management, or a transaction fee from the Net Asset Value of the fund.

40.     Mutual fund advisers charge and collect substantial management, administration, marketing and distribution, and other fees and compensation from the funds as a percentage of assets under management. Mutual fund advisers have a direct economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

## 2.    **NAV Pricing**

41.     Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time.  The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day.  Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day.  Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00 p.m. are priced at the next day's NAV.  This practice is known as "forward pricing" and has been required by law since 1968.

42.     Because NAV is set just once at 4:00 p.m. every day under the forward pricing rules, each day's NAV is inefficient.  This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

43.     Forward pricing gives rise to a number of manipulative practices, all of which may be characterized as "market timing."  These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and redemptions of mutual fund shares that are "timed" to precede small movements in the

market prices of the securities in which a fund invests before the NAV reacts to the price changes.

### 3.     **Market Timing Transactions**

44.     Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the foreign markets have not yet incorporated movements in the United States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds — where the price inefficiency lasts longer because the information that causes the security to be re-valued takes longer to be disseminated by the financial markets — the duration of the round trip will be slightly longer.

45.     Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

46.     Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

47.     Many market timers purchase mutual funds when trading models analyzing

performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the trader acquires small cap mutual fund shares in order to capture the benefit of the price rise.  The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

48.     By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and sale of stock, which costs are borne by the fund itself.

49.     Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

50.     One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices.  A typical example is a U.S. mutual fund that invests in Japanese securities.  Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time.  When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old.   If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially

low.  A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

51.     Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day.  By the time a trader can buy the securities, the market price has risen to reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes available while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

52.     Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge profits with little or no corresponding risk.

53.     Yet another market timing scheme is "liquidity arbitrage."  Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments,

such as high-yield bonds or the stock of small capitalization companies. The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

### 4.    **Late Trading**

54.    Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading." Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares *after* 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

55.    Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively. "Late trading can be analogized to betting today on yesterday's horse races."[5] The manipulative device virtually eliminates investment risk.

56.    The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys or redeems. When the late trader redeems his shares and claims his profit, the mutual fund manager has to either sell stock or use cash on hand — stock and cash that belong to the fund and its shareholders and would otherwise remain invested — to give

---

[5] *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

the late trader his gain.  The late trader's profit is revenue withheld from the mutual fund.

The forward pricing rule was enacted to prevent precisely this kind of abuse.  *See* 17 C.F.R.

§270.22c-1(a).

57.     Late trading can be accomplished in at least two different ways.  The first way

market timers are able to trade late is by making arrangements with a mutual fund adviser

or a third-party intermediary who has made arrangements with a mutual fund adviser to have

access to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS

provided trading terminals to at least three broker-dealers that engaged in market timing and

Canary — in effect, making them branch offices of BAS, but unencumbered by BAS's

obligation to adhere to the forward pricing rule — giving them the ability to place orders for

mutual fund shares as late as 6:30 p.m. Pacific Time, more than five hours after the financial

markets closed in New York each day.  As ste forth below, the Trustee and Director

Defendants enacted policies at the Alliance Funds which authorized the Alliance Defendants

to enter into Select Dealer Agreements whereby select dealers could place orders for the

purchase and sale of mutual funds as late as 6:00 p.m.

58.     Market timers are also able to trade late by making arrangements with

intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine

the market timers' trades with other mutual fund purchases or redemptions each day, which

are processed as batch orders.  These intermediaries net purchases against redemptions, and

submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement,

Entry and Verification Service ("FundSERV"), an automated system operated by the

33

National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

59.     Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.   Often intermediaries process orders in the early evening.  The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

60.     Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.  For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents. These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading.  In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 p.m.  Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m..  Finally, some late traders were given trading platforms, integrated hardware-software systems, that allowed them to trade mutual fund shares directly without using an intermediary to submit orders to FundSERV.   In some cases fund managers themselves permitted and aided late trading by fund investors.

61.     Late traders were not necessarily restricted to trading in any single fund family through these schemes. Often intermediary broker-dealers sell shares of many different fund families through "Supermarkets."   It is not unusual for a single Supermarket to offer

thousands of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late trade many different mutual funds through agreements with broker-dealers who operate a fund Supermarket.

62.     Market timing was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds.  Fund insiders, like advisers, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing provided for quick profits at the expense of the mutual funds.

### 5.     Mutual Fund "Short Selling" Strategy

63.     A corollary to market timing used by some investors pursuing market timing strategies involved shorting the underlying securities that make up a fund portfolio.  Using this technique timers were able to profit in both rising and falling markets. Generally, fund managers do not disclose the portfolio holding information of the funds they manage. Although this information is disclosed in semi-annual and annual reports, the information is not current when it becomes publicly available.  In fact, portfolio managers are generally protective of this information and will not disclose it to individual investors and fund trackers like Morningstar.  However, some fund insiders, including certain of the Alliance Defendants, as set forth below, provided detailed information regarding the portfolio holdings of funds to market timers.  The market timers could then buy the fund and simultaneously sell

short[6] a basket of stocks that mirrored the fund's holdings, leaving the timer overall market neutral.  If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit.  When the value of the underlying securities decreased the timer would close out the short position, again earning a quick profit.  By working with derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.  Often the derivative dealers who assisted timer in creating short baskets were affiliates of banks that were loaning money to timers for timing purposes.

### 6.   Market Timing Is Easy to Detect and Has Been Well-Known Since 1997

64.     Market timing in mutual funds has occurred at least since the late 1980s. During the 1980s and 1990s, a number of papers and reports were published by the media, by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the *Putnam International Equities Fund No Action Letter*, Fed. Sec. L. Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

65.     Prior to September 3, 2003, market timing and late trading had become

---

[6]   Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

common practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

66.     In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI") held a conference in Chicago attended by brokers and capacity consultants who secured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds. The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

67.     Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance. Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

68.     Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer. The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers.  These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

69.     However, mutual fund managers, including investment advisers and portfolio

managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market timing and late trading on mutual funds and fund performance, and despite the measures they adopted ostensibly to prevent or deter market timing and late trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

70.     Market timing is easy to detect through shareholder turnover data.  A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds.  Because timers make frequent "round trips," when a timer is active in the fund, the number of shares redeemed greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

71.     A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of redemptions-to-shares outstanding.  Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

72.     Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

73.     By 1997, market timing in mutual funds was well-known and well-documented. During October, 1997, Asian markets were experiencing severe volatility.  On

Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market. Later on Tuesday the 28th, the New York markets rallied. Knowing that the Hong Kong market would rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV based on another method. Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternate method to calculate NAV. Some investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

74.     On November 5, 1997 the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil. *See Mutual Funds Fight the 'Market Timers,'* Wall St. J., 11/5/97, C1. For example, the article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

75.     The SEC's investigation of fund companies' responses to the October, 1997, turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations. Further, the number of investors who attempted to take

advantage of the arbitrage opportunity was "fairly large." *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years,* 1997 ICI SECURITIES LAW PROCEDURES CONFERENCE (Dec. 4, 1997).

76.    By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors. *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, JOURNAL OF FINANCIAL ECONOMICS 131 (July 2002).

77.    One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers. See Eric Zitzewitz, *Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds,* Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280

78.    By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds.  These firms provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated.  One firm, ITG, now offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S." *See* "http://www.itginc.com/research/fvm.html"

### 7.    Market Timing Arrangements

79.    Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families.  The

authority to time mutual funds is known as "capacity." Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

80.     Timers, the intermediaries and the Funds' managers and advisers entered into *specific negotiated agreements* to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades. Through the misuse of the sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which *guarantees* profits.

81.     Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

82.     Market timers frequently offered mutual advisers, distributors, and their affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time. In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

83.     As Stephen M. Cutler, The Director of the SEC's Division of Enforcement, testified on November 3, 2003 before the Senate Subcommittee on Financial Management,

the Budget, and International Security, Committee on government Affairs.[7]

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders**: 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing - *i.e*, these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with the groups' policies, and in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations. We are aggressively following up on these arrangements.

> **Quid pro quo arrangements:** Although the information provided in this area is limited, it appears that many of the person proposing a special arrangements to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex. In most of the situations where sticky assets were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the person involved in the arrangement.

84.    Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through broker-dealers or other timers. Many fund families had "Anchor Brokers" or "Anchor Timers," who were designated broker-dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

85.    Negotiated market timing arrangements often involved other financial

---

[7] *Testimony Concerning Recent Commission Activity To Combat Misconduct Relating to Mutual Funds: Hearing Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs, 108th Cong. (Nov. 3, 2003)* (testimony of Stephen M. Cutler, Director, Division of Enforcement, U.S. Securities & Exchange Commission). Mr. Cutler offered the same testimony on Nov. 4, 2003, before the *House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services.*

institutions as participants in the timing schemes, and those financial institutions (such as banks and brokerage firms) had other business relationships with the mutual funds that encouraged the funds to accommodate the other financial institutions as well as the market timers.

86.     Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.  The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.  The financing consisted of loans for market timing and late trading, and swaps for shorting.  The collateral for the loans were mutual fund shares, so the banks followed trading closely to ensure that their loans were fully secured.  Under swap arrangements, the swaps are in the bank's name as account holder, in which event the market timer manages the money, pays interest to the bank, and keeps the profit.

87.     Broker-dealers and other intermediaries who offered timing capacity received remuneration from both the mutual funds themselves and the market timers to whom they allocated capacity.

88.     Distributors and other service agents who permitted timing also benefitted by receiving increased fees based on the money deposited into the mutual funds for market timing purposes.  Distributors often receive fees based on assets under management and may earn commissions on sales of fund shares.  Such fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under

the ICA for marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds.  17 C.F.R. ¶ 240.12b-1.

89.    Intermediaries who facilitated market timing also received "wrap fees" from market timers.  Wrap fees are customarily charged to investors as a single fee for a variety of investment services, such as commission trading costs and fees of an outside money manager.  Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis.  The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee – usually from 1 to 3 percent of assets.  Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

90.    Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's primary distributor, usually an affiliate of the adviser.  Distributors usually pay a portion of those 12b-1 Fees to the broker-dealers who sell fund shares.  The broker-dealers continue to receive 12b-1 fees for as long as their client's money is invested in the funds.  However, broker-dealers who offered timing capacity often received 12b-1 Fees directly from the funds themselves, which were paid in addition to the 12b-1 fees paid to the mutual fund distributors.

91.     Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes.  For example, market t timers frequently traded through third parties, *i.e.*, broker-dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to mutual fund companies *en masse*.  By trading this way, market timers evaded detection of their activity amid the other trades in the omnibus accounts.  This is one example of market timing "under the radar."

92.     Timing under the radar is intended to avoid the "market timing police," a colloquial term used by market participants to describe persons employed by mutual funds ostensibly to detect and prevent market timing.   Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors were exempt from the restrictions..

93.     Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity.   These tactics included: (a) using multiple account numbers, registered representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated broker dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families.  Some market timers employed these tactics directly, without relying on an intermediary broker.

### a.      Banc of America Securities LLC

94.     Some time prior to late 1999, in order to facilitate late trading and timing of

45

mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers.

95.     RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem.  In effect, those who had the box became branches of BAS.

96.     Those market timers and broker-dealers who received the box could enter mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m. closing price up to 3-1/2 hours later.  BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

97.     The box allowed broker-dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

98.     In addition, broker-dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades *en masse* after the 4:00 p.m. deadline at that day's prices.

46

99.     Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and defendant Aurum, a broker-dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable, and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

100.    BAS installed the box in the offices of three broker-dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  BAS gave the box to defendant Aurum in around late 1999 or early 2000, to defendant Trautman in or about early 2001, and to defendant Pritchard in early 2003.  Each of these broker-dealers was charged $10 for each trade that was entered through the box.

101.    BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws. By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the broker-dealers.

