# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION** | : | |
| | : | |
| | : | |
| **ALLIANCE, FRANKLIN/TEMPLETON BANK OF AMERICA/NATIONS FUND, AND PILGRIM BAXTER** | : | **Civ. No.  04-md-15862** |
| | : | |
| | : | **The Honorable Andre M. Davis** |
| | : | |
| **(ALLIANCE)** | : | |
| | : | |
| | : | |

| | | |
|---|---|---|
| **LOGUE v. CALVERT, ET AL.** | : | **Civ. No. 04-md-00859** |
| | : | |
| | : | |

## VERIFIED AMENDED DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY AND FOR
## CONTRIBUTION UNDER THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 3

PARTIES ............................................................................................................................ 4

Plaintiff ............................................................................................................................... 4

Defendants ......................................................................................................................... 4

     (a)     Nominal Defendant Alliance Holding .................................................. 4

     (b)     Defendant Alliance Capital -- the Mutual Fund Management Entity ................... 5

     (c)     Defendant ACMC -- The Managing General Partner ........................................... 7

     (d)     The ACMC Director Defendants .......................................................... 8

     (e)     The Alliance Capital Individual Defendants ........................................ 14

     (f)     The Controlling Shareholder Defendants ............................................ 15

     (g)     The Calugar Defendant(s) .................................................................... 17

FIDUCIARY DEFENDANTS' DUTIES TO
ALLIANCE HOLDING AND ITS UNITHOLDERS ................................................. 17

The Fundamental Duties of the Fiduciary Defendants ................................................ 17

Special Knowledge, Skill and Expertise of the Director Defendants .......................... 22

KNOWLEDGE OF GENERAL STANDARDS
OF INTERNAL CONTROL AND CORPORATE COMPLIANCE ........................... 22

Sentencing Guidelines ................................................................................................... 23

COSO Framework ......................................................................................................... 24

Caremark ....................................................................................................................... 28

i

Sarbanes-Oxley ................................................................................ 29

Revisions to Sentencing Guidelines ................................................... 30

Revised Principles of Federal Prosecution ......................................... 31

Knowledge Of Internal Control And Compliance Standards
Specifically Affecting Investment Companies And Investment Advisers ................................... 32

MARKET TIMING HAS LONG BEEN RECOGNIZED
WITHIN THE INDUSTRY AS A MAJOR PROBLEM ........................................... 35

Net Asset Value Arbitrage .................................................................. 37

Arbitrage Activities Cost Long-Term
Mutual Fund Investors  Billions of Dollars ......................................... 39

Investment Adviser Companies Face
A Clear, Inherent Conflict of Interest ................................................. 39

Arbitrage Dilution of Mutual Funds Has A Long History ........................................ 41

The 1981 Putnam No-Action Letter ................................................... 42

The Industry's Heightened Awareness Of And
Regulatory Emphasis On Front-Running And
Other Improper Trading Practices By In-House Personnel ......................................... 43

The October 1997 Asian Market Crash And Resultant Outcry .................................. 45

Continued Regulatory And Industry Action
Regarding Mutual Fund Arbitrage Abuses ........................................ 49

    (a)    The December 1999 SEC Letter To The ICI ..................................... 49

    (b)    The April 2001 SEC Letter To The ICI ........................................... 50

The Increase In NAV Arbitrage Abuses In The
Late 1990's And Early 2000's Was Actively
Tracked  And Well-Documented In Academic Articles .......................... 51

The Mutual Fund Industry Has Been Slow To React,
And Has Implemented Policies And Procedures
Designed To Permit Selective Arbitrage Activity ........................................................ 54

CERTAIN ARBITRAGEURS OPERATED
WITH IMPUNITY AT ALLIANCE ................................................................ 56

The Truth Behind Alliance's Market Timing Supervisor ........................................... 59

Alliance's Market Timing Arrangement With Canary ............................................... 60

Alliance Capital's Long Market Timing History with Calugar .................................. 62

Alliance Capital Enters Into Similar Timing
Arrangements with Other Brokers ................................................................ 72

Alliance Capital Even Permitted Its Own
Hedge Funds To Time Its Mutual Funds ..................................................... 73

Routine Fund Reporting Data from Alliance
Mutual Funds Revealed Stark and Unambiguous
Evidence of Widespread Market Timing ....................................................... 74

The Truth About Alliance's Market
Timing Arrangements Is Revealed .............................................................. 76

Alliance Was Well Aware Of The Risks And Problems
Inherent In Market Timing, And Had The Ability
To Monitor And Stop It ............................................................................ 78

THE DIRECTOR DEFENDANTS
BREACHED THEIR FIDUCIARY DUTIES ............................................. 79

DAMAGES SUSTAINED BY ALLIANCE ............................................... 87

DEMAND FUTILITY .............................................................................. 89

COUNT I - Derivative Claim Against ACMC
for Breach of Fiduciary Duty ................................................................... 103

COUNT II - Derivative Claim Against The Director Defendants
for Breach of Fiduciary Duty ................................................................... 105

COUNT III - Derivative Claim Against Equitable
for Breach of Fiduciary Duty ................................................................................... 106

COUNT IV - Derivative Claim Against AXA Financial
for Breach of Fiduciary Duty ................................................................................... 108

COUNT V - Derivative Claim Against AXA
for Breach of Fiduciary Duty ................................................................................... 109

COUNT VI - (Against Alliance Capital for Aiding and
Abetting Breach of Fiduciary Duty) ....................................................................... 110

COUNT VII - (Against the Director Defendants for Aiding and Abetting
Breach of Fiduciary Duty by ACMC) ..................................................................... 112

COUNT VIII - (Against Defendant Daniel Calugar for Aiding and
Abetting Breach of fiduciary Duty) ........................................................................ 113

COUNT IX - (For Contribution Under Rule 10b-5 Against
Alliance Capital Management L. P., Alliance Capital Management
Corporation, AXA Financial, Inc., AXA SA, ACMC, Equitable,
Gerald Malone,Charles Scaffran, Michael Laughlin, John Carifa,
Daniel Calugar, Securities Brokerage, Inc. and John Does 1-100) ........................... 115

JURY DEMAND .................................................................................................... 121

Plaintiff, by her undersigned attorneys, on personal knowledge as to herself and her acts and on information and belief as to all other matters, based upon an investigation by plaintiff's counsel, alleges as follows:

## INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of Alliance Capital Management Holding ("Alliance Holding") for damages caused to Alliance Holding by the Individual Defendants' breaches of fiduciary duties owed to Alliance Holding and its unitholders.

2.      On September 3, 2003, New York Attorney General Eliot Spitzer announced the settlement of a state civil enforcement action against hedge fund Canary Capital Partners, LLC, its principal Edward J. Stern, and related entities (collectively "Canary") (the "Canary Settlement"). Canary agreed to pay $40 million to settle charges that it had violated New York's anti-fraud statutes by entering into arrangements with numerous mutual fund management companies ("investment adviser companies") granting it special privileges to engage in short-term trading practices that effectively siphoned profits from these mutual funds at the clear expense of long-term investors, who constitute the backbone of the multi-trillion dollar mutual fund industry. The Canary Settlement made clear that the motivation for these investment adviser companies to permit such improper and illegal conduct was simple -- greed -- a the quid pro quo for allowing such short-term trading practices were certain reciprocal practices that resulted in substantially increasing the revenue, profits and fees to the investment adviser companies.

3.      The Canary Settlement revealed that mutual fund management companies entered into long-term and comprehensive arrangements with Canary allowing it to market time specified funds under their stewardship in exchange for Canary's agreement to separately invest or "park"

1

substantial amounts in other investment vehicles managed by the fund adviser, generating millions of dollars in fees to them based on the level of assets under management.

4.      The SEC, in its settlement agreement with Alliance Capital Management, LP ("Alliance Capital"), entered on or about January 15, 2004 (the "SEC Settlement") detailed two ways that the market timing transactions Alliance Capital authorized and implemented improperly benefitted itself and the other Fiduciary Defendants, in breach of its fiduciary duties and to the detriment of investors:

> The fee structure through which Alliance Capital earned management fees meant that Alliance Capital earned fees from the timing relationships at the expense of long-term shareholders. First, Alliance Capital earned fees from management of mutual funds based on a percentage of assets under management, generally up to one percent. Thus, to the extent timers increased assets under management, Alliance Capital earned greater fees.

> Second, Alliance Capital also sponsored and managed hedge funds. In some cases a single portfolio manager managed both a mutual fund and a hedge fund. The hedge funds are a potentially lucrative source of income, both to Alliance Capital and the portfolio managers. In addition to receiving a fee based on a percentage, generally one percent, of assets under management, Alliance Capital and the portfolio managers also receive a performance fee based on a percentage, generally 20 percent, of net return on investment.

> Alliance Capital permitted certain of its mutual funds to be timed by agreement with certain timers, and with brokers acting on behalf of timers. In return for this "timing capacity," Alliance Capital solicited, at various times and in varying proportions, timers to make long-term investments, so-called "sticky assets," in hedge funds, mutual funds, and other investment products managed by Alliance Capital. In particular, with respect to certain timers, Alliance Capital permitted timing in certain mutual funds in return for sticky asset investments in hedge funds managed by the same portfolio managers. Thus, Alliance Capital used timing capacity in its mutual funds to obtain investments in its hedge fund products.

5.      In fact, as detailed herein, the conduct identified in the Spitzer complaint was only part of a comprehensive, long-standing market timing system, involving multiple segments of the U.S. financial industry, brokerages, investment banks, lending institutions, clearing houses and

multiple mutual funds, including Alliance, to support and facilitate trading activity the entire industry was on notice was improper and harmful to long-term mutual fund investors.

6.     As alleged in detail below, the boards of directors of the investment advisers were subject to specific fiduciary obligations requiring their active intercession in assuring implementation and adherence to policies and procedures designed to detect and eliminate activity constituting a known risk to the Company.  Their personnel, some of whom have also been named as defendants herein, directed or knowingly or recklessly failed to stop the wrongdoing.  As the board and employees were well aware, the investment advisers by contract undertook to ensure compliance with regulation and law.  These obligations were knowingly and/or recklessly violated for the direct financial benefit of Alliance.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S. §§1331 and 1367.

8.     Venue is proper in the judicial district in which this action was originally filed pursuant to 28 U. S. C. §§1391 and 1401, because a substantial part of the events and omissions giving rise to the claims asserted occurred there. Additionally, this case involves a strong federal interest, poses a substantial federal question and/or is predicated on the presence of a federal issue in a state-created cause of action. This action was transferred to this judicial district for pretrial purposes pursuant to 28 U. S. C. §1407.

## PARTIES

### Plaintiff

3

9.     Plaintiff Camille Logue is currently, and has been at all relevant times the owner of Alliance Holding Units.

**Defendants**

    (a)     **Nominal Defendant Alliance Holding**

10.     Nominal Defendant Alliance Holding ("Alliance Holding" or "the Company") is a publicly traded Delaware limited partnership, headquartered at 1345 Avenue of the Americas, New York, New York.  Alliance Holding, a registered investment advisor under the Investment Advisors Act of 1940, is part of a complex multi-entity structure through which the Alliance Capital investment management business is capitalized, controlled and conducted.  Alliance Holding units (representing assignments of beneficial ownership of limited partnership interests in Alliance Holding) trade publicly on the New York Stock Exchange under the ticker symbol "AC."

11.     Alliance Holding's business consists entirely of holding, as of February 1, 2004, approximately 31.3 % of the outstanding limited partnership units of Alliance Capital and related activities.  Alliance Holding's income consists of distributions from Alliance Capital, and Alliance Holding is required by the terms of its partnership agreement to distribute all of its available cash flow to its general partner and holders of its limited partnership units.  Alliance Holding has no Board of Directors, but has a sole General Partner, ACMC.  97.2% of Alliance Holding's units are publicly held, with the remaining ownership being 1.0% to ACMC, and 1.8% to AXA, AXA Financial, Equitable, and certain Equitable subsidiaries.

    (b)     **Defendant Alliance Capital -- the Mutual Fund Management Entity**

12.     Alliance Capital ("Alliance Capital" or "Alliance") is also a Delaware limited partnership.  Its units are not publicly traded.  As noted above, approximately 31.3% of the Alliance

4

Capital limited partnership units are held by Alliance Holding.  Alliance Capital's recent public disclosures more fully describe its ownership structure as follows:

- 58% (or approximately 146.5 million units) directly or beneficially owned by AXA, AXA Financial, Equitable, and certain Equitable subsidiaries;

- 31.3% (or approximately 79 million units) owned by Alliance Holding;

- 9.7% (or approximately 24.5 million units) owned by SCB, Inc.(formerly known as Sanford C. Bernstein Inc., with units originally paid in October 2000 pursuant to the purchase of SCB, Inc. by Alliance Capital); and

- 1% (or approximately 2.5 million units) owned by ACMC in its capacity as the General Partner of Alliance Capital.

13.    Alliance Capital is the "operating partnership" in the Alliance multi-entity structure, meaning that it is this entity that in fact conducts the investment management business activities through its employees, agents and subsidiaries.  Registered as an investment adviser under the Investment Advisors Act of 1940, Alliance Capital provides diversified investment management and related services globally to: (a) institutional investors; (b) private clients, (e.g.,  high net-worth individuals, trusts and estates, charitable foundations, etc); and (c) retail, i.e., mutual fund, investors.  As of June 9, 2004, Alliance Capital reported preliminary assets under management of $472 billion, over $150 billion of which represented assets invested in retail mutual funds sponsored by Alliance Capital, its subsidiaries and affiliated joint venture companies.

14.    As is typical in the mutual fund industry, Alliance Capital provides not only investment management to the Alliance mutual funds, but also runs virtually every business function of the funds, including distribution, shareholder services, and administrative functions such as compliance with the requirements of the Investment Company Act of 1940 and other applicable laws and regulations.  Alliance Capital earns revenue by charging fees for managing the investment assets of clients, which are generally calculated as a percent of the value of assets under management, and

5

vary with the type of account managed.   Retail services constitute the principal source of revenue to Alliance Capital, despite their disproportionately smaller amount of assets under management, as indicated by the following chart for the year (as ending December 31):

|  | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| retail revenue | $1.743 b | $1.598 b | $1.364 b | $1.276 b |
| total revenue | $2.522 b | $2.992 b | $2.742 b | $2.733 b |
| % of total revenue | 69% | 53.4% | 49.7% | 46.7% |
| % of total assets under management | 39.3% | 37.9% | 35.2% | 32.4% |

15.   Alliance Capital's Form 10-K filed with the SEC makes clear that it must distribute all of its Available Cash Flow[1] to the General Partner (ACMC) and to Alliance Capital's other unitholders.  Alliance Capital makes quarterly distributions over a fiscal year which runs from March to February.  Thus, fiscal year (FY) 2002 runs from March 1, 2001 through February 28, 2002.  Alliance Capital made the following annual distributions per unit:

| FY 2002 | FY 2003 | FY 2004 |
|---|---|---|
| $3.03 | $2.44 | $1.65[2] |

---

[1]      Available Cash Flow is defined as cash received by the Partnership, minus such amounts as the General Partner (ACMC) determines, in its sole discretion, should be retained by the Partnership for use in its business.

[2]      Based upon reserves taken against amounts paid in connection with settlements with regulators, no distributions were made to any Alliance Capital Unitholders for the fourth quarter (December 2003 through February 2004).

16.   These distributions resulted in total payments to each of the above designated Alliance Capital unit holders in the following approximate amounts:

| Unitholder | FY 2002 | FY 2003 | FY 2004 |
|---|---|---|---|
| AXA, et al. | $443.9 million | $357.46 million | $241.73 million |
| Alliance Holding | $239.37 million | $192.76 million | $130.35 million |
| SCB, Inc. | $ 74.24 million | $ 59.78 million | $ 40.43 million |
| ACMC | $ 7.58 million | $ 6.10 million | $ 4.13 million |

### (c)   Defendant ACMC -- The Managing General Partner

17.   ACMC, a Delaware corporation, is sole general partner for both the Alliance Holding limited partnership and the Alliance Capital limited partnership.   Under the respective limited partnership agreements for, and public filings of both Alliance Holding and Alliance Capital, and, pursuant to the Delaware Revised Limited Partnership Act, ACMC "generally has the exclusive right and full authority and responsibility to manage, conduct, control and operate their respective businesses."

18.   Under these provisions and controlling Delaware law, ACMC has total and absolute control over the operations and activities of the limited partnerships.   Specifically, ACMC is responsible for: (i) the selection and dismissal of executive officers, employees and agents of the partnerships; (ii) the creation and direction of any and all subsidiaries of the partnerships; and,  (iii) through these executive officers, employees, agents and subsidiaries, the day-to-day operations of the partnerships and the mutual fund clients of Alliance Capital, including setting prices and pricing policies and procedures, overseeing and executing trades and all transactional clearing operations; and the adoption, enforcement and oversight of policies and procedures designed to detect and

prevent violation of all relevant laws, regulations and rules of conduct applicable to the partnerships and mutual funds in the conduct of their respective businesses.

19.     ACMC's activities are limited to the management and operations of Alliance Holding and Alliance Capital, for which it receives no management fees.  It is an indirect wholly-owned subsidiary of AXA, and is used by AXA as a vehicle to exercise total control over the business and affairs of both Alliance Holding and Alliance Capital.  All but one of ACMC's directors are current or former directors, executives or employees of defendant AXA or its subsidiaries (other than ACMC).

**(d)     The ACMC Director Defendants**

20.     Director Defendant Bruce W. Calvert ("Calvert) has served as a director of ACMC since 1992, as Chairman of the Board of Directors since 2001, and as Chief Executive Officer from 1999 until June 2003.   Calvert joined ACMC in 1973 as an equity portfolio manager.

21.     Director Defendant Donald H. Brydon ("Brydon") has been a director of ACMC since 1997.  He is Chairman and former Chief Executive Officer of AXA Investment Managers, a subsidiary of defendant AXA, SA ("AXA").

22.     Director Defendant John D. Carifa ("Carifa") was a director of ACMC from 1992 to November 2003.  In addition, he was Chief Financial Officer of ACMC from 1973-1994, and Chief Operating Officer and President from 1993 until his resignation on November 11, 2003.  He served as Chief Executive Officer of Alliance Capital's Mutual Funds Division, and was Chairman and a Director of the majority of Alliance Capital's Mutual Fund Boards.  Carifa has also served on the board of governors of the Investment Company Institute ("ICI"), an industry group of which the overwhelming majority of mutual fund management organizations in the United States are members.

8

23.     Director Defendant Henri DeCastries ("DeCastries") has been a director of ACMC since 1993.  Since 2000, DeCastries has been Chairman of the Management Board of defendant AXA—a position equivalent to that of a CEO of a corporation in the United States.   Since 1998 he has been Chairman of defendant AXA Financial.  He is also a director and officer of various subsidiaries and affiliates of defendants AXA, AXA Financial and Equitable;

24.     Director Defendant Christopher Condron ("Condron"), has been a director of ACMC since May 2001.  Condron is also a Director, President and Chief Executive Officer of defendant AXA Financial, Chairman of the Board and Chief Executive Officer of defendant Equitable, and a member of the Management Board of defendant AXA.   Prior to being named to head AXA Financial, Mr. Condron served both as President and Chief Operating Officer of Mellon Financial Corporation ("Mellon") since 1999, and as President and Chief Financial Officer of The Dreyfus Corporation since 1995.  He was Vice Chairman of The Boston Company from 1989 to 1993, and was then named Executive Vice President of Mellon in 1993, when Mellon acquired The Boston Company.  Mr. Condron was named Vice Chairman of Mellon in 1994.  In 1990, Mr. Condron was appointed a Director and Treasurer of Central Supply Corp.   Like Director Defendant Carifa, Condron served on the Board of Governors of ICI from October 1997 through October 2000, and served on ICI's Executive Committee from November 1998 through October 2000. He was re-appointed to the ICI's Board of Governors in October 2001. In 1999, Mr. Condron was appointed a Director of The American Ireland Fund, for which he also serves as Treasurer.

25.     Director Defendant Denis Duverne ("Duverne") has been a director of ACMC since 1996. Duverne is also Group Executive Vice President Finance, Control and Strategy of defendant AXA, as well as a Director of defendant Equitable and various other subsidiaries and affiliates of AXA.

9

26.     Director Defendant Richard Dziadzio ("Dziadzio") has been a director on the Board of ACMC since 2001.  Dziadzio is also Senior Vice President of defendant AXA, which he joined AXA in 1994 and where he has assumed various responsibilities in the asset management, corporate finance and insurance businesses.

27.     Director Defendant Herve Hatt ("Hatt") was elected a Director of ACMC in May 1998 and served in that capacity until a date between April 1, 2001 and March 28, 2002.  He also served as Senior Vice President-Asset Management Activities and Group Strategic Planning of AXA from March 1998. From 1992 to 1998 he was a senior engagement manager with McKinsey & Company, the management consultants, in London and Paris.

28.     Director Defendant Alfred Harrison ("Harrison") has been a director of ACMC since 1992 and a Vice-Chairman of its Board of Directors since 1993.  He is in charge of Alliance Capital's Minneapolis office, is a Senior Portfolio Manager, and presided, as leader of Alliance Capital's Large Cap equity team, over aggressive investments by Alliance Capital on behalf of institutional clients in Enron up to and including the months immediately prior to Enron's ultimate collapse and bankruptcy in December 2001, a time-frame during which fellow ACMC Director Defendant Frank Savage (see below) also served on the Finance Committee of the Enron Board of Directors.

29.     Director Defendant Roger Hertog ("Hertog") was elected Director and Vice Chairman of ACMC in 2000.   Prior thereto, he was President and Chief Operating Officer of Sanford C. Bernstein Inc. ("Bernstein"), an investment research and management company acquired by Alliance Capital in October, 2000.  Hertog joined Bernstein as a research analyst in 1968.

30.     Director Defendant Michael Hegarty ("Hegarty") was elected a Director of Alliance in May 1998  and served in that capacity until a date between April 1, 2001 and March 28, 2002.

He also served during that time as Senior Vice Chairman, Chief Operating Officer and a Director of AXA Financial. Mr. Hegarty joined AXA Financial in 1998. He previously served as Vice Chairman of the Chase Manhattan Corporation and the Chase Manhattan Bank.

31.     Director Defendant Benjamin D. Holloway ("Holloway") has been a director of ACMC since 1987.  From September 1988 until his retirement in March 1990, Mr. Holloway was a Vice Chairman of defendant Equitable, where he also served as an Executive Vice President from 1979 until 1988.  Prior to his retirement, he also served as a Director and Officer of various Equitable subsidiaries.

32.     Director Defendant W. Edwin Jarmain ("Jarmain") has been a director of ACMC since 2000. Mr. Jarmain has also been a Director of defendants AXA Financial and Equitable since July 1992, and a director of several other companies affiliated with Equitable.

33.     Director Defendant Peter D. Noris ("Noris") has, since 1995, has been a director of ACMC and an Executive Vice President and Chief Investment Officer of defendants AXA Financial and Equitable.

34.     Director Defendant Lewis A. Sanders ("Sanders") has been a director of ACMC since 2000, and was named Chief Executive Officer of ACMC effective June 30, 2003.  Mr. Sanders has been Director, Vice Chairman and Chief Investment Officer of defendant Alliance Capital since October 2, 2000.  Prior thereto, he served as Chairman and Chief Executive Officer of Bernstein, which he joined in 1968 as a research analyst.

35.     Director Defendant Frank Savage ("Savage") has been a director of ACMC since 1993.  He also served as Chairman of Alliance Capital Management International, a division of Alliance Capital, from May 1994 until July 31, 2001. Savage served on the Enron Board from 1999 to 2002, and served on the Finance Committee of the Enron Board -- a committee that, according

11

to Enron's public disclosures, "serve[d] as a monitor of Enron's finance activities"--during his tenure there.

