IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS | ) | MDL No. 1586 |
| INVESTMENT LITIGATION | ) | |
| | ) | Case No. 04-MD-15862-04 |
| This Document Relates To: | ) | (Hon. J. Frederick Motz) |
| *Pilgrim Baxter Sub-Track*, | ) | |
|     04-md-15862-04 | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENTS
AND PLAN OF ALLOCATION IN THE PILGRIM BAXTER SUB-TRACK**

Dated:  September 14, 2010

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES ................................................................................. iv

I.   INTRODUCTION ............................................................................... 2

     A.   The Settlements ........................................................................ 2

     B.   Reason for the Settlements ....................................................... 3

II.  THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE AND
     ADEQUATE AND SHOULD BE APPROVED ........................................ 5

     A.   The Standards for Judicial Approval of Class Action and
          Derivative Action Settlements ................................................. 5

     B.   Application of the Fairness Factors Supports Final Approval of the
          Settlements ............................................................................. 7

          1.   The Posture of the Case and Extent of Discovery ..................... 7

          2.   The Circumstances Surrounding the Negotiations ................... 10

          3.   The Experience of Counsel in Securities Class Action &
               Derivative Litigation ............................................................. 12

     C.   Application of the Adequacy Factors Supports Final Approval of
          the Settlements ....................................................................... 13

          1.   The Strength of Plaintiffs' Cases and  the Potential
               Difficulties of Proof or Strong Defenses .................................. 14

          2.   The Anticipated Duration and Expense of Additional
               Litigation ............................................................................. 19

          3.   The Solvency of Defendants and the Likelihood of
               Recovery on a Litigated Judgment .......................................... 20

          4.   Class Member and Current Shareholder Reaction to the
               Proposed Settlements ............................................................ 20

III. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED ................ 26

IV.  THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED
     FOR SETTLEMENT PURPOSES UNDER RULE 23 ................................ 28

V.     THE NOTICE TO SETTLEMENT CLASS MEMBERS AND CURRENT
       SHAREHOLDERS SATISFIED THE REQUIREMENTS OF THE
       FEDERAL RULES OF CIVIL PROCEDURE, THE PSLRA, AND DUE
       PROCESS. ................................................................................................................. 29

VI.    CONCLUSION............................................................................................................. 30

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

D'Amato v. Deutsche Bank,
    236 F.3d 78 (2d Cir. 2001)........................................................................................23

Flinn v. FMC Corp.,
    528 F.2d 1169 (4th Cir. 1974) ...................................................................... passim

Henley v. FMC Corp.,
    207 F. Supp. 2d 489 (S.D.W. Va. 2002)...............................................................20

In re AremisSoft Corp. Sec. Litig.,
    210 F.R.D. 109 (D.N.J. 2002)................................................................................14

In re AT&T Corp. Sec. Litig.,
    455 F.3d 160 (3d Cir. 2006)...................................................................................23

In re EVCI Career Colls. Holding Corp. Sec. Litig.,
    No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007)...........13, 27

In re Global Crossing Sec. & ERISA Litig.,
    225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................13, 18

In re Jiffy Lube Sec. Litig.,
    927 F.2d 155 (4th Cir. 1991) ......................................................................... passim

In re Marsh & McLennan Cos. Sec. Litig.,
    No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009).............18, 26

In re MicroStrategy. Inc. Sec. Litig.,
    148 F. Supp. 2d 654 (E.D. Va. 2001) ....................................................................7

In re MicroStrategy, Inc. Sec. Litig.,
    148 F. Supp. 2d 654 (E.D. Va. 2001) ............................................................ passim

In re Mid-Atl. Toyota Antitrust Litig.,
    605 F. Supp. 440 (D. Md. 1984) ...........................................................................5

In re The Mills Corp. Sec. Litig.,
    265 F.R.D. 246 (E.D. Va. 2009) ................................................................... passim

In re Mut. Funds Inv. Litig.,
    590 F. Supp. 2d 741 (D. Md. 2008)................................................................16, 18

In re Mut. Funds Inv. Litig.,
    608 F. Supp. 2d 677 (D. Md. 2009) .....................................................................16

*In re Mut. Funds Inv. Litig.*,
626 F. Supp. 2d 530 (D. Md. 2009) ............................................................................16

*In re OCA, Inc. Sec. and Derivative Litig.*,
No. 05-2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009) ..........................................24

*In re PaineWebber Ltd. P'ships. Litig.*,
171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997)..............................27

*In re PNC Fin. Servs. Grp., Inc. Sec. Litig.*,
440 F. Supp. 2d 421 (W.D. Pa. 2006).......................................................................10

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998).......................................................................................23

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ...............................................................................28

*In re Serzone Prods. Liab. Litig.*,
231 F.R.D. 221 (S.D. W. Va. 2005)......................................................................5, 20

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)........................................................................................20

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)................................................................26

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 CIV 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ...............26

*Int'l Union v. Ford Motor Co.*,
Nos. 05-74730, 2006 WL 1984363 (E.D. Mich. July 13, 2006) ..............................23

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
No. 1:08cv1310 (AJT/JFA), 2009 WL 3094955 (E.D. Va. Sept. 28, 2009) .........5, 6

*Muhammad v. Nat'l City Mortg., Inc.*,
No. 2:07-0423, 2008 WL 5377783 (S.D.W. Va. Dec. 19, 2008) ........................7, 10

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
390 U.S. 414 (1968)....................................................................................................19

*S.C. Nat'l Bank v. Stone*,
139 F.R.D. 335 (D.S.C. 1991) ........................................................................ *passim*

*Strang v. JHM Mortg. Sec. Ltd. P'Ship*,
890 F. Supp. 499 (E.D. Va. 1995) ........................................................................7, 10

*Zimmerman v. Bell*,
   800 F.2d 386 (4th Cir. 1986) ........................................................................................... *passim*

## STATUTES & RULES

Fed. R. Civ. P. 23 ................................................................................................18, 28, 29

Fed. R. Civ. P. 23(b)(3) ..............................................................................................18

Fed. R. Civ. P. 23(c)(2) ..............................................................................................30

Fed. R. Civ. P. 23(e) ...............................................................................................5, 30

Fed. R. Civ. P. 23.1 .................................................................................................5, 30

## OTHER AUTHORITIES

4 NEWBERG ON CLASS ACTIONS § 11.51 ..............................................................................10

Court-appointed Lead Plaintiff in the Class Action, the Ohio Public Employees Deferred Compensation Plan ("Class Lead Plaintiff"), on behalf of itself and all members of the Settlement Class; and plaintiffs Chuck Hall, Korshed Jungalawala, Risa Schneps, Katherine Simpkins and James Cohen, acting on behalf of the mutual funds that are successors to PBHG Funds Inc. (the "Funds") in the Derivative Action (collectively, the "Derivative Plaintiffs," and together with Class Lead Plaintiff, the "Plaintiffs"), respectfully submit this Memorandum of Law in support of their motion for final approval of their respective proposed settlements of class and derivative claims pending in the Pilgrim Baxter sub-track of MDL-1586 - *In re Mutual Funds Investment Litigation* (the "MDL") (the "Settlements") and final approval of the proposed plan of allocation of the settlement proceeds in the Pilgrim Baxter sub-track (the "Plan of Allocation").[1]  Specifically, Plaintiffs seek entry of proposed Orders and Final Judgments that will, *inter alia*, finally approve the Settlements and certify the Settlement Class (defined in Section IV, below) for settlement purposes.  Plaintiffs also seek entry of a proposed order approving the Plan of Allocation.[2]