102.    BAS also installed the box in Canary's offices in or around the summer 2001, but did not charge any fee to Canary for orders placed through the box.  Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a broker-dealer, as part of a special arrangement negotiated between Stern and Theodore Siphol III ("Siphol") of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

103.   On September 16, 2003, the SEC instituted an administrative proceeding against Siphol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies.  The SEC charged Siphol[8] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

> "Manual" Late Trading at BAS
>
> 15.   In or around May 2001, Canary began to late trade the Nations Funds.  At first, Canary conducted its late trading "manually."  In the manual stage, Canary was able to engage in late trading primarily because Siphol and his team falsified BAS' books and records.  Prior to 4:00 p.m. ET, a Canary trader would send Siphol or a member of his team a series of "proposed" mutual fund trades by e-mail or facsimile.  Upon receipt, Siphol, or a member of his team acting upon his instructions, would fill out an order ticket, time stamp it, and set it to one side until that evening.  Thus, Siphol created false order tickets that made it appear as if the orders had been received prior to 4:00 p.m. ET.
>
> 16.   Sometime after 4:00 p.m. ET, a Canary trader would telephone Siphol or a member of his team, and would either confirm or cancel the "proposed" trades.  If confirmed, Siphol's team would fax the order (with its pre-4:00 p.m. time stamp and no post-4:00 p.m. time stamp) to the clearing department for processing.  As a result, Canary would receive that day's NAV. If Canary cancelled the "order," Siphol or a member of his team would discard the ticket.
>
> *Late Trading Through BAS' Electronic System*

---

[8]  Siphol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

17.  In the summer of 2001, BAS technicians installed the direct access system in Canary's offices.  Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.

18.  After a Canary trader entered the trades directly into the system, the trader would print out a document confirming the trades and the time (after 4 p.m.) that the trades had been entered.  The trader then faxed the document to Siphol or a member of his team.  The following day, Siphol or a member of his team would use this document to reconcile Canary's trades.  Once the trades were reconciled, Siphol or a member of his team discarded the document.

19.  From the summer of 2001 until the summer of 2003, Canary used the electronic system to late trade.  Canary also late traded "manually" whenever there were technical problems with the electronic system.  BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.  The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.  By using the electronic system, Canary was able to send orders directly to BAS' clearing function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

21.  Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link.  Siphol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

104.  By March 2004, BOA admitted that, by allowing Canary and others to time and late trade mutual funds through its clearing platform, it caused harm not only to the Nations

Funds, but to other mutual fund families as well:

> The Corporation has announced it will establish a restitution fund for shareholders of the Nations Funds who were harmed by Canary's late trading and market timing practices. In addition, the Corporation announced that it will provide restitution for shareholders of ***third party mutual funds who were harmed by any late trading activities by Canary that are found to have occurred through the Corporation*** in the event restitution is not otherwise available from Canary, its affiliates, its investors or from any other third parties.

BOA Form 10-K for Fiscal year 2003, filed March 1, 2004 (emphasis added).

105.    On March 15, 2004, the SEC and the New York Attorney General announced a $675 million joint settlement in principle with BOA and Fleet in connection with their involvement in late trading and market timing. BOA's monetary settlement was $375 million, comprised of restitution of $250 million and penalties of $125 million (and a fee reduction of $80 million over 5 years).

106.    The SEC Press Release announcing the settlement in principle states that the $375 million "will be distributed to the mutual funds and their shareholders that were harmed as a result of market timing in Nations Funds and ***other mutual funds through Bank of America***." (Emphasis added). In the same release quoted Mark Schonfeld of the SEC as saying:

> This settlement is a new benchmark in mutual fund market timing and late trading. Bank of America not only permitted timing in its own funds, ***it provided the instruments for timing and late trading of numerous other funds through its broker-dealer. This settlement will ensure compensation for all victims of the harm that resulted and prevent this misconduct from happening again***.

107.    BOA's Press Release announcing the settlement states that, "subject to further discussions with the Nations Board of Trustees," approximately $25 million "would go to Nations Funds shareholders" and the remainder to shareholders of other funds that were harmed by BAS' clearing of timing trades.  Thus, ***BOA itself attributed $350 million of its $375 million monetary settlement to harm caused to other mutual fund families as a result of BAS' facilitation of late trading and market in other mutual fund families***.

108.    In further recognition of BAS's misconduct in facilitating late trading through the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

109.    Between late 1999 through 2003, BAS, either manually or by providing the box, allowed Aurum to late trade approximately $5.6 billion in third-party mutual funds, Trautman to late trade approximately $8.6 billion in third-party mutual funds, Canary to late trade $21.2 billion in third party mutual funds, and Pritchard to late trade approximately $4.9 billion in third party mutual funds.

110.    Defendant BAS, by providing the box to the Aurum Defendants, Trautman and Pritchard facilitated their late trading and timing in the Alliance Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Technology A | 31,904,446 | 1,579,148,128 | 1,598,714,357 | 19,566,229 |
| Alliance Premier Growth A | 60,822,032 | 1,043,970,329 | 1,049,998,035 | 6,027,706 |
| Alliance Mid-Cap Growth A | 227,309,917 | 895,197,813 | 897,340,413 | 2,142,600 |
| Alliance Growth & Income A | 75,198,720 | 279,791,686 | 281,721,239 | 1,929,553 |
| Alliance Bond Corp Bd A | 7,547,988 | 86,163,650 | 86,702,224 | 538,575 |
| Alliance Growth A | 1,527,423 | 50,253,451 | 50,608,907 | 355,456 |

| | | | |
|---|---|---|---|
| Alliance Emerging Market Debt | 111,163 | 696,168 | 707,939 | 11,771 |
| Alliance Multi Strategy A | 352,205 | 2,060,000 | 2,067,062 | 7,062 |
| Alliance Global Small Cap A | 43,642 | 303,269 | 306,256 | 2,987 |
| Alliance Technology Adv. | 13 | 1,000 | 990 | -10 |
| Alliance Bond U.S. Govt A | 9,143,993 | 66,223,463 | 66,206,321 | -17,142 |
| Alliance Bernstein Inc. NY Mu A | 215,911 | 3,059,000 | 3,034,481 | -24,519 |
| Alliance Quasar A | 16,740,508 | 238,768,371 | 238,728,888 | -39,482 |
| Alliance Balanced Share A | 849,213 | 12,487,124 | 12,235,237 | -251,887 |
| Alliance Bernstein Sm VI A | 13,514,392 | 147,506,392 | 147,056,209 | -450,183 |
| **TOTAL** | **445,282,127** | **4,405,629,844** | **4,435,428,560** | **29,798,716** |

111.    Defendant BAS, by providing the box to Canary, facilitated Canary's late trading and timing in the Alliance Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Mid Cap Growth A | 438,415,666 | 1,774,930,741 | 1,781,396,269 | 6,465,528 |
| Alliance Orth & Income A | 537,618,898 | 1,468,582,456 | 1,472,134,356 | 3,551,900 |
| Alliance Premier Growth A | 73,686,331 | 1,076,925,816 | 1,079,254,882 | 2,329,066 |
| Alliance Bond U.S. Govt A | 66,834,688 | 486,073,904 | 487,382,584 | 1,308,680 |
| Alliance Growth A | 10,778,341 | 247,952,359 | 249,013,094 | 1,060,735 |
| Alliance Technology A | 560,210 | 25,221,921 | 25,376,880 | 154,959 |
| Alliance Bernstein R/B/A | 3,219,728 | 37,913,116 | 37,992,480 | 79,364 |
| Alliance Balanced Share A | 241,752 | 3,595,024 | 3,648,784 | 53,760 |
| Alliance Quasar A | 1,585,548 | 25,680,331 | 25,727,301 | 46,970 |
| Alliance New Europe A | 19,639 | 279,260 | 287,704 | 8,444 |
| Alliance International A | 110,260 | 1,098,638 | 1,106,704 | 8,066 |
| Alliance Bernstein International | 0 | 0 | 0 | 0 |
| Alliance Bernstein Sm VI A | 311,621 | 3,856,147 | 3,815,788 | 40,359 |
| **TOTAL** | **1,133,382,681** | **5,152,109,712** | **5,167,136,827** | **15,027,115** |

## b.    Canary

112.    In or about the summer of 2001, as part of a package deal with BAS that included late trading and timing capacity in the Nations Funds, financing for late trading and timing trades in Nations Funds and other mutual funds, and unlimited capacity to late trade and time hundreds of other mutual funds, defendant BAS installed the "box", free of charge,

at Canary's offices in Secaucus, New Jersey. The deal is memorialized in a letter dated May

1, 2001 by Stern to Siphol of BAS, in which, among other things, Stern writes:

> We plan on transacting our trades manually at first (via Fax), at a time of day that is a little bit earlier than Matt [Augliero, a mutual fund clearing specialist at BAS] specified in our first meeting. As soon as we can work out our lending arrangement with the bank and begin transacting electronically via ADP [i.e. the box] we will draw down leverage against the capital we have deployed in the Nations funds, effectively increasing our trading capital with your firm to $32 million. If all goes well, this capital should grow larger as we get a sense of what trades can and cannot be done via the Banc of American Securities Platform. We really would like to get going with ADP and begin trading electronically as soon as possible.

### c.  **Aurum Defendants, Trautman, and Prichard**

113.    The Aurum Defendants, Trautman, and Pritchard were broker-dealers or market timers who entered into express agreements with BAS enabling them to time and late trade mutual funds through the BAS box.  These defendants timed and late traded mutual funds both for their clients, who bought and sold hundreds of millions dollars worth of mutual funds, and for their own accounts.

114.    The Aurum Defendants, which had the box since about late 1999 or early 2000, late traded and timed the Alliance Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Technology A | 2,256,735 | 210,813,493 | 214,066,466 | 3,252,973 |
| Alliance Growth & Income A | 46,526,787 | 179,670,360 | 180,863,465 | 1,193,105 |
| Alliance Premier Gr A | 5,341,227 | 161,838,493 | 162,832,482 | 993,988 |
| Alliance Growth A | 695,142 | 32,707,992 | 33,152,867 | 444,875 |
| Alliance Mid-Cap Gr A | 731,710 | 5,026,274 | 5,083,959 | 57,685 |

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Quasar A | 181,710 | 5,066,178 | 5,089,179 | 23,000 |
| Alliance Technology Adv | 13 | 1,000 | 990 | -10 |
| **TOTAL** | **55,733,324** | **595,123,791** | **601,089,408** | **5,965,617** |

115.    The Aurum Defendants late traded and timed the Funds on their own account, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Growth & Income A | 37,714 | 140,200 | 142,041 | 1,841 |
| Alliance Growth A | 4 | 200 | 204 | 4 |
| Alliance Premier Gr A | 223 | 8200 | 8186 | -14 |
| Alliance Technology A | 94 | 13,200 | 13,184 | -16 |
| Alliance Quasar A | 2,524 | 65,000 | 64,808 | -192 |
| Alliance Mid-Cap Gr A | 3,756 | 25,200 | 24,830 | -370 |
| **TOTAL** | **44,314** | **252,000** | **253,253** | **1,253** |

116.    Trautman, which had the box since about early 2001, late traded and timed the Alliance Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Technology A | 11,481,070 | 533,805,863 | 545,314,888 | 11,509,026 |
| Alliance Premier Gr A | 42,374,966 | 694,030,957 | 699,008,050 | 4,977,093 |
| Alliance Grth & Inc. A | 28,671,933 | 100,121,326 | 100,857,774 | 736,448 |
| Alliance Bond Corp. Bd A | 7,547,988 | 86,163,650 | 86,702,224 | 538,575 |
| Alliance Bond U.S. Govt A | 5,039,782 | 36,723,463 | 36,757,973 | 34,510 |
| Alliance Emg Mkt Debt A | 111,163 | 696,168 | 707,939 | 11,771 |
| Alliance Multi Strat A | 352,205 | 2,060,000 | 2,067,062 | 7,062 |
| Alliance Glob Sm Cap A | 43,642 | 303,269 | 306,256 | 2,987 |
| Alliance Bernstein In NY Mu-A | 215,911 | 3,059,000 | 3,034,481 | -24,519 |
| **TOTAL** | **95,838,658** | **1,456,963,695** | **1,474,756,648** | **17,792,953** |

117.    Trautman also late traded and timed the Funds on behalf of Canary, as

follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| AllianceTechnologyA | 8,341,693 | 348,749,351 | 356,624,566 | 7,875,215 |
| Alliance Premier Gr A | 14,907,757 | 228,581,374 | 232,703,030 | 4,121,655 |
| Alliance Growth & Income A | 14,032,934 | 43,783,061 | 44,495,424 | 712,363 |
| Alliance Mutual Strat A | 3,426,618 | 20,024,000 | 20,039,767 | 15,767 |
| Alliance Mutual Income Natl A | 334,975 | 3,500,000 | 3,413,894 | 13,894 |
| Alliance Bond U.S. Govt A | 1,124,202 | 8,200,000 | 8,198,878 | 1,122 |
| **TOTAL** | **42,168,180** | **652,737,786** | **665,475,559** | **12,737,773** |