36.     Director Defendant Lorie Slutsky ("Slutsky") has been a director of ACMC since 2002.  Slutsky appears to be the only director of ACMC who has never been a director, executive officer, or employee of AXA or one of its affiliates.

37.     Director Defendant Peter J. Tobin ("Tobin") has been a director of ACMC since 2000.  He has also been a Director of defendant AXA Financial since March 1999.   Tobin was Chief Financial Officer at The Chase Manhattan Corporation from 1996 to 1997.  Prior thereto, he was Chief Financial Officer of Chemical Bank (which merged with Chase in 1996) from 1991 to 1996 and Chief Financial Officer of Manufacturers Hanover Trust (which merged with Chemical in 1991) from 1985 to 1991.  Mr. Tobin is a member of the American Institute of Certified Public Accountants, the New York State Society of CPAs and the Financial Executives Institute.

38.     Director Defendant Stanley B. Tulin ("Tulin") has been a director of ACMC since 1997.  He is also Vice Chairman and Chief Financial Officer of defendant AXA Financial, and a director, Vice Chairman and Chief Financial Officer of defendant Equitable.  Since December 2000, he has also been Executive Vice President of defendant AXA and a member of its Executive Committee, and has responsibility for Group financial communication, relations with rating agencies and consolidated risk assessment.

39.     Director Defendant David H. Williams ("Williams") joined ACMC in 1977, and was Chairman of the Board until May 1, 2001, when he became Chairman Emeritus.  He also served as a director of defendant Equitable from March 1991 until April 2001, as a director of defendant AXA Financial from May 1992 until April 2001, and as a Senior Executive Vice President of defendant

12

AXA from January 1997 through January 2000.  David Williams is the spouse of Director Defendant Reba Williams.

40.     Director Defendant Reba Williams ("Williams") was elected a Director of ACMC in October 1993 and served in that capacity until May 1, 2001.  She also served as the Director of Special Projects of Alliance Capital, and on the Boards of Directors of the India Liberalization Fund, The Spain Fund, The Austria Fund and The Southern Africa Fund.  Reba Williams, who has worked at McKinsey & Company. and as a securities analyst at Mitchell, Hutchins, Inc.  She has a Masters in Business Administration and a Ph.D. in Art History.

41.     Each of the Director Defendants served as a member of the Board of Directors of ACMC during the period of the wrongdoing alleged herein.

42.     During the relevant period, Director Defendants Holloway, Jarmain and Tobin were members of the Audit Committee of the ACMC Board.  The purpose of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities, particularly with respect to the accounting and financial reporting processes and internal controls, including systems of legal and regulatory compliance, of Alliance Holding and Alliance Capital.

43.     Because Director Defendants  Holloway, Jarmain and Tobin knew at all relevant times that all other ACMC directors (other than Director Defendant Slutsky) were present of former employees of AXA or AXA affiliates, and thus were likely to be, and in fact were beholden to AXA, and faced actual or potential conflicts of interest with respect to representing the interests of the public unitholders of Alliance Holding, each of them faced a special responsibility and heightened duty to act in good faith, with due care and diligently in the oversight role they agreed to undertake.  Moreover, director defendant Tobin, who has been designated as ACMC's "audit committee

13

financial expert," possessed at all relevant times special knowledge and expertise with respect to matters of internal control and audit committee functions.

### (e)   The Alliance Capital Officer Defendants

44.   Defendant Gerald Malone ("Malone") was at all relevant times a Senior Vice President at Alliance Capital and a portfolio manager of several AllianceBernstein Funds (including the AllianceBernstein Technology Fund) and Alliance hedge funds, and was an active participant in the unlawful schemes alleged herein.

45.   Defendant Charles Schaffran ("Schaffran") was at all relevant times a marketing executive at Alliance Capital, who sold Alliance hedge funds to investors, and was an active participant in the unlawful schemes alleged herein.

46.   Defendant Michael J. Laughlin ("Laughlin") was, until his forced resignation in November 2003, chairman of the Alliance Capital's mutual fund distribution unit.  Laughlin joined the firm in 1987.  According to a November 2003 Alliance Capital press release, along with Director Defendant Carifa, Laughlin "had both senior and direct responsibility over the firm's mutual fund unit which . . . allowed market-timing transactions, some of which had an adverse impact on mutual fund shareholders."

47.   Each of defendants Laughlin, Malone, and Schaffran, as officers and employees of Alliance Capital, owed fiduciary duties of good faith, loyalty and care to Alliance Capital and its unitholders, including Alliance Holding.

48.   Each of defendants Laughlin, Malone, and Schaffran were, as Alliance Capital officers and employees appointed by ACMC and involved in the management of the business and affairs of Alliance Capital, agents of ACMC, the managing general partner of both Alliance Capital and Alliance Holding; accordingly, as a matter of law, the knowledge possessed and gained by each

of them, and actions taken by each of them, while acting for the benefit of ACMC in the furtherance of its duty to manage Alliance Capital, must be imputed to ACMC.

      **(f)**    **The Controlling Shareholder Defendants**

49.    Defendant Equitable Life Assurance Society of the United States ("Equitable"), a New York Corporation headquartered in New York City, owns the entire equity interest in defendant ACMC. Equitable is among the largest life insurance companies in the United States, with approximately 2.9 million policy and contract holders as of December 31, 2003. Equitable is an indirect wholly-owned subsidiary of defendant AXA Financial Inc. ("AXA Financial").

50.    Defendant AXA Financial is an international financial services organization which provides financial advisory, insurance and investment management products and services worldwide. AXA Financial is a Delaware corporation and maintains its principal place of business at 1290 Avenue of the Americas, New York, New York 10104. AXA Financial is a wholly-owned subsidiary of defendant AXA, SA ("AXA").

51.    Defendant AXA is a holding company organized under the laws of France and engaged in the insurance and financial services industries through its subsidiary companies. Based on available information at December 31, 2003, AXA is one of the world's largest insurance groups, with consolidated gross revenues of $71.6 billion for the year ended December 31, 2003. AXA is also one of the world's largest asset managers, with total assets under management as at December 31, 2003 of $775 billion, including assets managed on behalf of third party clients of $392.3 billion. Based on available information at December 31, 2002, AXA was the world's eighth largest asset manager, including banking companies engaged in the asset management business, with total assets under management of $741.6 billion.

52.     Through its 100% ownership of defendant AXA Financial, which in turn indirectly owns the entire equity interest in defendant Equitable, which in turn owns 100 % of the stock in defendant ACMC, AXA beneficially owns the entire equity interest in ACMC.  Through its control of the voting stock in ACMC, AXA elects all of ACMC's directors, all but one of whom is a present or former director and/or officer of AXA or an AXA-affiliated entity.  AXA's designees on the ACMC board of directors in turn appoint ACMC's officers in accordance with the directives of AXA.  Thus AXA possesses and exercises the power to control the business and affairs of ACMC, and, as alleged above, uses ACMC as a vehicle to control the business and affairs of both Alliance Capital and Alliance Holding.

53.     ACMC, Equitable, AXA Financial and AXA, together with the Director Defendants named above, are referred to herein as the Fiduciary Defendants.  Under Delaware law, ACMC, as general partner of Alliance Holding, owes the Company and its unitholders fiduciary duties of loyalty, good faith and care.  Additionally, under Delaware law, each member of ACMC's board of directors, as directors of the Company's corporate general partner, owes the Company and its unitholders fiduciary duties of loyalty, good faith and due care.    Finally, each controlling shareholder of ACMC, including Equitable, AXA Financial, and AXA, pursuant to Delaware law, owe to the Company and its unitholders fiduciary duties of loyalty, good faith and due care.

**(g)     The Calugar Defendant(s)**

54.     Defendant Daniel Calugar ("Calugar") is a resident of Las Vegas, Nevada and Los Angeles, California.  At all relevant times, Calugar was the President and 95% owner of Security Brokerage, Inc.

55.     Defendant Securities Brokerage, Inc. is a broker dealer firm registered with the Securities and Exchange Commission ("SEC") and located in Las Vegas, Nevada.

16

56.     As alleged herein, the Calugar Defendants entered into illicit market timing and related arrangements with Alliance Capital.

**FIDUCIARY DEFENDANTS' DUTIES TO**
**ALLIANCE HOLDING AND ITS UNITHOLDERS**

**The Fundamental Duties of the Fiduciary Defendants**

57.     As detailed herein, each of the following named defendants owed Alliance Holding and its unitholders fiduciary duties, including the duties of loyalty, good faith and care.

58.     ACMC, as the general partner of Alliance Holding, a Delaware limited partnership, owes to the partnership and to its limited partners fiduciary duties of loyalty, good faith and care. Under the terms of the Alliance Holding Limited Partnership Agreement, the general partner (ACMC) has the sole power, authority and responsibility to manage the business and affairs of the partnership for the benefit of the partnership and its partners.  ACMC's undertakings in this regard give rise to a relationship of trust and confidence between it and all other partners in the partnership. Accordingly, under Delaware law, ACMC owes fiduciary duties to Alliance Holding and its limited partners (or unitholders) akin to the duties owed by directors of a Delaware corporation to their corporation and shareholders.

59.     Each director of ACMC owes fiduciary duties of loyalty, good faith and care to Alliance Holding and its limited partners.  Because these directors have the power, authority and responsibility to manage the business and affairs of ACMC, and because the sole function of ACMC is to act as general partner of both Alliance Holding and Alliance Capital, these directors in reality control the property of both Alliance Holding and Alliance Capital.  Further, the property of Alliance Holding, consisting chiefly of limited partnership interests in Alliance Capital, depends for its income generating capacity upon proper management of the property of Alliance Capital.

17

Accordingly, the power, authority and responsibility of the Director Defendants with respect to directing ACMC's management and control  of the property of Alliance Holding and the property of Alliance Capital give rise under Delaware law to fiduciary duties running from the Director Defendants to Alliance Holding and its unitholders.

60.     Equitable, as the owner of 100% of the stock in ACMC, controls the property of Alliance Holding through its power, and the exercise thereof, to elect the directors of ACMC, the general partner of Alliance Holding and Alliance Capital.  Equitable has exercised its elective power to place the designees of AXA and AXA Financial on the Board of ACMC, which in fact consists predominately of executive officers of AXA and AXA-controlled affiliates.  Accordingly, because it controls the property of Alliance Holding, Equitable owes fiduciary duties of loyalty, good faith and care to Alliance Holding and its unitholders.

61.     AXA Financial, as an indirect controlling shareholder of ACMC, controls the property of Alliance Holding through its complete control of Equitable, which it wholly owns. Because it controls the property of Alliance Holding, Equitable likewise owes fiduciary duties of loyalty, good faith and care to Alliance Holding and its unitholders.

62.     AXA, as the ultimate controlling shareholder of ACMC, controls the property of Alliance Holding through its 100% ownership of AXA Financial, which in turn owns 100% of Equitable, which in turn owns 100% of ACMC.  AXA has exercised its power over the business and affairs of ACMC by placing its designees on the ACMC Board, which consists almost entirely of executive officers of AXA and AXA-controlled affiliates.  In fact, five ACMC board members are among the most senior executive officers of AXA: DeCastries (Chairman of the Management Board of AXA (equivalent to CEO), Calvert, Condron and Duverne (members of AXA Management Board), and Tulin (in charge of AXA U. S. investor relations).  Through AXA's domination of the

18

ACMC Board, it essentially dictates the enterprise policy of Alliance Holding and Alliance Capital. This pervasive control over the business and property of Alliance Holding gives rise to fiduciary duties running from AXA to Alliance Holding and its unitholders.

63.     As detailed herein, to discharge their legal duties, ACMC, the Director Defendants, Equitable, AXA Financial and AXA were required to exercise reasonable and prudent supervision over, and keep themselves informed of Alliance Holding's senior management, policies, practices, controls and financial affairs, which included,  inter alia, taking necessary steps to ensure that adequate policies and reporting systems existed at the Company and functioned properly to ensure that relevant federal government rules and regulations under which the Company and its subsidiaries operated were followed.  Moreover, each of ACMC, the Director Defendants, Equitable, AXA Financial and AXA, due to their substantial experience and expertise in the specialized area of investment management, mutual fund and/or financial services industries, were aware of the highly fiduciary nature of the business -- that is, they were aware that Alliance Capital, as an investment adviser and as a sponsor, manager and administrator of mutual funds, was in a position of trust and confidence with respect to the funds and the persons who invested their money in the funds, and that this relationship gives rise to  fiduciary duties and potential liabilities to the entities and persons to whom those duties are owed.  Accordingly, their duties of loyalty, good faith and care to Alliance Holding and its unitholders required that they take appropriate action to ensure compliance by Alliance Capital (and those acting on its behalf) with the fiduciary duties owed to third parties, so as to protect the Company and its unitholders from losses arising from liability for breach of those duties.

64.     Further, ACMC, the Director Defendants, Equitable, AXA Financial and AXA, pursuant to Delaware law, to the extent that they exercised control over management of the business

19

and affairs of Alliance Holding and Alliance Capital, were required to use their knowledge, experience and ability to control and direct Alliance Holding and Alliance Capital in furtherance of the best interests of Alliance Holding and its unitholders.  Particularly with respect to the Director Defendants, many of them have, and at all relevant times had, special knowledge, skill, expertise and experience directly gained as a result of, among other things, their executive roles at Alliance Capital, ACMC, and/or the direct or indirect controlling entities of ACMC, which include AXA, AXA Financial, and Equitable.

65.     One of the most important duties of the general partner of the Company (and of those controlling it, including its directors and direct and indirect controlling shareholders) is to ensure that it has in place adequate systems of internal control to ensure its compliance, across all business unit and operating segments, with all applicable laws, regulations, and standards of conduct.  The Fiduciary Defendants are and for all relevant periods have been fully aware of this critical function. The importance of legal and regulatory compliance is spelled out in the Company's Annual Report on Form 10-K, a comprehensive disclosure reviewed by the ACMC Board each year before its public dissemination, and signed by the Director Defendants.  Alliance Holding's  2003 Form 10-K states that:

> Alliance Capital's business is subject to pervasive regulation, both in the U.S. and globally, with attendant costs of risk management, and compliance and serious consequences for violations.
>
> Virtually all aspects of Alliance Capital's business are subject to various federal and state laws and regulations and to the laws in the foreign countries in which Alliance Capital's subsidiaries conduct business.  Violations of such laws or regulations could subject Alliance Capital and/or its employees to disciplinary proceedings or civil or criminal liability, including revocation of Alliance Capital's and its subsidiaries' registrations as an investment adviser or broker-dealer, revocation of the licenses of individual employees, censures, fines or temporary suspension or permanent bar from the conduct of business.  Any such proceeding or liability could have a material adverse effect on Alliance Capital's business, financial condition, results of

20

operations and business prospects.  These laws and regulations generally grant supervisory agencies and bodies' broad administrative powers, including, in some cases, the power to limit or restrict carrying on of business for failure to comply with such laws and regulations.  Due to the extensive regulations and laws to which Alliance Capital is subject, management is required to devote substantial time and effort to legal and regulatory compliance issues.

In addition, the regulatory environment in which Alliance Capital operates is subject to change.  Alliance Capital may be adversely affected as a result of new or revised legislation or regulations or by changes in the interpretation or enforcement of existing laws and regulations.

## Special Knowledge, Skill and Expertise of the Director Defendants

66.     The Director Defendants were required by their fiduciary duty of good faith to bring to bear their special knowledge, skill, expertise and experience for the benefit of ACMC, Alliance Holding and Alliance Capital in the exercise of their judgment as directors of ACMC.  The collective level of industry-specific special knowledge, skill, expertise and experience on the ACMC board, due to, inter alia, the presence of a large proportion of insiders (in terms of persons holding executive positions and/or directorships at affiliated companies), is much higher than generally found in a typical public company board consisting of ostensibly outside directors from diverse industries.   Further, because the Director Defendants were designees of and acted as agents of defendant AXA, AXA Financial, and Equitable -- each of which is a sophisticated financial services business organization in its own right -- their collective knowledge, skill and expertise can and should as a matter of law be imputed to these entity defendants.

## KNOWLEDGE OF GENERAL STANDARDS
## OF INTERNAL CONTROL AND CORPORATE COMPLIANCE

67.     As sophisticated business people with extensive financial services industry and executive management experience in publicly traded United States and/or international companies, the Director Defendants were each aware of basic concepts of internal controls as applied to

21

complex business organizations, as well as the importance of adequate and effective systems to assure corporate compliance with applicable laws and regulations.

68.     Although issues of internal control and corporate compliance had received extensive congressional, regulatory, industry and public attention in the 1970s and 1980s, in the early 1990s, two developments pertaining to organizational governance clearly and unambiguously established the crucial responsibilities of corporate directors in these critical areas.

**Sentencing Guidelines**

69.     First, pursuant to the Sentencing Reform Act of 1984, in 1991 the United States Sentencing Commission adopted the Organizational Sentencing Guidelines (the "Sentencing Guidelines"). The Sentencing Guidelines set forth a uniform structure for sentencing organizations for violations of federal criminal statutes, creating powerful incentives for corporations to have in place effective compliance programs, and establishing minimum criteria for evaluating such programs.

70.     The Sentencing Guidelines garnered wide-spread support and recognition. Delaware law recognizes, in the context of defining the oversight duties of corporate directors, that in order to attend in good faith to their fiduciary responsibilities, directors must take into account the Sentencing Guidelines for corporate compliance programs.

71.     Among the minimum criteria for an effective compliance program under the Sentencing Guidelines are:

- standards and procedures to be followed by employees and other agents that are reasonably capable of reducing the prospect of illegal conduct;

- assignment of overall responsibility to oversee compliance with such standards and procedures to high-level personnel;

22

- utilization of monitoring and auditing systems reasonably designed to detect illegal conduct by employees and other agents;

- having in place a reporting system whereby employees and other agents could report illegal conduct without fear of retribution;

- consideration of the likelihood that certain offenses may occur because of the nature of the company's business;

- consideration of the prior compliance history of the company; and

- ensuring that the company's compliance program incorporates and follows standards called for by any applicable government regulation.

72.     These explicit criteria support the common-sense proposition that directors, in performing their compliance oversight function, must satisfy themselves that the corporation's compliance program is appropriately designed to address the compliance risks arising from the nature of company's business and its specific compliance history, and must conclude that the company employs a system of monitoring and auditing that will provide them with reasonable assurance that the compliance program is in fact operating effectively.

**COSO Framework**

73.     Second, in 1992, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") published "Internal Control -- Integrated Framework," ("COSO Framework") which provides a broad framework of criteria against which companies can evaluate the effectiveness of their internal control systems. The COSO Framework became the basis for many existing rules, regulations and laws, and, most recently, was recognized by the SEC (in its final rule regarding Management's Reports on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, IC-26068) as the only currently existing internal control evaluation criteria satisfying the SEC's evaluative standard requirement applicable in the United States.

23

74.     Highly relevant to the degree of respect and deference given to the COSO Framework was the expansive and multi-disciplinary nature of the input, review and assessment reflected in its creation.  Specifically, the COSO Framework was the product of a process that solicited the views of a broad base of corporate executives, legislators, regulators, academics and auditors.  In addition, an exposure draft was widely released, and comments were received, considered and processed in arriving at the final version.

75.     The COSO Framework defines internal control as "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" in three categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.  COSO further states that internal control consists of five components:

- *Control Environment* -- The core of any business is its people -- their individual attributes, including integrity, ethical values, and competence -- and the environment in which they operate.  They are the engine that drives the entity and the foundation on which everything rests.

- *Risk Assessment* -- The entity must be aware of the risks it faces.  It must set objectives, integrated with the sales, production, marketing, financial and other activities so that the organization is operating in concert.

- *Control Activities* -- Control policies and procedures must be established and executed to help ensure that the actions identified by management as necessary to address risks to achieve the entity's objectives are effectively carried out.

- *Information and Communication* -- Surrounding these activities are information and communication systems.  These enable the entity's people to capture and exchange the information needed to conduct, manage and control its operations.

- *Monitoring* -- The entire process must be monitored, and modifications made as necessary.  In this way, the system can react dynamically, changing as conditions warrant.

24

76.     The COSO Framework contains separate chapters addressing each internal control components.  Each chapter concludes with a section concerning evaluation of the effectiveness of the relevant internal control component and gives illustrative examples of key inquiries to be made by the evaluator.  Highlights of these illustrative examples include:

- *Control Environment* -- To what extent is there pressure to meet unrealistic short-term performance targets and to what extent is compensation based on achieving them?  To what extant is the board or audit committee independent of management?  To what extent is sufficient and timely information provided to the board or audit committee?

- *Risk Assessment* -- Are mechanisms to identify risks arising from external sources adequate?  Are mechanisms to identify risks arising from internal sources adequate?  Is the risk analysis process, including estimating the significance of risks, assessing the likelihood of their occurring and determining needed actions, adequate?

- *Control Activities* -- Have appropriate  policies and procedures been designed and implemented relative to the risks identified and assessed in the risk assessment process?

- *Information and Communication* -- Is information provided to the right people in sufficient detail and on time to enable them to carry out their responsibilities efficiently and effectively?  Have channels of communication been established for people to report suspected improprieties?

- *Monitoring* -- Are internal audit activities effective?  Is the entity responsive to internal and external auditor recommendations on means to strengthen internal controls?

77.     Most importantly, the COSO Framework recognizes that: "an active and involved board of directors . . . possessing an appropriate degree of management, technical and other expertise coupled with the necessary stature and mind set so that it can adequately perform the necessary governance, guidance and oversight responsibilities . . . is critical to effective internal control."  One key environmental factor that creates a temptation for employees to engage in improper acts is "[a]n ineffective board of directors that does not provide objective oversight of top

management."  Moreover, "an unassertive or ineffective board or audit committee can provide opportunities for indiscretions."

78.     The COSO Framework also states that the duty of a company's CEO, who has "ultimate ownership responsibility for the internal control system," is to ensure that "all of the components of internal control are in place," and that "the CEO [is] ultimately accountable to the board."  The board itself must satisfy itself that the internal control system is reasonably designed and operates effectively.  The COSO Framework states that "[e]ffective boards and audit committees [must] determine whether the internal control system has the necessary critical underpinnings," that "[m]embers of the board should discuss with senior management the state of the entity's internal control system[,] provide oversight as needed[, and] seek input from the internal and external auditors," and that the "audit committee, in conjunction with or in addition to a strong internal audit function, is often in the best position within an entity to identify and act in instances where top management overrides internal controls or otherwise seeks to misrepresented reported financial results."

79.     The COSO Framework further provides that:

Management is accountable to the board of directors or trustees, which provides governance, guidance, and oversight.  By selecting management, the board has a major role in defining what it expects in integrity and ethical values, and can confirm its expectations through its oversight activities.  Similarly, by reserving authority in certain key decisions, the board can play a role in high-level objective setting and strategic planning, and with the oversight that the board provides, the board is involved pervasively in internal control.

Effective board members are objective, capable, and inquisitive.  They have working knowledge of the entity's activities and environment and commit the time necessary to fulfill their board responsibilities.  They should utilize resources as needed to investigate any issues they deem important, and have an open and unrestricted communications channel with all entity personnel, including the internal auditors, and with the external auditors and legal counsel.

80.     One of the basic concepts set forth in the COSO Framework -- and perhaps the most crucial in terms of highlighting the necessity of active involvement and oversight by a company's directors -- is that internal controls may be circumvented by management:

> The term "management override" is used here [in the COSO Framework] to mean overruling prescribed policies or procedures for illegitimate purposes with the intent of personal gain or an enhanced presentation of an entity's financial condition or compliance status. . . . [A]ctions to override usually are not documented or disclosed, with an intent to cover up the actions.