---

[1] Class Lead Plaintiff is simultaneously submitting herewith the Declaration of Chad Johnson, William C. Fredericks and Jerald Bien-Willner in Support of Motion for Final Approval of Proposed Settlements, Plan of Allocation of Settlement Proceeds, and Application for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses in the Pilgrim Baxter Sub-Track (the "BLB&G Declaration" or "BLB&G Decl.").  The BLB&G Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Class Action in this sub-track; the nature of the claims asserted in this litigation; the negotiations leading to the Settlements; the value of the Settlements to the Settlement Class, as compared to the risks and uncertainties of continued litigation; the extensive notice program conducted in this sub-track; and the terms of the Plan of Allocation for the settlement proceeds.  Similarly, detailed information about the history of the Derivative Action and the work performed by Derivative Counsel is set forth in the Declaration Nicholas E. Chimicles in Support of Motion for Final Approval of the Proposed Settlements, Plan of Allocation of Settlement Proceeds, and Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses in the Pilgrim Baxter Sub-Track (the "Chimicles Declaration" or "Chimicles Decl."), which is being filed contemporaneously herewith.

[2] The proposed Orders and Final Judgments and the proposed Order Approving the Plan of Allocation in the Pilgrim Baxter Sub-Track will be submitted to the Court with Plaintiffs' filing on October 6, 2010.

I.      **INTRODUCTION**

A.      **The Settlements**

The proposed Settlements now before the Court for final approval in the Pilgrim Baxter sub-track provide for the total payment of $31,538,600 in cash, plus interest earned thereon (the "Settlement Fund").  The Settlement Fund is comprised of: (i) $26,500,000 paid on behalf of the PB Advisor Defendants[3] for the benefit of the Settlement Class and the PBHG Successor Funds; (ii) $2,865,000 paid on behalf of the Canary Defendants for the benefit of the Settlement Class and the PBHG Successor Funds; (iii) $1,232,000 paid on behalf of the Bear Stearns Defendants for the benefit of the Settlement Class; (iv) $500,000 paid on behalf of the Appalachian Trails Defendants for the benefit of the Settlement Class; and (v) $441,600 paid on behalf of BAS for the benefit of the Settlement Class and the PBHG Successor Funds.[4]  Pursuant to the Stipulations, these settlement funds have been paid into interest-bearing escrow accounts pending final approval of the Settlements and distribution to the Settlement Class pursuant to the Plan of Allocation.   In addition to these amounts, Class Lead Counsel intends to distribute $5,730,000 plus interest (which was obtained by the Office of the New York Attorney General in its settlement with the Canary Defendants) to the Settlement Class.

The Settlements are the result of hard fought, arm's-length negotiations between the relevant Lead Counsel for the Plaintiffs, who were well informed in the strengths and

---

[3] All capitalized terms not otherwise defined herein shall have the meanings set forth in the Preliminary Order for Notice and Hearing in Connection with Settlement Proceedings in the Pilgrim Baxter Sub-Track dated May 19, 2010 (Dkt. No. 1286) (the "Preliminary Approval Order").

[4] The stipulations and agreements setting forth the full terms of the Settlements are included in the Pilgrim Baxter Appendix submitted in connection with Plaintiffs' Motion for Preliminary Approval (Dkt. No. 1274) as Exhibits 2 to 10 (Dkt. Nos. 1274-8 to 1274-16).  Class Lead Plaintiff, on behalf of the Settlement Class, is a party to all of the Settlements and the Derivative Plaintiffs, on behalf of the Funds, are parties to the proposed settlements with the PB Advisor Defendants, the PB Funds Defendants, the Canary Defendants and BAS.

weaknesses of their claims, and the relevant experienced counsel for the Settling Defendants.  It is the informed opinion of Plaintiffs and their Lead Counsel that, given the uncertainty and further substantial expense of pursuing the Actions in this sub-track through trial and possible appeals, that their proposed, respective Settlements are fair, reasonable, and adequate.  Indeed, if the Actions were to continue, Plaintiffs would face significant risks in obtaining any recovery from the defendants.  For example, Plaintiffs would have faced significant obstacles in establishing the liability of the Settling Defendants and proving damages above the significant amounts that certain Settling Defendants had already paid in restitution to government regulators, which have been distributed to certain Class members and the PBHG Successor Funds.

As discussed in detail below, Class Lead Plaintiff and its counsel submit that all of the Settlements are fair, reasonable, and adequate and in the best interests of the Settlements Class. Derivative Plaintiffs and their counsel submit that the Settlements in which they are participating are fair, reasonable, and adequate and in the best interests of the Funds. Accordingly, Plaintiffs respectfully move for final approval of their respective proposed Settlements.

### B.  <u>Reason for the Settlements</u>

The proposed Settlements are the end of result of the vigorous prosecution of these complex litigations by Plaintiffs and their Lead Counsel for over six years including, for example, detailed investigation of their claims, briefing on dispositive motions to dismiss and on a large number of other matters, comprehensive analysis of potential damages by an expert retained by Class Lead Plaintiff, comprehensive analysis of potential damages recoverable under Section 36(b) of the Investment Company Act by Derivative Counsel, formal and informal discovery, and extensive settlement negotiations with multiple sets of defendants.  By the time the Plaintiffs reached their respective agreements in principle to settle with each of the Settling

Defendants, Plaintiffs possessed a thorough understanding of the strengths and weaknesses of their claims, the damages suffered by the Settlement Class and the Funds, and the potential strength of the defenses put forward by the Settling Defendants.  *See* BLB&G Decl. ¶ 4.

In reaching the Settlements, Lead Counsel considered the complexity of the litigation and the substantial additional expense and time that would be necessary to prosecute the Actions through the completion of discovery, class certification, summary judgment, trial, and the inevitable appeals.  These Actions raise novel and unsettled questions of law and involve numerous complex legal and factual issues, as well as the procedural complexities created by the existence of several sets of plaintiffs litigating against multiple sets of defendants represented by separate counsel.  *See, e.g.,* BLB&G Decl. ¶¶ 27-28, 36-42, Chimicles Decl. ¶¶ 32-36.  Plaintiffs also faced the reality that, to the extent that members of the Class and/or the Funds had suffered compensable damages, Defendants could put forth a strong argument that the payments made by certain of the defendants to the SEC and other government regulators and subsequently distributed to certain PBHG Funds investors (and certain of the PBHG Funds themselves) should offset any damages recovered at trial.  *See, e.g.,* BLB&G Decl. ¶¶ 39-41.  In light of all the circumstances, after a careful analysis of the relative strengths and weaknesses of the claims and defenses asserted, the risks of continued litigation and the time and expense that would be necessary to prosecute these complex Actions through to verdicts and possible appeals, Plaintiffs and their Lead Counsel believe that their respective proposed Settlements – which will result in the global settlement of all Class and Derivative claims asserted in the Pilgrim Baxter Sub-track – are fair, adequate and reasonable.  Accordingly, Plaintiffs respectfully submit that the Settlements should be approved by this Court.