118.   Trautman late traded and timed the Funds for its own account, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Technology A | 20,886 | 802,126 | 810,680 | 8,554 |
| Alliance Multi Strategy A | 94,915 | 560,000 | 556,362 | -3,638 |
| Alliance Premier Gr A | 110,278 | 1,680,867 | 1,676,299 | -4,568 |
| **TOTAL** | **226,080** | **3,042,993** | **3,043,341** | **348** |

119.   Pritchard, which had the box since about early 2003, late traded and timed the

Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Alliance Technology A | 18,166,641 | 834,528,772 | 839,333,003 | 4,804,230 |
| Alliance Mid-Cap Gr A | 226,578,207 | 890,171,539 | 892,256,454 | 2,084,914 |
| Alliance Premier Gr A | 13,105,840 | 188,100,879 | 188,157,504 | 56,625 |
| Alliance Bond U.S. Govt A | 4,104,211 | 29,500,000 | 29,448,348 | -51,652 |
| Alliance Quasar A | 16,558,799 | 233,702,192 | 233,639,710 | -62,483 |
| Alliance Growth A | 832,281 | 17,545,459 | 17,456,040 | -89,419 |
| Alliance Balanced Sh A | 849,213 | 12,487,124 | 12,235,237 | -251,887 |
| Alliance Bernstein SmVl A | 13,514,953 | 147,506,392 | 147,056,209 | -450,183 |
| **TOTAL** | **293,710,145** | **2,353,542,358** | **2,359,582,504** | **6,040,146** |

120.   The late trading and timing orders that were processed through the box consisted of both "under the radar" late trading and timing, and late trading and timing arrangements between the Aurum Defendants, Trautman, and Pritchard, or their intermediaries, on the one hand, and mutual fund advisers, on the other hand. These defendants, or their intermediaries, received wrap fees for providing under the radar or negotiated late trading/timing capacity in mutual funds.

121.   Even where late trading and timing was "under the radar," mutual fund advisers knew that funds were being timed by the sheer volume of asset turnover in the funds.  One advantage to the brokers and timers that late traded and/or timed "under the radar" — as the Aurum Defendants, Trautman and Pritchard sometimes did — was that they avoided paying wrap fees to the mutual fund families.  Where there was a negotiated timing arrangement with a mutual fund family, the defendants often shared their wrap fees with the mutual fund family advisers.

122-250. [Intentionally Omitted]

## 8.    Impact of Market Timing and Late Trading

251.   Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments.  Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts.  Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.   Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways.  The types of adverse impact caused to mutual funds from market timing generally can be grouped into three categories: (a) Dead Weight, (b) Dilution, and (c) Concentration.

253.   Dead Weight losses result from frequent transactions in mutual fund shares by market timers.  Dead Weight harms not just the Funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.   Dead Weight includes, but is not limited to, the following:

(a)    increased service agent  fees, such as transfer agent, compliance administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)    statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

(c)    higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who flee the fund after learning of the late trading and timing scandal;

(d)    lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)      inefficient trading in the Funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (e.g., buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)      transaction costs for transactions in the Funds' underlying portfolio securities that result from market timing (as well as from the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

(g)      interest on borrowing to maintain the mutual funds' position in the underlying portfolio securities; and

(h)      increased expenses for fixed costs (including trustee or director expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.    Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to invest, the net return on all fund assets (including the transient cash

deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.   Dead Weight costs harm not only the funds that are timed, but can also harm non-timed funds.   Non-timed funds are harmed by market timing when timing increases costs that are shared by timed and non-timed funds within the same fund family.   Certain costs, for example custodian fees, are shared by all funds in a mutual fund family.   Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family.   This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds.   If fees are calculated on a transactional basis, the costs are increased directly.   If fees are calculated as a percentage of assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions.   Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257.   Non-timed funds were also harmed by market timing when large numbers of innocent investors redeemed their shares in the wake of the scandal.   Fixed costs, such as director's fees, are shared among funds and are accrued daily.   When large numbers of investors redeemed their shares after discovering that the funds were implicated in the market timing scandal, the assets of the funds shrank and the fixed costs became a greater burden.

258.    Dead Weight costs are exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259.    In addition to exposing mutual funds to Dead Weight costs, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets.   When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises.   The timer therefore pays less than the true value of the fund share.   When the underlying securities increase in price (as anticipated), the fund's NAV increases and the timer participates in this "unearned appreciation."   The timer's unearned appreciation results in dilution of the fund's NAV dollar for dollar.

260.    Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old.   Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.    Late trading in particular dilutes the assets of a mutual fund.   When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV.   However, late traders are able to purchase the fund shares at the current day's

lower NAV, thus reducing the purchase price for the shares and depriving the funds of the NAV appreciation between the two days.  Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated.  In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed.  The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the underlying securities increased.  Since the timer's money is either invested at a non-stale price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities.  The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution.  The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices.  Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

**B.**     **Fund Family Specific Facts**

      **1.**     **The Alliance Family Fund Organization**

61

### a.    **The Funds**

264.    The Alliance Funds collectively hold over $165 billion of invested assets, and consist of nominally separate and distinct investment companies variously organized under the laws of Delaware, Maryland, Massachusetts, New Jersey and New York. The Funds function as open-ended management investment companies with an unlimited number of authorized shares of beneficial interest. Such investment companies are commonly referred to as mutual funds. Their affairs are governed by the Investment Company Act of 1940 (the "ICA"). These Funds are all sponsored and managed by the Alliance Corporate Defendants.

265.    Some of these Funds sell a single class of shares, while others sell multiple classes of shares, which are invested in a common portfolio of securities but differ in the sales charges and operating expenses they impose. Some of these Funds are stand-alone entities; others are not entities at all, but are portfolios of investments offered by other Alliance entities ("master trusts"). Investors in portfolios in fact hold equity interests in the master trust that issues these portfolios.  A list of these funds and master trusts is attached as the Appendix.

266.    The Alliance Funds are not required to hold annual meetings and, upon information and belief, do not regularly hold annual meetings.

### b.    **Management of the Funds**

267.    The Alliance Funds were all created and sponsored, and are all managed, by the Alliance Corporate Defendants, with which each Fund has entered into a series of form contracts. All the Alliance Corporate Defendants are owned and controlled, directly or

indirectly, by Alliance Management, a limited partnership whose sole general partner is ACMC, an indirect, wholly-owned subsidiary of Axa Financial.

268.    Each of the Alliance Funds has a common form Advisory Agreement with Alliance Management.  Each of these Advisory Agreements is for a term of one year and is renewable annually through a majority vote of a majority of the "disinterested" members of the board of directors, i.e., all of the members of the board other than Carifa or Mayer.

269.    Under the terms of each of the Advisory Agreements, Alliance Management is paid a fee consisting of a percentage of the net assets of the respective fund under management.  Thus, the Advisory Fee paid to Alliance Management under the form Advisory Agreements increased in direct proportion to any increase in daily net asset values. Pursuant to these agreements, Alliance received tens of millions of dollars in advisory fees for each of the Alliance Funds on an annual basis.

270.    Each of the form Advisory Agreements provides:

> The Advisory Agreement may be terminated without penalty on 60 days' written notice by a vote of a majority of the Fund's outstanding voting securities or by a vote of a majority of the Fund's Directors, or by the Adviser on 60 days' written notice, and will automatically terminate in the event of its assignment.

Nevertheless, even upon disclosure of the rampant timed and late trading practices perpetrated by the Alliance Defendants, as set forth below, none of the boards of any of the Alliance Funds ever terminated that Fund's Advisory Agreement with Alliance Management.

271.    Each of the form Advisory Agreements further provides:

63

We shall expect of [Alliance], and [Alliance] will give us the benefit of, your best judgment and efforts in rendering these services to us, and we agree as an inducement to your undertaking these services that you shall not be liable hereunder for any mistake of judgment or in any event whatsoever, except for lack of good faith, provided that nothing herein shall be deemed to protect, or purport to protect you against any liability to us or to our security holders to which you would otherwise be subject by reason of willful misfeasance, bad faith or gross negligence in the performance of your duties hereunder, or by reason of your reckless disregard of your obligations and duties hereunder.

272. The Board of each of the Alliance Funds has voted to extend the Advisory Agreement with Alliance Management (as well as the Distribution Agreement and Transfer Agency Agreements with Alliance Subsidiaries, discussed below) even after the revelation of the timed and late trading orchestrated by the Alliance Defendants. The canned explanation of the reasons for approving the extension is the exact same – word for word – as the explanations given each year prior to the revelation of the Alliance Defendants' fraudulent scheme.

273. Each of the Alliance Funds also entered into a form Distributorship Agreement with ABIRM, whereby ABIRM acted as the principal underwriter and distributor of shares of each of the Alliance Funds. Under the form Distributorship Agreement, ABIRM was entitled to the sales charges or "loads" paid by investors to purchase the funds and all distributorship fees collected under the Distributorship Services Agreement adopted by each of the respective funds under Rule 12b-1. The distributorship fees collected by ABIRM under Rule 12b-1 agreements consist of a percentage of the daily average net assets under management of each class of shares for which a Rule 12b-1

agreement has been adopted, ordinarily including Class A, B and C shares.  Thus, the 12b-1 fees paid to ABIRM under the form Distributorship Agreements increased in direct proportion to any increase in daily net asset values of the Funds.  Pursuant to these Agreements, ABIRM receives tens of millions of dollars from each of the Alliance Funds on an annual basis.

274.   Each of the Alliance Funds also entered into a form Transfer Agency Agreement with AGIS, a wholly owned subsidiary of Alliance.  Pursuant to the form Transfer Agency Agreement, AGIS receives a transfer agency fee per account holder of each of the Class A shares, Class B shares, Class C shares and Advisor Class shares of the Fund, plus reimbursement for out-of-pocket expenses.  Pursuant to these Agreements, AGIS received millions of dollars from each of the Alliance Funds on an annual basis.

275.   The Alliance Corporate Defendants have earned billions of dollars in fees from the Funds over the years, pursuant to these form agreements, as shown in this chart:

|  | MANAGEMENT | ADMINISTRATIVE | DISTRIBUTION |
|---|---|---|---|
| 2003 | 233,046,638 | 24,818,891 | 167,889,860 |
| 2002 | 389,064,305 | 66,518,602 | 284,944,792 |

c.   **Trustees of the Alliance Funds**

276.   The Alliance Funds  have a "core group" of trustees who sat on virtually all of the Fund boards during the relevant period. Carifa or Mayer was the management representative; and Block, Dievler, Dobkin, Foulk, Michel and Robinson typically filled out

the remaining positions. These six "non-interested" directors earned hundreds of thousands of dollars in trustee fees each year.

| DIRECTOR | COMPENSATION | | | | |
|---|---|---|---|---|---|
| | FY 1999 | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
| John D. Carifa | | | | | |
| Ruth Block | 154,263 | 155,738 | 186,050 | 192,600 | 205,550 |
| David H. Dievler | 210,188 | 223,025 | 244,350 | 246,238 | 264,400 |
| John H. Dobkin | 206,488 | 187,175 | 210,900 | 241,700 | 234,550 |
| William H. Foulk, Jr. | 246,413 | 220,738 | 249,400 | 241,700 | 248,650 |
| Clifford L. Michel | 183,388 | 171,138 | 199,088 | 201,950 | 209,550 |
| Donald J. Robinson | 154,313 | 160,777 | 186,050 | 193,100 | 205,347 |
| **Totals:** | **$1,155,053** | **$1,118,591** | **$1,275,838** | **$1,317,288** | **$1,368,047** |

## 2. Alliance's Contractual Prohibitions and Policies Concerning Late Trading and Market Timing

277. Through each Fund's public filings, as well as the form Advisory, Transfer Agency and Distribution Agreements, the Alliance Defendants represented that they had strict policies with regard to late and timed trading. By failing to enforce and/or follow regulations and policies listed in the Alliance Funds' public filings and Agreements with each of the Funds prohibiting late and timed trading, the Alliance Defendants allowed and encouraged select investors to rapidly buy and sell Alliance Funds, the very funds that defendants had the fiduciary duty to oversee and protect from such malfeasance, in a manner represented in the Alliance Funds' prospectuses. As detailed below, the conduct continued for a substantial period of time and was so well known within Alliance, that Alliance appointed a Market Timing Supervisor.