81.     Thus, the COSO Framework repeatedly emphasizes the critical importance of the role of directors, functioning in an audit committee or as the full board, in conjunction with a strong internal audit function, to identify and act in instances where top management overrides internal controls. It identifies management override as one instance in which the "audit committee or board must carry its oversight role to the point of directly addressing serious events or conditions."

**Caremark**

82.     Additionally, the decision of the Delaware Court of Chancery in In re Caremark International, Inc. Derivative Litigation, Del. Ch., 698 A.2d 959 (1996) further sharply focused attention of corporate legal advisers, commentators and directors on the compliance oversight responsibilities of corporate boards. In that decision, the Court of Chancery opined that within the general legal and regulatory framework affecting public company's in 1996, a corporate board has responsibility to assure that management has established information and reporting systems to provide senior management and the board with material information concerning the corporation's compliance with applicable statutes and regulations:

> I note the potential impact of the federal organizational sentencing guidelines on any business organization. Any rational person attempting in good faith to meet an organizational governance responsibility would be bound to take into account this development and the enhanced penalties and the opportunities for reduced sanctions it offers.

27

83.    Thus, by 1996, directors of Delaware corporations were on plain notice that performance of their fundamental duty of good faith required assurance that management had established a reasonably designed and effectively operating corporate compliance system, and that this compliance system was designed to, and could be expected to, provide the board or an appropriate committee with sufficient, timely and accurate information to enable them to fulfill their oversight responsibilities.

**Sarbanes-Oxley**

84.    In the wake of the 2001 Enron collapse, issues of internal control and compliance -- and particularly, the responsibilities of corporate directors with respect to these matters -- have received renewed and intense legislative, regulatory, industry and public scrutiny.   A Senate investigation into the Enron situation led to publication of a July 2002 report laying a significant part of the blame for the Company's collapse on the failure of the directors to take appropriate action to address known risks.  This report led to enactment of the Sarbanes Oxley Act of 2002.

85.    Among the Sarbanes Oxley Act's key provisions include:

•      Requiring companies to establish an Audit Committee of the Board, consisting entirely of independent directors.

•      Requiring companies to disclose the name of at least one Audit Committee member who is a "financial expert," or to publicly explain why the committee includes no such member.[3]

---

[3]       The SEC's final rules regarding this requirement, effective March 3, 2003, define the term "audit committee financial expert" as having all five of the following attributes: Understands GAAP and financial statements; Can apply GAAP to estimates, accruals and reserves; Has personal experience or has supervised those with experience in preparing, auditing, analyzing or evaluating financial statements of a breadth and complexity comparable to the breadth and complexity of the company's financial statements; Understands internal controls and financial reporting procedures; and Understands audit committee functions.

- Requiring officers signing annual and quarterly reports to certify, among other things, that they have disclosed to the Audit Committee all significant deficiencies in the design or operation of the company's internal controls which could adversely affect the company's ability to record, process, summarize and report financial data, as well as any fraud, material or not, that involves management or other employees who have a significant role in the company's internal controls.

- Requiring each annual report to contain an internal control report stating the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting and containing an assessment, as of the end of the most recent fiscal year, of the effectiveness of the internal control structure, which must be attested to by the company's independent auditor in connection with its audit report.

These provisions make clear that federal law directly places upon directors of public companies a duty to actively oversee internal controls.

**Revisions to Sentencing Guidelines**

86.    Other regulatory and law enforcement action since 2001 has clearly emphasized director responsibility for oversight of compliance programs.   For example, revisions to the Sentencing Guidelines, to be effective November 1, 2004 address the role of the organization's "governing authority" -- in most cases, a board of directors -- in an effective compliance program:

The organization's governing authority shall be knowledgeable about the content and operation of the program to prevent and detect violations of law and shall exercise reasonable oversight with respect to the implementation and effectiveness of the program to prevent and detect violations of law.

Specific individual(s) within the high level personnel of the organization shall be assigned direct, overall responsibility to ensure the implementation and effectiveness of the program to prevent and detect violations of law.  Such individual(s) shall be given adequate resources and authority to carry out such responsibility and shall report on the implementation and effectiveness of the program to prevent and detect violations of law directly to the governing authority or an appropriate subgroup of the governing authority.

87.    These revisions were intended to *clarify the already-existing* compliance responsibilities of: (i) members of the governing authority; (ii) executive leadership; and (iii)

individuals having primary responsibility for the compliance program.  Explaining the revised standard, the Advisory Group wrote:

> [T]he current total silence in the organizational sentencing guidelines relating to the role of the governing authority fails to state what may otherwise be obvious: ultimately the governing authority is responsible for the activities of the organization.  It can only perform this function if its members are actively involved in compliance reviews and reasonably educated about the business of the organization and the legal and fiduciary duties of governing authority members.

### Revised Principles of Federal Prosecution

88.    In January 2003, the Justice Department issued revised Principles of Federal Prosecution of Business Organizations.  Like the original principles issued in 1999, these revised principles list the existence of an effective corporate compliance program as an important consideration for prosecutors in making charging decisions.  However, the revised principles go far beyond the original principles in emphasizing the responsibility of directors to oversee a corporate compliance program, making explicit reference to the Caremark case.

89.    The revised principles list as questions the prosecutor may consider:

•    Do the corporation's directors exercise independent review over proposed corporate actions rather than unquestioningly ratifying officers' recommendations?

•    Are the directors provided with information sufficient to enable the exercise of independent judgment? and

•    Have the Directors established an information and reporting system in the organization reasonably designed to provide management and the board with timely and accurate information sufficient to allow them to reach an informed decision regarding the organization's compliance with the law?

90.    Recognizing that all these reforms are relevant to the issue of a director's good faith, former Delaware Chief Justice Veasey in prepared remarks to the National Association of Corporate Directors on October 21, 2003, stated:

30

[B]oards should be told that it is arguable -- but not settled -- that the issue of good faith may be measured not only by the evolving expectations of directors in the context of Delaware common law fiduciary duty, but it also may well be measured against the backdrop of relevant Sarbanes-Oxley SEC Rules and the SRO requirements. . . . That is, when and if these reforms are presented as part of a board's conduct in a Delaware court where that conduct is relevant, adherence to these reforms may be relevant and would be advisable.

91.    Clearly, in light of all the aforementioned attention to internal controls and compliance, the good faith of directors must be measured in the context of specific facts bearing upon their conduct, and, for directors responsible for the governance of publicly traded companies in the United States, the general regulatory environment within which they operate includes, among other things, the Sentencing Guidelines, Sarbanes Oxley and related regulations and SRO listing rules, as well as best practices in internal control founded upon the COSO Framework.  Clearly, shareholders in publicly traded companies have a right to expect that directors will take into account these laws, regulations, and rules relating to company governance.

**Knowledge Of Internal Control And Compliance Standards**
**Specifically Affecting Investment Companies And Investment Advisers**

92.    Not only were the Director Defendants aware of the above enunciated internal control and compliance standards affecting public companies in general, but they were also aware, as detailed herein, that every aspect of Janus' investment advisory business is subject to pervasive regulation, and they were further aware that the SEC is Janus' principal federal regulator.  Numerous federal securities statutes and regulations administered by the SEC and applicable to investment advisors make clear the importance of effective compliance programs.  For example:

•    Section 203(e)(6) of the Advisers Act [15 U.S.C 80b-3(e)(6)] provides that a person shall not be deemed to have failed to supervise any person if: (i) the adviser had adopted procedures reasonably designed to prevent and detect violations of the federal securities laws; (ii) the adviser had a system in place for applying the procedures; and (iii) the person had reasonably discharged his supervisory

31

responsibilities in accordance with the procedures and had no reason to believe the supervised person was not complying with the procedures.

• Rule 206(4)-6 under the Advisers Act [17 CFR 275.206(4)-6] requires investment advisers to adopt and implement written policies and procedures that are reasonably designed to ensure that the adviser votes proxies in the best interest of clients. Similarly, funds must disclose the policies and procedures that they use to determine how to vote proxies relating to portfolio securities. Form N-1A, Item 13(f) [17 CFR 239.15A; 274.11A]; Form –2, Item 18.16 [17 CFR 239.14; 274.11a-1]; Form –3, Item 20(o) [17 CFR 239.17a; 17 CFR 274.11b]; and Form N-CSR, Item 7 [17 CFR 249.331; 17 CFR 274.128].

• Section 204A of the Advisers Act [15 U.S.C. 80b-4a] requires each adviser registered with the SEC to have written policies and procedures reasonably designed to prevent the misuse of material non-public information by the adviser or persons associated with the adviser. Rule 17j-1(c)(1) under the Investment Company Act [17 CFR 270.17j-1(c)(1)] requires a fund and each investment adviser and principal underwriter of the fund to "adopt a written code of ethics containing provisions reasonably necessary to prevent" certain persons affiliated with the fund, its investment adviser or its principal underwriter from engaging in certain fraudulent, manipulative, and deceptive actions with respect to the fund.

• Moreover, under 31 CFR 103.130(c), funds must develop an anti-money laundering program, which includes the establishment and implementation of "policies, procedures, and internal controls reasonably designed to prevent the mutual fund from being used for money laundering or the financing of terrorist activities and to achieve compliance with the applicable provisions of the Bank Secrecy Act and the implementing regulations thereunder."

93.     In addition to the various regulations set forth above, the SEC further made clear in a 2001 accounting and auditing release concerning the "Relationship of Cooperation to Agency Enforcement Decisions" that effective systems of corporate compliance could have a significant effect on SEC enforcement decisions.

94.     The consequences of inadequate compliance programs -- and particularly of failing to have in place a compliance monitoring structure independent of the underlying business line activity -- were likewise well publicized through SEC releases regarding enforcement actions. See e.g., Millennium Capital Advisors, Investment Advisers Act Release No. 2092 (Dec. 13, 2002)

(unauthorized trading in client account and concealment of this trading were facilitated by adviser's vague and insufficient compliance procedures and absence of independent monitoring of portfolio manager); Gintel Asset Management, Investment Advisers Act Release No. 2079 (Nov. 8, 2002) (repeated improper cross trades, principal transactions, and personal trading resulted in part from inadequate procedures to prevent violation of the adviser's code of ethics); Back Bay Advisors, Investment Advisers Act Release No. 2070 (Oct. 25, 2002) (excessive reliance on self-reporting and self-monitoring by portfolio managers to determine whether the firm was in compliance with the federal securities laws resulted in improper cross-trades); Western Asset Management, Investment Advisers Act Release No. 1980 (Sept. 28, 2001) (subadviser had not established adequate procedures to detect portfolio manager's fraudulent activities with respect to the purchase and pricing of private placement securities); Scudder Kemper Investments, Investment Advisers Act Release No. 1848 (Dec. 22, 1999) (adviser did not have in place procedures that could have prevented and detected trader's unauthorized trading for investment company accounts); Rhumbline Advisers, Investment Advisers Act Release No. 1765 (Sept. 29, 1998) (absence of procedures enabled chief investment officer to engage in unauthorized trading and to misrepresent resultant losses); Kemper Financial Services, Investment Advisers Act Release No. 1494 (June 6, 1995) (adviser had no guidelines or procedures in place to address conflicts of interest and funds' portfolio manager misappropriated funds' investment opportunity on behalf of private profit-sharing plan he also managed).

95.     In what now appears to have been a starkly prescient understatement, the SEC observed in a February 2003 Release that not all firms registered with it have adopted and implemented adequate compliance programs.  As demonstrated herein, this was surely true with respect to Janus, and for this failure, the Director Defendants are responsible.

33

## MARKET TIMING HAS LONG BEEN RECOGNIZED
## WITHIN THE INDUSTRY AS A MAJOR PROBLEM

96.     As detailed herein, because share valuation for mutual funds is done, not on an on-going basis like stocks, but rather only once a day, it has long been a well-recognized fact among regulators and the industry that this structure creates a substantial risk for abuse by arbitrageurs, to the detriment of long-term investors.  There is a long history of Congressional and regulatory action based on this reality, and mutual fund companies themselves frequently tout in regulatory filings and other public representations, the procedures and practices allegedly in place to protect their investors from such risks.

**Net Asset Value Arbitrage**

97.     The term "market timing" describes the practice of making frequent purchases and corresponding redemptions of mutual fund shares to exploit well-documented inefficiency in the way such shares are priced.  Instead of being continuously priced by market trading transactions, mutual fund shares are priced once a day, typically at the 4 p.m. close of market trading, at their pro rata share of the fund's total net asset value ("NAV").  NAV is set based on the last traded price of each security held by the fund, except when market prices are not readily available.  Thus, for orders received prior to 4 p.m. on a given business day, the price will be the NAV calculated at 4 p.m. that day.  For orders received after 4 p.m., the price will be the NAV calculated at 4 p.m. the next day. (Rule 22d-1 promulgated by the SEC.)

98.     This pricing system creates a clear and well-documented arbitrage opportunity.  For many types of assets held by mutual funds, the most recent trading price does not fully reflect all available market information.  In other words, the prices are stale.  The most obvious examples are international stocks that trade on overseas exchanges that close up to 15 hours before the 4 p.m.

34

Eastern Standard Time (EST) close of U. S. markets.  Thus, arbitrageurs will track short-term shifts

in overseas and U.S. markets, and make market timed trades to capture resulting profits.  As an

example to explain this practice:

> DAY 1 - Overseas:  overseas markets perform poorly, with stock prices declining.
> Overseas markets close and prices are set before U.S. markets even open.

> DAY 1 - in the U.S.: because of poor performance in overseas markets, mutual funds
> that trade in such securities will record a decline in NAV.  However, U.S. market
> perform well.  Prior to 4:00 p m. EST, an arbitrageur buys shares in a mutual fund
> that trades in overseas stocks -- knowing that the NAV to be set for that purchase at
> 4:00 p.m. that afternoon will reflect the poor performance overseas earlier that day.
> The arbitrageur makes this purchase based on the well-documented fact that foreign
> markets tend to follow U.S. market performance, and thus, the depressed overseas
> markets would be expected to react favorably tomorrow to today's strong trading on
> U.S. markets.

> DAY 2 - Overseas:  the overseas markets, as anticipated, react favorably to the
> strong trading in U.S. markets, and share prices, which declined the prior day,
> rebound.  The arbitrageur turns around and sells his mutual fund shares, capturing
> the short-term profit that will be reflected in the increased NAV set at 4:00 p.m. on
> DAY 2.

99.     The arbitrage described in the above example is not perfect, since the trader is still

exposed to the risk that after the purchase on DAY 1, the overseas markets on DAY 2 do not react

favorably to the strong U.S. market performance.  The trader can seek to hedge this exposure

through selected options and/or futures transactions.  This exposure can further be reduced by "late

trading," a term which describes the illegal practice of purchasing shares after the 4:00 p.m. EST

(i.e., with knowledge of events that occur following the setting of the NAV), but still getting those

shares at that day's NAV, rather than the next day's NAV, as required by law.

100.     Similar arbitrage strategies can be practiced in mutual funds that invest in other asset

classes that exhibit stale pricing within the mutual fund pricing system, including small-cap stocks,

high-yield bonds, and convertible bonds.  These asset classes often trade infrequently, and have wide

35

bid-ask spreads, frequently resulting in the most recent trade price being systematically different from the price that would prevail in a liquid market.

**Arbitrage Activities Cost Long-Term**
**Mutual Fund Investors  Billions of Dollars**

101.    While only capturing small price differentials by systematically employing such arbitrage strategies, traders can extract enormous cumulative returns over time.  According to an October 2002 academic article, entitled "Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds," Professor Eric Zitzewitz of the Stanford Graduate School of Business (the "Zitzewitz Article") found:

> Arbitrageurs who buy international funds on days the S&P 500 has risen and sell them on days it has declined can earn uncompounded excess returns of 35 percent per year; refinements to the trading strategy can double these returns.  The arbitrage returns available in domestic small-cap and convertible and high-yield and convertible bond funds are smaller but still substantial, at 20-25 percent and 10-25 percent, respectively.

102.    The profits taken by short-term traders utilizing these arbitrage strategies come directly from the pockets of long-term mutual fund investors on a dollar-for-dollar basis.  This result, called "dilution" of the mutual fund, can be illustrated by the following highly-simplified example:

Without a Market Timer:

DAY 1 --  Fund has 10 outstanding shares, owned one share each by 10 investors, and a prior day NAV of $100; with each share thus redeemable at a price of $10.

DAY 2 -- the value of the Fund's assets increase 15%, resulting in a new NAV at the end of business on DAY 2 of $115; with each share now being redeemable for $11.50.  Each current shareholder thus has earned a return (on paper) of 15%.

With A Market Timer:

DAY 1 -- same as above, except that Trader purchases 1 share for $10.00.

36

DAY 2 -- The Fund's new NAV, including the 15% gain on underlying assets and the additional $10 share purchase price (which has not yet been invested in any assets, and thus, will not itself generate any profit to the Fund), is now $125. If Trader redeems his share on Day 2, his redemption price will be $11.36 ($125 total value of Fund divided by the 11 outstanding shares), and the Fund's total NAV after the redemption will be $113.64. Thus, instead of sharing equally the 15% gain, and having a Fund share value of $11.5 on DAY 2, the Fund's original ten long-term investors now have a Fund share value of only $11.36 at the close of business on DAY 2. The 14 cents per share dilution to the Fund has been skimmed by the market timer.

103.    Empirical research has established that the dilutive effect of market timing exists and is substantial. For example, the Zitzewitz Article "present[ed] evidence from a sample of funds that suggests long-term shareholders are losing about $5 billion per year across all asset classes" to systematic market timing. Professor Zitzewitz further observed that this dilution of long-term shareholder value had "grown rapidly in the last four years."

104.    Dilution of long-term shareholder value is not the only harm caused by market timing. Frequent and substantial in and out trading in mutual funds by market timers imposes burdensome transactional costs on the target funds. These costs may include sales of portfolio securities to cover large redemptions, or the cost of stand-by funds to cover such redemptions. When a fund must execute trades to cover timer redemptions, it may be forced to realize capital gains at an undesirable time, or to sell stock into a falling market. To the extent that a portfolio manager elects to keep cash on hand to cover timer redemptions, the fund may suffer from cash/investment allocation that diverges from what otherwise would be optimal.

105.    The potentially substantial adverse effects of market timing on a mutual fund are both well-documented and well-known by regulators and the industry. In fact, as part of their inducement to potential investors, many mutual fund prospectuses set forth a litany of measures they have allegedly adopted to identify and preclude such practices. For example, most mutual funds state that they reserve the right to decline purchase orders; and some specifically state in their fund prospectus

37

that this right may be exercised to decline purchases from investors who exhibit a pattern of trading that appears to be designed to take advantage of short-term market movements.

**Investment Adviser Companies Face**
**A Clear, Inherent Conflict of Interest**

106.    Typically, a single investment adviser company sets up a number of mutual funds to form one or more family of funds.  For example, Janus Capital is the manager for an entire array of mutual funds (see ¶**, infra).  While each mutual fund is in fact its own company, as a practical matter the investment adviser company operates and controls it.  The investment adviser company, either directly or through affiliated entities, provides: (i) portfolio management, (ii) marketing and distribution, and (iii) other administrative functions, including back office operations and compliance.  Thus, the portfolio managers who make the investment decisions for the funds, the administrators who run the back office and perform compliance functions, and the executives to whom they report are all typically employees of the same investment adviser company, and not the mutual funds themselves.  This structure creates a clear potential conflict of interest between the funds (and their investors) and the investment managers.

107.    This inherent structural conflict of interest has long been recognized by the industry, regulators and legislators.  In a statement before the Senate Governmental Affairs Subcommittee on Financial Management, the Budget, and International Security on January 27, 2004, John P. Freeman, Professor of Law, University of South Carolina Law School stated:

> **The Fund Industry's Moral Compass is Broken; Conflicts of Interest are**
> **Rampant.** The fund industry's hallmark is its external management set-up by which an outside company manages the fund while populating a number of seats on the fund's board, including the Chairman's seat.  The external manager typically controls all facets of fund life, from the fund's incorporation through the selection of the initial board.  Historically, this control has tended not to be relinquished over time.

* * *

The fund industry's structure thus features a built-in conflict of interest; *it creates and perpetuates the risk, always, that the manager will treat fund shareholders unfairly.*

Emphasis added.

108.    Former SEC Commissioner David Ruder, in his testimony before the Committee on Banking, Housing, and Urban Affairs of the United States Senate on February 26, 2004 regarding mutual fund reform, directly highlighted the crux of this structural conflict of interest:

When a mutual fund investor entrusts funds to an investment adviser, conflicts inevitably arise. The adviser seeks to maximize their profits, while the fund shareholders want the adviser to charge the lowest fees possible. *Conflicts also exist because the adviser who has control over investors' money may engage in transactions with the fund that are to the advantage of the adviser and to the detriment of investors.*

Emphasis added.

109.    This inherent and manifest conflict of interest creates heightened compliance risks for mutual fund management companies.  Therefore, these fiduciaries have a heightened burden to design and implement compliance policies and procedures which ensure that fund managers are not finding ways to increase their fee income in a manner detrimental to the interests of, and unfair to, mutual fund investors who entrust their savings to these companies.

110.    As detailed herein, the market timing scandal was a product of the clear failure on the part of the directors, officers and management of a large number of investment adviser companies -- with full knowledge and/or conscious disregard of the inherent conflicts of interest and obvious red flags highlighted by regulators, academicians and the general press over many years -- to take reasonable, adequate and appropriate compliance oversight action..

**Arbitrage Dilution of Mutual Funds Has A Long History**

39

111.     The market timing scandal revealed by the Canary Settlement represents a prime example of precisely the type of heightened compliance risk, born of the inherent conflict of interest that characterizes the mutual fund industry, that appropriately designed and implemented compliance programs at the fund management companies must detect and prevent.   Professor Mercer Bullard, a former SEC Investment Management Division attorney, in his November 3, 2003 testimony before the Senate Subcommittee on Financial Management, the Budget and International Security, testified that:

> The alleged frauds in [the market timing and late trading scandal], however, were open and notorious and violated express legal requirements. *Fund stewards were on notice and failed to take action.*  There are no significant legal loopholes to close or grounds to excuse a fundamental failure of compliance.  These systemic frauds have exposed a compliance system that is not working and is in dire need of structural reform.
>
> *   *   *
>
> The[se] frauds . . .  represent a systemic compliance failure in the fund industry. *Each of these frauds reflects a failure to ensure that there are compliance procedures in place that are reasonably designed to protect shareholders, and that steps are taken to ensure that the procedures are working.*  None of these frauds is surprising in the sense that the fraud reflects an unknown vulnerability in the operation or regulation of mutual funds.  *Each of these frauds was predictable and could and should have been prevented simply by enforcing minimal compliance standards.*

Emphasis added.

112.     In 1940, Congress adopted the Investment Company Act of 1940 ("the 40 Act"). One of the primary goals of the 40 Act was to seek to eliminate the opportunity for insiders to trade fund shares at prices that differ from their true value, and thus diluting the interests of long-term fund security holders.

113.     Following passage of the 40 Act, most mutual funds processed transactions at the most recent prior-computed NAV.  This fact allowed speculators to transact at prior day NAV's on

days that the market had moved significantly.   In 1968, the SEC again acted, this time adopting Rule 22c-1 to protect long–term mutual fund investors from the dilutive effects of such speculative trading.   Rule 22c-1 requires forward pricing of mutual fund share sales and redemptions.   The SEC's forward pricing rule sought to eliminate an obvious loophole that encouraged a relatively unsophisticated form of arbitrage -- mutual fund trading based on already-published, and obviously stale, NAV's.