## II.     THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED

### A.     The Standards for Judicial Approval of Class Action and Derivative Action Settlements

There is a strong judicial policy in this Circuit favoring the resolution of litigation through settlement, particularly in class actions and other complex litigation. *See Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08cv1310 (AJT/JFA), 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009); *see generally* Plaintiffs' Omnibus Memorandum of Law In Support of Final Approval of Proposed Settlements and Plans of Allocation ("Omnibus Final Approval Memo"), § I.A.[5]

Federal Rules of Civil Procedure 23(e) and 23.1 respectively govern settlements of class and derivative actions, such as the instant Actions, and require a judicial determination that settlements of any such claims are "fair, reasonable, and adequate" and were entered into without collusion of the parties. *See* Fed. R. Civ. P. 23(e)(2) and 23.1; *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 223 (S.D. W. Va. 2005); *In re Mid-Atl. Toyota Antitrust Litig.*, 605 F. Supp. 440, 442 (D. Md. 1984); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir. 1986) (approval of derivative actions); *see also* Omnibus Final Approval Memo §§ I.A, II.   In evaluating the reasonableness of the result reached, the Court must recognize that "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution," *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 258 (E.D. Va. 2009).   Accordingly, the trial court "should not make a proponent of a

---

[5] In addition to the points and authorities in this Memorandum in support of final approval of Plaintiffs' respective Settlements in the Pilgrim Baxter sub-track, Plaintiffs respectfully refer the Court to the Omnibus Final Approval Memo, which is being filed concurrently with this Memorandum and is frequently referred to herein, for additional points and authorities concerning the legal standards applicable to Plaintiffs' motion for final approval of the Settlements and Plan of Allocation.

proposed settlement justify each term of a settlement agreement against a hypothetical or speculative measure of what concessions might have been gained." *Lomascolo*, 2009 WL 3094955, at *10; *accord Mills*, 265 F.R.D. at 257.  In determining whether a given settlement meets this standard, the court "should not. . . turn the settlement hearing into a trial or rehearsal of the trial nor need it reach any dispositive conclusions on the admittedly unsettled legal issues in the case." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1974) (citations and internal quotation marks omitted).

The Fourth Circuit has identified a set of factors that a district court should consider in determining whether a proposed settlement is "fair, reasonable, and adequate," which are grouped into two principal components: (1) considerations of *fairness*, which focus on whether the proposed settlement is the result of good-faith, arms'-length negotiations, and (2) considerations of *adequacy*, which focus on substantive terms of the settlement and, in particular, whether the settlement consideration provided to class members is sufficient in light of the risks and costs of continued litigation.  *See Jiffy Lube*, 927 F.2d at 158-59; *In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001); *see also Zimmerman*, 800 F.2d 391-92 (similar factors applied to derivative settlements).

As discussed in detail below, consideration of these factors demonstrates that the Settlements are fair, reasonable, and adequate and should be approved.  The Settlements are each the result of extensive arms'-length negotiations by informed counsel and offer substantial benefits for their respective intended beneficiaries, including the creation of a Settlement Fund of more than $31.5 million in cash.  Given the complexity of this litigation and the significant risks that would be faced if the parties were to proceed with continued litigation and a possible trial and appeals, Plaintiffs believe that the Settlements they have entered into, respectively, represent

excellent recoveries for the Settlement Class and the Funds that they represent.  The Settlements eliminate the substantial risks that Plaintiffs, after years of additional litigation, might not recover anything from the Settling Defendants or might recover an amount less than the settlement funds obtained.

> **B.**  **Application of the Fairness Factors**
> **Supports Final Approval of the Settlements**

Courts in the Fourth Circuit analyze four factors when assessing the fairness of a proposed settlement: (i) the posture of the case at the time settlement was proposed, (ii) the extent of discovery that had been conducted, (iii) the circumstances surrounding the negotiations, and (iv) the experience of counsel.  *See Jiffy Lube*, 927 F.2d at 158-59; *see also Zimmerman*, 800 F.2d at 391-92; Omnibus Final Approval Memo § I.B.  These factors strongly support approval of the proposed Settlements.

> **1.**  **The Posture of the Case and Extent of Discovery**

The first two *Jiffy Lube* factors direct the Court to consider the stage of the litigation at the time settlement was reached and extent of discovery that has been conducted in the case. *See, e.g.*, *Mills*, 265 F.R.D. at 254; *Muhammad v. Nat'l City Mortg., Inc.*, No. 2:07-0423, 2008 WL 5377783, at *3 (S.D.W. Va. Dec. 19, 2008); *MicroStrategy*, 148 F. Supp. 2d at 664; Omnibus Final Approval Memo § I.B.1.  No specific amount of formal discovery is necessary – the key inquiry for the Court is whether the parties and their counsel have "sufficiently developed the case such that they can appreciate the merits of the claims." *Muhammad*, 2008 WL 5377783, at *3; *accord Strang v.  JHM Mortg. Sec. Ltd. P'Ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995) ("Plaintiffs have conducted sufficient informal discovery and investigation to fairly evaluate the merits of Defendants' positions during settlement negotiations"); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *12 (E.D. La. Mar. 2, 2009) ("The

question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.").

In the Pilgrim Baxter sub-track, Plaintiffs and Plaintiffs' Counsel participated in protracted, arms'-length settlement negotiations with separate groups of defendants, represented by separate, highly experienced counsel, over the course of several years to reach their respective Settlements, and even the earliest proposed agreements in principle to settle only occurred after Plaintiffs' Counsel, on behalf of their respective clients, had engaged in a significant investigation of the facts and claims in the Actions.  *See, e.g.*, BLB&G Decl. ¶¶ 12-13, 20-26; Chimicles Decl. ¶¶ 12-13, 19-25.  The news of alleged market timing and late trading in various mutual fund families first broke in 2003.  Several lawsuits were filed starting in late 2003, the instant MDL was formed and organized in the early part of 2004, and Plaintiffs and their counsel began investigating their respective claims during that time frame.  BLB&G Decl. ¶¶ 7-12, Chimicles Decl. ¶¶ 12-13, 19-25.  Only after all of those events had occurred, the first proposed settlement – the agreement in principle to settle with the Canary Defendants – was reached in July 2004, and it reflects the only one of the Settlements reached prior to defendants filing their vigorously contested motions to dismiss in 2005.  As a result of the proposed Canary Defendant settlement, Plaintiffs obtained a significant global monetary recovery, as well as substantial non-public factual information concerning their claims, which included multiple interview sessions with a percipient witness and a wealth of non-public documents, all of which helped them to advance their cases against the other defendants and to file robust consolidated amended complaints in late September 2004.  BLB&G Decl. ¶ 13; Chimicles Decl. ¶¶ 13, 20.

As the Court is aware, the other defendants filed numerous motions to dismiss and other legal challenges to Plaintiffs' claims.  All proposed settlements (except, as noted above, the proposed Canary settlement) were reached after defendants' voluminous motions to dismiss were filed.  *See, e.g.*, BLB&G Decl. ¶¶ 17-26; Chimicles Decl. ¶¶ 20-25.   Each of the proposed settlements was reached only after Plaintiffs, through the efforts of their respective counsel, had developed a thorough understanding of the strengths and weakness of their respective cases.  *See, e.g.,* BLB&G Decl. ¶¶ 20-26, Chimicles Decl. ¶ .  For example, Class Lead Plaintiff, through its counsel, engaged in significant informal discovery with the PB Advisor Defendants, who produced trading data to Class Lead Plaintiff that was essential for its damages analyses, as well as a large quantity of documents concerning market timing that the PB Advisor Defendants had previously produced to the SEC.  BLB&G Decl. ¶ 23.  In addition, Class Lead Counsel, in some instances together with its damages expert, along with outside counsel for the PB Advisor Defendants, participated in exchanges of information with Dr. Kenneth Lehn, the Independent Distribution Consultant for the settlement between Pilgrim Baxter and the SEC.  *Id.*  Beginning in early 2007, Class Lead Plaintiff also engaged in significant formal written discovery with the PB Advisor Defendants and the Appalachian Trail Defendants prior to reaching agreements to settle with those defendants.  *Id.* ¶¶ 30-31.  Moreover, the Bear Stearns Defendants did not agree to settle until well after a program of discovery had been initiated by BLB&G.  *Id.* ¶¶ 33-34.  In addition, the progress of cases in certain other sub-tracks, including briefs filed and decisions rendered by the Court, provided Plaintiffs in the Pilgrim Baxter sub-track with an unusually detailed understanding of certain legal issues that would also be confronted in their Actions.