### a.   Late Trading

278.   Late trading is prohibited by law.  To comply with the law, the form Transfer Agency Agreement provided detailed requirements with regard to the daily valuation of shares in each Fund to purportedly prohibit late trading as follows:

> *As soon as possible after 4:00 p.m., Eastern time or at such other times as the Fund may specify in Written or Oral Instructions for any Series (the "Valuation Time") on each Business Day Fund Services shall obtain from the Fund's Adviser a quotation* (on which it may conclusively rely) of the net asset value, determined as of the Valuation Time on that day.  On each Business Day Fund Services shall use the net asset value(s) determined by the Fund's Adviser to compute the number of Shares and fractional Shares to be purchased and the aggregate purchase proceeds to be deposited with the Custodian.

* * *

> *Prior to the Valuation Time on each Business Day, as specified in accordance with SECTION 13, Fund Services shall process all requests to redeem Shares* and, with respect to each Series, shall advise the Custodian of (I) the total number of Shares available for redemption and (ii) the number of Shares and fractional Shares requested to be redeemed.

279.   Similarly the form Distribution Agreement also provides:

> *In selling shares of the Fund, the Underwriter shall use its best efforts in all material respects duly to conform with the requirements of all federal and state laws relating to the sale of such securities.* Neither the Underwriter, any selected dealer, any selected agent nor any other person is authorized by the Fund to give any information or to make any representations, other than those contained in the Fund's Registration Statement (the "Registration Statement"), as amended from time to time, under the Securities Act and the Investment Company Act or the Prospectus and Statement of

67

Additional Information or any sales literature specifically approved in writing by the Fund.  (Emphasis added)

280.   The form Distribution Agreement further provides:

The Underwriter shall have the right to enter into selected dealer agreements with securities dealers of its choice ("selected dealers") and selected agent agreements with depository institutions and other financial intermediaries of its choice ("selected agents") for the sale of shares and fix therein the portion of the sales charge that may be allocated to the selected dealers and selected agents . . .  ***Shares sold to selected dealers or through selected agents shall be for resale by such selected dealers and selected agents only at the public offering price*** set forth in the Prospectus and Statement of Additional Information. (Emphasis added)

281.   Similarly, the form Distribution Agreements provides that the selling price of

shares for the Fund are established at the net asset value as follows:

***The net asset value of shares of the Fund shall be determined by the Fund, or any agent of the Fund, as of the close of regular trading on the New York Stock Exchange on each Fund business day*** in accordance with the method set forth in the Prospectus and Statement of Additional Information and guidelines established by the Directors of the Fund. (Emphasis added)

282.   Similarly the prospectuses for the Funds further contained the following form

language,  which purportedly would prohibit late trading:

Exchanges of shares are made at the next determined NAV, without sales or service charges. ***You may request an exchange by mail or telephone. You must call by 4:00 p.m. Eastern time to receive that day's NAV.***

***Your broker must receive your sales request by 4:00 p.m., Eastern time, and submit it to the Fund by 5:00 p.m., Eastern***

*time, for you to receive that day's NAV*, less any applicable CDSC.   (Emphasis added)

*The Funds' net asset value or NAV is calculated at 4 p.m. Eastern time each day the Exchange is open for business.* To calculate NAV, a Fund's assets are valued and totaled, liabilities are subtracted, and the balance, called net assets, is divided by the number of shares outstanding. The Funds' value their securities at their current market value determined on the basis of market quotations, or, if such quotations are not readily available, such other methods as the Funds' directors believe accurately reflect fair market value.

*Your order for purchase, sale, or exchange of shares is priced at the next NAV calculated after your order is accepted by the Fund.* (Emphasis added)

283.   The Statement of Additional Information filed with the SEC for each of the funds named herein, signed by each of the directors thereof,  further contained the following statement:

The Fund will accept unconditional orders for its shares to be executed at the public offering price equal to their net asset value next determined (plus applicable Class A sales charges), as described below. Orders received by the Principal Underwriter prior to the close of regular trading on the Exchange on each day the Exchange is open for trading are priced at the net asset value computed as of the close of regular trading on the Exchange on that day (plus applicable Class A sales charges). In the case of orders for purchase of shares placed through selected dealers, agents or financial representatives, as applicable, the applicable public offering price will be the net asset value as so determined, but only if the selected dealer, agent or financial representative receives the order prior to the close of regular trading on the Exchange and transmits it to the Principal Underwriter prior to 5:00 p.m. Eastern time. The selected dealer, agent or financial representative, as applicable, is responsible for transmitting such orders by 5:00 p.m. Eastern time (*certain selected dealers,*

*agents or financial representatives may enter into operating agreements permitting them to transmit purchase information to the Principal Underwriter after 5:00 p.m. Eastern time and receive that day's net asset value*). If the selected dealer, agent or financial representative fails to do so, the investor's right to that day's closing price must be settled between the investor and the selected dealer, agent or financial representative, as applicable. If the selected dealer, agent or financial representative, as applicable, receives the order after the close of regular trading on the Exchange, the price will be based on the net asset value determined as of the close of regular trading on the Exchange on the next day it is open for trading. (Emphasis added)

### b.   Market Timing

284.   Likewise, each of the Alliance Funds was sold pursuant to a Prospectus signed by each of the directors of the funds named herein, usually a common Prospectus by which a number of the different funds could be sold. Representations in the Alliance Funds' prospectuses gave investors the misleading impression that the Alliance Defendants sought to restrict timing in the mutual funds. The prospectuses for each of the Funds expressly informs investors "*You should consider an investment in the Fund as a long-term investment.*" Regarding the purchase and sales of shares of the mutual funds, the prospectuses further stated:

A Fund may refuse any order to purchase shares. *In particular, the Funds reserve the right to restrict purchases of shares (including through exchanges) when they appear to evidence a pattern of frequent purchases and sales made in response to short-term considerations.*

### 3.   Despite These Pronouncements, Massive Market Timing and Late Trading Afflict the Alliance Funds

285.   The foregoing statements, signed by each of the Trustees, including Alliance Management's representatives on the respective boards, demonstrated that the respective boards, at the recommendation of Alliance Management had allowed the Alliance Defendants to enter into agreements with selected dealers whereby trades submitted after 5:00 p.m. could still obtain that days NAV.  This policy facilitated the timed trading set forth below.  Moreover, until the filing of this action, the respective funds failed to institute any monitoring of such late trades or effective controls of such trades, even though the Trustee Defendants, each of which was a member of the respective audit committees, had approved the policy which made late trading possible.

286.   Thus, despite the representations set forth in the Prospectus, Statement of Additional Information and the Annual and Semi Annual Reports to shareholders with respect to the monitoring of timed and late trading, the Alliance Defendants entered into agreements with select dealers to assist timed and late traders in avoiding sales charges or "loads" paid by other shareholders, and distribution expenses, in turn forcing the funds, and ultimately the holding shareholders to pay inflated fees and expenses.

287.   Based upon an investigation conducted by the SEC, the Alliance Defendants were aware of the adverse effects of market timing set forth above. In September 1999, an internal Alliance memorandum, circulated among mutual fund sales employees, noted the adverse impact that market timers had on mutual funds, which included: (1) an increase in capital gains taxes caused by sale of stocks to cover redemptions by timers; (2) an increase in trading costs; and (3) lower returns.

288.    Similarly, in February 2001, in a memorandum concerning fund performance, the Chief Executive Officer ("CEO") of Alliance noted that in a certain Alliance sub-advised fund, market timers "probably cost 400 basis points before it was controlled" by prohibiting all market timing in that fund.

289.    On occasions when Alliance canceled or blocked trades by unapproved market timers, Alliance notified the timer that it had canceled the trade because "short-term trading is detrimental to the mutual fund."

290.    Moreover, the Alliance Defendants demonstrated that they had the ability to detect market timing and, at times, acted to prevent timers from trading in certain Alliance mutual funds.  For example, in 1998 and 1999, the Alliance Defendants monitored market timing in its international equity and municipal bond funds, and acted to prohibit such market timing.  Periodic memoranda to the sales force identified the funds that were restricted from timers and explained the restriction in terms of risk to long-term shareholders: "Alliance goes to great lengths to minimize excessive exchange activity/market timing. This type of activity exposes both our funds and our funds' shareholders to unnecessary financial risk."

291.    Moreover, in order to avoid paying excessive commission costs to salespersons for frequent sales to timers, the Alliance Defendants, including ABIRM, devised a system of identifying certain market timing trades and backing them out of the sales levels upon which commissions to the sales force were based. Similarly, the Alliance

Defendants, including ABIRM, stopped accepting manual trade orders from identified timers in order to reduce its risk of liability for errors on manual orders.

292.    Alliance Management was well aware of the evils of late trading and market timing and identified them as transactions which were monitored and prohibited.  Yet, it allowed its own employees and affiliates to engage in these types of transactions and gave access to favored clients to engage in as well.  This was injurious to the funds and its shareholders.

293.    In early 2001, the Alliance Defendants even went to the extent of appointing a sales support employee to be a "Market Timing Supervisor" to manage the relationships between Alliance and market timers.

294.    In sum, by early 2003, the Alliance Defendants had extensive relationships with approved timers. Alliance permitted over $600 million in timing capacity in Alliance mutual funds. According to a list created by the Market Timing Supervisor in 2003, Alliance's "Top 10 Timers" had collectively $543 million in timing capacity in Alliance mutual funds.

### a.     Disclosures of the Regulatory Proceedings

295.    On  September 30, 2003, Alliance Management announced that it had been contacted by the New York State Attorney General and the SEC in connection with the regulators' investigation of market timing and late trading practices in the mutual fund industry. Additionally, Alliance Management revealed the following:

based on the preliminary results of its own ongoing internal investigation concerning mutual fund transactions, *it has identified conflicts of interest in connection with certain market timing transactions. In this regard, Alliance has suspended two of its employees, one of whom is a portfolio manager of the AllianceBernstein Technology Fund, and the other of whom is an executive involved with selling Alliance hedge fund products.* (emphasis added.).

296. On October 1, 2003, an article appearing in *The Wall Street Journal* identified the two Alliance Management employees who were suspended as a result of their involvement in conflicts of interests as Gerald Malone and Charles Schaffran. The article revealed that Alliance had been subpoenaed by the New York State Attorney General's Office early on in its inquiry into the mutual fund industry, and further, elaborated on defendants Malone and Schaffran's wrongful and illegal misconduct:

> *certain investors were allowed to make rapid trades in a mutual fund managed by Mr. Malone in exchange for making large investments in Alliance hedge funds also run by Mr. Malone[.]*
> . . . .
>
> Mr. Schaffran is alleged to have helped a broker at a Las Vegas firm called Security Brokerage Inc. gain the ability to make short term trades in shares of Mr. Malone's mutual fund in exchange for investments into Mr. Malone's hedge funds[.]
> . . . .
>
> As previously reported . . . *Canary, appears to had arrangements allowing short-term trading with Alliance funds. . . Meanwhile, according to a copy of trade orders obtained by [Attorney General Elliot] Spitzer's office, on the evening of Jan. 13 this year, Mr. Stern placed late trades through Bank of America's trading system to sell 4,178,074 shares of Alliance Growth and Income Fund, which at the*

>**_time would have amounted to an approximately $11 million_**
>**_transaction._** (emphasis added.)

297.   In addition to the AllianceBernstein Technology Fund, the article stated that

Malone also managed two technology hedge funds, the ACM Technology Hedge Fund and

the ACM Technology Partners LLP.

298.   On November 10, 2003, Alliance announced the ouster of John D. Carifa, its

President, Chief Operating Officer and Director, as well as Chairman of the Board and

president of each of the Alliance mutual funds.  In addition, the Alliance Defendants ousted

Michael J. Laughlin as Chairman of its mutual fund distribution unit.  Alliance based its

removal of Carifa and Laughlin on the fact that

>**_"they had both senior and direct responsibility over the firm's_**
>**_mutual fund unit which . . . allowed inappropriate market_**
>**_timing transactions . . . ."_** (emphasis added).