**The 1981 Putnam No-Action Letter**

114.   The SEC's adoption of Rule 22c-1 did not eliminate speculative short-term trading in mutual fund shares or the dilution it caused.   While the forward NAV pricing required by Rule 22c-1 made purchasing mutual fund shares based on a prior-computed and announced NAV impossible (absent illegal conduct such as late trading), arbitrageurs still recognized multiple opportunities to profit from stale pricing effects inherent in the procedures used to value mutual fund shares, i.e., due to time zone differences or limited liquidity.

115.   Putnam, on behalf of two of its international funds, sought advice from the SEC request, regarding its proposed practice of calculating NAV's using local closing prices on all days except if "some extraordinary event were to occur after the close," which could result in that market's closing prices to "no longer [be] a reasonable estimate of such securities' values as of 4:00 p.m."   The SEC's response, approving Putnam's proposed use of fair value pricing, issued in a No-Action Letter dated February 23, 1981, put the mutual fund industry on notice of the potential risks for arbitrage resulting from stale pricing, especially with mutual funds that traded in overseas securities.

116.   Although the 1981 Putnam No-Action Letter allowed Putnam and other investment adviser companies to "fair value" the assets of the funds under their management if they concluded

41

that local market closing prices did not reasonably reflect current market value as of 4:00 p.m. EST, in practice, fair value pricing was applied extremely rarely.   Thus, arbitrageurs could and did continue to actively target mutual funds, focusing on securities traded on overseas exchanges for speculative trading.

**The Industry's Heightened Awareness Of And
Regulatory Emphasis On Front-Running And
Other Improper Trading Practices By In-House Personnel**

117.   From as early as 1994, the investment industry was repeatedly placed on direct notice of increased regulatory concerns about and emphasis on improper trading activities by industry insiders for their personal accounts, in breach of their fiduciary duties of public investors.   For example,   The Wall Street Journal, in an article dated August 14, 1997, entitled "Putnam Suit Spotlights Personal Trades," reported that:

> A legal skirmish between Putnam Investments and a former staff attorney for the big, Boston-based mutual-fund company has opened a window onto the murky world of personal trading by fund managers.
>
> The lawsuit, filed originally in Massachusetts Superior Court in Boston and later transferred to a federal court there, was brought by Edward A.H. Siedle, a former Putnam chief of compliance.   It is essentially a breach-of-contract dispute involving his contentious departure from Putnam in 1988.
>
> The suit also charges, however, that during the late 1980s, some senior fund managers at Putnam asked colleagues to hold off on trades for clients so that the managers could complete trades in the same stocks for themselves. These allegations raise issues of "front running," an illegal practice.   When front running, a money manager seeks to profit personally as the firm's massive buying power eventually pushes up the price of a stock he bought previously.

118.   At this time, concerns over personal trading by fund managers was an increasingly important issue with both regulators and the industry.   The Wall Street Journal article went on to state:

42

In the past few years, the $4 trillion industry has begun to restrict personal trading by fund managers as money has continued pouring into mutual funds at record levels.  Because fund firms don't publicly disclose their managers' personal trades, however, it is difficult to determine just how fruitful such efforts at limiting conflicts-of-interest have been.

119.    The issue of front-running and personal trading by fund management personnel in

breach of their fiduciary duties had been a "hot topic" with regulators, and thus with the industry,

for some time.  The article continued:

Government regulators and fund companies stepped up their scrutiny of personal trading by fund managers in 1994 after the firing of Invesco Funds' star portfolio manager, John Kaweske, for violating the company's rules on personal trading. (Invesco is now part of Amvescap PLC.)

That year, a "blue-ribbon" industry panel issued a set of personal-trading restrictions, and in the years since the Kaweske incident, the Securities and Exchange Commission and some other fund companies, including Putnam, have punished other prominent fund managers for personal-trading violations.

Certainly, under federal securities laws, investment advisers -- including fund managers -- have long been held to exacting standards of fiduciary responsibility that ban conflicts-of-interest with clients -- including in the manager's personal investments.

"Your duty to your client should come before personal interests," says Janet Olsen, a fund lawyer at Bell, Boyd & Lloyd in Chicago. "To put a client in a position where the client might be disadvantaged violates your duty. Most of the time, advisers attempt to fulfill their duties by having clients go first" in trades.

Moreover, the SEC requires mutual-fund companies to write, distribute and enforce a code of ethics governing such issues as personal trading and conflicts of interest.

**The October 1997 Asian Market Crash And Resultant Outcry**

120.    The risks and consequences of timed trading and market arbitrage burst onto the

regulatory and general press forefront again, this time in connection with an Asian market crash in

October, 1997.  On October 28, 1997 the Hong Kong market closed down 14%, while later that

same day, the S&P 500 rose 6.1% on U.S. market trading.  Since Hong Kong's market closes six

43

hours prior to the opening of the U.S. market, the closing prices of Hong Kong stocks did not reflect the fact that the U.S. market had surged.

121.    Some funds maintained standard fund share pricing procedures and did not factor the strong performance by the U.S. market into their valuation of the Hong Kong stocks in their portfolios.  Fidelity, however, invoked the concept of fair market pricing, and incorporated this fact (and its likely positive affect on Hong Kong stock prices) into its share valuation.  T. Rowe Price likewise effectively used fair value pricing by waiting until the Hong Kong Market opened on October 29th before evaluating the NAV for funds including such stocks.  Other funds that failed to factor the rebound effect that the subsequent strong U.S. market performance would have on the value of their Hong Kong shares in essence allowed speculative investors to purchase shares of their funds with Hong Kong holdings at prices substantially below their true current value.

122.    Much to the dismay of the arbitrageurs in the Fidelity and T. Rowe Price funds, by implementing fair value pricing, these two firms effectively acted to protect long-term investors in the foreign funds under their management.  Arbitrageurs who had invested in these funds but were unable to profit from stale pricing complained loudly, asserting that they were unaware that the management companies could deviate from using the stale local market closing prices to set the fund NAV's.  These complaints led to an SEC investigation in which the SEC concluded that Fidelity had acted properly.  In a December 4, 1997 speech to the Investment Company Institute ("ICI")(an industry group comprising approximately 95% of mutual fund management companies) the SEC's Director of Investment Management, Barry Barbash, stated:

> Taken as a whole, the results of our recent exams and disclosure reviews have convinced us that we need to undertake a broader and more comprehensive analysis of fund pricing issues. We have decided to make such an analysis a priority of the investment management division for 1998.

As part of our review, we will look closely at the procedures funds follow in pricing their shares and will consider whether we should fine-tune some of our rules and current interpretations relating to pricing.

123.   <u>The Wall Street Journal</u> further reported on December 5, 1997:

"Funds that use fair-value pricing in this context appear to better protect long-term shareholders," Mr. Barbash said in an interview.  "That's what our findings show."

\*   \*   \*

In fact the SEC examination of fair-value pricing has turned up a number of interesting findings, including the extent to which investors speculated in mutual-fund shares during October's market turbulence.  These market timers complained to the SEC that they didn't know that their fund companies could use fair value pricing; many said they lost money in the process.

But Mr. Barbash said the commission believes fair-value pricing succeeds in upholding one of the commission's public policy goals -- protecting long-term investors from speculators who can "dilute" the holdings of those who stay with the funds through thick and thin.  In effect, short-term traders who pile into a fund on a price dip, then bail out as soon as the price recovers, skim off some of the profits that would have been realized by longer-term investors.

Mr. Barbash also said that the speculators who said they were caught off guard would have known about fair value if only they read their fund's disclosure documents.  Mr. Barbash said the review found that fund companies did disclose that they can turn to fair value when they see fit.  He added that some of the explanations were too legalistic, but they were there nonetheless.

124.   On December 18, 1997, <u>The Wall Street Journal</u>, in an article entitled "Market

Timers Beware," reported:

A number of mutual-fund companies, fearing a new wave of speculative trading the next time global markets wobble, are taking steps to thwart those investors who seek to capitalize on market gyrations.

One step is expanding the use of "fair-value pricing" for fund shares -- a controversial pricing system in which fund companies come up with share prices by using information other than the closing market price of stocks in their portfolios.  Other fund companies say they will simply refuse to take orders from customers they suspect to be market timers, while another group is lobbying the giant fund supermarkets to help their cause.

45

Why all the concern?  During the market correction of late October, a number of fund companies found themselves at the mercy of mutual-fund market timers, who spotted a profitable short-term investment because of the time differences between overseas and U.S. markets.

The timers were able to buy Asian funds on the cheap, knowing full well that these shares would rise after the U.S. markets began to recover, and then selling those shares for a quick profit.  While timers are able to profit whenever there is a time difference between markets, the magnitude of the problem first became apparent in October.

Fund companies say the market timers earned a quick profit at the expense of the funds' long-term shareholders by diluting the holdings of those investors who hang on through thick and thin.  The Securities and Exchange Commission, the fund industry's top cop, agrees and is looking at ways fund companies can best protect themselves and their customers against timers.  Barry Barbash, SEC director of investment management, says the SEC may ultimately "bless a number of pricing methods" and will make some recommendation on the matter in 1998.

Several fund companies concede they were caught off guard by the immense amount of speculative trading in late October.  They are looking to take action before the next big market move.

Of course, some firms, like giant Fidelity Investments, protected themselves by employing fair-value pricing of fund shares during the late October correction.  As a result, many of the speculators and other investors didn't know that they actually purchased Asian fund shares at a higher price -- based on what Fidelity thought was the "fair value" of stocks in its funds.  Fidelity based the prices on such information as trading of futures tied to the stocks, rather than their closing prices on the Asian markets.

Officials of Harris Associates, the manager of the Oakmark funds, have been on a campaign to weed out market timers.  David Herro, manager of Oakmark International Fund, says his fund, with assets of about $1.7 billion, has turned away potential investors who wanted to put almost $100 million to work.  "The firm has seen more short-term trading in recent weeks," says William Nygren, Harris's director of research.  "In volatile markets, the timers are more active."

But other fund companies did nothing, only to discover that the market timers had won out.  One such fund group, Guinness Flight Investment Management, observed that some timers took advantage of its China & Hong Kong Fund, buying shares priced on the decline of Asian market at a time when the U.S. markets were rebounding.  The next day, when the Asian markets did indeed recover, as they often do after a rise in the U.S. markets, some investors sold their shares for a quick profit.

46

125.    Thus, at a minimum, the result of the wide-spread and well-publicized market timing that occurred in connection with the October 1997 Asian market crash, and the ensuing SEC investigation, findings and general press coverage left the entire mutual fund industry aware that: (i) arbitrageurs targeted mutual funds holding assets exhibiting stale pricing, such as funds investing in stocks trading on an overseas exchange; (ii) permitting such speculative trading in mutual fund shares harmed long-term investors by diluting the fund NAV; (iii) a highly effective method of preventing such arbitrage was available and permissible under the regulations extant at that time; and (iv) the industry's principal regulator, the SEC, had decided to focus attention on these issues.

**Continued Regulatory And Industry Action**
**Regarding Mutual Fund Arbitrage Abuses**

126.    Pursuant to its initial investigation of the event surrounding the 1997 Asian market crash, the SEC had stated that fair value pricing was "permitted, but not required."  The SEC "clarified" this position in December 1999 and April 2001 letters to ICI -- the mutual fund management group where Defendants Carifa and Condron served on the board of governors at the time of the letters.  These letters constitute yet another red flag, of which directors of companies with significant operations in the investment advisory business, either were aware of, or absent reckless indifference, should have been aware of, indicating substantial compliance risk in connection with arbitrage opportunities arising from the stale pricing of fund assets.

(a)    <u>The December 1999 SEC Letter To The ICI</u>

127.    In its December 8, 1999 Letter to the ICI, the SEC reiterated that the 40 Act's pricing requirements "are critical to ensuring that the prices at which fund shares are purchased and redeemed are fair, and do not result in dilution of shareholder interests or other harm to shareholders."  This letter observed that the 40 Act requires mutual funds to value their portfolio

47

securities by using the market value of the securities when market quotations for the securities are readily available; however, when such quotations are not readily available, funds must otherwise arrive at a determination of the fair value of the securities.

128.    The SEC used the September 1999 Taiwan earthquake, which resulted in the closing of the Taiwan exchange for a number of days, as an illustration of circumstances when market quotations of certain securities were not readily available.  The SEC thus determined that "funds should consider adopting procedures that are designed to alert the board and fund management to conditions that may necessitate fair value pricing of portfolio securities."

129.    The SEC recognized the reality that it was the investment adviser firm, and not the mutual fund itself, that acted as "fund management," with day-to-day responsibility for operations, including setting share prices.  Thus, despite the fact that the 40 Act places the responsibility to set a fair value for portfolio securities on the fund board, the December No-Action Letter stated: "Mutual fund boards, however, typically are only indirectly involved in the day-to-day pricing of a fund's portfolio securities," and that most fund "boards fulfill their obligations by reviewing and approving pricing methodologies, which may be formulated by the [fund] board, but more typically are recommended and applied by fund management."

(b)    **The April 2001 SEC Letter To The ICI**

130.    In its April 30, 2001 Letter to the ICI, the SEC issued a much stronger statement regarding both the need for fair value pricing and the inherent risks of dilution and injury to long-term investors posed by fund arbitrageurs.  The April 2001 letter directly addressed the time zone arbitrage problem, and found that failure to apply fair value pricing following an event significant enough as to possibly affect the accuracy of local market closing prices could result in fund dilution. The SEC specifically stated that "funds should continuously monitor for events that might

48

necessitate the use of fair value prices." The SEC further stated that, with respect to securities traded on foreign exchanges, "a fund must evaluate whether a significant event (i.e., an event that will affect the value of a portfolio security) has occurred after the foreign exchange or market has closed, but before the fund's NAV calculation." The SEC further recognized this same problem can exist regarding fair value pricing of relatively illiquid securities.

131. Finally, the SEC attached as an exhibit to the April 2001 No-Action letter a hypothetical example of how using accurate fair value pricing could completely eliminate the arbitrage opportunity resulting from stale pricing of foreign portfolio securities, thus protecting long-term fund investors from dilution.

132. The SEC's illustrative example highlighted beyond dispute that: (i) the SEC considered market timing by arbitrageurs to be dilutive and injurious to long-term investors in mutual funds; and (ii) fund management (i.e., the investment adviser companies responsible for setting share prices and ensuring compliance with laws and regulations) were required to practice fair market pricing in order to eliminate arbitrage opportunities that result from stale market pricing practices. In addition, the SEC also provided the mutual fund industry with a clear and explicit road map detailing exactly how to prevent the entire problem of market timing.

**The Increase In NAV Arbitrage Abuses In The
Late 1990's And Early 2000's Was Actively
Tracked  And Well-Documented In Academic Articles**

133. Over the same period that the SEC was undertaking repeated investigations and issuing its findings regarding market timing and arbitrage abuses in the mutual fund industry, extensive study and analysis by numerous academicians were also being publicized and widely disseminated which arrived at exactly the same findings and conclusions.

49

134.    On May 3, 2004, <u>The Wall Street Journal</u> published an article entitled "Discovering

Profits in Timing Funds," which noted:

> [A] small group of academics had been pointing out the potential problems with
> market-timing strategies for years.  Since the late 1990s, more than a dozen finance
> professors at numerous universities have done research to document how market
> timing works and how it hurts mutual-fund investors.  Prompted more by academic
> curiosity and professional competition than by investor advocacy, the researchers
> working alone and in small teams wrote at least eight papers on the topic.  All were
> published or widely circulated well before questions about the fund-timing issues
> attracted Mr. Spitzer's attention beginning last summer.

135.    These academic studies, while heightening both SEC and industry awareness of the

market-timing problem, ironically, led to <u>increased</u> market timing activity as more arbitrageurs

became aware of the arbitrage opportunities available.  The May 3 article went on to state:

> [W]hen Mr. Dubofsky jointly wrote a second paper on market timing in 2001, he and
> co-author Rahul Bhargava from the University of Nevada at Reno got several dozen
> calls from interested parties asking for copies of the study.  But the calls didn't come
> from regulators - they came from sophisticated investors who wanted to learn more
> about how to trade mutual funds.

136.    Professor Zitzewitz, in his October 2002 article "Who Cares About Shareholders"

(quoted above), listed well-publicized academic studies concerning mutual fund market timing:

> Several academic papers have discussed NAV predictability and the associated
> arbitrage opportunity: Bhargava, Bose, and Dubofsky (1998), Chalmers, Edelen, and
> Kadlec (2001), Goetzmann, Ivkovic, and Rouwenhorst (2001), Greene and Hodges
> (2002), and Boudoukh, Richardson, Subrahmanyam, and Whitelaw (2002).  These
> papers focus on different asset classes and aspects of the problem: Bhargava, et. al.
> and Goetzmann, et. al. focus on international funds while Chalmers, et. al. studies
> small-cap U.S. equity funds as well.  Goetzmann et. al. and Greene and Hodges
> provide estimates of dilution, while Boudoukh, et. al. examines the extent to which
> arbitrage trading strategies can be hedged.

137.    In October 2002, three Yale School of Management professors, William N.

Goetzmann, Zoran Ivkovic, and K. Geert Rouwenhorst, published an article entitled "Day Trading

International Mutual Funds: Evidence and Policy Solutions" (the "2002 Yale Study").  The 2002 Yale Study clearly recognized the abundance of literature on this topic:

> We are not the only researchers to point out the problem posed by the use of stale prices to compute NAVs.  Neumark, Tinsley, and Tosini (1991) show that the opportunity for speculative profits in international mutual funds is not as much of an informational efficiency problem as it is an institutional efficiency problem. Contemporaneous research by Chalmers, Edelen, and Kadlec (2001), Greene and Hodges (2002), and Zitzewitz (2002) investigates the potential profitability of trading on stale prices using both international and small-cap funds.  Using various performance measures, all three papers show that day trading in mutual funds using current information has the potential to generate profits.

138.    The widespread press reporting, regulatory actions and academic publications educated the arbitrage community about the opportunities inherent in mutual fund pricing practices. Four Professors of Finance at the Stern School of Business, New York University, Professors Jacob Boudoukh, Matthew Richardson, Marti Subrahmanyam, and Robert F. Whitelaw, in an article in the July/August 2002 edition of The Financial Analysts Journal entitled "Stale Prices and Strategies for Trading Mutual Funds," explained how specific market timing strategies could be refined through hedging.  Additionally, the authors noted that they "know of at least 16 hedge fund companies covering 30 specific funds whose stated strategy is 'mutual fund timing.'"

139.    The popular press also carried articles attacking market timing practices long after the initial flurry of articles attendant to the October 1997 Asian market crash.  For example, a June 2000 article in TheStreet.com, entitled "Your International Fund May Have the Arbs Welcome Sign Out," highlighted the NAV arbitrage problem and the dilution to long-term mutual fund shareholders it causes, and a July 2000 article in the same publication, entitled "International Funds Still Sitting Ducks for Arbs," presented a detailed example of an April 2000 recurrence of the October 1997 Asian market crash arbitrage opportunity, albeit on a smaller scale.

140.   These academic and press articles constituted yet other substantial red flags highlighting the pervasive and costly nature of the market timing problem across the industry. These articles, especially in combination with the other widely reported and available regulatory, academic and general press information on the topic, at a minimum, put directors and senior management of companies with significant operations in the mutual fund management industry on notice that the problem existed and was pervasive, resulting in billions of dollars in dilution to long-term investors each year; but that it could be effectively addressed and resolved through reasonable compliance oversight and implementation of fair value pricing practices.

**The Mutual Fund Industry Has Been Slow To React,**
**And Has Implemented Policies And Procedures**
**Designed To Permit Selective Arbitrage Activity**

141.   As detailed herein, the market timing/late trading problem has long been both pervasive and well recognized. The solution to it has been clear, yet in most instances too little, too late has been undertaken by the mutual fund industry in response. The reason why is inter-twined with the inherent conflict of interest manifest in the mutual fund industry. As noted above, mutual funds are largely overseen and managed by investment adviser companies. Fees and payments to the investment adviser companies are tied to assets under management (typically paid as a percentage thereof), and not to the performance of the funds. Schemes that (as part of a reciprocal agreement with arbitrageurs) permit investment adviser companies to increase their fees and payments by artificially increasing the amount of assets under advisement or by increasing investments in hedge funds and other investment vehicles also managed by the same advisers have a direct impact on the adviser firm's bottom line. Thus, investment adviser companies have little real incentive to design and implement truly effect anti-arbitrage policies and practices.

52

142.     It is beyond cavil that the mutual fund industry was on clear notice of the existence and scope of the problem.  Stark evidence of the practice, and its harmful dilutive consequences, was readily available to mutual fund management based on routinely generated trading records from the funds.  Illustrative of this fact, New York Attorney General Eliot Spitzer testified before the Senate Committee that:

> Here's why directors were on notice that their funds were being mismanaged:
>
> Fund directors could and should have suspected that their funds were permitting market timing by simply comparing the fund's average net assets -- the amount, on average, that a fund's shareholders have invested in a fund, with the fund's total redemptions -- the amount that the fund paid out to shareholders cashing out their shares.  Since most fund shareholders are relatively long-term investors, total redemptions are on average a percentage of its net average assets.  A red flag should therefore have been raised if a fund's total redemptions are several times its average net assets.  While not the only possible explanation, it strongly suggests that the fund is permitting rapid-fire, in-and-out market timing and trading.
>
> *     *     *
>
> A red flag should also be raised when there is a very close correlation between a fund's total sales and total redemptions.  Since market timers cycle large amounts of money in and out of the funds they are timing, those funds are likely to report that total sales -- which represents money flowing into the fund, and total redemptions -- which represents money flowing out of the fund, are close to equal.  At a minimum, directors who were doing their jobs would give a fund that has an almost 1:1 ratio of sales to redemptions some added scrutiny.

143.     Transactional data similar to that highlighted by Spitzer, routinely collected by and/or for Janus Capital, likewise demonstrated the presence of rampant market timing at Janus mutual funds as well.

144.     Spitzer's testimony, while focused on the failure of fund directors to monitor such basic information, applies with even greater force to fund adviser companies, who are routinely tasked with the actual responsibility for all day-to-day operations at the funds, including setting price and share redemption policies and practices.  As detailed herein, while fund management companies

53

explicitly represented in their funds' prospectuses that they actively policed the funds they managed for timing activity, many -- including Alliance Capital -- nevertheless entered into multiple sweetheart side deals with particular market timers willing to play ball with them in pay-to-play schemes involving increasing the fund management company's and managers' fees based income by parking assets in their hedge funds and other investment vehicles.

## CERTAIN ARBITRAGEURS OPERATED
## WITH IMPUNITY AT ALLIANCE

145.    As detailed above, the once a day NAV pricing mechanism for mutual funds has long been recognized in the financial industry and academic community as inefficient, and thus, rife with opportunities for arbitrage profiteering. Efforts to capture these arbitrage opportunities were open, obvious and institutionalized. Because of the enormous profits to be mined, these efforts encompassed both coordinated and competitive activities across a wide swath of the financial industry, including, inter alia, mutual funds, hedge funds, brokerages, clearing firms, investment banks and other lending institutions.

146.    These various entities served different, and, in some cases multiple functions in order to facilitate market timing activities. As described herein, mutual funds investment advisers developed the product -- capacity to time specific mutual funds within fund families. Brokerage companies such as Salomon Smith Barney, Bear Stearns, Prudential, PaineWebber, Northeast Securities, and Brean Murray, acted as intermediaries between the mutual fund investment adviser companies and potential market timing partners, earning for themselves commissions on the actual transactions involved. Players such as CIBC, Bank of America, Deutchebank, Bear Stearns, Zurich and Credit Lyonnaise provided financing for market timing positions. The clearing of billions of dollars of market timing transactions across multiple mutual fund companies was handled by firms

54

like Bank of America and Bear Sterns.  An entire sub-industry of brokers, some employed by the

investment advisers, some independent, matched timing capacity with the hundreds of market

timers, including hedge funds, searching out timing capacity authorized by the investment advisers.