Similarly, Fund Derivative Plaintiffs, through their counsel, engaged in significant analysis of their claims and damages.  Prior to filing their consolidated amended complaint,

Derivative Counsel conducted an in-depth investigation related to demand futility allegations, including a significant analysis of SEC filings.  Chimicles Decl. ¶¶ 12-15, 19-24.  Similarly, Fund Derivative Plaintiffs conducted a detailed investigation of claims and damages, particularly damages potentially recoverable under Section 36(b) of the Investment Company Act, through SEC filings, materials available from public enforcement actions, and other sources.  *Id.*   Fund Derivative Counsel also participated in meetings and conferences with Lead Class Plaintiff's damage expert.  Chimicles Decl. ¶ 19.

Therefore, Plaintiffs had a thorough understanding of the strengths and weaknesses of their claims, as well as the likelihood of obtaining a greater recovery, with respect to each of their respective proposed Settlements, before agreeing in principle to settle.  Thus, these factors weigh in favor of approval of the Settlements.  *See, e.g., MicroStrategy*, 148 F. Supp. 2d at 664 (approving proposed settlement despite the fact that it was reached "relatively early" in the litigation because the settlement came after the parties vigorously contested defendant's motion to dismiss); *In re PNC Fin. Servs. Grp., Inc. Sec. Litig.*, 440 F. Supp. 2d 421, 433 (W.D. Pa. 2006) (approving settlement where counsel had "gained a thorough understanding of the legal and factual issues" despite the lack of formal discovery); *Strang*, 890 F. Supp. at 501 (same).

### 2.    The Circumstances Surrounding the Negotiations

In evaluating the fairness of the proposed settlements, courts consider the circumstances surrounding the settlement negotiations.  *See generally* Omnibus Final Approval Memo at § I.B.2; *see also, e.g., Mills*, 265 F.R.D. at 255; *MicroStrategy*, 148 F. Supp. 2d at 665.  In the absence of any evidence to the contrary, the court "may presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Muhammad*, 2008 WL 5377783, at *4; *see* 4 NEWBERG ON CLASS ACTIONS § 11.51, at 158

(courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered").

The proposed Settlements here were the product of lengthy, arms'-length negotiations, undertaken by experienced counsel in good faith after substantial factual investigation and legal analysis.  As highlighted above and as also described in the accompanying papers, at the time the Settlements were reached in the Pilgrim Baxter sub-track, Plaintiffs and Plaintiffs' Counsel were well informed of the strengths and weaknesses of Plaintiffs' claims, both factually and legally, and were able to use this knowledge to engage in a complex negotiation process with multiple defendants.

The settlement negotiations with defendants were hard fought and often very complicated, given the number of parties involved, and involved many contested issues, including liability and damages.  The fact that several years intervened between the first agreement in principle with the Canary Defendants and the last agreement to settle, demonstrates, in part, that Plaintiffs and their counsel were not willing to settle easily but were determined to pursue this litigation until they and their counsel were able to negotiate proposed settlements that they considered fair and adequate.  For example, as detailed in the BLB&G Declaration, prior to reaching a settlement with the Pilgrim Baxter fund family defendants, plaintiffs engaged in lengthy, hard-fought settlement negotiations with this group of defendants which involved Class Lead Counsel requesting and obtaining significant information to aid in its and its client's assessment of the adequacy of the settlement proposals.  *See* BLB&G Decl. ¶¶ 23-24.  In late 2005 Derivative Plaintiffs became involved in the settlement negotiations and, ultimately, after nearly two years of hard-fought negotiation, Class and Derivative Plaintiffs reached the joint settlement with the PB Advisor Defendants in late 2007.  *See* Chimicles Decl.

¶¶ 22-26. The fact that the Settlement reached with PB Advisor Defendants and the other proposed Settlements are the product of lengthy, arms'-length negotiations, undertaken by experienced counsel in good faith after substantial factual investigation and legal analysis, weighs strongly in favor of their approval. *See Mills*, 265 F.R.D. at 255 (where settlement was the "product of a long series of dealings" between class counsel and defendants and the negotiations were "sufficiently thorough [and] contentious," this factor weighed in favor of settlement); *MicroStrategy*, 148 F. Supp. 2d at 665 (the settlement was fair where counsel "participated in numerous meetings and extensive and intensive discussions extending over a period of months"); *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991) (approving settlement where negotiations were found to be "hard fought and always adversarial" and there was "no indication of any collusion").

### 3. The Experience of Counsel in Securities Class Action & Derivative Litigation

As set out in firm resumes submitted to the Court, Lead Counsel for all Plaintiffs have extensive experience in litigating their respective types of Actions (*i.e.*, securities class actions and derivative actions), and have successfully litigated these types of cases in courts throughout the United States. *See* BLB&G Decl. Ex. 4-C; Affidavit of Nicholas E. Chimicles in Support of Joint Petition for Attorneys' Fees and Reimbursement of Expenses, filed contemporaneously herewith ("Chimicles Aff."), Ex. 3.

After informing themselves of the salient factual and legal circumstances in their respective Actions and weighing the potential risks and costs of continued litigation, Plaintiffs' Counsel have concluded that the Settlements are fair, reasonable, and adequate and in the best interests of each of the parties they represent. *See* BLB&G Decl. ¶ 4; Chimicles Decl. ¶ 4. The judgment of experienced counsel that the proposed settlements are fair and adequate should be

given considerable weight by the Court. *See Flinn*, 528 F.2d at 1173. "[W]hen Class Counsel are 'nationally recognized members of the securities litigation bar,' it is entirely warranted for this Court to pay heed to their judgment in approving negotiating, and entering into a putative settlement." *Mills*, 265 F.R.D. at 255 (quoting *MicroStrategy*, 148 F. Supp. 2d at 665).

The fairness of the Settlements is further supported by the fact that Class Lead Plaintiff, the Ohio Public Employees Deferred Compensation Plan, an institutional investor with a substantial financial interest in the outcome of this action, participated in the settlement negotiations and approved of the Settlements. *See* Declaration of Matthew J. Lampke, Esq., Assistant Section Chief for the State of Ohio Attorney General's Office, attached to the BLB&G Decl. as Ex. 1, at ¶¶ 5-7. *See In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007) ("a settlement reached under the supervision of appropriately selected lead plaintiffs is entitled to an even greater presumption of reasonableness"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (the participation of a sophisticated institutional investor lead plaintiff in the settlement process supports approval of the settlement).