299.   On November 14, 2003, the Alliance Defendants announced that Malone and

Schaffran had resigned at the Company's request and that "[o]ther employees, all in the

mutual fund distribution unit, have been or will be asked to resign."  These firings were

related to "market timing relationships."  The Alliance Defendants also announced that it

recorded a charge to income of $190 million for the quarter ended September 30, 2003, to

cover restitution, litigation and other costs associated with its internal investigation of the

market timing activities.

300.   On January 15, 2004, the Alliance Defendants entered into a consent decree

with the SEC, pursuant to which they consented to the entry of findings by the SEC to the

effect that they had conspired with Calugar, Canary and eighteen other brokers to engage in market timing and late trading in many of the Alliance Funds, in exchange for the deposit of "sticky asset" investments with certain Alliance hedge funds and mutual funds. Pursuant to the consent decree, the Alliance Defendants were required to pay $250 million in disgorgement and penalties, to be distributed according to a yet to be formulated distribution plan, and to implement a series of oversight and governance reforms. Alliance Management also agreed to reduce its management fees charged to the Alliance Funds for a period of up to five years.

301.    Alliance's single largest timer was Daniel Calugar, the owner and president of Security Brokerage, Inc., a registered broker-dealer in Las Vegas, Nevada. At his height in 2003, Calugar had $220 million in timing capacity in Alliance mutual funds. The Alliance Defendants accommodated Calugar's market timing activity in its mutual funds in exchange for the fees derived from Calugar's timing assets and the assets Calugar invested in certain Alliance hedge funds.

302.    In April 2001, hedge fund sales executives at Alliance negotiated an agreement with Calugar providing market timing capacity in the Tech Fund and the Growth Fund in exchange for Calugar's investments in Alliance hedge funds in a ratio of 10:1 mutual fund timing capacity to hedge fund investment. Calugar summarized the terms of this agreement in a note to an Alliance representative:

> I very much appreciate the $10 million timing position that was given to me in Alliance Technology (ALTFX) and Alliance Growth (AGRFX). ... You indicated that the managers of these

two funds also run hedge funds at Alliance. I have been an active investor in timing mutual funds for 15 years, and have never invested in a hedge fund or similar investment, however, I am willing to make an investment in Alliance hedge funds equal to 10% of the timing allocation that I maintain in your mutual funds. I will keep the hedge fund position as long as I have the timing allocation in the mutual funds. My understanding is that you would be able to give me an exit opportunity from the hedge funds at the end of any month, however, I would not exercise that opportunity as long as I continue to have the timing allocation on the mutual fund side.

303.    Shortly thereafter, Calugar began timing the Tech Fund and the Growth Fund, and invested in Alliance hedge funds, including a hedge fund managed by the Tech Fund portfolio managers. As a hedge fund sales executive later explained in an email, "Calugar would only invest in our hedge funds if we provided him with market-timing space within our [mutual funds]." Thus, the Alliance Defendants were more than willing to sacrifice the interests of their Funds in order to reap additional fees from their hedge funds (which, like the mutual funds, paid fees based on a percentage of total assets in the fund plus additional bonuses unavailable from the mutual funds).

304.    In June 2001, the Alliance Defendants agreed to increase Calugar's market timing capacity to $100 million in the Tech Fund and $20 million in the Premier Growth Fund with four round trips per month in return for a 20% investment in Alliance hedge funds.

305.    Members of senior management of the Alliance Corporate Defendants, including Alliance Management and ABIRM, were aware of the arrangement with Calugar. In June 2001, notification of the arrangement with Calugar was conveyed through a series

of emails from hedge fund sales personnel to mutual fund management, including Carifa, the then President and Chief Operating Officer ("COO") of Alliance Management, who also served as the Chairman and President of the mutual funds at issue here. In particular, senior management at Alliance received a forwarded email describing aspects of the Calugar arrangement: The Tech Fund portfolio managers "did indeed authorize [sic] up to $100 million of market timing money for Dan Calugar in the Tech fund. Dan has subsequently subscribed to [the portfolio managers'] hedge fund for 20% of the underlying assets as of June 1 in anticipation of this."

306.    Later in 2001, the Alliance Defendants increased Calugar's market timing capacity in the Tech Fund to $150 million with the understanding that Calugar would make long-term investments in Alliance hedge funds in a ratio of 5:1 mutual fund capacity to hedge fund investment. Throughout the latter part of 2001, Calugar continued to make additional investments in Alliance hedge funds consistent with the agreed ratios.

307.    In January 2002, Calugar made a large exchange in the Tech Fund that evoked a complaint from the portfolio manager. Thereafter, Calugar and the Alliance Defendants representatives had further discussions concerning the terms of his timing capacity in Alliance Funds. At the time, one member of Alliance senior management remarked that he would not want to read about these matters on the front page of the newspaper. Nevertheless, certain members of senior management at Alliance discussed the continuation of Calugar's timing trading at Alliance on renegotiated terms.

308.    COO Carifa received the following email from an Alliance executive vice president ("EVP"), reviewing the details of Calugar's timing arrangement and noting the potential for a renegotiated agreement:

> Following our telephone conversation, I spoke with [the head of hedge fund sales and the Tech Fund portfolio manager] to get the latest on Dan Calugar who has placed roughly $150 million of "timer" money into the Tech Fund and $30 million into the Tech Hedge Fund. Calugar also placed $55 million into Premier Growth as an offset to $17 million into Alpha 20 and $4 million in the Muni Hedge Fund. Apparently the original ratio of "timer" money to Hedge Fund investments was negotiated at 5 to 1 . . .. This deal was negotiated outside the system that [the head of domestic mutual fund sales] set up ... which generally discourages "timers" altogether, but controls the few we do have.

> [The head of hedge fund sales] has spoken to Calugar, and thinks he can negotiate a better deal for Alliance. [The head of hedge fund sales] is also going to speak with [the Market Timing Supervisor] to set up better controls over the round trips in order to protect the fund shareholders. According to [the Tech Fund portfolio manager], this has not been an issue except for a brief volatile period in January when he was forced to reduce his cash position from 6% to 4% in order to cover a redemption....

> Obviously, [the Tech Fund portfolio manager and the head of hedge fund sales] and presumably the other portfolio managers want to keep the relationship. According to [the head of hedge fund sales,] [the CEO] is OK with this. From a purely Mutual Funds standpoint, we get very little out of this, and would not be disappointed to see Calugar go away. As you know, he has made a lot of money on this deal by trading the funds. [The head of hedge fund sales] points out that the Hedge Funds appear to be virtual loss leaders for his timing practice.

309.    In an email reply, COO Carifa noted the financial benefit to the Alliance Corporate Defendants from the relationship with Calugar in the form of increased management fees: "Assuming the assets stay in [t]he funds for a year our fund management fees come out to about $1.8 million per year. Assuming no impact on our shareholders and no unique operational issues it is beneficial to our funds group by retaining 55% of the fees."

310.    The head of hedge fund sales then negotiated with Calugar the terms of his timing arrangement and sent an email to COO Carifa and others describing the new arrangement, including: (1) "ratios are reset from 5:1 mutual to hedge investment to 4:1 for Premier Growth and 3:1 for Tech;" (2) "Calugar's mutual fund trades will be made in $10MM `blocks';" and (3) Calugar "will redeem all hedge fund positions" annually.

311.    The renegotiated terms primarily benefitted the Alliance Defendants. The new ratios meant more money for the hedge funds for the same timing capacity. The annual redemption of Calugar's hedge fund positions also benefitted the Alliance Defendants. By Calugar agreeing to redeem and reinvest his hedge fund positions annually, the Alliance Defendants, including ACMC, increased their opportunity to profit from Calugar's hedge fund investments. Each time Calugar redeemed, the Alliance Defendants would be eligible to earn performance fees from any increase in value, without having first to earn back any prior losses.

312.    In or about July 2002, the Alliance Defendants increased Calugar's timing capacity in the Premier Growth Fund from $17 million to $57 million. In or about September 2002, the Alliance Defendants granted Calugar $56 million timing capacity in

the Growth & Income Fund, and Calugar invested in a hedge fund managed by the same portfolio manager.

313.   Despite the impact Calugar's trading had on the Alliance Funds, the Alliance Defendants made substantial efforts to accommodate and retain Calugar's business. Thus, when a portfolio manager complained about Calugar's trading, the Alliance Defendants reduced Calugar's timing capacity in that mutual fund, only to increase his timing capacity in other Alliance Funds. For example, in early 2003, the portfolio manager for the Premier Growth Fund complained about Calugar's trading in his mutual fund. Thereafter, the Alliance Defendants decreased Calugar's timing capacity in the Premier Growth Fund by $20 million and increased his timing in the Growth & Income Fund and the Tech Fund by the same amount. As the head of hedge fund sales explained in an email to Calugar: "In order further to reduce your exchanges in Premier Growth Fund from $70MM to $50MM ... [the Growth & Income Fund portfolio manager] has agreed to increase your exchange limit on Growth & Income from $43MM to $53MM and [the Tech Fund portfolio manager] has agreed to increase your exchange limit on Tech from $100MM to $110MM."

314.   The head of hedge fund sales then forwarded that email to others at Alliance, noting: Calugar "is an important relationship for this organization and extremely cooperative."

315.   Calugar was an "important relationship" because of his investments in Alliance hedge funds. By early 2003, Calugar's investments in the Alliance hedge funds became such a large percentage of the hedge fund assets that the hedge funds could not

survive without Calugar. The head of hedge fund sales noted at the time that Calugar's investments were important to the continued survival of the hedge funds. In a meeting with certain members of Alliance management in or about January 2003, the head of hedge fund sales explained Calugar's investments in the hedge funds and the importance as a percentage of total fund assets:

| Hedge Fund | Calugar Investment | Total Hedge Fund Assets | Percentage |
|---|---|---|---|
| Tech Partners | $37.4MM | $42.5MM | 88% |
| Research Partners | $7.7MM | $15.0MM | 51% |
| Muni NY | $5.0MM | $6.0MM | 83% |
| Muni Nat'l | $10.3MM | $12.7MM | 81% |

316.    In an email in February 2003, the head of hedge fund sales wrote that Calugar "now is almost single-handedly supporting our domestic Tech Hedge, Research and Muni Funds."

317.    In or about February 2003, following discussions regarding Calugar's market timing, members of the Alliance Corporate Defendants' senior management were advised that the linkage between Calugar's timing activity and hedge fund investments was improper. Thereafter, the EVP sent an email to the head of hedge fund sales and others explaining "we have to officially `de-link' the mutual funds activity so as to not in any way suggest that it is conditional on hedge fund participation or vice versa." The head of hedge

fund sales responded: "Agreed." In fact, Calugar's timing of Alliance mutual funds and his investment in Alliance hedge funds continued.

318.   In the summer of 2002, the Tech Fund portfolio manager sought to trade futures in order to increase liquidity to accommodate the Alliance Defendants' approved timers. At that time, the portfolio manager explained that, among other things, futures trading would provide a more liquid vehicle for dealing with what are highly volatile fund flows from market timers. At the same time, the portfolio manager reduced Calugar's market timing capacity in the Tech Fund to $50 million until the Tech Fund board approved the futures trading.

319.   Alliance Management did not act on the futures trading at that point. In or about December 2002, the Alliance Defendants increased Calugar's timing capacity in the Tech Fund to $100 million "subject to satisfaction of the usual agreed conditions."

320.   The issue of using futures trading to accommodate market timers in the Tech Fund arose again in early 2003 after a meeting of certain members of the Alliance Defendants' senior management concerning the arrangement with Calugar. In an email, the head of hedge fund sales notified Calugar that Alliance would seek approval to permit futures trading in the Tech Fund and that this would "better accommodate increasing your Tech Fund exchanges in the future."

321.   Permitting futures trading required approval of both the Tech Fund board and the shareholders. An initial draft of the memorandum to the board recommended approval because, among other things, "the Fund's investment strategies may be affected by cash

flows due to substantial purchases or redemptions of the Fund's shares resulting from, among other things, market timers because it may be unable to sell or purchase ... thinly traded securities on a timely basis."