147.   The practice was so wide-spread and organized that analysts and other industry

publications closely tracked and publicly reported on the performance of timers, and there was even

a Society of Asset Allocators and Fund Timers (SAAFTI) created by advocates.  The astounding

financial returns consistently earned by hedge funds and other active market timers were closely

followed by market players -- especially in the bear market following the market crash and

subsequent recession in 1999 and 2000 -- and underpinned the stampede of new parties trying to get

on the timing band wagon in 2001 and 2002.

148.   Thus, while market timing had long been active in the financial industry, several

general market factors and specific Alliance circumstances combined in 2001 and 2002 to change

both the market timing environment and Alliance's reaction to it:

149.   At a general market level:

•       in 2001, in part as the result of the April 2001 SEC No-Action Letter regarding fair
        value pricing, mutual fund companies acted to substantially reduce market timing in
        their international funds, thus significantly reducing the total universe of mutual
        funds available and suitable for market timing;

•       as noted above, economic market conditions at the same time created an explosive
        increase in demand for timing capacity by players; and

•       leading up to this point, mutual fund companies had suffered devastating losses of
        assets under management, and were struggling to attract new business in a down
        market.

150.   As an example, Alliance, through it mutual funds, had suffered massive losses in the

bear market.  Retail assets under management dropped an astounding *$35.6 billion,* or 20%, from

55

December 31, 2001 to December 31, 2002.  This precipitous decline consisted of a drop of $24.1 billion from market depreciation, and $12 billion from assets outflows.  As a result, over this same period, Alliance lost over $232 million in revenues.

151.    These factors led many mutual fund companies, including Alliance, around 2001 to treat market timing capacity more as a potentially highly profitable commodity to be aggressively marketed and 'sold' to select customers as part of a scheme to increase the amount of assets under management -- and thus the companies' own profitability -- through the investment of sticky assets as the quid pro quo for granting these market timing arrangements.

152.    As detailed herein, over the next several years, Alliance aggressively marketed hundreds if millions of dollars of timing capacity in various of its mutual funds.  Using such capacity, an array of favored customers, using hundreds of millions of dollars of negotiated capacity, were able to execute hundreds of market timing transactions involving billions of dollars.

153.    Alliance packaged and marketed the majority of its market timing capacity through certain brokerage firms, including, inter alia, Brean Murray, Northeast Securities, Pritchard and Salomon Smith Barney.  Alliance alone controlled which brokerages firms were allocated capacity, and in what amounts.

154.    Either directly or through its brokerage intermediaries, Alliance aggressively solicited market timers who were willing to park substantial amounts of sticky assets in return for the privilege of market timing Alliance funds.  Two such preferred customers who actively market timed Alliance mutual funds pursuant to such negotiated arrangements were Daniel Calugar, and a group of entities affiliated with Canary Investment Management, LLC and controlled by Edward J. Stern (collectively "Canary").  At its peak, Canary's market timing capacity at Alliance exceeded $120 million and Calugar's exceeded $220 million.  According to a list created by the Market

56

Timing Supervisor in 2003, Alliance Capital's "Top 10 Timers" collectively had $543 million in total timing capacity in the Company's mutual funds.

**The Truth Behind Alliance's Market Timing Supervisor**

155.    In connection with its plan to institutionalize and formalize its market timing activities at Alliance Capital, in early 2001 the Company appointed a sales support employee to be a "Market Timing Supervisor."  Consistent with implementing an effective market timing operation at Alliance, however, the primary responsibilities of this potentially critical employee were <u>not</u> to ferret out and guard against market timing activities, but rather to coordinate, oversee and support them in an organized manner.

156.    Hank Brennan ran the market timing desk at Alliance.  As such, one of Brennan's principal responsibilities was to monitor for compliance with existing arrangements to ensure that no unauthorized timers were permitted to time Alliance funds, and, equally important, to ensure that authorized timers adhered to the parameters of their arrangements (including as to amount of sticky assets paid and the number of market timing transactions per week or month) as reported to him by sales personnel.

157.    To fulfil this function, Brennan's job included his periodic review of computer printouts of trading data from Alliance's mutual funds in order to identify and eliminate accounts with high levels of trading activities that had not been approved by the Company.

158.    As detailed herein, the Market Timing Supervisor played a critical role in facilitating the efficient and effective execution of the market timing arrangements in place at Alliance.

**Alliance's Market Timing Arrangement With Canary**

57

159.    In the summer of 2001, Canary considered investing in an Alliance Capital hedge fund.  When making the commitment to invest in the hedge fund, Canary sought reciprocal market timing capacity in the AllianceBernstein Mid-Cap Fund ("Mid-Cap Fund").  Pursuant to this arrangement, Alliance Capital provided to Canary two dollars of market timing capacity in the Mid-Cap Growth Fund for each dollar invested in the hedge fund.  Canary continued to use its market timing capacity in the Mid-Cap Fund until June 2003, when the portfolio manager finally acted to prohibit Canary from further market timing in that mutual fund.

160.    In April 2003, Alliance Capital offered Canary an additional $30 million in market timing capacity across several Alliance Capital mutual funds, in return for which Canary was required to park $3 million of "sticky assets" in the Premier Growth Fund.  As noted above, at the peak of its market timing arrangement with Alliance, Canary had timing capacity in excess of $120 million.

161.    Canary financed its market timing positions at Alliance through outside sources, including CIBC and the Bank of America.  Transactions in Alliance mutual funds using CIBC financing were executed through separate accounts opened at the various brokerage firms through which Canary obtained its capacity.  Each of these brokerage firms would then open an account at Alliance in its name.  Thus, for example, market timing done through capacity obtained from SSB would be structured as follows: Canary would open an account at SSB (in the name of CIBC) using financing obtained through CIBC.  SSB would then open an account in at Alliance in SSB's name.  All market timing transactions in Alliance mutual funds using Bank of America provided financing, on the other hand, were made through the Canary account called Cockatiel.  In addition, Canary had at least one direct relationship with Alliance, under which it received market timing capacity in return for an investment in the Alliance High Grade fund.

58

162.    While these timing agreements were verbal, no efforts were ever made to hide or disguise their existence, and even the most cursory review of the trading records on these various accounts at Alliance (or, for that matter, at the brokerage firms) would have clearly demonstrated the presence of massive market timing rapid in-and-out transactions.  Thus, for this reason, as well as the fact that Alliance itself had authorized the various broker 'authorized' to offer the market timing capacity at issue in the first place, preclude Alliance from raising any reasonable claims that it was not fully aware that these accounts were being used to market time Alliance mutual funds..

163.    The huge scope and notorious nature of these suspect transactions is evidenced by an October 12, 2003 The Wall Street Journal article, which reported that, for example, "on the evening of January 13, [Canary] system to sell 4,178,074 shares of Alliance Growth and Income Fund, which at that time would have amounted to an approximately $11 million transaction."

164.    The Market Timing Supervisor played another key role in assisting in the expansion of market timing pursuant to these formal arrangements at Alliance.  Specifically, while Alliance Capital had a practice of maintaining as confidential the actual identification and weighted value of the securities owned by Alliance mutual funds, only disclosing this information to the public at certain times of the year, it nonetheless on more than one occasion provided this confidential information to Canary upon request.

165.    For example, in May 2003, a Canary representative asked the Market Timing Supervisor to provide Canary updated portfolios for certain mutual funds.  The Market Timing Supervisor requested and received this confidential information from the respective mutual fund portfolio managers or their assistants, and, on May 29, 2003, sent it via e-mail to the Canary representative. This e-mail contained a list of all securities (and their weighted value in the portfolio)

59

owned by the following five of funds as of May 28, 2003: the Growth Fund, the Mid-Cap Growth Fund, Growth and Income Fund, the Premier Growth Fund, and the Quasar Fund.

166.    Canary was subsequently able to use this confidential information to design and purchase a complex transaction (an "equity basket") that allowed it to establish a synthetic short position on these funds, enabling it to profit from market timing even during falling markets.

**Alliance Capital's Long Market Timing History with Calugar**

167.    In April 2001, hedge fund sales executives at Alliance Capital negotiated an agreement with Calugar providing market timing capacity in the AllianceBernstein Technology Fund ("Tech Fund") and the AllianceBernstein Growth Fund ("Growth Fund") in exchange for Calugar's investments in Alliance Capital hedge funds in a ratio of 10:1 (mutual fund timing capacity to hedge fund investment).  In a note to an Alliance Capital representative summarizing the terms of this agreement, Calugar made clear not only the terms, but also the fact that Alliance Capital had conditioned the agreement on Calugar making separate investments in Alliance hedge funds as part of a reciprocal quid pro quo arrangement.

> I very much appreciate the $10 million timing position that was given to me in Alliance Technology (ALTFX) and Alliance Growth (AGRFX) ... .  You indicated that the managers of these two funds also run hedge funds at Alliance.  I have been an active investor in timing mutual funds for 15 years, and have never invested in a hedge fund or similar investment, however, I am willing to make an investment in Alliance hedge funds equal to 10% of the timing allocation that I maintain in your mutual funds.  I will keep the hedge fund position as long as I have the timing allocation in the mutual funds.  My understanding is that you would be able to give me an exit opportunity from the hedge funds at the end of any month, however, I would not exercise that opportunity as long as I continue to have the timing allocation on the mutual fund side.

168.    Shortly thereafter, Calugar began timing the Tech Fund and the Growth Fund, and invested in Alliance Capital hedge funds, including a hedge fund managed by the Tech Fund portfolio managers.  In June 2001, Alliance Capital agreed to increase Calugar's market timing

60

capacity to $100 million in the Tech Fund, and to $20 million in the AllianceBernstein Premier Growth Fund ("Premier Growth Fund") -- allowing for a total of four round trips trading transactions per month -- in return for a 20% investment in Alliance Capital hedge funds.

169.    Members of senior management at Alliance Capital were fully aware of these arrangements with Calugar.  For example, in June 2001, notification of the arrangement with Calugar was conveyed through a series of e-mails from hedge fund sales personnel to mutual fund management, including then-President and Chief Operating Officer ("COO") of Alliance Capital, defendant Carifa, who not only also served as the Chairman and President of the mutual funds at issue, but also as the Chief Operating Officer, President, and member of the Board of defendant ACMC.

170.    The forwarded e-mail specifically described aspects of the Calugar arrangement, including noting that the Tech Fund portfolio managers "did indeed authorise [sic] up to $100 million of market timing money for Dan Calugar in the Tech fund.  Dan has subsequently subscribed to [the portfolio managers'] hedge fund for 20% of the underlying assets as of June 1 in anticipation of this."

171.    Press reports in December 2003 indicate that at least four, if not more, of the Director Defendants had actual knowledge of the Calugar market timing arrangements.  On December 17, 2003, The Wall Street Journal reported:

> Roger Hertog, vice chairman of Alliance Capital Management Holding LP, was included in e-mail correspondence discussing details of one of the firm's largest market-timing accounts, according to copies of those e-mails reviewed by The Wall Street Journal.   Further, the text of the e-mails suggests that Bruce Calvert, Alliance's board chairman, also was familiar with the arrangement and approved it. This arrangement permitted a Las Vegas-based broker to engage in market-timing trades in a number of the firm's mutual funds despite the fact Alliance had rules discouraging such frequent in-and-out activity.

The apparent awareness of Messrs. Hertog and Calvert, along with John Carifa, who was asked to resign last month from his posts as president of Alliance and chairman of the board of the Alliance funds, suggests that nearly the entire upper echelon of Alliance's management knew about the arrangements.

*   *   *

Two of the e-mails reviewed by The Wall Street Journal were exchanged between Mr. Laughlin and Mr. Carifa on Jan. 29, 2002. Among those sent copies of the e-mails were Mr. Hertog. The e-mails, with the subject line "Alliance Technology Fund," lay out in detail the arrangement to allow the Las Vegas broker, Daniel Calugar, to engage in market-timing trades in a number of the firm's mutual funds in connection with his investments in Alliance hedge funds and other products.

One of the e-mails discussed the ratio of so-called sticky-asset investments that Mr. Calugar agreed to make in Alliance hedge funds in exchange for being allowed to time the mutual funds. For example, Mr. Calugar would be allowed to make market-timing trades in Alliance's Premier Growth Fund that totaled up to four times the amount of money that he had invested in an Alliance hedge fund. At the time, Premier Growth was managed by Alfred Harrison, a vice chairman at Alliance. Mr. Harrison was also sent a copy of one of the e-mails. An Alliance spokesman said Mr. Harrison wasn't available for comment.

Mr. Laughlin's e-mail to Mr. Carifa also said that, according to Mr. Schaffran, "Bruce Calvert is OK with this," an apparent reference to the timing arrangement with Mr. Calugar. Mr. Schaffran was also copied on that e-mail. David M. Brodsky, Mr. Schaffran's attorney, said his client would have no comment.

The e-mail from Mr. Laughlin also cited an occasion where Mr. Calugar's trading was disruptive to the Alliance Technology Fund. It said that Mr. Malone "was forced to reduce a cash position to cover a redemption." Mr. Malone's attorney, Jonathan D. Polkes, declined to comment. Mr. Calugar couldn't be reached for comment.

172.    Later in 2001, Alliance Capital increased Calugar's market timing capacity in the Tech Fund to $150 million, with the understanding that Calugar would make reciprocal long-term investments in Alliance Capital hedge funds in a ratio of 5:1 (mutual fund capacity to hedge fund investment).  Throughout the latter part of 2001, Calugar continued to make additional investments in Alliance Capital hedge funds consistent with the agreed ratios.

62

173.     While these reciprocal market timing arrangements directly benefitted Alliance Capital, it was also clearly recognized that they were injurious to the funds long-term investors.  For example, in January 2002, Calugar made a large exchange in the Tech Fund that evoked a complaint from that fund's portfolio manager.  Thereafter, Calugar and Alliance Capital representatives had further discussions concerning the terms of Calugar's timing capacity in Alliance mutual funds.  Ironically, at the time, one member of Alliance Capital senior management presciently remarked that he would not want to read about these matters on the front page of the newspaper.  Senior management nonetheless entered into discussions with Calugar regarding the continuation of market timed trading at Alliance Capital on renegotiated terms.

174.     Defendant Carifa received the following e-mail from an Alliance Capital executive vice president ( referred to hereinafter as the "EVP"), reviewing the details of Calugar's timing arrangement and noting the potential for a renegotiated agreement, demonstrating the active role played by Alliance Capital personnel in trying to maximize the benefits to it under the agreements:

> Following our telephone conversation, I spoke with [the head of hedge fund sales and the Tech Fund portfolio manager] to get the latest on Dan Calugar who has placed roughly $150 million of "timer" money into the Tech Fund and $30 million into the Tech Hedge Fund.  Calugar also placed $55 million into Premier Growth as an offset to $17 million into Alpha 20 and $4 million in the Muni Hedge Fund.  Apparently the original ratio of "timer" money to Hedge Fund investments was negotiated at 5 to 1 ... .  This deal was negotiated outside the system that [the head of domestic mutual fund sales] set up ... which generally discourages "timers" altogether, but controls the few we do have.
>
> [The head of hedge fund sales] has spoken to Calugar, and thinks he can negotiate a better deal for Alliance.  [The head of hedge fund sales] is also going to speak with [the Market Timing Supervisor] to set up better controls over the round trips in order to protect the fund shareholders.  According to [the Tech Fund portfolio manager], this has not been an issue except for a brief volatile period in January when he was forced to reduce his cash position from 6% to 4% in order to cover a redemption ... .

Obviously, [the Tech Fund portfolio manager and the head of hedge fund sales] and presumably the other portfolio managers want to keep the relationship. According to [the head of hedge fund sales,] [the CEO] is OK with this. From a purely Mutual Funds standpoint, we get very little out of this, and would not be disappointed to see Calugar go away. As you know, he has made a lot of money on this deal by trading the funds. [The head of hedge fund sales] points out that the Hedge Funds appear to be virtual loss leaders for his timing practice.

(Bracketed language in place of specifically named individuals in this and other e-mails quoted herein is as redacted by the SEC in its Settlement.)

175.    In a reply e-mail, defendant Carifa specifically highlighted the direct financial benefit to Alliance Capital (in the form of increased management fees) from the relationship with Calugar: "Assuming the assets stay in [t]he funds for a year our fund management fees come out to about $1.8 million per year. Assuming no impact on our shareholders and no unique operational issues it is beneficial to our funds group by retaining 55% of the fees."

176.    The Head of Hedge Fund Sales (Schaffran) then negotiated with Calugar the terms of his timing arrangement, and sent an e-mail to defendant Carifa and others describing the new arrangement, specifically highlighting the increased benefits to Alliance Capital in the revised agreement, namely: (i) "ratios are reset from 5:1 mutual to hedge investment to 4:1 for Premier Growth and 3:1 for Tech;" (ii) "Calugar's mutual fund trades will be made in $10MM `blocks';" and (iii) Calugar "will redeem all hedge fund positions" annually.

177.    As the SEC found, these renegotiated terms primarily benefitted Alliance Capital because:

a.    the new ratios meant Calugar was required to invest more money into the hedge funds in return for the same timing capacity as before; and

b.    the annual redemption and reinvestment obligation on Calugar increased Alliance Capital's opportunities to profit from such investments, as Alliance Capital would

64

now be eligible to earn performance fees from any increase in value at each redemption, without having first to earn back any prior losses.

178.    In or about July 2002, Alliance Capital almost tripled Calugar's timing capacity in the Premier Growth Fund from $17 million to $57 million. In or about September 2002, Alliance Capital also granted Calugar an additional $56 million timing capacity in the Growth & Income Fund, with Calugar, in return, being required to invest in a hedge fund managed by the same portfolio manager.

179.    Despite the recognized negative impact timed trading had on its mutual funds, Alliance Capital continued over a multi-year period to make substantial efforts to accommodate, retain and expand its market timing arrangements. For example, even in the face of complaints by specific portfolio managers regarding the negative effect of Calugar's timed trading in particular mutual funds, Alliance Capital took no reasonable steps to end the scheme, but rather simply shifted the timed trading around to a different fund. As such, in early 2003, in response to complaints by the Premier Growth Fund portfolio manager about Calugar's trading in his fund, Alliance Capital decreased Calugar's timing capacity in that fund by $20 million, but then increased his timing capacity in two other funds, the Growth & Income Fund and the Tech Fund, by the same amount.

180.    The Head of Hedge Fund Sales explained this shift in an e-mail to Calugar:

> In order further to reduce your exchanges in Premier Growth Fund from $70MM to $50MM ... [the Growth & Income Fund portfolio manager] has agreed to increase your exchange limit on Growth & Income from $43MM to $53MM and [the Tech Fund portfolio manager] has agreed to increase your exchange limit on Tech from $100MM to $110MM.

181.    The Head of Hedge Fund Sales then forwarded the above e-mail to others at Alliance Capital, noting: Calugar "is an important relationship for this organization and extremely cooperative."

65

182.    Calugar undoubtedly was an "important relationship" for Alliance Capital hedge funds because of the total amount he invested in them.  By early 2003, Calugar's investments in the Alliance Capital hedge funds -- a routine quid pro quo to his participation in the market timing scheme -- became such a large percentage of the hedge fund total assets that the SEC found that: "the hedge funds could not survive without Calugar."

183.    In fact, even the Head of Hedge Fund Sales noted at the time that Calugar's investments were important to the continued survival of the hedge funds.  In a meeting with certain members of Alliance Capital management in or about January 2003, the Head of Hedge Fund Sales described Calugar's investments in the hedge funds, and explained their importance as a percentage of total fund assets:

| Hedge Fund | Calugar Investment | Total Hedge Fund Assets | Percentage |
|---|---|---|---|
| Tech Partners | $37.4MM | $42.5MM | 88% |
| Research Partners | $7.7MM | $15.0MM | 51% |
| Muni NY | $5.0MM | $6.0MM | 83% |
| Muni Nat'l | $10.3MM | $12.7MM | 81% |

184.    In addition, in an e-mail in February 2003, the Head of Hedge Fund Sales wrote, Calugar "now is almost single-handedly supporting our domestic Tech Hedge, Research and Muni Funds."

185.    In or about February 2003, following discussions regarding Calugar's market timing, members of Alliance Capital senior management determined that a risk existed from the evidence of continued linkage between Calugar's timing activity and hedge fund investments.  Rather than immediately taking reasonable steps to discontinue the practice, the Fiduciary Defendants instead

took (or authorized the taking) of steps to make it more difficult to track the scheme internally, and thus disguise its existence.

186.    Specifically, despite the fact there was a clear linkage between the grant of capacity and the payment of sticky assets -- as the market timing arrangements were premised specifically on payment of such a reciprocal quid pro quo -- the EVP sent an e-mail to the Head of Hedge Fund Sales and others explaining "we have to officially `de-link' the mutual funds activity so as to not in any way suggest that it is conditional on hedge fund participation or vice versa." The Head of Hedge Fund Sales responded: "Agreed." In reality, timing of Alliance Capital mutual funds in returned for guaranteed investments in Alliance Capital hedge funds still continued unchecked.

187.    As noted above, execution of the market timing arrangements required the willing cooperation of fund portfolio managers as well. As such, in the summer of 2002, the Tech Fund portfolio manager sought to trade futures in his fund in order to increase liquidity to accommodate Alliance Capital's approved timers. Specifically, the portfolio manager explained that, among other things, futures trading would provide a more liquid vehicle for dealing with what were highly volatile fund flows from market timers. Such a change required approval of the Tech Fund board and shareholders. Pending such approval, the portfolio manager reduced Calugar's market timing capacity in the Tech Fund to $50 million.

188.    Despite the fact Alliance Capital had not yet pursued approval to trade futures, in or about December 2002, it nonetheless again increased Calugar's timing capacity in the Tech Fund to $100 million "subject to satisfaction of the usual agreed conditions."

189.    The issue of permitting futures trading as a means to accommodate market timers in the Tech Fund arose again in early 2003 after a meeting of certain members of Alliance Capital

senior management.  In an e-mail, the Head of Hedge Fund Sales notified Calugar that Alliance Capital would seek approval to permit futures trading in the Tech Fund, and that this would "better accommodate increasing your Tech Fund exchanges in the future."

190.    As noted above, authorizing futures trading at the Tech Fund required approval of both the fund board and its shareholders.  An initial draft of the memorandum to the Tech Fund board recommended approval because, among other things, "the Fund's investment strategies may be affected by cash flows due to substantial purchases or redemptions of the Fund's shares resulting from, among other things, market timers because it may be unable to sell or purchase ... thinly traded securities on a timely basis."

191.    Ultimately, however, Alliance Capital determined to disguise its improper trading scheme from the Tech Fund board, changing the language of the memorandum to avoid any mention of market timing or its connection to the request for futures trading.  The final version of the memorandum to the fund board instead only referred to the benefit of futures because "the fund frequently experiences significant cash flow changes."

192.    In reasonable part based on this deceptive rationale advanced by Alliance Capital to support the change, the Tech Fund board voted to recommend that shareholders approve the amendment permitting futures trading.  Pursuant to this, the Tech Fund filed with the SEC a proxy statement that recommended approval of the amendment, in relevant part, because trading futures would "enable the fund to manage cash flows even more efficiently ... ."  The proxy statement did not mention market timed trading, much less disclose the fact that one of the reasons for removing the restriction on futures trading was to accommodate Alliance Capital-approved market timers in the Tech Fund.  The Tech Fund shareholders approved the amendment as recommended to them.