### C.    Application of the Adequacy Factors Supports Final Approval of the Settlements

In assessing the adequacy of a proposed settlement, courts in the Fourth Circuit consider the following factors: (i) the relative strength of the plaintiffs' case on the merits; (ii) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (iii) the anticipated duration and expense of additional litigation; (iv) the solvency of defendants and the likelihood of the recovery on a litigated judgment; and (v) the class's and current shareholders' reaction to the proposed settlements. *See Jiffy Lube*, 927 F.2d at 159; *Zimmerman*, 800 F.2d at 391-92 *see generally* Omnibus Final Approval Memo § I.C.

The proposed Settlements are adequate under these standards and should be approved by the Court.  Indeed, in the opinion of Plaintiffs and their counsel, the Settlements represent very positive results for the Settlement Class and the Funds.

### 1.    The Strength of Plaintiffs' Cases and the Potential Difficulties of Proof or Strong Defenses

While Plaintiffs and Plaintiffs' Counsel believe their respective claims are strong on the merits and that their respective claims would ultimately result in a verdict, litigation is never free from risk and uncertainty, and Plaintiffs and Plaintiffs' Counsel recognize that Plaintiffs' success was not assured.  *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 125 (D.N.J. 2002) ("Regardless of the strength of case counsel might present at trial, victory in litigation is never guaranteed."); *see also S.C. Nat'l Bank*, 139 F.R.D. at 340 ("Although the plaintiffs . . . may firmly believe that their claims have merit, the complexities and uncertainties characteristic of class action securities litigation, . . . make it appropriate for such plaintiffs to compromise their claims pursuant to a reasonable settlement.").  As in every complex case of this kind, Plaintiffs faced formidable obstacles to recovery, both with respect to liability and damages.  The Actions before the Court were especially complex, involving complicated legal and factual issues as well as multiple defendants.

In particular, courts have frequently recognized that securities fraud claims present numerous hurdles that plaintiffs must overcome to establish the elements of liability, including *scienter*, at trial and to prove damages.  *See, e.g.*, *Mills*, 265 F.R.D. at 256 (plaintiffs cannot never be confident of the outcome of securities fraud cases because "[e]lements such as scienter, materiality of misrepresentation and reliance by the class members often present significant barriers to recovery"); *MicroStrategy*, 148 F. Supp. 2d at 664 ("the complexities and uncertainties characteristic of class action securities litigation, and the associated expenses of

such litigation, make it appropriate for . . . plaintiffs to compromise their claims pursuant to a reasonable settlement"); *S.C. Nat'l Bank*, 139 F.R.D. at 340. Similarly, derivative actions and, in particular, actions under Section 36(b) of the Investment Company Act notoriously difficult.

Moreover, the mutual fund investment litigation generally, and the Actions in this sub-track specifically, posed additional, unique challenges to establishing liability and proving damages that would have created additional hurdles for the recovery by the Plaintiffs above and beyond the risks present in typical securities class action and derivative litigation.

***Risks of Establishing Liability***. First, there would have been risks involved in establishing that the defendants' alleged participation in or facilitation of market timing and late trading violated the law relevant to the claims in each respective Action because there is little or no established precedent for applying Plaintiffs' legal theories of liability to the specific factual context of their claims. Especially at the time the Settlements were reached, this lack of precedent as to how or whether these claims would fit into the existing legal framework of the relevant laws created substantial unpredictability as to the ultimate outcome of the case following motions for summary judgment, trial and potential appeals. If the Class and Derivative Actions had continued to be litigated, it is highly foreseeable that defendants would have raised many of the same – and perhaps additional – arguments raised by other defendants in the MDL in the cases that were litigated through summary judgment. Those defenses – which in some instances proved successful in the MDL actions litigated through summary judgment – may have included: lack of standing, no actionable statement/omission, no duty to disclose, lack of scienter, no reliance or presumption of reliance, and/or failure to establish "scheme" liability. *See, e.g.,* BLB&G Decl. ¶ 37.

*Risks of Establishing Damages*.   In addition to the substantial risks of establishing liability against defendants, these Actions also presented additional, equally significant risks in connection with proof of damages.   There would have been substantial dispute as to whether, and to what extent, the alleged market-timing and late-trading activity of the defendants damaged the members of the Settlement Class who owned shares in the mutual funds when these practices occurred or damaged the PBHG Funds.   Certain potential outcomes with respect to liability issues could have dramatically limited the available damages, if for example, *scienter* was found lacking in those market-timing transactions that were not shown to be specifically agreed to by the PB Advisor Defendants.   *See, e.g.*, *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 752-53 & n.12 (D. Md. 2008); *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d 530, 536-37 (D. Md. 2009).   Similarly, damages recoverable under Section 36(b) would have been significant issue.

Defendants also would have argued that, to the extent that members of the Settlement Class or the PBHG Funds had suffered damages at all, the payments made by certain of the defendants to the SEC and other government regulators and subsequently distributed to investors in certain of the PBHG Funds (and to the PBHG Funds or their successors) should offset any damages recovered at trial.   This argument was particularly formidable in light of this Court's summary judgment decisions in other sub-tracks requiring such an offset.   *See, e.g., Mut. Funds Inv. Litig.*, 590 F. Supp. 2d at 751-52; *In re Mut. Funds Inv. Litig.*, 608 F. Supp. 2d 677 (D. Md. 2009).

Many of the defendants in the Pilgrim Baxter sub-track have paid significant amounts in disgorgement and civil penalties that were (or will be) distributed to investors in certain of the PBHG Funds (and to the Funds themselves), which defendants may contend offset damages.   For example, Pilgrim Baxter & Associates, Ltd. and two individual PB Advisor Defendants, Gary

Pilgrim and Harold Baxter, alone paid $250 million, including disgorgement of $160 million, into the SEC's fair fund – an amount which the Independent Distribution Consultant for that settlement concluded was sufficient to compensate for all economic harm covered by that settlement. *See, e.g.,* BLB&G Decl. ¶ 40 & n.12.  Although Plaintiffs were well prepared to dispute that assessment, in light of the uncertainties about the amount of damages that could be established at trial, the very significant size of the restitution payments made by these key defendants that have or will be distributed to investors in the PBHG Funds and to the PBHG Funds themselves, and the Court's previous decisions on this matter, Plaintiffs faced a very real risk that – even if they were successful in establishing liability – all or a substantial portion of the damages proven would have been offset by the distributions from these regulatory settlements.

In addition, as the Court is aware, there are a variety of competing views about the proper way to measure the damages suffered by investors as a result of alleged market timing, which could result in substantial differences in the overall calculation of damages.  *See* BLB&G Decl. ¶ 41.  This issue would certainly have been the subject of competing expert testimony at summary judgment and trial.  As with any issue subject to contested expert testimony, this created additional litigation risk because Plaintiffs could not be certain that their experts' view of the matter would be accepted by the Court and the jury.  *See, e.g.*, *Mills*, 265 F.R.D. at 256 ("the damages issue would have become a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury") (quoting *MicroStrategy*, 148 F. Supp. 2d at 666-67).