322.    Neither the Tech Fund board nor its shareholders were advised that the request for approval of futures trading was related to the Alliance Defendants' accommodation of market timing in the Tech Fund. The final version of the memorandum to the board omitted the reference to market timing and instead referred to the benefit of futures because "the fund frequently experiences significant cash flow changes." Nevertheless, given the board approved policy allowing select dealers to complete trades after 5:00 p.m. Eastern Time and the turnover in advisor class shares of the Tech Fund, the board either knew or were reckless in not knowing that the liquidity issues were caused by timed trading.

323.    Based upon this incomplete and inaccurate information,  at its Regular Meeting on February 11, 2003, the Board of Directors of the Tech Fund considered and approved Alliance's recommendation that the Fund's fundamental investment restriction prohibiting investments in commodities or commodity contracts be amended to permit the Fund to invest in financial futures contracts and options on such futures contracts and to remove restrictions on (I) investments in illiquid securities; (ii) short sales of securities, maintaining short positions and writing put options; (iii) investments in unseasoned issuers; (iv) the purchase of securities of other investment companies or investment trusts; (v) the purchase or retention of securities of any company, if officers and directors of the Fund and employees of the Fund's investment adviser who each own beneficially more than one-half

84

of 1% of the outstanding securities of the company together own more than 5% of the securities of the company; and (vi) the Fund's participation on a joint or joint and several basis in any securities trading account.

324.   The foregoing modifications to the fundamental investment policies of the Tech Fund were made to provide liquidity necessitated by the timed and late trading.  To obtain the approval for this fundamental change, Alliance Management represented to the Trustees and shareholders that: "the use of financial futures contracts and options thereon has become more prevalent in the marketplace, the Fund's inability to use these instruments may unduly impede its investment latitude.  According to Alliance, elimination of this restriction will enable the Fund to manage cash flows even more efficiently and to respond more quickly to volatile market conditions."  This matter was further submitted to the shareholders for their approval at a shareholders' meeting held on April 22, 2003, without disclosing to the shareholders the true reason for this fundamental change in the investment policies of the Tech Fund.

325.   The Tech Fund board voted to recommend to the shareholders the amendment to permit futures trading. As set forth above, the Tech Fund filed with the Commission a proxy statement that recommended approval of the amendment, in relevant part, because trading futures would "enable the fund to manage cash flows even more efficiently...." The proxy statement did not disclose the fact that one of the reasons for removing the restriction of futures trading was to accommodate Alliance-approved timers in the Tech Fund. The Tech Fund shareholders approved the amendment.

85

326.   In July 2003, at a meeting of the Tech Fund board of directors, the portfolio manager gave a presentation on performance of the Tech Fund. In a chart titled, "Impact From Market Timers," the portfolio manager stated his belief that, the performance of the Tech Fund was diminished by 1.4 percent during the first six months of 2003 due to market timers. Despite being informed of the scope and effects of timed trading on the Tech Fund, the Trustees failed to take any action and failed to disclose the existence of this timed trading to members of other Alliance Funds' boards on which they served.

327.   In contrast to the harmful effects on the Technology Fund, Calugar benefitted from the relationship. From 2001 to 2003, Calugar generated approximately $64 million in profits from timing Alliance mutual funds, including the Tech Fund. During the same period, the net asset value ("NAV") of the Tech Fund declined substantially.

### b.   BOA

328.   Defendant BOA's Private Banking Group, as part of the package of late-trading and timing services BOA and BAS agreed to provide to Canary, financed Canary's late trading and market timing in the Funds. BOA also provided financing for Canary's "swap" transactions, which were arranged through BOA's "swaps desk."

329.   Canary created a limited liability company, "Cockatiel," which had four subsidiaries, and opened accounts at BOA under their names to effectuate the timing and short selling transactions funded by BOA.

86

330.    On July 26, 2001, BOA and Canary executed a "Credit Agreement," which gave Canary a revolving credit facility of $70 million.  Canary used a portion of this financing to time the Funds.

331.    In an August 21, 2001 e-mail from Ted Siphol to Rob Gordon of BOA's credit department, Siphol provides an "update" on the financing for Canary timing transactions including "[c]los[ing] a $75MM credit facility [for Canary] with Frank Drury and the Private Bank," "[d]raw[ing] down $20MM on the credit facility" and "[i]ntroduc[ing] an additional clearing relationship (currently in the final credit approval stages) that they [Canary] will use to draw down the loan facility and commit to pre-negotiated space in an additional fund family — potentially as large as the Alliance trades."

332.    In an October 26, 2001 e-mail from Andrew Goodwin of Canary to Ian Reisner of BOA, Goodwin, discussing certain swap transactions between Canary and BOA, writes that "[h]opefully, Noah [Lerner of Canary], can work with Frank Drury [BOA Private Banking] to get an ISDA [swap agreement] executed and discuss the need for additional capital to support a line for me to trade these products with Cockatiel [Canary]."

333.    On February 21, 2002, BOA and Canary amended the Credit Agreement to increase Canary's revolving credit facility to $75 million.

334.    A BOA document dated June 13, 2002, entitled "Cockatiel Capital Associates, LLC et al, CAR Comments" states that a loan agreement between Canary and BOA "renew[s] for an additional year the existing $125MM revolving line of credit" extended by BOA to Canary for the purpose of "invest[ing] in open-ended mutual funds and if

availability allows, cover interest payments." A second loan facility, "to renew the existing equity derivative facility," would "remain unchanged at $166.7MM."

335. BOA charged Canary LIBOR + 150 bps interest for providing 2:1 leverage on straight late trading and timing transactions. Swap transactions required higher leverage, sometimes as high as 6:1. With swap transactions, BOA generally was the account holder, with a security interest in the assets of the account, which, until the closing of the swap transaction, would consist of Canary's mutual fund shares. BOA would lend Canary funds and, at the appropriate time, Canary would use the funds to execute the swap transaction, and deposit the proceeds in BOA's account. Canary would pay BOA a set commission for the necessary purchases and sales, and BOA would return to Canary the profit on the transaction minus a 2% fee for providing the financing.

336. Canary's timing assets in the Funds were used as collateral for the BOA financings. The proposed loan facility of June 13, 2002 notes that "[r]epresentatives from BAS and Nationsfunds have confirmed that our [BOA] collateral can be liquidated in one day. Since the loan's inception, full positions in various mutual fund investments have been liquidated in one day *with the largest being $28MM in the Alliance Mid-Cap Growth Fund* and $24MM in the Invesco Cash Reserves Fund." *Id.*

337. BOA's financing of Canary's wrongful late trading and timing not only dramatically increased Canary's ability to late trade and time the Funds, and thereby caused greater harm to the Funds, but resulted in handsome profits for BOA for its known wrongful conduct.

### c.     **Smith Barney**

338.     In or around March 2002, Neal Kelly ("Kelly"), a Smith Barney broker located in New York, offered Canary, a $5 million "under the radar" timing capacity in certain Alliance fund(s). Canary accepted Kelly's offer.

339.     Canary timed the Alliance funds(s) offered by Kelly, through a Smith Barney account, from March of 2002 until Canary was served with the subpoena from the New York Attorney General ("NYAG") in July of 2003.

340.     Kelly charged Canary a wrap fee for providing this timing capacity, which Canary paid.

341.     In or around March of 2002, Matt Curley, a Smith Barney broker located in Chicago, offered Canary $3 million negotiated timing capacity in the Alliance Mid-Cap Growth Fund held in an ING annuity. Canary accepted the offer.

342.     Canary timed the Alliance Mid-Cap Growth Fund in the ING annuity from July 2002 until April 2003.

343.     In an earlier email dated May 5, 2001, Andrew Goodwin of Canary relayed to Stern timing offers made by Neal Kelly in unnamed Alliance funds:

> Neil says that the offshore fund families are begging for money and don't care about timing. He thinks we can do 2-3- million per name at scudder and alliance and don't need to put any money down. I told him to work the phones to get us large international tickets in return for bond money.

344.     Curley charged Canary a wrap fee for brokering these timing arrangements between Canary and Alliance, which Canary paid.

### d.      **Kaplan**

345.    During 2000, D.J. Santana and Larry Leibowitz, two brokers at Kaplan, offered Canary late trading and timing capacity in an Alliance real estate mutual fund. Canary accepted the offer and entered into a written late trading agreement with Kaplan.

346.    Canary late traded and timed a $1-2 million ticket in the Alliance real estate mutual fund through an account at Kaplan.

347.    Kaplan charged Canary a wrap fee of 1¼% for brokering this timing arrangement, which Canary paid, and which, upon information and belief, was approved by Alliance.

348.    In 2001, Kaplan continued to offer Canary capacity in Alliance funds.  In an email dated February 27, 2001, Noah Lerner and Andrew Goodwin have an exchange regarding Kaplan's capacity in Alliance:

> If I am not mistaken both Kaplan and Empire have offered us
> Alliance Tech in the past.  If so we should try and push them to
> later that 4:15 and possibly do late day cap gap there as well for
> a little.

### e.      **Northeast Securities**

349.    In late 2002, Timothy Manning ("Manning"), a broker at Northeast Securities, offered Canary a $10 million negotiated timing capacity in the Alliance High Yield Fund, which Canary accepted.

350.    In late 2002, Manning also offered Canary $27 million capacity in five other Alliance funds, which Canary accepted.

351.    In early 2003, Canary opened an account at Northeast Securities in the name of Nichols Point, a Canary entity, to carry out the timing in the Alliance bond fund, but subsequently transferred it to Tripod, a Canary entity created to time only high yield bond funds.

352.    Manning of Northeast Securities requested, and Canary paid, wrap fee of 50 bps for arranging this timing.

353.    Northeast Securities set up the timing accounts to clear through Security Trust Company, which permitted late trading until May of 2003, when the accounts were moved to BAS.

354.    In April of 2003, Manning offered Canary an additional $30 million negotiated timing capacity in an Alliance fund, in exchange for $3 million in sticky assets in the Alliance Premier Growth Fund, Inc.  Canary accepted the offer, and timed and late traded the funds until July 2003, when Canary was served with the NYAG subpoena.

**f.**     **Pritchard**

355.     In March of 2002, Joseph John Van Cook ("Van Cook"), a broker at Pritchard, offered Canary $35 million of timing capacity in three Alliance Funds:  AllianceBernstein Mid-Cap Growth A, AllianceBernstein Growth and Income A, and AllianceBernstein Premier Growth A.  The quid pro quo for the timing deal brokered by Van Cook was that Canary invest $3.5 million (10% of the timing capital) in AllianceBernstein Balanced Shares A.

356.     Canary accepted Van Cook's offer on the condition that the timing trades be executed through Canary's BAS box, because BOA was providing the financing for the deal, which involved swap transactions – i.e. netting long positions in the Funds against short positions in the underlying securities.

357.     Canary timed the Funds until it was served with the subpoena from the New York Attorney General in July 2003.

358.     Canary paid Van Cook of Pritchard a wrap fee of 110 bps for securing this timing arrangement with Alliance.

359.     Pritchard offered timing capacity in the Funds to other timers.

361-500 [Intentionally Omitted]

## V. **DEMAND FUTILITY ALLEGATIONS**

501.     The allegations concerning demand futility do not apply to claims asserted by the plaintiffs under Section 36(b) of the ICA, which does not confer a direct right upon the Funds or the Trusts to bring such claims.

502.   Plaintiffs have not made a demand upon the Trustees of the Funds to bring action against the Adviser, the Distributor, the officers of the Funds, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

(a)   No demand is required with respect to plaintiffs' claims under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with compensation and other payments of a material nature to the Adviser Defendants or their affiliates.

(b)   The Trustees are put into office by officers of the Funds or the Adviser, and are not required to stand for election or reelection by shareholders of the Funds except on rare occasions, and thus are not accountable to the shareholders of the Funds.  Rather, the  Trustees effectively serve at the pleasure of the Adviser.  Additionally, the Trustees serve on the boards of virtually all of the Funds of the Fund Family, and are paid for this service with substantial Trustees' fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of the Adviser when the interests of the Adviser may conflict with the interests of the Funds.