68

193.    It was beyond question that activities of the market timers directly and substantially harmed the long-term investors in the Tech Fund.  For example, at a July 2003 meeting of the Tech Fund board of directors, the portfolio manager gave a presentation on the performance of the fund. In a chart entitled, "Impact From Market Timers," the portfolio manager stated his belief that the performance of the Tech Fund was diminished by 1.4 percent during the first six months of 2003 due to market timers.

194.    As detailed above, both Alliance Capital and Calugar thus directly benefitted from their improper relationship.  From 2001 to 2003, Calugar and Securities Brokerage generated approximately $64 million in profits from timing and late trading in Alliance Capital mutual funds, including the Tech Fund.  Alliance Capital profited by way of increased advisory and other fees.

**Alliance Capital Enters Into Similar Timing**
**Arrangements with Other Brokers**

195.    As noted above, in addition to its relationships with hedge funds like Canary and Calugar, from 2001 to July 2003, Alliance Capital also actively negotiated timing capacity arrangements with approximately 18 brokers.  These arrangements were typically brokered through the Alliance Market Timing Supervisor, who  coordinated with the market timer and the Alliance Capital portfolio team regarding such critical issues as: (i) which Alliance Capital mutual funds would be involved; (ii) the number of "round trips" (i.e., exchanges into and out of the fund) that would be permitted within a given time frame; and (iii) the maximum dollar amount allowed per exchange.

196.    During 2001 to 2003, Alliance Capital provided capacity to market timers in the following funds: Tech Fund, Growth Fund, Growth & Income Fund, Premier Growth Fund, Mid-

Cap Fund, Quasar Fund, Small Cap Value Fund, High-Yield Fund, Disciplined Value Fund, and Americas Government Income Trust Fund.

197.    In 2003, for example, in exchange for or in connection with granting market timing capacity in Alliance mutual funds, the Alliance Market Timing Supervisor typically sought a reciprocal quid pro quo arrangement of parked or sticky fund investments (in an investment vehicle managed by Alliance Capital) in an amount equal to 10 percent of the authorized timing capacity. In order to promote such arrangements, Alliance Capital began paying commissions to its wholesalers on the sticky assets received in exchange for timing capacity.  Sales personnel referred to the sticky assets as "legit assets."  The Market Timing Supervisor maintained a schedule of "legit assets" as they were received.  During the first three quarters of 2003, Alliance Capital received $45 million in "legit assets" from timers.

**Alliance Capital Even Permitted Its Own**
**Hedge Funds To Time Its Mutual Funds**

198.    The Fiduciary Defendants not only permitted AllianceBernstein funds to be timed by Canary and other outside market timers, *they also allowed Alliance Capital's own ACM Hedge Funds to do so as well.*  The financial benefits to Alliance Capital were substantially increased by maintaining these hedge fund investments all within the same family of funds, and then moving them around among the various funds.   This practice allowed Alliance Capital to collect management and other fees on these amounts, whether they were in the target fund, the resting fund, or moving in between.  In addition, fund managers would also routinely waive applicable early redemption fees, further increasing the profitability of the scheme to Alliance Capital, and exacerbating the injury to the fund, now deprived of money that would have at least partially reimbursed it for the impact of timing.

199.    Moreover, by allowing Alliance Capital's own ACM Hedge Funds to market time Alliance's own mutual funds, Alliance Capital was further able to increase management fees to itself, as well as the ACM Hedge Funds' own returns, and the ACM Hedge Funds manager's fees.

200.    The AllianceBernstein funds' prospectus, far from disclosing to investors that the funds would be used for timing, instead created the intentionally misleading impression that Alliance Capital identified and barred timers from its funds.   As quoted herein, the AllianceBernstein prospectuses in fact included the language specifically reserving the right to shut market timers down:

> A Fund may refuse any order to purchase shares.  In particular, the Funds reserve the right to restrict purchases of shares (including through exchanges) when they appear to evidence a pattern of frequent purchasers and sales made in response to short-term considerations.

201.    Contrary to the express language contained in the AllianceBernstein funds' prospectus, Alliance Capital, however, knowingly and intentionally allowed certain investors, including Alliance's own hedge funds, to repeatedly make "frequent purchases and sales ... in response to short-term considerations."

**Routine Fund Reporting Data from Alliance
Mutual Funds Revealed Stark and Unambiguous
Evidence of Widespread Market Timing**

202.    Routinely collected and reported transactional data from Alliance's mutual funds -- such as that reviewed by Brennan in his capacity as Market Timing Supervisor (see e.g., ¶157 above) clearly demonstrated the scope and nature of the timing activity, and constituted further direct and explicit warnings of both the existence and magnitude of the problem at the Company. This is true because one consequence of market timing is increased turnover of portfolio assets, as

the manager must buy or sell stocks to accommodate the rapid-in-and-out of cash flow resulting from market timed transactions.

203.    Routine transactional data from the AllianceBernstein Tech fund is highly illustrative. For example, according to AllianceBernstein Tech Fund's own filings with the SEC, in the five years preceding 2002, the fund's share turnover had never exceeded 67% of total assets, and was as low as 46% in 2000.  In 2002, however, this number catapulted to 117%, and remained there -- the fund reported a turnover rate of 116% for the six months ending May 31, 2003.

204.    Extraordinary or unusual cash flow activity is also a clear warning of improper market timing or late trading activities at a mutual fund.  Data readily available from fund-tracker Lipper Inc. ("Lipper") clearly demonstrated cash pouring in and out of the AllianceBernstein Tech Fund in patterns reflecting market timing.[4]

205.    A review of the Lipper data for the AllianceBernstein Tech Fund (again, based on data collected by the fund itself) demonstrates that by the middle of 2001, a clear and suspect pattern developed of unusual and highly suspect massive cash flow movements in and out of the fund's A-share class:

•    in April, 2001, $53.7 million flowed into the fund A-shares, followed within a month by outflows of $54.2 million;

•    In June 2001, $66.8 million flowed in, and in July, $71.2 million flowed out again;

•    in January 2002, $184.5 million flowed in, and in February, $191.1 million flowed out again;

---

[4]    Lipper estimates monthly net fund flows based on month-end net assets reported by mutual funds themselves.  Lipper then backs out any increase in assets that appear to be a result of market appreciation, based on its information regarding each fund's actual holdings.

- in February 2003, $157 million flowed in, and in March, $146.4 million flowed back out again; and

- in April, 2003, $63.3 million flowed in, and in May, $62.2 million flowed back out again.

206.    In light of the economic conditions at the time, such activity was not typical, and clearly demonstrates that the Alliance Capital was allowing certain investors to market time, making rapid trades in and back out of the fund.  This conclusion is made even more evident when one contrasts the trading results for the Class A shares with the other share classes in the fund, which all almost exclusively showed cash outflows since late 2000.

**The Truth About Alliance's Market**
**Timing Arrangements Is Revealed**

207.    As noted above, in September 2003, New York State Attorney General Eliot Sptizer disclosed an investigation into widespread improper market timing involving Canary and a continually expanding array of well known mutual fund families.  Press reports made clear that Spitzer's office, and other state and federal regulatory agencies were continuing to investigate other companies for the same practices.

208.    On September 30, 2003, before the markets opened, Alliance Capital announced the following:

As has been publicly reported, the Office of the New York State Attorney General ("NYAG") and the United States Securities and Exchange Commission ("SEC"), are investigating practices in the mutual fund industry identified as "market timing" and "late trading" of mutual fund shares.

Alliance Capital Management L.P. ("Alliance Capital"), investment adviser to the Alliance family of mutual funds, announced today that it has been contacted by these regulators in connection with this mutual fund investigation, and has been providing full cooperation.

73

209.     On October 1, 2002, <u>The Wall Street Journal</u> reported Alliance had suspended a

portfolio manager for AllianceBernstein (Gerald Malone) and an executive selling Alliance Capital

Hedge Fund products (Charles Schaffran) because an internal inquiry found that "certain investors

were allowed to make rapid trades in a mutual fund managed by Malone in exchange for making

larger investments in Alliance hedge funds also run by Malone."

210.     In an effort at damage control, on October 30, 2003, a conference call was held

regarding Alliance Holding's third quarter 2003 performance.  After a presentation by defendant

Carifa, Alliance Vice Chairman and CEO Lewis Sander falsely assured investors:

> I can say that our own investigation has not uncovered any new findings.  We have
> no reason to believe that any alliance employees was complaisant in late day trading
> and we have no evidence that Alliance fund managers were engaged in market times
> in the funds that they managed.  Our investigation, however, is ongoing, including
> work now underway to determine the effect of market timing on shareholder returns,
> if any.

211.     On November 6, 2003, <u>The Washington Post</u> reported that Spitzer was weighing legal

action against Alliance, and that a source had confirmed that Alliance had been notified of

impending SEC action.  Alliance then confirmed that it had received a "Wells Notice" from the SEC

on October 31, 2003, auguring impending SEC charges.

212.     On November 10, 2003, Alliance announced the resignations of defendant Carifa and

Michael J. Laughlin, head of the mutual funds distribution unit.  In a press release, Alliance stated

that the resignations had been requested because the "unit" these individuals had supervised had

allowed illicit market timing, but did not accuse either Carifa or Laughlin of any direct wrongdoing.

213.     In December 2003, Alliance Capital entered into settlements with the SEC and the

State of New York.  The facts revealed in the settlement documents for the first time publicly

disclose chronological information regarding the enormous and pervasive market timing schemes implemented by the Alliance defendants.

**Alliance Was Well Aware Of The Risks
And Problems Inherent In Market Timing,
And Had The Ability To Monitor And Stop It**

214.    Alliance fund prospectuses began making explicit reference to market timing prohibitions in 1997.  Prior to 1997, Alliance fund prospectuses simply stated that the funds could reject any purchase orders.   However, beginning in 1997, and repeated in virtually identical language thereafter, Alliance fund family prospectuses were changed to explicitly provide:

> The Funds may refuse any order to purchase shares.  In this regard, the Funds reserve the right to restrict purchases of Fund shares (including through exchanges) when they appear to evidence a pattern of frequent purchases and sales made in response to short-term considerations.

215.    The SEC further found:

> Alliance Capital was aware of the potential adverse effects of market timing.  In September 1999, an internal Alliance Capital memorandum, circulated among mutual fund sales employees, noted the adverse impact that market timers had on mutual funds, which included: (1) an increase in capital gains taxes caused by sale of stocks to cover redemptions by timers; (2) an increase in trading costs; and (3) lower returns.

216.    Similarly, in February 2001, in a memorandum concerning fund performance, the Chief Executive Officer of Alliance Capital noted that in a certain Alliance Capital sub-advised fund, market timers "probably cost 400 basis points before it was controlled by prohibiting all market timing in that fund."  On occasions when Alliance Capital canceled or blocked trades by

75

unapproved market timers, Alliance Capital notified the timer that it had canceled the trade because "short-term trading is detrimental to the mutual fund."

## THE DIRECTOR DEFENDANTS
## BREACHED THEIR FIDUCIARY DUTIES

217.    As detailed above, the entire mutual fund industry within which Alliance Holding and Alliance Capital operate has long been structured around an inherent conflict of interest -- exacerbated by the traditional mode of compensation of investment advisers to mutual funds on the basis of a percentage of assets under management.  These circumstances create an ever-present and well-documented risk that investment adviser management personnel may act to their personal benefit at the expense of fund investors.  This substantial conflict is reflected in the fact the mutual fund industry is highly regulated, with the Company having repeatedly recognizing in its public filings that it faces a potential for severe sanctions should it fail to adequately and effective oversee and monitor compliance.

218.    In the face of these manifest conflicts of interest and risks of costly sanctions, ACMC, as the general partner for both Alliance and Alliance Capital, has long permitted Alliance Capital to assume contractual responsibility not only for providing fund investment management services for the hundreds of billions of dollars of investor assets under management, but also to assume virtually all compliance obligations for these funds as well.  These facts act to create a special relationship of trust and confidence with respect to the funds and the investors in them, placing upon the Company a heightened fiduciary duty under federal statutory and state common law.

219.    As detailed herein, the phenomenon of market timing in mutual funds has long been a matter of substantial regulatory, academic and public concern.  Exacerbating this clear and well-known risk was the fact that, as the result of the market crash and subsequent recession between 2000 and 2003, Alliance found itself facing a substantial deterioration of its 'economic environment' -- a highly important risk assessment trigger specifically recognized and cautioned against by COSO.

220.    Within this context, the Director Defendants, and in particular the members of the Audit Committee, were required to act with reasonable care and diligence to design and implement an adequate and effective system of compliance oversight and control at Alliance and Alliance Capital.  In conformity with, inter alia, the basic tenants of the Sentencing Guidelines, COSO and fundamental corporate governance standards, the Director Defendants were thus required to ensure the Company implemented a compliance system:

- that was reasonably designed in light of known and material risks, including harm to mutual fund investors caused by widespread and well-known speculative short term trading in the fund securities, conflicts of interest created by the Company's mutual fund sales compensation practices, risks of unethical and/or illegal conduct by sales personnel created by aggressive short-term performance and growth goals;

- that included policies and procedures designed to address each of these risks and their potential, indeed likely, convergence;

- that included reasonable and adequate oversight and monitoring procedures to ensure the efficacy of the compliance system;

- that included reasonable random and periodic monitoring and compliance checks conducted by audit personnel independent and outside of the business line;

- that incorporated a reasonable and adequate level of reporting directly to the board and/or appropriate committees thereof to permit the Director Defendants to fulfill

their clearly mandated obligation to assure themselves that the corporate compliance system was operating effectively; and

•   that included procedures reasonably designed to detect and report attempts by management to override compliance policies and procedures, including suitable periodic reporting obligations to the board to assure system effectiveness.

221.    The Director Defendants breached their fiduciary duty by failing to implement a compliance system at the Company that, as a threshold matter, imposed any of the simple, straight-forward and highly effective measures to foreclose market timing that were well-understood and readily available.

222.    Ironically, the reason market timing is possible also explains how to eradicate it.  As detailed above, market timing results from pricing inefficiencies inherent in using stale pricing to arrive at a single, daily NAV price for each mutual fund.  Elimination of such pricing inefficiencies through the use of fair value pricing -- a practice repeatedly endorsed by the SEC in multiple publications to the industry -- by definition also eliminates the opportunity to market time.  This simple fact was reflected in a May 10, 2004 <u>The New York Times</u> editorial:

> The really grating aspect of the SEC's extravaganza of rule-making is that *there is a simple, non-harmful remedy for stale-pricing trading -- fair-value pricing.*  This technique requires funds to adjust stale prices to values that would obtain if trading were continuous.

> Even better, the remedy is already in place.  The SEC mandated fair-value pricing in 2000 and 2001.  Pretty much nobody paid attention and the SEC itself let the matter languish.  Then, last December and again in April, two of the SEC rule-making proposals adopted on compliance and disclosure referenced the fair-value pricing requirement, underlining that mandate.

Emphasis added.

78

223.    At a minimum, the Director Defendants further breached their fiduciary duties by intentionally or recklessly failing to even impose effective procedures to materially curtail the ability to profit from market timing arbitrage activities.  For example, ACMC's board could have, but recklessly failed to direct Alliance management to remove the ability to profit from such arbitrage activities.  In a classic case of 'closing the barn door after the horse,' Mr. John Hill, the independent board chairman for more than 100 mutual funds operated by Putnam (another company, like Alliance, that was particularly hard hit by the market timing scandal) recently was quoted in a The Wall Street Journal as describing one obvious example:

> We've also added 2% short-term transaction fees on trades within five days buying fund shares.  We had 1% fees on trades within 90 days of purchase.  *We think if you take away the ability to profit from timing, the problem will go away.  We want timers to know Putnam is not a good place to go.*

Emphasis added.

224.    While Alliance did publicly disclose the existence of redemption fees in its mutual funds, what redemption fee provisions Alliance did establish were left to management to implement, and the application of these redemption policies by Alliance Capital personnel were -- like the ability to market time itself -- left totally subject to the control and discretion of the operational arm of the Company, and were routinely waived  by operations personnel as part of the arrangements made with favored market timers.

225.    As was apparent, the direct and inherent bias and financial conflict of interest these operational personnel faced with respect to market timing arrangements -- particularly as Alliance struggled to increase falling assets under management in the midst of a market decline that had materially reduced its fee income -- precluded their ability reasonably or logically to be vested with

79

such discretion. Thus the Director Defendants disregarded the known risks that generally inured in the investment advisory industry's compensation system, and the specific risks to Alliance posed by this system in the context of the Company's declines in assets under management. It was a classic case of leaving the fox to guard the henhouse. Those who had the most to gain by permitting select investors to market time -- players who were willing to play ball by parking substantial assets in Alliance advised mutual funds or hedge funds -- were given the discretion to enforce, and thus the ability to override, the policies and procedures to police and prevent market timing that had been advertised to the market in the various Alliance fund prospectuses.

226.    The scope, magnitude and long history of major market timing activity at Alliance made substantially more egregious the Director Defendants' failure to take direct and effective action in response to it. As detailed herein, the market timing arrangements continued unchecked for multiple years -- and were only discontinued when outside regulators forced them Company to do so in late 2003. The arrangements in place at the Company were with at least eighteen separate entities, and entailed *hundreds of trades* involving *billions of dollars*. The massive dollar amounts at issue, coupled with the rapid nature of the trades and large number of entities involved, would have made detection of the practice inevitable under even the most rudimentary tracking system.

227.    Cutting deals with market timers was in fact an open and notorious practice at Alliance Capital. Alliance Capital even went so far as to openly put in place specific procedures to support and foster the illicit market timing arrangements. As alleged above, by early 2001, Alliance Capital had even appointed a sales support employee as "Market Timing Supervisor," whose assigned role was *to coordinate, oversee, and support the illicit market timing arrangements.*

228.     Coupled with the openness and notoriety of these arrangements within Alliance Capital, there was also clear knowledge of their impropriety among Alliance Capital senior management and sales personnel.  For example:

- as found by the SEC and New York Attorney General, during negotiations in 2002 between Alliance Capital and Calugar, "one member of Alliance Capital senior management remarked that he would not want to read about these matters on the front page of the newspaper;"

- as found by the SEC and New York Attorney General, sales personnel involved in the market timing arrangements referred to parked sticky assets as "legit assets" -- ironically viewing the non-timing quid pro quo of the market timing arrangements as being the "legitimate" part, as opposed to the illegitimate part, of the arrangement; and

- as found by the SEC and New York Attorney General, "members of Alliance Capital senior management were advised that the linkage between Calugar's market timing activity and hedge fund investments was improper," yet instead of ceasing the improper activity, Alliance Capital management continued it unabated, acting only to "officially de-link" the two components of the illicit arrangement within the records of Alliance Capital to hide its improper nature.

229.     This pervasive knowledge of unchecked improper activity -- as well as senior management directives to eliminate any paper trail by "officially de-linking" market timing from sticky assets -- is indicative of a reckless failure on the part of ACMC and the Director Defendants to foster a  culture of compliance at the company so as to provide reasonable assurance that an effective control environment -- one of the requisite components of effective internal control under the COSO Framework -- existed at Alliance Capital.

230.     The pervasiveness of the illicit arrangements was so extensive and so blatant by the summer of 2002 that Alliance Capital acted to change an investment restriction in the Alliance Tech Fund to add futures trading authorization for the express purpose of better accommodating liquidity

requirements caused by the timing activity, a change that required fund board and fund shareholder approval.  Alliance Capital obtained this approval through deception, by intentionally failing to disclose to the fund board or investors that the change was driven by timing activity, even though an early draft of the proxy statement (later revised)  used by Alliance Capital to obtain the required shareholder approval had disclosed the timing link.

231.   In the face of this blatant and long-term misconduct, even the slightest directorial oversight, through appropriate attention by the Audit Committee, supported by an appropriately directed and overseen internal audit function, would have revealed that management was routinely overriding the Company's policies and procedures and acting to illicitly increase assets under management by permitting market timers to skim profits from innocent and unsuspecting long-term Alliance fund investors.

232.   The Director Defendants' failure to take effective or reasonably adequate steps to preclude the recognized, apparent and known improper market timing activities prevalent at the Company over several years cannot be reconciled with any good faith attempt to oversee Alliance's compliance in a manner consistent with its fundamental fiduciary duties to its clients.   In disregarding this clear compliance risk, the Director Defendants also ignored the corresponding risk of massive financial and reputational harm -- in terms of liability to fund investors, adverse regulatory action, and damage to the reputation and goodwill upon which the Company's business depends -- to Alliance and its unitholders.  Stark evidence of the reality of this harm is found in the fact that, following public disclosures of this misconduct by regulators in September, 2003, Alliance mutual funds were hard hit, with irrate investors withdrawing *billions of dollars*.

82

233.    Moreover, the Director Defendants failed to take any action to ensure  that effective systems of communication would bring to their attention material information concerning the Company's compliance with its fundamental fiduciary duties to its mutual fund clients and the investors therein.  As alleged above, on numerous occasions, Alliance personnel questioned the propriety and advisability of continuing management's practice of overriding market timing prevention policies and procedures for favored investors.  Yet these questions were misdirected, flowing directly to sales and management personnel who had personal interests in increasing or maintaining assets under management at all costs.  No effective line of communication for reporting such matters, or raising such questions, with the Audit Committee or full Board was established. In failing to take action to ensure that such a reporting system was in place, the Director Defendants failed to take into account one of the basic requirements of an effective compliance system under the Sentencing Guidelines: "having in place and publicizing a reporting system whereby employees and other personnel could report [illegal] conduct by others within the organization without fear of retribution."

234.    The manifest failure to take action to prevent or detect and eliminate Alliance Capital's management's overrides of its market timing policing and prevention policies and procedures represents a breakdown in internal control in an area of known material risk for which the Director Defendants are entirely responsible.  The COSO Framework -- the universal standard for evaluating the effectiveness of financial reporting, operational, and compliance-directed systems of internal control, within the United States -- makes clear that only the Board (or the Audit Committee acting on its behalf) -- is in a position to act to address situations where management overrides internal control policies and procedures for improper purposes.  The Director Defendants'

failure to take any action whatsoever to address the critical risk of management override -- particularly as market declines placed severe performance stresses on Alliance Capital's management -- constituted a reckless breach of the directors' duty to attend in good faith to their fundamental oversight duties.

## DAMAGES SUSTAINED BY ALLIANCE

235.   As detailed above, on December 18, 2003, Alliance Capital and Alliance Holding issued a press release indicating that settlements had been reached with both the SEC and the New York Attorney General's Office.   Alliance Holding's most recent Form 10-K described the settlements as follows:

> Among the key provisions of the [SEC and New York settlements] are the following: Under both Agreements, Alliance Capital must establish a $250 million fund to compensate fund shareholders for the adverse effect of market timing.  Of the $250 million fund, the Agreements characterize $150 million as disgorgement and $100 million as a penalty.  The Agreement with the NYAG requires a weighted average reduction in fees of 20% with respect to investment advisory agreements with Alliance Capital-sponsored U.S. long-term open-end retail mutual funds for a minimum of five years, which commenced January 1, 2004.  This reduction in fees is expected to reduce Alliance Capital revenues by approximately $70 million in 2004.

236.   These settlements are expected to cost Alliance Capital more than $600 million. Based on Alliance Holding's 31.3% ownership interest in Alliance Capital, the harm to Alliance Holding from these settlements alone amounts to more than $200 million.

237.   Further, the SEC and New York investigations have cost Alliance millions of dollars in professional fees and other defense costs, and the settlements, including their provisions for revamped mutual fund compliance systems, will require additional expenditures that would not have been incurred but for the defendants' breaches of duty as alleged herein.