***Risks of Establishing Class Certification***.  Finally, if litigation had continued, defendants would also have vigorously contested class certification (as occurred in other MDL actions where the litigation continued to that point).  Although Class Lead Plaintiff believes that the Class Action is appropriate for class treatment, this was an additional risk that could not be

entirely discounted. *See In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at \*6 (S.D.N.Y. Dec. 23, 2009) (risk that the court might deny motion for class certification, supported approval of the settlement); *Global Crossing*, 225 F.R.D. at 460 (same). In particular, although this is not a concern with respect to classes certified for settlement purposes, a class certified for trial consisting of investors in 11 separate mutual funds might have raised manageability concerns under Rule 23(b)(3). *See Mut. Funds Inv. Litig.*, 590 F. Supp. 2d at 759 (deferring ruling on class certification motions in Janus and Putnam sub-tracks but noting, ominously, that "considerations of litigation manageability must be taken into account in defining the scope of any class certification"). Indeed, certain MDL defendants previewed these arguments in their 2007 motion to dismiss for lack of standing or, in the alternative, determination of the applicable law under Rule 23. *See* BLB&G Decl. ¶ 35. Given the comparatively small size of individual shareholders' claims, failure to obtain class certification here would have effectively ended any hope of a recovery against any remaining defendant.

*     *     *

In conclusion, the amount of any proposed settlement cannot be considered in the abstract but must be measured against the strengths and weaknesses of the plaintiffs' case. *See Flinn*, 528 F.2d at 1172. Here, the risks to recovery posed by difficulties in establishing liability, proving damages above the amount of any offset(s) and obtaining class certification in the Class Action were substantial and there was no guarantee that Plaintiffs would succeed. The proposed Settlements eliminate these risks and create immediate and substantial recoveries for the benefit of the Settlement Class and the Funds. Indeed, in the judgment of Plaintiffs and Plaintiffs' Counsel, the Settlements represent excellent results for the Settlement Class and the Funds under the circumstances.

### 2.   The Anticipated Duration and
### Expense of Additional Litigation

Another reason for the parties and their counsel to recommend, and the court to approve, a proposed settlement is the expense and duration of further litigation.  *See generally* Omnibus Final Approval Memo § I.C.2; *see also, e.g.*, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 434 (1968) (court must consider "the complexity, expense, and likely duration of such litigation"); *Mills*, 265 F.R.D. at 256 ("the substantial time and expense" of continued litigation strongly supported settlement in a securities class action); *MicroStrategy*, 148 F. Supp. 2d at 667 (approving settlement where "there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.").

At the time the Settlements were reached, formal discovery had not reached an advanced stage with respect to certain of the Settling Defendants, including, for example, the Canary Defendants and BAS, and if the Actions were to proceed, there is no question that additional discovery (including fact and expert depositions) would be expensive and lengthy.  In addition, motions for class certification and summary judgment, a trial and the inevitable post-trial appeals would entail substantial time and significant expense for both sides.  Given the already substantial amount of time devoted to the Actions over the course of the past six years, continued litigation would mean that recovery for the Settlement Class and/or the Funds could be delayed for many additional years.[6]   Accordingly, this factor also weighs heavily in favor of the Settlements.

---

[6] Such delays would, of course, have further exacerbated the difficulties already faced by some Settlement Class Members in obtaining information or documents concerning their holdings in the PBHG Funds.

### 3.   The Solvency of Defendants and the Likelihood of Recovery on a Litigated Judgment

The reasonableness of a proposed settlement should be considered in light of the solvency of the defendants and the likelihood of recovery on a litigated judgment. *See Jiffy Lube*, 927 F.2d at 159; *Serzone*, 231 F.R.D. at 245; *MicroStrategy*, 148 F. Supp. 2d at 667; *S.C. Nat'l Bank*, 139 F.R.D. at 341; *see generally* Omnibus Final Approval Memo § I.C.3.

Although many of the defendants in this sub-track may have been theoretically capable of paying a larger judgment than the amount recovered through settlement, courts have repeatedly noted that, where other factors weigh in favor settlement, this fact will not stand in the way of approval of a proposed settlement. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (affirming district court's conclusion that a defendant's "ability to pay a higher amount was irrelevant to determining the fairness of the settlement"); *Serzone*, 231 F.R.D. at 245 ("Since the remaining factors weigh in favor of finding the Settlement to be adequate, this factor may be given little weight."); *Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D.W. Va. 2002) ("The Court has no doubt [defendant] would be able to satisfy any judgment entered against it.  That consideration, however, is largely beside the point given the other factors weighing in favor of a negotiated resolution.").

### 4.   Class Member and Current Shareholder Reaction to the Proposed Settlements

The reaction of class members and current shareholders to the proposed settlements "as expressed directly or by failure to object" is also "a proper consideration for the trial court." *Flinn*, 528 F.2d at 1173; *Zimmerman*, 800 F.2d at 391-92. A low number of objections and, in the case of the Class Action, opt-outs in comparison to the size of the settlement class can provide evidence of the fairness of the proposed settlement. *See* Omnibus Final Approval Memo § I.C.4.  However, "a settlement is not unfair or unreasonable simply because a large number of

class members oppose it." *Flinn*, 528 F.2d at 1173. Here, the reaction to the Settlements of the Settlement Class, and the current shareholders of the mutual funds that are successors to PBHG Funds Inc., has been, on balance, overwhelmingly positive and there have been very few requests for exclusion. Therefore, this factor also weighs heavily in favor of settlement approval, as described in greater detail below.

By way of background, the Settlement Class and current shareholders of the mutual funds that are successors to PBHG Funds Inc. received notice of the settlement pursuant to the Preliminary Approval Order. In accordance with that order, the Garden City Group, Inc. ("GCG"), the Court-appointed Claims Administrator for the Pilgrim Baxter sub-track, implemented the extensive notice program (the "Notice Program") developed by counsel and approved by the Court to advise potential members of the Settlement Class and current shareholders of the pendency of the Actions, the proposed Settlements and their rights with respect thereto. Thus, GCG, under the supervision of Class Lead Counsel: (i) caused the Court-approved Notice of Pendency and Proposed Settlements of Class Action, Motion for Attorneys' Fees and Expenses, and Settlement Hearing (the "Notice")[7] to be mailed to all identifiable members of the Settlement Class, which resulted in the more than 500,000 Notices being mailed to potential Class Members as of September 10, 2010;[8] (ii) published the Court-approved

---

[7] Consistent with the requirements of Rule 23(c)(2)(B) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(7), the Notice contains, *inter alia*, a description of the nature of the Actions, the definition of the Class certified; and the material terms of the Settlements, including an estimate of the per share recovery for Settlement Class Members; a description of the claims that will be released in the Settlements; a description of Settlement Class Members' right to request exclusion from the Class and the procedure for doing so; and a description of the right of Settlement Class Members and current shareholders of the mutual funds that are successors to PBHG Funds Inc. to object to the proposed Settlements, Plan of Allocation or counsel's request for attorneys' fees and expenses and the procedure for doing so.

[8] *See* Declaration of Stephen J. Cirami Concerning the Notice Program and Report on Exclusion Requests Received in the Pilgrim Baxter Sub-Track (the "PB Notice Declaration" or "PB Notice Decl."), attached the BLB&G Decl. as Exhibit 2, at ¶ 12.