(c)   The Trustees have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Fund, yet have failed to investigate or to do anything to recover for damages caused to the Fund by such activities.  Indeed, despite the Trustees' awareness of investigations by state and federal law enforcement authorities, and of the legal actions that have been brought by such authorities, the Trustees have failed

to take any action to investigate and have failed to take any action to recover for the Fund the damages cause to it by such unlawful activity.

(d)     Market timing is a phenomenon that has been common knowledge in the mutual fund industry at least since the 1980s.  As early as 1989, the high-profile mutual fund company Fidelity Investments began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares.  In 1992, a widely-publicized book, entitled *The New Market Wizards,"* focused attention on market timing.

(e)     Since at least as early as November 5, 1997, when an article appeared in THE WALL STREET JOURNAL entitled *"Mutual Funds Fight the 'Market Timers,'"* the unlawful practices complained of have been well-known to persons in the mutual fund industry, including the Trustees of the Funds.  That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual funds, and the types of measures that some mutual funds had taken and were taking in order to discourage or prevent such market timing altogether.

(f)     As stated in an article printed in FORTUNE on April 19, 2004, "Clearly, by 2001 everyone connected with the fund industry had to know how crooked the business had become." *See The Secrets of Eddie Stern*, FORTUNE (April 14, 2004).  The article also noted that after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25 percent allowed late trading.

(g)     Even though the Trustees have (or should have) had knowledge of the

existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual funds and fund shareholders, the Trustees either have failed to take action, despite their knowledge, with respect to such practices in connection with the Funds or they have failed to put in place the proper supervision and control mechanisms that would have brought the existence of such unlawful practices in the Funds to their attention.

(h)     Under Section 15©) of the ICA, 15 U.S.C. § 15©), the Trustees have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.  In this case, the Trustees have and had a duty to obtain all information regarding all arrangements of the Adviser that related to the Adviser's management agreement, including all terms and conditions applicable to the Adviser's performance of its duties.  Any terms, conditions, or arrangements whereby the Adviser facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading are and were, in fact, part of the Adviser's contract.

(i)     Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Adviser's contract, within the meaning of Section 15©) of the Investment Company Act. Consequently, the Trustees either failed to request all of the "reasonably necessary" information they needed to evaluate the Adviser's contract or they knew about or approved such arrangements with respect to the Fund.

(j)     Indeed, given the Trustees' knowledge of the prevalence and

95

commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon the Trustees to take the obvious, prudent measure of implementing some kind of audit system or program that would enable them to discover all aspects and all components of the advisory contract with respect to the Funds.  Had the Trustees done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such funds.  However, the Trustees failed to put any such necessary system or program in place, thus subjecting themselves to a substantial risk of personal liability for breach of their fiduciary duty because of their gross negligence, and rendering themselves incapable of being able to impartially consider a shareholder demand, thereby compromising their independence.

(k)     Each Trustee was also members of the Audit Committee of each of the funds, charged with overseeing and approving the financial reporting of each of the Funds. In this capacity, the Trustees had access to internal documents that revealed the timed trading patterns alleged herein, but took no steps to either monitor or prevent such timed trading.

(l)     The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action. Their duties did not and do not come into play only when "kick-started" by a shareholder demand. The Trustees' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

(m)     On September 3, 2003, the NYAG commenced the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world. Before and after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading.  Since the NYAG Complaint was filed, state and federal regulators have entered into consent enforcement actions with at least six different mutual fund families, representing recoveries of civil penalties and recoveries in excess of $2 billion. The regulators' investigation, the filing of the NYAG Complaint, and the subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Trustee could claim to be ignorant of the market timing and late trading scandal since September 3, 2003.  Despite that, however, the Trustees have failed to take any action against the Adviser, the Distributor, or any persons responsible for causing harm to the Funds by market timing or late trading.

(n)     The purpose of a demand requirement is to bring matters to the attention of the Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees *already are aware* of the matters about which they should take action to recover damages for harm to the Funds caused by market timing and late trading.  Since the Trustees are already aware of the matters requiring their action, and of their duty to act, any demand under these circumstances would be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

(o)     Because the Trustees have failed for a lengthy time period to take action to recover for the Fund the damages it has suffered because of market timing and late trading, doing so at this point would be tantamount, from their perspective, to an admission that earlier action on their part was required but not forthcoming, thereby subjecting themselves to a substantial likelihood of personal liability for breach of their duty of care.

(p)     Given the Trustees' awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Trustees' failure of oversight as outlined above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds. This exposure to a substantial likelihood of personal liability prevents the Trustees from being able to consider a demand impartially, if one had been made.

(q)     The likelihood of personal liability is  pronounced in this case since each of the   Trustees except Carifa served on the Audit Committee of the Funds.  As such each of the Trustees, had easy access to the internal documents that revealed the market timing and late trading that harmed the Funds yet they took no steps to prevent such activity or to recover damages that the Funds suffered on account of such activity.

503.   Demand on the members of the board of the Tech Fund, namely Defendants Carifa, Foulk, Alexander, Guzy and Turner and members of its audit committee, namely Defendants Foulk, Alexander, Guzy and Turner is further excused on the basis that they had

actual knowledge of the timed trading within that fund and took no steps to either stop or remedy the injuries inflicted on the Tech Fund by such timed trading.  As set forth above, in July 2003, at a meeting of the Tech Fund board of directors, the portfolio manager gave a presentation on performance of the Tech Fund. In a chart titled, "Impact From Market Timers," the portfolio manager stated his belief that, the performance of the Tech Fund was diminished by 1.4 percent during the first six months of 2003 due to market timers. Furthermore, Defendants Carifa, Foulk, Alexander, Guzy and Turner failed to disclose the extent of the timed trading permitted by the Alliance Defendants or the ramifications thereof to the board members of other Alliance Funds on which they served.

504.    As set forth above, defendants Carifa, Block, Dievler, Dobkin, Foulk, Michel and Robinson served together as members of the Board for at least 38 of the investment companies in the Alliance Funds.  Demand on these Trustees was futile for the following reasons:

505.    The majority of members of the Boards consisting of Carifa, Block, Dievler, Dobkin, Foulk, Michel and Robinson were not disinterested Trustees due to long standing business ties and relationships with ACMC and/or its parent and affiliated corporations, rendering them incapable of making independent business decisions on behalf of the respective funds:

(a)    Carifa was admittedly an interested party and affiliated with Alliance as Alliance Capital's president;

(b)    Block  was formerly an Executive Vice President and the Chief

99

Insurance Officer of Equitable Life Assurance Society of the United States ("Equitable"). At relevant times ACMC, the sole general partner of Alliance, was a wholly owned subsidiary of Equitable.  Equitable was also the beneficial owner of an approximately 55.4% partnership interest in Alliance.  At all relevant times, Equitable was a wholly owned subsidiary of AXA Financial, Inc. ("AXA Financial"), a Delaware corporation whose shares are traded on the New York Stock Exchange.[9]  Block was also formerly a director of Donaldson Lufkin & Jenrette Securities Corporation, which at relevant times was another wholly owned subsidiary of AXA Financial;

(c)     Dievler was formerly a Senior Vice President of Alliance Capital until December 1994, responsible for mutual fund administration.  While serving in that capacity, he served as Chairman and President of each of the Alliance Funds and was an interested person as defined by the Investment Company Act of 1940;

(d)     Likewise, Dobkin was a Director and Chairman of the Audit Committee of Alliance Capital from 1988 through 1992; and

(e)     For serving on the board of a substantial number of Alliance Funds, Defendants Block, Dievler, Dobkin, Foulk, Michel and Robinson received hundreds of thousands of dollars:

506.    For those Investment Companies that are organized under Massachusetts law,

---

[9]  At March 31, 2003, AXA Financial was the beneficial owner of approximately 1.9% of the outstanding Alliance Holding Units and approximately 54.7% of the outstanding Alliance Units which, including the general partnership interests in Alliance and Alliance Holding, represent an economic interest of approximately 55.7% in Alliance.

demand on the shareholders is excused because it would be unduly burdensome.

507-600.. [Intentionally Omitted]

## COUNT I

## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT

## (Against The Alliance Corporate Defendants)

601.    Plaintiffs incorporate by reference the preceding paragraphs, except for paragraph 502.

602.    The Alliance Fund Complex consists of registered investment companies within the meaning of Section 2 of the ICA.

603.    Alliance Management, Alliance Holding and ACMC are each  an investment adviser for the Funds as that term is defined in Section 2 of the ICA.

604.    ABIRM is an affiliate of the Adviser Defendants for purposes of Section 36(b) of the ICA.

605.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

606.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to

its receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person. Those fiduciary duties include, but are not limited to, the duty of the Adviser to seek approval of any advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

607. Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

608. Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the Adviser's compensation. Information concerning conflicts of interest, the nature and extent of market timing and late trading in the Funds, the nature and extent of capacity arrangements for market timing and late trading in the Funds, and the Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in the Funds, are particularly important to the Funds and to their independent trustees.

609. After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that, for any of the Funds, the Adviser Defendants and their affiliates

did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under advisory and/or other agreements, including in particular the Adviser Defendants' permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

610.  Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

611.  After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that, for any of the Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

612.  Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

613.  The Alliance Corporate Defendants breached their fiduciary duty to the Funds

103

by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, market timing and late trading, all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

614.   By agreeing and/or conspiring with the market timers to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, market timing and late trading, the Alliance Corporate Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

615.   As alleged herein, the Adviser and its affiliates breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

616.   By virtue of the foregoing, the Adviser and its affiliates have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

617.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

618.   The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## **COUNT II**

## VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT

### (Against The Alliance Defendants, the Trustee Defendants
### and the Parent Defendant)

619.    Plaintiffs incorporate by reference the preceding paragraphs.

620.    The Alliance Fund Complex consists of registered investment companies, as defined by Section 2 of the ICA.

621.    The Adviser Defendants are investment advisers under Section 36(a) as that term is defined in Section 2 of the ICA.

622.    The Distributor Defendants  act as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

623.    The Trustee Defendants are directors under Section 36(a) as that term is defined in Section 2 of the ICA.

624.    Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendants, the Distributor Defendants, and the Trustee Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty of the advisers to seek approval of any advisory agreement will full disclosure of information material to the board's decision regarding their compensation and the duty of the trustees to request and evaluate such information as may reasonably be necessary to evaluate advisory agreements.

625.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund

"such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

626.    After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendants did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

627.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

628.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

629.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment

advisory or distribution agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party." Pursuant to that provision, any such agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

630.    Each of the Adviser Defendants, the Distributor Defendants, and the Trustee Defendants breached his, her, or its fiduciary duty to the Funds by the other acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

631.    By agreeing and/or conspiring with the Additional Defendants to permit and/or encourage them to time the Funds, the Adviser Defendants and the Distributor Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

632.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

633.    The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT III

## VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT

### (Against the Alliance Corporate Defendants)

634.    Plaintiffs incorporate by reference the preceding paragraphs.

635.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-4(b), any contract made in violation, or the performance of which results in a violation, of the ICA is declared unenforceable.

636.    For the reasons alleged herein, the agreements between or among the Adviser, the Distributor, and the Funds and the 12b-1 Plans were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

637.    Under Section 47(b) of the ICA, 15 U.S.C. § 80a-4(b), the advisory agreements and the 12b-1 Plans may be voided and the Adviser Defendants and the Distributor Defendants are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

638.    The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT IV

## VIOLATION OF SECTIONS 206 AND 215 OF
## THE INVESTMENT ADVISERS ACT

### (Against The Adviser Defendant and the Distributor Defendants)

639.    Plaintiffs incorporate by reference the preceding paragraphs.

108

640.    The Adviser Defendants and the Distributor Defendants are investment advisers within the meaning of the IAA.

641.    The Funds are clients of the Adviser Defendants and the Distributor Defendants within the meaning of Section 206 of the IAA.

642.    Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

643.    The Adviser Defendants and the Distributor Defendants have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendants facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading for their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

644.    Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment

109

adviser agreement made or approved in violation of any provision of the IAA, including the investment adviser agreements between the Adviser Defendants or the Distributor Defendants and the Funds and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

645.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

646.    The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT V

### CONTROL PERSON LIABILITY UNDER SECTION 48 OF THE INVESTMENT COMPANY ACT

### (Against The Adviser Defendant, The Distributor Defendants And The Trustee Defendants)

647.    Plaintiffs incorporate by reference the preceding paragraphs.

648.    Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

649.    The Parent Defendant, directly or indirectly, caused the Alliance Defendants to engage in the unlawful conduct alleged herein.