84

238.    Additionally, the market timing scandal has severely damaged Alliance Capital's reputation, a circumstance that has caused and will continue to cause severe financial harm to Alliance Capital and, correspondingly, to Alliance Holding.  As stated in Alliance Holding's most recent filed Form 10-K:

> Alliance Capital's involvement in the market timing investigations and related matters has had and may continue to have an adverse effect on assets under management, including an increase in mutual fund shareholder redemptions, and has caused and may continue to cause general reputational damage, both of which could result in decreased revenues.
>
> Alliance Capital's reputation has suffered and could continue to suffer as a result of the issues related to the market timing of mutual fund shares.  Alliance Capital's business is based on public trust and confidence and any damage to that trust and confidence can cause assets under management to decline.  Investors in the Alliance Mutual Funds may choose to redeem their investments from funds or products managed by Alliance Capital.  This may require the Alliance Mutual Funds to sell investments held by those funds to provide for sufficient liquidity and could also have an adverse effect on the investment performance of the funds.  In addition, increased redemptions of mutual fund shares or reductions in assets managed by Alliance Capital for institutional or private clients, whether caused by specific concerns relating to market timing or by more general reputational damage, would reduce the management fees Alliance Capital earns and have an adverse effect on results of operations.  Also, any increase in redemptions of Back-End Load Shares could contribute to the creation of an impairment condition of Alliance Capital's deferred sales commission asset and the recognition of a loss.  Finally, to the extent the Independent Distribution Consultant concludes that the harm to mutual fund shareholders caused by market timing exceeds $200 million, Alliance Capital will be required to contribute additional monies to the restitution fund.

239.    In addition to the regulatory settlement payments and fee reductions, Alliance Capital faces untold millions in liabilities to mutual fund investors and others as a result of the breaches of duty alleged herein.  In fact, Alliance has already incurred massive expenses in defending the regulatory investigations and investor lawsuits.  Total liabilities from these numerous actions have not yet been determined, but will likely run into the hundreds of millions of dollars.  None of these

expenses would have been incurred but for the breaches of fiduciary duty of the Fiduciary Defendants and the Alliance Capital Individual Defendants.

## **DEMAND FUTILITY**

240.     Plaintiff brings this action derivatively in the right and for the benefit of Alliance Holding to redress both injuries already suffered and those continuing to be suffered by Alliance Holding as a direct and proximate result of the breaches of fiduciary duty by Defendants ACMC, Calvert, Brydon, Carifa, DeCastries, Condron, Duverne, Dziadzio, Harrison, Hatt, Hegarty, Hertog, Holloway, Jarmain, Noris, Sanders, Savage, Slutsky, Tobin, Tulin, David Williams, Reba Williams, Malone, Schaffran, Laughlin Equitable, AXA Financial, and AXA, as  alleged herein, and for contribution under the federal securities laws against the Defendants named in Count IX below. Plaintiff will adequately and fairly represent the interests of Alliance Holding and its unitholders in enforcing and prosecuting their rights, and has retained counsel who are competent and experienced in litigating derivative actions.

241.     Plaintiff has not made demand upon the general partner (ACMC) of Alliance Holding because such demand would be futile.  Futility of demand on ACMC is manifest for numerous reasons.

242.     First, ACMC is a separately named defendant in this action and prosecution of the causes of action alleged against it in this Complaint would adversely affect its interests because it faces a substantial threat and likelihood of liability in that ACMC, as a corporate entity is, as a matter of law, charged with knowledge of the facts known by its executive officers, employees and agents, including those persons whom it selected, empowered and authorized to manage the business

operations of Alliance Capital.  As described in particularized allegations herein, senior executive

officers of Alliance Capital, who acted with actual authority as agents of ACMC:

- had actual knowledge of the market timing arrangements with numerous privileged investors here at issue, and in fact aggressively pursued, negotiated, approved and/or acquiesced in them;

- had actual knowledge of the undisputed and well-publicized detrimental impact of market timing on long-term investors in the target mutual funds;

- knowingly and intentionally or recklessly disregarded such harm to the long-term fund investors;

- were responsible for and/or had knowledge of the uniform fund prospectus disclosures of the targeted funds regarding market timing, and thus had actual knowledge that the improper market timing arrangements were inconsistent with those prospectus disclosures;

- knowingly and intentionally or recklessly disregarded the discrepancy between the market timing arrangements and the fund prospectus disclosures;

- intentionally or recklessly permitted the market timing arrangements for the purpose of increasing the management fee income of Alliance Capital and, thus, directly and indirectly, of ACMC and the entities controlling it;

- designed and established a formal management structure within Alliance Capital to accommodate and pursue market timing arrangements, headed by a "Market Timing Supervisor;"

- specifically discussed and recognized the impropriety of tying market timing privileges to the investment or parking of "sticky assets," yet instead of ceasing this conduct altogether, instead consciously and intentionally attempted to cosmetically "de-link" the connection between sticky assets and market timing privileges while still continuing to actively pursue the practice;

- recognized the clear reputational injury and damages that public revelation of the market timing arrangements would have upon Alliance Capital, and intentionally or

recklessly disregarded the harm that such reputational damage would cause to both Alliance Capital and Alliance Holding;

• recognized that the market timing arrangements carried an extreme risk of severe, adverse regulatory action, and recklessly disregarded the harm that such regulatory action would cause to both Alliance Capital and Alliance Holding;  and

• recognized that the market timing arrangements carried an extreme risk of  massive civil liability to the target funds and investors therein, and recklessly disregarded the harm that such civil liability would cause to both Alliance Capital and Alliance Holding.

243.    Among the executive officers, employees and agents of ACMC who had actual knowledge of, and actively participated in, the market timing arrangements detailed above were:

a.    Defendant Carifa, who at all relevant times was President and Chief Operating Officer of ACMC, and Chief Executive Officer of Alliance Capital's Mutual Funds Division;

b.    Defendant Laughlin, Chairman of Alliance Capital's mutual fund distribution unit (who was selected for this role pursuant to ACMC's power to select officers and employees for Alliance Capital);

c.    Defendant Malone, who was at all relevant times a Senior Vice President of Alliance Capital and a portfolio manager of several AllianceBernstein mutual funds, including the AllianceBernstein Technology Fund as well as certain Alliance Capital-managed hedge funds in which "sticky assets" were parked as part of the market timing arrangements detailed above  (who was selected for this role pursuant to ACMC's power to select officers and employees for Alliance Capital); and

88

d.      Defendant Schaffran, a marketing executive at Alliance Capital who sold Alliance Capital-managed hedge funds to investors  (who was selected for this role pursuant to ACMC's power to select officers and employees for Alliance Capital) and who actively participated in negotiating and facilitating certain of the market timing and "sticky asset" arrangements detailed above, including arrangements with Daniel Calugar;

e.      the "Market Timing Supervisor," on information and belief Brennan, who was selected for this role pursuant to ACMC's power to select officers and employees for Alliance Capital; and

f.      each author and recipient of the internal Alliance Capital e-mails described herein ( who were selected for their respective roles as executive officers and/or employees of Alliance Capital pursuant to ACMC's power, as general partner, to select officers and employees for Alliance Capital).

244.    Accordingly,  ACMC, charged with all of the knowledge of its executive officers, employees and agents, knowingly and intentionally or recklessly caused Alliance Capital to violate federal and state securities laws and the fiduciary duties it owed to the target funds and the long term investors therein, in reckless disregard of the best interests of Alliance Holding  and its unitholders, and will, with virtual certainty, be held to account in this action, for the resulting harm to Alliance Holding.  The magnitude of ACMC's liability to Alliance Holding will run into the hundreds of millions of dollars.

245.    Second, in considering a pre-suit demand, ACMC would not only be required to consider commencing action against itself, but also against its 100% direct and indirect owners (namely, Equitable, AXA Financial and AXA), which are also defendants in this action, a

89

circumstance that, standing alone, has been held to excuse demand under Delaware law in the limited partnership derivative action context; and

246.    ACMC would likewise be required to consider commencing action against: (i) Defendant De Castries, who is the Chairman of the Management Board of AXA (the ultimate parent entity of ACMC), a position equivalent that of Chief Executive Officer at a United States corporation; (ii) Director Defendant Condron, a member of the Management Board of AXA in charge of United States activities (and who also serves as President and CEO of AXA Financial (an indirect 100% owner of ACMC)); (iii) Director Defendant Duverne, a member of the Management Board of AXA in charge of finance, control and strategy; and (iv) Director Defendant Tulin, a senior executive of AXA in charge of relations with United States analysts, investors and rating agencies (as well as serving as Vice Chairman and CFO of AXA Financial).

247.    These ACMC directors are four of the most senior executive officers of AXA, which controls and dominates ACMC through 100% ownership and through its selection of ACMC directors, a majority of whom are current or former executives of AXA or affiliated companies. There is no reasonable likelihood that ACMC would commence action against these four Director Defendants, regardless of the merits of such an action.

248.    The economic realities of this case create far more than a reasonable doubt that pre-suit demand on ACMC could be considered with a disinterested and independent view toward the best interests of Alliance Holding.  The economic interests of AXA and its controlled, wholly-owned direct and indirect subsidiaries AXA Financial, Equitable, and ACMC are diametrically opposed to causing Alliance Holding to commence action against AXA, AXA Financial, Equitable,  ACMC, and Alliance Capital.

90

249.    AXA clearly has little if any economic interest in causing Alliance Holding to pursue claims against the Director Defendants.  Alliance Holding, the entity on whose behalf this action is brought, is publicly held, with no unitholder or partner having an equity interest of five percent or greater.  Thus, the  economic interest of AXA and its affiliates, which control ACMC, in pursuing any recovery on behalf of Alliance Holding is de minimis, and in all events is at best commensurate with AXA's less than 5% beneficial ownership in Alliance Holding.

250.    On the other hand, to the extent that AXA or a wholly-owned subsidiary of AXA were held liable to Alliance Holding, the judgment would fall 100% on AXA's financial interests. In other words, for each $100 that AXA or one of its wholly-owned direct or indirect subsidiaries were required to pay in damages to Alliance Holding, AXA would benefit less than $5 (due to its less than 5% ownership interest in Alliance Holding).  Given these economic realities, this is simply not a case to which the normal presumption that an *independent* corporate board of directors -- which the board of ACMC is plainly not-- would appropriately consider a demand to bring action on behalf the corporation should be applied.

251.    A demand on ACMC would thus essentially be a request that an AXA-controlled subsidiary whose board is wholly populated by AXA designees consider bringing action against AXA and its affiliates on behalf of an entity -- Alliance Holding -- in which AXA has a de minimis financial interest.  At the very least, given these facts, there is a reasonable doubt that ACMC could, with the legally required level of disinterest and independence, properly consider such a demand.

252.    While demand upon ACMC's board of directors is not required under Delaware law, ACMC's board would, assuming normal corporate governance procedures were to be applied, be called upon to act with respect to any pre-suit demand presented to ACMC.  These directors,

however, for numerous reasons detailed below, could not act with disinterest and independence in considering such a demand, and, as a result, ACMC could not properly consider and act upon such a demand.

253.    First, a majority ACMC's directors could not act with disinterest and independence because eleven (11) of the seventeen (17) ACMC directors on the Board at the time of the filing of the original underlying complaint in this action (Calvert, Brydon, De Castries, Condron, Duverne, Dziadzio, Harrison, Hertog, Sanders, Savage, and Tulin) are employed by AXA and/or AXA-controlled affiliates, hold no other significant employment, and are beholden to AXA for the substantial compensation and perquisites they receive in those positions.  For example, in 2002, the following Director Defendants received compensation as follows:

- **Calvert:**

$275,002 in fixed compensation and at least $2 million in bonus compensation in connection with his employment at ACMC;   and 291,500 euros in fixed compensation and 3.71 million euros in variable compensation from AXA in connection with his employment as Chairman and CEO of Alliance Capital.

- **Hertog:**

$275,002 in fixed compensation and at least $2 million in bonus compensation in connection with his employment at ACMC;

- **Sanders:**

$275,002 in fixed compensation and at least $2 million in bonus compensation in connection with his employment at ACMC;

- **De Castries:**

500,000 euros in fixed compensation  and over 1.35 million euros in variable compensation from AXA.

- **Condron:**

1.06 million euros in fixed compensation and 4.028 million euros in variable compensation from AXA.

- **Duverne:**

272,527 euros in fixed compensation and 485,335 euros in variable compensation from AXA.

- **Tulin:**

795,000 euros in fixed compensation and 3.02 million euros in variable compensation from AXA.

254. Plaintiffs have not uncovered salary information for ACMC Director Harrison; however, Harrison received awards under the Alliance Partners Compensation plan of $2 million and $1.5 million at year end 2001 and 2002, respectively. Accordingly, plaintiff alleges on information and belief that Harrison receives substantial compensation in connection with his employment by ACMC for which he is beholden to AXA.

255. Although plaintiffs have not uncovered disclosures of compensation for ACMC Directors Brydon, Noris and Dziadzio, plaintiffs allege on information and belief, based upon their disclosed roles as executive officers of AXA or AXA affiliates (Brydon is Chairman of AXA Investment Managers, SA, Noris is Executive Vice President and Chief Investment officer of AXA Financial and Equitable, and Dziadzio is Senior Vice President of AXA in support of AXA Financial and the asset management activities of AXA), that they, too, receive substantial compensation in connection with their employment by AXA or AXA-controlled affiliates.

256. Finally, ACMC director Williams is compensated pursuant to a consulting agreement providing $275,000 per year running through May 2006. ACMC and Alliance Capital may be excused from their obligations to pay Williams under the consulting agreement if he makes "any

statement, written or oral, that would disparage the Partnership [Alliance Capital] and its affiliates or the personal or professional reputation of any of the present or former directors or senior executive officers of the Partnership and its affiliates."  As a result of this "nondisparagement" clause, Williams faces the risk that his personal financial interests would be detrimentally impacted if he were to take any action against ACMC, Alliance Capital, AXA, AXA Financial, Equitable, or any of their senior executive officers or directors, including a vote in favor of commencing action against any or all of them for reckless breach of fiduciary duty.  In addition to the actual dollar value of the amount of this compensation, further evidence of the potential detrimental impact to Williams is the specific provisions of the agreement providing that in the event of his death during its term, the payments that would have been due to him will be paid to his spouse.

257.    Thus, a majority of ACMC's directors, being beholden to AXA for their livelihoods, could not, realistically, act with appropriate disinterest and independence in considering whether Alliance Holding should commence action against defendants including AXA and its most senior executives.

258.    Second, a substantial majority of the Director Defendants face a substantial threat of personal liability in such an action.

259.    As evidenced by their annual signatures on the Forms 10-K filed by Alliance Holding and Alliance Capital, each of the Director Defendants was aware that the business operations of Alliance Capital are conducted under pervasive regulation.  Further, the annual Forms 20-F filed by AXA, signed by Director Defendant Duverne and certified by both Duverne and Director Defendant DeCastries, explicitly state that AXA's investment management businesses, which include Alliance

Capital, "are subject to extensive regulation in the various jurisdictions in which they operate" and that such regulation is geared principally toward protection of asset management clients.

260.     Each of Director Defendants Calvert, Brydon, DeCastries, Condron, Duverne, Dziadzio, Harrison, Hertog, Holloway, Jarmain, Noris, Sanders, Savage, Tulin and Williams has many years of experience, and has gained knowledge and expertise in the investment management and financial services industries, as well as an intimate and expert awareness that the investment management business is fiduciary in nature, is characterized by an inherent conflict of interest necessitating substantial compliance efforts to provide assurance that managers are not devising ways to benefit themselves at the expense of mutual fund investors, and is characterized by an "assets under management" compensation structure creating conflicts and fiduciary compliance risks that must be actively and rigorously monitored.

261.     In particular, by virtue of their personal experience, knowledge and expertise, and as a result of:

a.       activities undertaken within the scope of their executive responsibilities (in the cases of Calvert, Brydon, DeCastries, Condron, Duverne, Dziadzio, Harrison, Hertog, Noris, Sanders and Tulin);

b.       activities undertaken to maintain their awareness of significant issues affecting the investment management and financial services industries; and

c.       reports and advice they have received in their executive capacities and as directors of ACMC, these ACMC directors (who are defendants herein) were aware of the following matters:

95

- The manner in which mutual fund shares are priced for purchase, redemption and exchange, and the rules promulgated under federal law that govern such pricing, including Rule 22c-1 requiring forward pricing and prohibiting late trading;

- The reason for the SEC's adoption of the forward-pricing rule, namely to prevent the encouragement of speculative short-term trading in mutual fund shares, because such trading harms the long-term, buy and hold investors for which mutual funds are intended by diluting their interests and imposing increased costs on the funds;

- That even with the forward pricing rule in place, there is a risk of harm to long term mutual fund investors from traders seeking to exploit arbitrage opportunities presented by stale pricing of mutual fund portfolio assets particularly in funds investing in securities trading on foreign stock exchanges (due to time zone differences affecting the relative closing times of foreign markets and the U. S. market) and in funds focusing on relatively illiquid investments. This risk was manifest due to numerous red flags, including the 1981 Putnam No Action letter (in which the SEC indicated that Putnam could apply fair value pricing to combat long term fund shareholder dilution in international funds), the events surrounding the October 1997 Asian market crash and the application of fair value pricing by Fidelity and T. Rowe Price to protect long term investors, all of which were extensively reported in the press and discussed in the industry, the SEC study that followed the October 1997 Asian market crash and the wide press reporting and industry discussion of that study, which focused on application of fair value pricing and other measures to protect funds and long-term investors therein from dilution resulting from speculative trading spurred by stale pricing, numerous academic and trade press articles documenting the arbitrage opportunity represented by stale pricing in mutual funds and the harm that frequent trading to exploit such opportunities imposed upon long term mutual fund investors in terms of dilution and increased transaction costs, the 1999 and 2001 SEC letters to the Investment Company Institute, which further discussed the obligation of funds to utilize fair value pricing to protect long term investors, and the industry-wide adoption of various measures designed ostensibly to detect and prevent such arbitrage-motivated trading, including limits on trading frequency, short-term redemption fees, expanded use of fair value pricing, and other measures;

- That investment advisors owe to the mutual funds they manage and to the investors therein fiduciary duties under federal and state law, which included the duty not to seek advantage at the expense of such investors, and the duty to detect and prevent such unscrupulous conduct by employees and agents;

- That the mutual fund management industry, due to its structure and the manner in which management companies are compensated (on the basis of assets under

96

management), is characterized by inherent conflicts of interest resulting in heightened compliance risks.

- That, in particular, the existence of discretionary measures employed by management companies ostensibly to combat market timing, coupled with the assets under management approach to management company and individual portfolio manager compensation, created a high risk of management company personnel cutting special deals with traders wishing to engage in market timing;

- That methods existed by which to detect and prevent, and even completely eliminate, market timing, and thereby (i) protect long term mutual investors from harm and (ii) protect the mutual fund management company from severe adverse regulatory action, severe reputational harm, and substantial liability.

262. Furthermore, the Director Defendants should have, but failed to, recognize that patterns of fund flows into and out of the Alliance Capital-managed mutual funds being targeted by market timers, patterns of portfolio turnover, shareholder redemption rates, comparison of average net assets to redemptions, and other basic statistical measures that would have been features of any rationally-conceived attempt to monitor and assure compliance indicated that substantial market timing activity, and corresponding harm to long-term fund investors, was in fact occurring over a long period of time in Alliance Capital-managed mutual funds. As put by Professor Mercer Bullard, the failure to detect and prevent this activity stemmed from a failure to adopt and implement the most basic compliance policies and procedures.

263. Being aware of all of these matters, the Director Defendants intentionally or recklessly failed to take appropriate and necessary action to prevent violation by Alliance Capital of its obligations under the federal securities laws and its fiduciary duties to the target funds and the investors therein, thus causing to Alliance Holding massive financial harm for which they must be held to account. Among the actions that these Defendant Directors could have, but failed, to take --

until, in the case of certain of these listed measures, forced to do so by government intervention --

are:

- the adoption and effective administration of a program of fair value pricing the mutual funds under Alliance Capital's management;

- the prohibition of market timing in all mutual funds under Alliance Capital's management, consistent with prospectus disclosures, together with an effective system of monitoring for evidence of prohibited timing (a system that was well within Alliance Capital's capabilities as evidenced by examples of selective enforcement of a purported "no market timing" policy cited in the SEC settlement);

- adoption and implementation of an appropriate code of ethics emphasizing the fiduciary responsibilities of Alliance Capital and all of its executives, officers and employees (as well as its General Partner);

- adoption of effective compliance, legal and risk management functions with empowered executives who are independent of the business lines and have direct reporting to the ACMC board; and

- adoption of basic statistical monitoring procedures to detect illicit market timing activity.

264.   If the Defendant Directors had caused ACMC, in its capacity as the managing general partner of Alliance Capital and Alliance Holding, to implement reasonable and adequate oversight, monitoring and compliance systems and controls including similar to those detailed above, the massive financial harm that Alliance Holding has suffered and will continue to suffer would have been prevented.

265.   Additionally, on information and belief, the Director Defendants who are compensated in their executive capacities directly by ACMC and/or Alliance Capital, including Calvert, Harrison, Hertog, and Sanders have a direct financial interest in the illicit market timing arrangements alleged herein, because their incentive compensation depends in part upon Alliance

98

Capital's assets under management, which were increased as a directly-intended result of the "sticky assets" features of such market timing arrangements.  Thus, these directors had a financial interest in such arrangements not shared by Alliance Holding and its limited partners generally.  As a result, these directors would bear the burden of establishing the entire fairness of such arrangements to Alliance Holding.  Accordingly, the substantial risk of liability faced by these directors is significantly increased.

266.   A decision by ACMC to commence litigation against the Director Defendants also would have a material adverse impact upon each of them to the extent that ACMC (and/or its direct and indirect parent companies, and/or Alliance Capital or Alliance Holding) maintains or previously maintained officers' and directors' liability insurance coverage, that insurance would be rendered void if  the Director Defendants caused ACMC to cause Alliance Holding to  commence proceedings against the Director Defendants, as these policies uniformly contain provisions which void coverage if the Company brings suit in its own name.

267.   Furthermore, the Director Defendants would be unlikely to consider, in good faith and with appropriate care, a demand on ACMC to commence the causes of action set forth in this complaint because the ACMC directors are insulated from the normal processes of corporate democracy.  Due to the limited partnership structure of Alliance Holding and sole ownership of ACMC (the corporate general partner) by an indirect wholly-owned subsidiary of AXA, the unitholders of Alliance Holding have no power to elect, remove, or even withhold proxies for the election of directors of ACMC.  Thus, although the Director Defendants owe fiduciary duties to the unitholders of Alliance Holding, they are not subject to an incentive to manage the business and affairs of ACMC and Alliance Holding in a manner that is cognizant of the rights, interests, views

or demands of Alliance Holding's unitholders, since they have no access to the normal machinery of corporate democracy. This being so, there exists a reasonable doubt that they would properly consider a pre-suit demand in this case without deferring to the wishes of AXA. For this additional reason, demand on AMC would be futile.

268.   Finally, the wrongful acts and omissions at issue constitute violations of law resulting from the Fiduciary Defendants' bad faith, reckless inattention to their duty to manage the business and affairs of the Company and ensure its compliance with applicable legal and regulatory requirements. Such conduct is thus not subject to the protection of the business judgment rule, nor are the Fiduciary Defendants protected from personal liability for such bad faith misconduct by virtue of any valid exculpatory provision in the Company's limited partnership agreement.