"global" summary notice (the "Publication Notice") – which was directed at members of the Class and current shareholders – once in each of *People* magazine, *The Wall Street Journal*, and *The New York Times*, and over *PR Newswire* and arranged for notice of the settlements through various web-based media outlets targeted at potential mutual fund owners;[9] (iii) established a specific website concerning the Settlements that provides for, among other information, downloadable copies of the Notice, Long-Form Notice, and Proof of Claim and which has received over 58,000 visits through September 10, 2010, *see* PB Notice Decl. ¶ 13; (iv) established a toll-free telephone hotline that has received 6,473 calls as of September 10, 2010, *see* PB Notice Decl. ¶ 15; and (v) maintained an email address and responded to 1,772 emails related to the Pilgrim Baxter sub-track, *see* PB Notice Decl. ¶ 16.  In response to the inquiries it has received in connection with the Notice Program, with the supervision of counsel, GCG has taken steps to ensure that it promptly responds to all written and telephone correspondence that it has received.  BLB&G has undertaken substantial efforts to consult and coordinate regularly with GCG, and has dedicated a team of professionals at its firm to respond promptly to any and all inquires that it receives from shareholders.  *See* BLB&G Decl. ¶ 45.

To date, the reaction of the Settlement Class and current shareholders has been overwhelmingly positive, with very few exceptions.  Indeed, a total of only eight objections and 12 requests for exclusion have been received, in comparison to the more than 500,000 Notices that have been mailed to potential Settlement Class Members and the over 14,800 claims that have already been filed as of September 10, 2010.[10]  *See* BLB&G Decl. ¶ 54; PB Notice Decl.

---

[9] *See* Declaration of Stephen J. Cirami Concerning Compliance with the Publication Components of the Notice Programs (the "Publication Declaration" or "Publication Decl."), attached hereto as Exhibit 3, at ¶ 4.

[10] A chart identifying all objections received to date is attached as Exhibit 5 to the BLB&G Declaration. Of the eight objections, only two have objected to the derivative settlements. *See* Dkt. Nos. 1309, 1316.

¶¶ 18-19.  The due date for filing claims is not until December 8, 2010, and Plaintiffs anticipate that additional claims will be filed.  Moreover, it has been BLB&G's experience – from its direct contact with various Class Members, and in particular those class members who have contacted us with questions about the Settlements and/or the claims process – that Class Members are pleased with the Settlements and with BLB&G's work in helping to bring the Settlements about.  *See* BLB&G Decl. ¶ 54.

The small number of objections in comparison to the size of the settlement class and the number of current shareholders supports the fairness of the Settlements.  *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) (where 18 class members filed written objections and 72 requested exclusion from a class of only 27,800 members, the district court "properly concluded that this small number of objections weighed in favor of the settlement"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (300 objections by class members and 19,000 opt-outs were "truly insignificant" in comparison to the 8 million policyholders provided with class notice and thus, "the limited number of objections filed . . . weighed in favor of approving the settlement"); *Int'l Union v. Ford Motor Co.*, Nos. 05-74730, 2006 WL 1984363, at *27 (E.D. Mich. July 13, 2006) (where "800 out of more than 170,000 class members," less than 0.5% of the class, objected, the court found that this "very small level of opposition [was] another reason to conclude that the Settlement is fair, reasonable, and adequate").

Moreover, to date, none of the objections or requests for exclusion have been filed by any institutional investors, a circumstance that courts have often found to support the conclusion that a proposed settlement is fair and reasonable.  *See, e.g.*, *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 166 (3d Cir. 2006) ("No objections were filed by institutional investors, those with the

greatest financial stake in the settlement."); *In re OCA, Inc. Sec. and Derivative Litig.*,No. 05-2165, 2009 WL 512081, at *16 (E.D. La. Mar. 2, 2009) ("Lead Counsel also noted that a number of the claimants were sophisticated financial institutions such as state and municipal pension funds. . . . That those institutions filed claims and voiced no objections further attests to the general support for the settlement.").

In addition, especially when evaluated in context, Plaintiffs respectfully submit that the objections submitted to date lack merit. For example, three of the objections generally oppose the amount of the Settlements as too small. *See* BLB&G Decl. Ex. 5.[11] As detailed herein, in light of the complexity of these cases and the significant risks that would be faced if plaintiffs were to proceed with continued litigation and a possible trial, a recovery in excess of $31.5 million represents an excellent result in this matter. Two objections have been received to the requirement that Settlement Class Members submit certain basic information or documents showing the number of shares that they owned in the PBHG Funds in order to file a claim for payment from the settlement proceeds. *See* BLB&G Decl. Ex. 5. In order to administer the proposed Plan of Allocation (described below) and accomplish a distribution of the Net Settlement Fund that bears a reasonable relation to the strength of Settlement Class Members' relative claims, here it was necessary to obtain information about Settlement Class Members' ownership of the PBHG Funds during the relevant time period, including which funds and how many shares they owned. Moreover, unlike in a typical securities class action settlement administration, where class members are required to submit detailed documentation – such as

---

[11] Four of the objections received concern counsel's request for attorneys' fees and expenses. *See* BLB&G Decl. Ex. 5. As described in the accompanying Memorandum submitted in support of Plaintiffs' Counsel's application for an award of attorneys' fees and expenses, given the substantial obstacles that they faced in achieving a recovery and the substantial amount of time and resources that they dedicated to this litigation, the requested total fee award of 15% of the Gross Settlement Fund applied for collectively by the undersigned counsel represents appropriate compensation for Plaintiffs' Counsel and the expenses for which reimbursement is sought were reasonable and necessary to the prosecution of the Actions.

brokerage confirmations – proving each purchase and sale transaction during the class period, Plaintiffs and their counsel have taken numerous steps here to reduce the burden on Settlement Class Members and limit the information and documents they are required to submit. First, only basic year-end information is requested, instead of the detailed transaction information typically required in other securities fraud class actions.

Additionally, with respect to the Settlement Class Members for whom Old Mutual possesses shareholding information – generally those investors who purchased or held shares directly with Pilgrim Baxter – a streamlined process has been developed and is in place allowing class members to call representatives of Old Mutual at a designated toll-free number and receive information concerning their PBHG Funds holdings, free of charge, that will allow them easily to complete the claim form and will be considered sufficient documentation to support the claim. This process for obtaining historical holding information has been, and will continue to be, publicized on the Pilgrim Baxter settlement website, the toll-free telephone Settlements hotline and in the many direct written and telephonic communications that the Claims Administrator and Class Lead Counsel have with class members who make inquiries or who submit deficient claims.

Finally, with respect to all Settlement Class Members, the documentation requirement is flexible by design – the claim form does not require any specific type of documentation of the shares held – and class members are encouraged to submit the best documentation they reasonably have or can obtain, such as tax filings, a signed letter from an accountant or broker, or any other verified information. The goal of this relaxed documentation requirement was to permit as many class members to participate as possible, while still protecting the substantial interest of the class in avoiding payment of fraudulent claims. Courts have repeatedly upheld as

proper, and indeed necessary, claims filing processes in securities case that have required much more detailed transaction information. *See, e.g. Marsh & McLennan*, 2009 WL 5178546, at *25 (rejecting objection to requirement that class members list purchases, sales and holdings of stock on their claim form, noting that "[w]ithout that necessary information the Claims Administrator could not calculate claimants' distributions" and that this requirement "comport[ed] with the long-approved procedures for efficient management of class-action settlement distributions."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV 3288 (DLC), 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) ("The information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds.").[12]

As is customary, once the September 21, 2010 deadline for submitting objections has passed – and any additional objections are received and evaluated – Plaintiffs may provide responses to the objections received to date and to any later-filed objections in their October 6, 2010 filing, as necessary and appropriate.