650.    Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Parent Defendant is liable for causing, directly or indirectly, the Adviser Defendants and the Distributor Defendants to engage in the unlawful conduct alleged herein.

651.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VI

## COMMON LAW BREACH OF FIDUCIARY DUTY

### (Against The Alliance Corporate Defendants And The Trustee Defendants)

652.    Plaintiffs incorporate by reference the preceding paragraphs.

653.    The Alliance Corporate Defendants and the Trustee Defendants (the "Fiduciary Defendants"), and each of them, owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, said defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

654.    To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls,

and financial and corporate affairs of the Funds.

655.    As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the timing and late trading schemes and other manipulative devices as alleged in this Complaint.

656.    As alleged above, the Fiduciary Defendants also breached their fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the market timing and late trading scheme.

657.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

658.    The Fiduciary Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT VII

### BREACH OF CONTRACT

### (Against The Adviser Defendants)

659.    Plaintiffs incorporate by reference the preceding paragraphs.

660.    The Funds have entered into Advisory Agreements with the Adviser

112

Defendant, which are renewed annually.

661.   The Funds have fully performed their obligations under those agreements.

662.   These Advisory Agreements required the Adviser to comply with the requirements of the ICA and all rules and regulations of the SEC promulgated thereunder.

663.   These Advisory Agreements also required the Adviser to comply with all the rules,  regulations and policies of the Funds, as set forth in the prospectuses, the SAIs and otherwise.

664.   As a direct and proximate result of the wrongful conduct alleged above, the Adviser has breached these Advisory Agreements.  The Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead weight, Dilution and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which the Advisor Defendant is liable.

## COUNT VIII

## BREACH OF CONTRACT

## (Against Defendant BAS)

665.   Plaintiffs incorporate by reference the preceding paragraphs.

666.   Upon information and belief, throughout the relevant period, BAS and Alliance Management and Alliance Holding were parties to written or oral sales agreements governing BAS's duties as broker-dealer in selling and processing trades of Fund shares (the "Dealer Agreements").

667.   The Funds, for whose benefit the Adviser entered into the Dealer Agreements,

113

are intended third-party beneficiaries of the Dealer Agreements.

668.    There is implied in all agreements an obligation of good faith and fair dealing pursuant to which neither party make take any action that will deliberately frustrate the other party's purpose in entering into the contract.

669.    Upon information and belief, under the Dealer Agreements, information and belief, in the Dealer Agreements, BAS expressly agreed to clear mutual fund orders through the NSCC's Fund/SERV system and to transmit orders that are received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a certain time the next business day ("Day 2"). Under the Dealer Agreements, BAS and the Adviser Defendants agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades at the Day 2 NAV.

670.    BAS had an express or implied obligation to comply with the federal securities laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the forward pricing rule.

671.    In breach of the express or implied terms of the Sales Agreements, and in violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers and timers, including defendants Aurum, Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1 NAV), in violation of the forward pricing rule, and permitted the funds in the Alliance family of funds to be late traded and timed to the detriment of the funds.

114

672.     Accordingly, BAS has breached its Dealer Agreements with the Adviser.

673.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT IX

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against The Additional Defendants)

674.     Plaintiffs incorporate by reference the preceding paragraphs.

675.     The Additional Defendants knew of the existence and extent of the fiduciary duties owed by the Fiduciary Defendants to the Funds.  The Timer Defendants and the Additional Defendants knew that market timing and late trading the Funds were manipulative devices and knew that these acts were a breach of the fiduciary duties owed to the Funds by the Fiduciary Defendants.

676.     The Additional Defendants maliciously, without justification and through unlawful means, aided and abetted and conspired with the Fiduciary Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

677.     The Additional Defendants are jointly and severally liable with the Fiduciary Defendants to the Funds for damages proximately caused by their aiding and abetting as

alleged herein

678.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT X

## UNJUST ENRICHMENT

## (Against All Defendants Except the Trustee Defendants)

679.    Plaintiffs incorporate by reference the preceding paragraphs.

680.    Defendants received a benefit in the profits it earned as a result of its unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

681.    Justice and equity require that  Defendants not be allowed to retain those profits.

682.    Justice and equity require that Defendants unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

683.    The Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT XI

## COMMON LAW INTERFERENCE WITH CONTRACT

## (Against Additional Defendants)

684.    Plaintiffs incorporate by reference the preceding paragraphs.

685.    The Adviser and the Funds are parties to the Investment Advisory Agreement

686.    The Advisers breached the Investment Advisory Agreement in the manner and by the actions described in this Complaint.

687.    The Additional Defendants knew of the existence of the Investment Advisory Agreement between the Adviser and the Funds and knew its terms.

688.    The Additional Defendants knowingly and intentionally induced the Adviser to breach that contract and interfered with the Adviser's present and future performance of the Investment Advisory Agreement by its acts of wrongdoing as described in this Complaint, intending to and proximately causing the described breaches of the Investment Advisory Agreement.

689.    The Additional Defendants carried out this wrongful conduct with knowledge that this conduct would interfere with the Investment Advisory Agreements and cause such breaches of the Investment Advisory Contract and did in fact cause breaches of such contract.

690.    The actions of the Additional Defendants were improper and without justification or privilege.

691.    As a direct and proximate result of the Additional Defendants' wrongful

117

conduct, Additional Defendants are jointly and severally liable to the Funds with the Adviser for injuries and damages the Funds have suffered and which they will continue to suffer and are liable for actual and punitive damages.

## COUNT XII

## CIVIL CONSPIRACY

### (Against All Defendants Except Trustee Defendants)

692.    Plaintiffs incorporate by reference  the preceding paragraphs.

693.    The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

694.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

695.    The Trustee Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their office.

696.    The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to the Funds for which they are jointly and severally liable.

697.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which

defendants are liable.

698.    The Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.    Removing the Adviser Defendants and the Distributor Defendants;

C.    Rescinding the management and other contracts for the Funds with the Advisor, Distributor and other Defendants;

D.    Rescinding the 12b-1 Plans adopted by the Funds;

E.    Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser and all profits earned on unlawful trading and all management and other fees earned during the period of such trading;

F.    Awarding monetary damages against all of the Defendants, individually, jointly, or severally, in favor of the Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon;

G.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  September 29, 2004

POMERANTZ, HAUDEK, BLOCK,
   GROSSMAN & GROSS, LLP

BY:  /s/_____
   Stanley M. Grossman
   H. Adam Prussin
   Jeremy A. Lieberman
100 Park Avenue
New York, NY  10017
(212) 661-1100

WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
   Daniel W. Krasner
   Mark C. Rifkin
   Demet Basar
   Christopher S. Hinton
   Robert Abrams
270 Madison Avenue
New York, NY  10016
(212) 545-4600

CHIMICLES & TIKELLIS, LLP
   Nicholas E. Chimicles
   Michael D. Gottsch
   Denise Davis Schwartzman
   Timothy N. Mathews
100 Haverford Centre
Haverford, PA  19085
(610) 642-8500

120

*Fund Derivative Executive Committee*

CHITWOOD & HARLEY
    Edward Nicholson
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 873-3900

FARUQI & FARUQI, LLP
    David Leventhal
    Dannis Dollar
320 East 39th Street
New York, NY 10016
(212) 983-9330

*Alliance Fund Derivative Committee*

# APPENDIX: List of Alliance Funds

## Alliance Bernstein Mutual Funds

Alliance Bernstein All-Asia Investment Fund
Alliance Bernstein Americas Government Income Trust
Alliance Bernstein Balanced Shares
Alliance Bernstein Balanced Wealth Strategy
Alliance Bernstein Blended Style Funds/ U.S. Large Cap Portfolio
Alliance Bernstein Blended Style Funds Intermediate Portfolio
Alliance Bernstein Blended Style Funds Tax Managed Intermediate Portfolio
Alliance Bernstein Bond Fund Corporate Bond Portfolio
Alliance Bernstein Bond Quality Bond Portfolio
Alliance Bernstein Bond U.S Government Portfolio
Alliance Bernstein Capital Reserves
Alliance Bernstein Disciplined Value Fund
Alliance Bernstein Emerging Market Debt Fund
Alliance Bernstein Exchange Reserves
Alliance Bernstein Global Research Growth Fund
Alliance Bernstein Global Small Cap Fund
Alliance Bernstein Global Strategic Income Trust
Alliance Bernstein Global Value Fund
Alliance Bernstein Government Reserves
Alliance Bernstein Greater China "97 Fund
Alliance Bernstein Growth & Income Fund
Alliance Bernstein Growth Fund
Alliance Bernstein Healthcare Fund
Alliance Bernstein High Yield Fund
Alliance Bernstein Institutional Resrvs. CA Tax-Free Port
Alliance Bernstein Institutional Resrvs. Government Port
Alliance Bernstein Institutional Resrvs. NY Tax-Free Port
Alliance Bernstein Institutional Resrvs. Prime Port
Alliance Bernstein Institutional Resrvs. Tax-Free Port
Alliance Bernstein Institutional Resrvs. Treasury Port
Alliance Bernstein Intermediate California Muni Portfolio
Alliance Bernstein Intermediate Diversified Muni Portfolio
Alliance Bernstein Intermediate New York Muni Portfolio
Alliance Bernstein International Premier Growth Fund
Alliance Bernstein International Value Fund
Alliance Bernstein Mid-Cap Growth Fund
Alliance Bernstein Money Reserves

Alliance Bernstein Multi-Market Strategy Trust
Alliance Bernstein Muni Market Strategy Trust
Alliance Bernstein Muni Income Fund Arizona Portfolio
Alliance Bernstein Muni Income Fund California Portfolio
Alliance Bernstein Muni Income Fund Florida Portfolio
Alliance Bernstein Muni Income Fund Insured California Portfolio
Alliance Bernstein Muni Income Fund Insured National Portfolio
Alliance Bernstein Muni Income Fund Massachusetts Portfolio
Alliance Bernstein Muni Income Fund Michigan Portfolio


Alliance Bernstein Muni Income Fund Minnesota Portfolio
Alliance Bernstein Muni Income Fund National Portfolio
Alliance Bernstein Muni Income Fund New Jersey Portfolio
Alliance Bernstein Muni Income Fund New York Portfolio
Alliance Bernstein Muni Income Fund Ohio Portfolio
Alliance Bernstein Muni Income Fund Pennsylvania Portfolio
Alliance Bernstein Muni Income Fund Virginia Portfolio
Alliance Bernstein Municipal Trust California Portfolio
Alliance Bernstein Municipal Trust Connecticut Portfolio
Alliance Bernstein Municipal Trust Florida Portfolio
Alliance Bernstein Municipal Trust General Portfolio
Alliance Bernstein Municipal Trust Massachusetts Portfolio
Alliance Bernstein Municipal Trust New Jersey Portfolio
Alliance Bernstein Municipal Trust New York Portfolio
Alliance Bernstein Municipal Trust Ohio Portfolio
Alliance Bernstein Municipal Trust Pennsylvania Portfolio
Alliance Bernstein Municipal Trust Virginia Portfolio
Alliance Bernstein New Europe Fund
Alliance Bernstein Premier Growth Fund
Alliance Bernstein Real Estate Investment Fund
Alliance Bernstein Select Investor Series Biotechnology Port
Alliance Bernstein Select Investor Series Premier Port
Alliance Bernstein Select Investor Series Technology Port
Alliance Bernstein Short Duration
Alliance Bernstein Small Cap Growth Fund
Alliance Bernstein Small Cap Value Fund
Alliance Bernstein Tax-Managed Balanced Wealth Fund
Alliance Bernstein Tax-Managed Wealth Appreciation Strategy
Alliance Bernstein Tax-Managed Wealth Preservation Strategy
Alliance Bernstein Technology Fund

Alliance Bernstein Treasury Fund
Alliance Bernstein Treasury Reserves
Alliance Bernstein Utility Income Fund
Alliance Bernstein Value Fund
Alliance Bernstein Wealth Appreciation Strategy
Alliance Bernstein Wealth Preservation Strategy
Alliance Bernstein Worldwide Privatization Strategy