## COUNT I

### Derivative Claim Against ACMC
### for Breach of Fiduciary Duty

269.   Plaintiff realleges and incorporates by reference each and every allegation contained above.

270.   As sole general partner of Alliance Holding, ACMC is a fiduciary of the Company and of all unitholders, and owes to them the duty to conduct the business of the Company loyally, carefully, diligently, prudently, and in good faith. This cause of action is asserted based upon ACMC's acts in violation of applicable state and common law, which constitute breaches of its fiduciary duties.

271.   ACMC breached its fiduciary duties, including the duties of good faith and of care to Alliance Holding and its unitholders, by not only failing to act as an ordinarily prudent person

100

would have acted in a like position, but also by acting intentionally and/or with gross recklessness and in conscious disregard of its responsibilities to act in the best interests of Alliance Holding.

272.    ACMC acts through its executive officers, employees and agents, who include all executive officers and employees it has selected for Alliance Holding and Alliance Capital, and has authorized to act in the management of the partnerships' respective businesses.  As a matter of law, ACMC is charged with knowledge of facts known by its executive officers, employees, and agents. Accordingly, ACMC had knowledge, inter alia, of: (i) the market timing arrangements alleged above, (ii) the inconsistency of those arrangements with the Alliance mutual fund prospectuses issued on behalf of the mutual funds managed by Alliance Capital, and (iii) the dilutive effect of market timing on the interests of long term mutual fund investors.  Despite this knowledge, ACMC failed to act to prevent such arrangements and thereby protect Alliance Capital from adverse regulatory action, liability to mutual fund investors, reputational damage, and other harm.

273.    As a result of ACMC's wrongful conduct and actions, Alliance Holding has suffered and will continue to suffer considerable damage.

274.    ACMC engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of its fiduciary duties to the Company.

275.    By reason of the foregoing, ACMC has breached its fiduciary duties to Alliance Holding and its unitholders.

276.    Alliance Holding and its unitholders have thus been injured by reason of ACMC's intentional and/or reckless disregard of its fiduciary duties to Alliance Holding.

## COUNT II

### Derivative Claim Against The Director Defendants

101

**for Breach of Fiduciary Duty**

277.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

278.    The Director Defendants are fiduciaries of the Company and of all of its public unitholders, and owe to them the duty to conduct the business of the Company loyally, carefully, diligently, prudently, and in good faith.  This cause of action is asserted based upon the Director Defendants' acts in violation of applicable state and common law, which constitute breaches of their fiduciary duties.

279.    The Director Defendants breached their fiduciary duties, including the duties of good faith and care to Alliance Holding and its unitholders, by not only failing to act as an ordinarily prudent person would have acted in a like position, but also by acting intentionally and/or with gross recklessness and in conscious disregard of their responsibilities to act in the best interests of Alliance Holding.

280.    Director Defendants Calvert, Brydon, Carifa, de Castries, Condron, Duverne, Dziadzio, Harrison, Hertog, Holloway, Jarmain, Noris, Sanders, Savage, Tulin and Williams each have substantial experience in the investment management and/or financial services industries, giving them knowledge and expertise that they were obligated to use for the benefit of ACMC, Alliance Holding and Alliance Capital in their roles as directors of ACMC, general partner of both Alliance Holding and Alliance Capital.  Given their substantial industry experience, knowledge and expertise, their failure to prevent the illicit market timing arrangements alleged above constitutes a reckless breach of the duties of good faith and care.

281.    As a result of the Director Defendants' wrongful conduct and actions, Alliance Holding has suffered and will continue to suffer considerable damage.

282.    The Director Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or in reckless disregard of their fiduciary duties to the Company and conspired to, and did abuse the control vested in them.

283.    By reason of the foregoing, the Director Defendants have breached their fiduciary duties to Alliance Holding and its unitholders.

284.    Alliance Holding and its unitholders have thus been injured by reason of the Director Defendants' intentional and/or reckless disregard of their fiduciary duties.

## COUNT III

### Derivative Claim Against Equitable
### for Breach of Fiduciary Duty

285.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

286.    Equitable exercises control over the property of Alliance Holding and Alliance Capital through its ownership of the entire equity interest in ACMC, and through electing all of its directors.  Equitable has caused the designees of AXA to constitute the entire board of directors of ACMC.

287.    Due to its control, and the exercise thereof, over ACMC (and thereby, over the property of Alliance Holding and Alliance Capital), Equitable is a fiduciary of the Company and of all of its public unitholders, and owes to them the duty to conduct the business of the Company loyally, carefully, diligently, prudently and in good faith.  This cause of action is asserted based

upon Equitable's acts in violation of applicable state and common law, which constitute breaches of its fiduciary duties.

288.    Equitable breached its fiduciary duties, including the duties of good faith and care to Alliance Holding and its unitholders, by not only failing to act as an ordinarily prudent person would have acted in a like position, but also by acting intentionally and/or with gross recklessness and in conscious disregard of its responsibilities to act in the best interests of Alliance Holding.

289.    As a result of Equitable's wrongful conduct and actions, Alliance Holding has suffered and will continue to suffer considerable damage.

290.    Equitable engaged in the aforesaid conduct in the intentional breach and/or in reckless disregard of its fiduciary duties to the Company.

291.    By reason of the foregoing, Equitable has breached its fiduciary duties to Alliance Holding and its unitholders.

292.    Alliance Holding and its unitholders have thus been injured by reason of Equitable's intentional and/or reckless disregard of its fiduciary duties to Alliance Holding.

## COUNT IV

### Derivative Claim Against AXA Financial
### for Breach of Fiduciary Duty

293.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

294.    AXA Financial exercises control over the property of Alliance Holding and Alliance Capital through its ownership of the entire equity interest in Equitable, which in turn owns the entire equity interest in ACMC, the general partner of both Alliance Holding and Alliance Capital.

Through its control over Equitable, AXA Financial has caused the designees of AXA to constitute the entire board of directors of ACMC.

295.    Due to its control, and the exercise thereof, over ACMC (and thereby, over the property of Alliance Holding and Alliance Capital), AXA Financial is a fiduciary of the Company and of all of unitholders, and owes to them the duty to conduct the business of the Company loyally, carefully, diligently, prudently and in good faith.  This cause of action is asserted based upon AXA Financial's acts in violation of applicable state and common law, which constitute breaches of its fiduciary duties.

296.    AXA Financial breached its fiduciary duties, including the duties of good faith and care to Alliance Holding and its unitholders, by not only failing to act as an ordinarily prudent person would have acted in a like position, but also by acting with gross recklessness and in conscious disregard of its responsibilities to act in the best interests of Alliance Holding.

297.    As a result of AXA Financial's wrongful conduct and actions, Alliance Holding has suffered and will continue to suffer considerable damage.

298.    AXA Financial engaged in the aforesaid conduct in the intentional breach and/or in reckless disregard of its fiduciary duties to the Company.

299.    By reason of the foregoing, AXA Financial has breached its fiduciary duties to Alliance Holding and its unitholders.

300.    Alliance Holding and its unitholders have thus been injured by reason of AXA Financial's intentional and/or reckless disregard of its fiduciary duties to Alliance Holding.

## COUNT V

105

**Derivative Claim Against AXA**
**for Breach of Fiduciary Duty**

301.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

302.    AXA is the ultimate parent company of ACMC.  AXA owns the entire equity interest in AXA Financial, which own the entire equity interest in Equitable, which owns the entire equity interest in ACMC, the general partner of both Alliance Holding and Alliance Capital.  Through its power to control AXA Financial and Equitable, AXA has caused its own designees to constitute the entire board of directors of ACMC.  With the exception of one director, all of ACMC's directors are current or former executive officers or employees of AXA or AXA-controlled affiliates.  AXA thus controls the property of Alliance Holding and Alliance Capital through its designees on the board of directors of ACMC.

303.    Due to its control, and the exercise thereof, over ACMC (and thereby, over the property of Alliance Holding and Alliance Capital), AXA is a fiduciary of the Company and of all of its unitholders, and owes to them the duty to conduct the business of the Company loyally, carefully, diligently, prudently, and in good faith.  This cause of action is asserted based upon AXA's acts in violation of applicable state and common law, which constitute breaches of fiduciary duties.

304.    AXA breached its fiduciary duties, including the duties of good faith and care to Alliance Holding and its unitholders, by not only failing to act as an ordinarily prudent person would have acted in a like position, but also by acting intentionally and/or with gross recklessness and in conscious disregard of its responsibilities to act in the best interests of Alliance Holding.

106

305.    As a result of AXA's wrongful conduct and actions, Alliance Holding has suffered and will continue to suffer considerable damage.

306.    AXA engaged in the aforesaid conduct in the intentional breach and/or in reckless disregard of its fiduciary duties to the Company.

307.    By reason of the foregoing, AXA has breached its fiduciary duties to Alliance Holding and its unitholders.

308.    Alliance Holding and its unitholders have thus been injured by reason of AXA's intentional and/or reckless disregard of its fiduciary duties to Alliance Holding.

## COUNT VI

### Against Alliance Capital for Aiding and Abetting Breach of Fiduciary Duty

309.    Plaintiff realleges and incorporates by reference each and every allegation set forth above.

310.    Defendant ACMC, as general partner of Alliance Holding, owes fiduciary duties of loyalty, good faith and care to Alliance Holding and its unitholders.  Furthermore, the Director Defendants owe fiduciary duties of loyalty, good faith and care to Alliance Holding and its unitholders.  Finally, defendants AXA, AXA Financial, and Equitable, as controlling stockholders of ACMC, owe fiduciary duties of loyalty, good faith and care to Alliance Holding and its unitholders.

311.    The conduct of defendants ACMC, AXA, AXA Financial, Equitable, and the Director Defendants as alleged above, constitutes a breach of the fiduciary duties of loyalty, good faith, and care owed by them to Alliance Holding and its unitholders.

107

312.    Defendant Alliance Capital, through its general partner and its officers, employees and agents, was fully aware of the fiduciary duties owed by ACMC, AXA, AXA Financial, Equitable, and the Director Defendants to Alliance Holding.  This knowledge is evidenced by the fact that ACMC is the general partner for both Alliance Holding and Alliance Capital, and by the facts and circumstances surrounding the October 1999 reorganization of Alliance Holding, pursuant to which the business and assets of Alliance Holding were transferred to Alliance Capital, a newly-formed operating partnership, in exchange for all Alliance Capital units, of which the directors, officers, employees, and agents of ACMC, AXA, AXA Financial, Equitable, and the officers, employees and agents of Alliance Capital are fully aware.

313.    Defendant Alliance Capital knowingly participated in the breaches of fiduciary duties owed by ACMC, AXA, AXA Financial, Equitable, and the Director Defendants to Alliance Holding, as alleged above.  This knowing participation is evidenced by the fact that the market timing scheme alleged above, by which Alliance Capital permitted favored investors to engage in market timing transactions in exchange for the parking of assets in investment vehicles managed by Alliance Capital, was conducted through the actions of the officers, employees and agents of Alliance Capital.  In other words, Alliance Capital is the instrumentality through which the wrongful conduct of the Fiduciary Defendants was perpetrated.  Furthermore, Alliance Capital is the vehicle through which the Fiduciary Defendants that control both it (including AXA, AXA Financial and Equitable) have concentrated their economic ownership interests in the Alliance investment management enterprise.  Accordingly, Alliance Capital knowingly participated in the breaches of fiduciary duty committed by ACMC, AXA, AXA Financial, Equitable, and the Director Defendants.

314.     This knowing participation by Alliance Capital was a proximate cause of the damages to Alliance Holding alleged herein.

## COUNT VII

### Against the Director Defendants for Aiding and Abetting
### Breach of Fiduciary Duty by ACMC

315.     Plaintiff realleges and incorporates by reference each and every allegation set forth above.

316.     Defendant ACMC, as general partner of Alliance Holding, owes fiduciary duties of loyalty, good faith and care to Alliance Holding and its unitholders.

317.     The conduct of ACMC, as alleged above, constitutes a breach of the fiduciary duties of loyalty, good faith, and care owed by it to Alliance Holding and its unitholders.

318.     The Director Defendants, in their capacities as such, are fully aware of the fiduciary duties owed by it to Alliance Holding.  This knowledge is evidenced by the fact that ACMC exists for the sole purpose of acting as managing general partner of Alliance Holding and Alliance Capital.

319.     The Director Defendants knowingly participated in the breaches of fiduciary duty owed by ACMC to Alliance Holding.  This knowing participation is evidenced by the particularized facts set forth herein.

320.     This knowing participation by Alliance Capital was a proximate cause of the damages to Alliance Holding alleged herein.

## COUNT VIII

### Against Defendant Daniel Calugar for Aiding and
### Abetting Breach of fiduciary Duty

109

321.     Plaintiff realleges and incorporates by reference each and every allegation set forth above.

322.     As alleged above, beginning in 2001 and continuing into 2003, Defendant Daniel Calugar negotiated special arrangements with Alliance Capital, permitting him to market time selected Alliance Capital-managed mutual funds in exchange for his agreement to invest specified capital in Alliance Capital-managed hedge funds.  Calugar, an attorney by training, fully understood that the officers, employees and agents of Alliance Capital with whom he was dealing owed fiduciary duties to both Alliance Capital and its owners, with Alliance Holding being a 31.3% owner of Alliance Capital.

323.     Defendant Calugar also fully understood, as a sophisticated investor who, by his own admission, had "been an active investor in timing mutual funds for 15 years," that market timing harms long-term mutual fund investors by skimming profits that would otherwise belong to them. Among the facts that evidence this knowledge are the: (i) purported prohibitions and restriction on frequent trading in mutual fund shares that exist throughout the mutual fund industry, which Calugar frequently encountered; (ii) the related fact that Calugar found it necessary to negotiate "timing capacity" in the funds he targeted for market timing; and (iii) the fact that he found it necessary to offer special incentives to the mutual fund management companies with which he dealt in order to induce them to permit him to skim fund profits through market timing.  Furthermore, as a trained attorney, Calugar knew that the mutual fund management companies with which he made such arrangements faced substantial risks of liability, adverse regulatory action, and reputational harm.

324.     As alleged above, Calugar did in fact offer inducements to both Alliance Capital, and the individual fund managers, to induce them to permit him to market time Alliance Capital-

managed mutual funds.  Calugar sought out, and negotiated with, Alliance Capital hedge fund marketing executives, offering to park assets in Alliance Capital hedge funds in exchange for market timing capacity.  To keep the portfolio managers of the target mutual funds happy, he arranged for and agreed to provide "sticky asset" investments in hedge funds managed by those same portfolio managers, resulting in increases in their personal compensation.

325.    Thus, Calugar knowingly participated in breaches of fiduciary duty by the Alliance Capital officers, executives, employees and agents with whom he dealt.

326.    This knowing participation by Calugar was a proximate cause of the damages to Alliance Holding alleged herein.

**COUNT IX**

**For Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a)**
**of the Exchange Act Against Alliance Capital Management L. P.,**
**Alliance Capital Management Corporation, Equitable,**
**AXA Financial, Inc., and AXA, SA and John Carifa**

327.    Plaintiff realleges and incorporates by reference each and every allegation set forth above.

328.    As a result of the conduct and events alleged above, Alliance Holding has been named as a defendant in numerous securities class action lawsuits brought on behalf of AllianceBernstein mutual fund investors in which it allegedly is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.

329.    Federal law provides Alliance Holding with a cause of action for contribution against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in Musick, Peeler & Garrett v. Employers Insurance of Wausau, 508 U. S. 286, Alliance Holding has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Alliance Holding to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending class actions, and sets forth specific rules regarding the determination of claims for such contribution.

330.    Accordingly, plaintiff, on behalf of Alliance Holding, hereby claims contribution against defendants Alliance Capital, ACMC, Equitable, AXA Financial, AXA and Carifa, each of whom has either been named in one or more of the currently pending securities class actions as a

joint tortfeasor with Alliance Holding under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Alliance Holding.

331.    Alliance Holding claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding Carifa, ACMC and Alliance Capital**

332.    As alleged above, Defendant Carifa was a senior executive officer of Defendants ACMC and Alliance Capital, and was chief executive officer of Alliance Capital's mutual funds division at all relevant times herein.

333.    Carifa (and ACMC and Alliance Capital, acting through Carifa) utilizing means and instrumentalities of interstate commerce, including the mails and/or interstate wire communications, in connection with the purchase or sale of securities, caused numerous Alliance Capital-managed mutual funds to issue prospectuses to the public, and to investors who purchased securities in such funds (and who are now represented in securities fraud class actions against such defendants and nominal defendant Alliance Holding) during the period relevant to the illicit mutual fund market timing arrangements detailed above.

334.    These prospectuses contained statements, and omitted to state facts, that were materially misleading to persons who purchased securities of said mutual funds during the relevant period.  In particular, the prospectuses created the false impression that Alliance Capital prohibited, and took steps reasonably designed to detect and prevent, market timing in said funds, and therefore that Alliance Capital was acting to protect investors in said mutual funds from the harmful effects of market timing.  The prospectuses failed to disclose that, in fact, Alliance Capital was entering into

113

and maintaining secret agreements to permit certain traders, including Canary and Calugar, as alleged above, to engage in market timing in said funds.

335.    For example, the prospectuses and/or amendments thereto issued by AllianceBernstein Technology Fund on October 30, 2002, January 30, 2003, February 11, 2003, and August 7, 2003, all contained the following language:

> A Fund may refuse any order to purchase shares.  In particular, the Fund reserves the right to restrict purchases of shares (including through exchanges) when they appear to evidence a pattern of frequent purchases and sales made in response to short-term considerations.

336.    Each one of these prospectuses and/or amendments thereto was signed by Carifa in his capacity as Chairman and President of said fund.

337.    The plaintiffs in the securities fraud class actions mentioned above allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing securities of said mutual funds, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

338.    Plaintiffs in the securities class actions suffered damages because they purchased said mutual fund securities at a time when, unbeknownst to them, the value of such securities was subject to ongoing dilution caused by market timing in said funds pursuant to the secret, undisclosed arrangements alleged herein.

339.    The damages suffered by said investors were caused by reason of the fact that: (i) they were induced to purchase said mutual fund securities, and (ii) the dilution to their investments

which resulted by reason of the market timing arrangements was directly causally related to the subject matter of the false and misleading disclosures..

340.     The plaintiffs in the securities class actions were unaware of the false and misleading nature of said statements and omissive disclosures.

341.     When Carifa signed and thus made the false statements and omissive disclosures detailed above, he had actual knowledge that they were false and misleading.  As alleged in detail herein, Carifa was party to numerous internal Alliance Capital email communications regarding the secret market timing arrangements with Calugar, Canary, and others.  He knew about the secret timing arrangements, he knew the contents of the prospectuses he signed, and he knew that the prospectuses were false and misleading because they created the intended impression that Alliance Capital prohibited, and took steps reasonably designed to detect and prevent, market timing in said funds, and therefore that Alliance Capital was acting to protect investors in said mutual funds from the harmful effects of market timing, when in fact it was actively entering into and maintaining secret market timing arrangements.  Carifa was motivated to make the false and misleading disclosures in order to increase or maintain the asset management fee income of Alliance Capital by causing investors to purchase securities of said mutual funds, and to thereby cause an increase in his own incentive compensation.

342.     Accordingly, Carifa is liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Alliance Holding were to be held liable in the investor securities fraud actions, Carifa would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Alliance Holding.

**Allegations Regarding Alliance Capital, ACMC,**

115

**Equitable, AXA Financial and AXA as Control Persons**

343.     In acting as alleged above, Carifa was acting as an authorized agent, and as an Executive Officer, of both ACMC and Alliance Capital.  Accordingly, these entities are charged with the knowledge that he had and with responsibility for his actions, which were undertaken to advance the interests of said defendants.  Further, as principals of their agent Carifa, said defendants had the power to control, and did control, Carifa's actions on their behalf, and thus are control persons under section 20(a) of the Exchange Act.

344.     Said defendants, through their power to control the operations and decision making of said funds, and through the exercise thereof, caused the false and misleading statements and omissions alleged herein to be made, and could have, but failed to, prevent the making of said statements and omissions.

345.     Accordingly, said defendants could be held liable to the investor class in the securities fraud class actions, and, were Alliance Holding to be held liable in said class actions, said defendants would be liable to it for contribution.

346.     Plaintiff hereby derivatively claims such right of contribution on behalf of Alliance Holding.

347.     Equitable, AXA Financial and AXA beneficially own 100% of the equity interest in defendant ACMC, and, as alleged above, have the power to, and in fact exercised such power to control over ACMC, and through it, over Alliance Capital and Carifa. Therefore, they are control persons under section 20(a) of the Exchange Act.

348.   Said defendants, through their power to control the operations and decision making of ACMC, Alliance Capital, Carifa, and through them said funds, and through the exercise of such power, caused the false and misleading statements and omissions alleged herein to be made, and could have, but failed to, prevent the making of said statements and omissions.

349.   Accordingly, said defendants could be held liable to the investor class in the securities fraud class actions, and, were Alliance Holding to be held liable in said class actions, said defendants would be liable to it for contribution.

350.   Plaintiff hereby derivatively claims such right of contribution on behalf of Alliance Holding.

**WHEREFORE**, plaintiff demands relief on behalf of Alliance as follows:

A.   Judgments against each of the Fiduciary Defendants for restitution and/or damages in favor of plaintiffs, on behalf of Alliance and its public unitholders, and awarding punitive and exemplary damages as appropriate, plus pre-judgment interest;

B.   Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, so as to assure that plaintiff and Alliance have an effective remedy;

C.   Contribution from the Defendants named in Count IX above;

D.   An award to plaintiff of the costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

E.   An award to plaintiff of such other and further relief as the Court may deem just and proper.

117

## JURY DEMAND

Plaintiff hereby demands a jury trial on all such issues which are triable before a jury.

Dated: September 29, 2004

**MORRIS AND MORRIS LLC**
**COUNSELORS AT LAW**

By: _____/s/_____
    Karen L. Morris
    Patrick F. Morris
1105 N. Market Street, Suite 803
Wilmington, DE 19801
Telephone: 302-426-0400
Facsimile: 302-426-0406

OF COUNSEL:

**LAW OFFICES**
  **BERNARD M. GROSS, P.C.**
Deborah R. Gross
Robert P. Frutkin
1515 Locust Street, 2nd Floor
Philadelphia, PA 19102
Telephone:  215-561-3600
Facsimile:  215-561-3000

**BULL & LIFSHITZ LLP**
Joshua Lifshitz
18 East 41st Street
New York, NY 10017
Telephone: 212-213-6222
Facsimile: 212-869-5632

**LAW OFFICES OF JAMES M.  ORMAN**
James M. Orman
1845 Walnut Street, Suite 14th floor
Philadelphia, PA 19103
Telephone: 215-523-78009

**PASKOWITZ & ASSOCIATES**
Laurence Paskowitz
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: 212-685-0969

**LAW OFFICE OF**
   **KENNETH A. ELAN**
Kenneth A. Elan
Joseph Garland
217 Broadway, Suite 606
New York, NY 10007
Telephone: 212-619-0261
Facsimile: 212-385-2707

**LASKY & RIFKIND LTD**
Leigh Lasky
100 Park Avenue, 12th Floor
New York, NY 10017
Telephone: 212-907-0800
Facsimile: 212-684-6083

## CERTIFICATE OF SERVICE

I, Patrick F. Morris, hereby certify that on September 29, 2004, I caused a copy of **VERIFIED AMENDED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND FOR CONTRIBUTION UNDER THE FEDERAL SECURITIES LAWS** to be served via e-mail on the following:

Wesley R. Powell
Clifford Chance US LLP
wesley.powell@cliffordchance.com

Andrew Gendron
Venable LLP
agendron@venable.com

G. Stewart Webb, Jr.
Venable LLP
gswebb@venable.com


    /s/
Patrick F. Morris