## III.    THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

Approval of a plan of allocation is governed by the same standards by which a class action settlement is scrutinized – namely, it must be fair, reasonable and adequate. *See Mills*, 265 F.R.D. at 258; *MicroStrategy*, 148 F. Supp. 2d at 668; *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005); *see generally* Omnibus Final Approval Memo § III. Where experienced, qualified counsel have endorsed the allocation plan, "the allocation need only have a reasonable and rational basis," *Mills*, 265 F.R.D. at 258, and the opinion of class

---

[12]   In this claims administration, in addition to the traditional claim filing method, whereby Investor Class Members may mail a paper copy of their claim form to the Claims Administrator, Investor Class Members have the option to submit their claims online using a simple, step-by-step process via the MFS settlement website. Of the roughly 14,800 claims filed through September 10, 2010, over 11,300 have been submitted via the settlement website's on-line claims filing mechanism. *See* PB Notice Decl. ¶ 18.

counsel is "entitled to significant respect." *Id.*; *see also EVCI*, 2007 WL 2230177, at * 11 ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.").

Although the allocation need not be done with "scientific precision," a plan of allocation should seek to distribute settlement proceeds based on the relative strengths and weaknesses of class members' claims. *Mills*, 265 F.R.D. at 258-59; *see MicroStrategy*, 148 F. Supp. 2d at 669 (plan of allocation properly made "interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue"); *In re PaineWebber Ltd. P'ships. Litig.,* 171 F.R.D. 104, 133 (S.D.N.Y.) (where "real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh "distribution of the settlement" . . . in favor of the plaintiffs whose claims [are] more likely to succeed"), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  The Court also has substantial flexibility in approving methods for the submission and processing of claims under the Plan of Allocation.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.66, at 331-32 (2004); Omnibus Final Approval Memo § III.

The proposed Plan of Allocation, as set forth in the Long-Form Notice at pages 7 to 9, provides for a fair and equitable way to distribute the net proceeds of the Settlements (and the funds obtained by the Office of the New York Attorney General in its settlement with the Canary Defendants) to members of the Settlement Class and the PBHG Successor Funds.  The Plan of Allocation provides that eligible Settlement Class Members who submit valid claim forms will receive *pro rata* allocations from the Net Settlement Fund based on the amount of their Recognized Claims. Their Recognized Claims will be based on the number of shares owned in each of the PBHG Funds at or around the end of each year from 1999 to 2003 and a formula that

27

reflects Class Lead Plaintiff's damages expert's estimate of the amount of dilution losses per share caused by the alleged late-trading and market timing in each specific PBHG Fund during each time interval. *See* BLB&G Decl. ¶ 59. After the distribution of the entire Net Settlement Fund to Settlement Class Members and additional re-distribution to Settlement Class Members, to the extent that deemed cost-effective by Plaintiffs' Counsel, the remaining balance of the Net Settlement Fund will be distributed to the PBGH Successor Funds in proportion to the alleged dilution losses found by Class Lead Plaintiff's Damages Expert, subject to Court approval. See Long-Form Notice ¶ 14.P, at p. 9; BLB&G Decl.¶ 60 n.17; Chimicles Decl. at ¶ 39.

The reaction to the Plan of Allocation to date has been overwhelmingly positive – as of the filing of this Declaration, only two objections that could be understood as concerning the Plan of Allocation have been received. Thus, as explained herein, the Plan of Allocation was designed to be – and is – fair, reasonable and adequate under the circumstances of these Actions and should be approved.

## IV.  THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES UNDER RULE 23

In granting final settlement approval, the Court should also certify the proposed Settlement Class for purposes of settlement under Rule 23 of the Federal Rules of Civil Procedure. Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *Mills*, 265 F.R.D. at 266 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995)); *S.C. Nat'l Bank*, 749 F. Supp. at 1428 ("settlement classes have proved to be quite useful in resolving major class action disputes") (citations omitted).

The proposed Settlement Class is defined as every natural person or any legal entity who, during the period between and including July 30, 1999 and November 13, 2003, held, purchased, or otherwise acquired shares in any of the PBHG Funds, subject to the exclusions set forth in ¶ 4 of the Preliminary Approval Order.   The Settlement Class meets the standards of class certification under Rule 23.   These standards, which apply equally in the context of preliminary and final approval, are set out in greater detail in Plaintiffs' Omnibus Memorandum of Law in Support of Preliminary Approval of Proposed Settlements (Dkt. No. 1275) ("Omnibus Prelim. Approval Memo") at 7-14, and Plaintiffs' Memorandum of Law in Support of Preliminary Approval of Settlements in the Pilgrim Baxter Sub-Track (Dkt. No. 1274-1) at 13-18.   Nothing has changed since then that would affect this analysis and there have been no objections to certification of the Settlement Class.

## V.  THE NOTICE TO SETTLEMENT CLASS MEMBERS AND CURRENT SHAREHOLDERS SATISFIED THE REQUIREMENTS OF THE FEDERAL RULES OF CIVIL PROCEDURE, THE PSLRA, AND DUE PROCESS.

As discussed above, Class Lead Counsel and the Claims Administrator have successfully executed the Notice Program for providing notice to Settlement Class Members and current shareholders of the mutual funds that are successors to PBHG Funds Inc. as approved by the Court in the Preliminary Approval Order.   Through September 10, 2010, over 500,000 Notices have been mailed to potential Settlement Class Members.   *See* PB Notice Decl. ¶ 12.   These mailings were supplemented by the global publication notice program, which included publication of a summary notice pertaining to sixteen of the seventeen sub-tracks, including the Pilgrim Baxter sub-track, in a number of nationally circulated magazines and newspapers and through various web-based media outlets, which were all specifically targeted to reach likely mutual fund owners.   *See* Publication Decl. ¶ 4.   The Settlements were further publicized on the Pilgrim Baxter mutual funds settlement website, which included copies of the Notice, Long-

Form Notice, Claim Form and other information and has received over 58,000 visits since it went live on June 30, 2010.  *See* PB Notice Decl. ¶ 13.

This combination of individual mailed notice and robust publication notice, which was executed in accordance with the Court's Preliminary Approval Order, was reasonably calculated to inform potential class members and current shareholders about the Settlements and constituted the best notice practicable under the circumstances, particularly with respect to a class of this size and geographic distribution.  *See* Omnibus Final Approval Memo § IV.  As previously found by the Court in its Preliminary Approval Order, the notices fairly apprised potential class members of the Settlements and their individual rights and options open to them with respect to the Settlements and provided all the specific information required by Rule 23(c)(2), Rule 23(e) and the PSLRA.  *See* Omnibus Prelim. Approval Memo at 5-6.  The notice provided to current shareholders of the Settlements of derivative action satisfied the standards of Rule 23.1 and due process.

## VI.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court (i) grant final approval to the Settlements as fair, reasonable and adequate; (ii) approve the proposed Plan of Allocation; (iii) certify the proposed Settlement Class for purposes of settlement; and (iii) approve the notice of the Settlements given to Settlement Class Members and the current shareholders of the mutual funds that are successors to PBHG Funds Inc.

DATED: September 14, 2010

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

    /s/  *Chad Johnson*
Chad Johnson
William C. Fredericks
Jerald Bien-Willner
John J. Mills
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Lead Counsel for the*
*Class Lead Plaintiff and the Settlement Class*

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles, Esq.
Denise Davis Schwartzman, Esq.
Timothy N. Mathews, Esq.
361 West Lancaster Avenue
Haverford, PA 19041
Telephone:  (610) 642-8500

*Fund Derivative Counsel*

BLBG #478095