IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | MDL 1586 |
| IN RE ALLIANCE, FRANKLIN/TEMPLETON, BANK OF AMERICA/NATIONS FUNDS, and PILGRIM BAXTER | Case No. 04-md-15862 (Judge J. Frederick Motz) |
| [Franklin Templeton Subtrack] | |
| Sharkey IRO/IRA v. Franklin Resources, *et al.* | Case No. JFM-04-1310 |

OPINION

This MDL proceeding encompasses numerous actions arising from market timing[1] in the mutual funds industry. Now before the court are two motions: (1) the motion of the Franklin Templeton defendants[2] ("Defendants" or "FT") for partial summary judgment on the claims brought under Rule 10b-5 as to non-arranged market timing in the Investor Class Action; and (2) the cross-motion of the lead plaintiff ("Plaintiff") for partial summary judgment on its 10b-5 claims as to certain non-arranged market timing from the commencement of the Class Period through the Fall of 2000. For the reasons below, I am granting the Defendants' motion for

---

[1] As explained in an earlier opinion in this same MDL proceeding, market timing is "the frequent buying and selling of mutual fund shares to exploit any lag between changes in the value of the fund's portfolio of securities and the reflection of that change in a mutual fund's share price." *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 851 n.1 (internal quotations and citations omitted). Market timing is not per se illegal, but it may be actionable on other grounds (such as when a mutual fund intentionally misrepresents the actions it is taking towards market timing).

[2] The Franklin Templeton defendants include the following: Franklin Resources Inc., Franklin Advisers Inc., Franklin/Templeton Distributors Inc., Franklin Alternative Strategies Inc., Franklin Strategic Series Inc., Gregory E. Johnson, and William N. Post II.

partial summary judgment and denying the Plaintiff's cross-motion for partial summary judgment.

I.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. The Supreme Court of the United States has held that in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

In order to prevail on a securities fraud claim under Rule 10b-5, a plaintiff "must show that: '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 745 (D. Md. 2008) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007)). FT's motion for partial summary judgment and Plaintiff's cross-motion for partial summary judgment both turn on the second of these elements, i.e. whether FT acted with scienter.

The Fourth Circuit has held that a plaintiff can establish scienter through a showing of intentional misconduct or recklessness. *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009). In the context of Section 10(b), a defendant's conduct is

considered "reckless" only if it is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quoting *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003)). "Mere negligence will not suffice." *Ottmann*, 353 F.3d at 343.

Plaintiff in this case asserts that FT is liable under Rule 10b-5 because its fund prospectuses stated that FT was taking steps to control market timing, yet failed to disclose that FT was intentionally or recklessly allowing such market timing to continue. Accordingly, "the relevant scienter inquiry is whether defendants' efforts in attempting (but failing) to control non-arranged market timing were intentional or reckless, or whether their efforts were in good faith or, at worst, negligent." *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d 530, 532 (D. Md. 2009).

II.

A.

In an attempt to show that FT acted with scienter in failing to stop non-arranged market timing, Plaintiff splits the class period into two stages. In the first, from the commencement of the class period in February 1999 until sometime in the Fall of 2000, Plaintiff contends that FT took no action to stop market timing and cross-moves for summary judgment on the issue of scienter as to all non-arranged market timing during this time period. In the second time period, from the Fall of 2000 until the end of the class period in February 2004, Plaintiff acknowledges that FT took steps to control market timing but maintains that FT was not as aggressive as it should have been. Plaintiff contends that FT's motion for summary judgment as to this time period therefore must be denied. Because Plaintiff's cross-motion focuses exclusively on the

3

facts that occurred first in the chronology of the case, this Opinion first analyzes Plaintiff's cross-motion and then addresses FT's motion.

Plaintiff cross-moves for summary judgment on the issue of scienter as to its 10b-5 claims as to all non-arranged market timing occurring from the commencement of the class period in February 1999 until sometime in the Fall of 2000.  FT argues that Plaintiff's motion must be denied because Plaintiff has failed to show that FT's efforts to control non-arranged market timing were not made in good faith.  (Defs.' Opp'n at 3.)  Plaintiff responds that it is entitled to summary judgment because during this time period FT "took no actions to prevent" market timing.  (Pl.'s Mem. at 3.)  Yet Plaintiff admits (as indeed, it cannot deny in the face of clear documentary evidence in the record) that FT actively tracked and studied market timing in its funds at this early stage of the class period.  (*See, e.g.*, Pl.'s Mem. at 10 [acknowledging that during this time, "FT reviewed certain items, or looked at others to study market timing"].)  Essentially, Plaintiff's argument is that FT intentionally or recklessly failed to prevent market timing because it merely "monitored," "looked at," and "studied" market timing, and "'studying' does not mean 'stopping.'"  (Pl.'s Mem. at 9-12; Pl.'s Reply at 19.)  This argument fails for two reasons.

First, to say that FT "monitored" and "studied" market timing but failed to take any steps to "stop" market timing is to draw a distinction without meaning.  Plaintiff concedes that, from the beginning of the class period, FT's Market Timing Desk ("MTD") actively monitored trading activity, identified suspected market timing accounts, and required that those accounts "register with [FT's] market-timing desk and place trades through the desk."  (Pl's Mem. at 11.)  The record also shows that FT progressively stepped up these efforts between the commencement of the class period and the Fall of 2000.  (*See, e.g.*, Defs.' Ex. 3 at FT-MIL 18910 [November 1999

memo recommending that FT's CEO "[h]ave the timing desk take on the responsibility of tracking individual timers in addition to the registered timing companies that they currently track"].) The purpose of tracking suspected timers and forcing them to register with the MTD, as Plaintiff itself highlights, was to allow the MTD to "study the timing issue in a controlled environment" so that FT's analysts could "get our hands around what was going on." (Pl.'s Mem. at 11-12; T. Johnson. Aff. at 2; O'Lear Tr. at 78-81.)  Thus, it is clear that the "monitor[ing]," "review[ing]," and "stud[ying]" that Plaintiff so harshly criticizes actually constituted the first step in the process of stopping market timing activity.  Plaintiff's attempt to hold FT liable for having made sure it understood the market timing problem before overhauling its investment policies is unavailing.

Plaintiff's argument also fails because the undisputed facts in the record demonstrate that even at this early stage of the class period, FT did more than simply "monitoring" and "studying" non-arranged market timing in its funds.  First, in November 1999, FT staff recommended several changes to the language of its fund prospectuses in order to combat market timing. (Pl.'s Ex. 253; Defs.' Ex. 3.)  These changes included broadening the definition of who would be considered a market timer, reserving the right to revise or reject any exchange if excessive timing was suspected, and requiring traders identified as market timers to register with and conduct trading through the MTD. (*Id.*)  Senior management at FT approved these changes just three months later in February 2000, (Defs.' Exs. 5-8), and the various fund boards approved and adopted them in April and May 2000, (Defs.' Exs. 10-12.)  Plaintiff dismisses these changes as ineffectual, but the record proves otherwise, as market timing "activity dropped sharply from August to September [2000] due to [FT's] efforts of enforcing prospectus language September

5

15. In addition, timing activity was minimal for October as well as November." (Defs.' Ex. 218.)

In addition to these changes to the prospectus language, FT used the information it derived from its study of market timing patterns to warn, restrict, and in some cases, completely shut down suspected market timers. The record shows that in late 1999 and early 2000, FT issued both written and oral warnings to suspected market timers about their trading patterns. (*See* Defs.' Ex. 44; Defs.' Ex. 234, T. Johnson Depo. at 65-66.) Additionally, FT placed "stop codes" on accounts of suspected market timers to prevent further market timing activity. (*See, e.g.*, Defs.' Ex. 82 [December 1999 e-mail from FT employee asking a colleague to "code . . . master accounts [of suspected timers] so as to avoid future Franklin Templeton purchases"]; *see also* Defs.' Exs. 17, 18, 84.) And finally, FT even rejected purchase orders from active accounts when market timing was suspected. (*See, e.g.*, Defs.' Ex. 202 [December 1999 e-mail describing the rejection of a purchase order from a suspected market timer who "has 3 accounts that we know of, which were set up through different [broker-dealers] to avoid detection"].)

Faced with this evidence of the steps taken by FT to control non-arranged market timing during the early stages of the class period, Plaintiff resorts to an attempt to downplay FT's efforts.[3] To that end, Plaintiff argues that the changes to the prospectus language "did not 'make

---

[3] Plaintiff also discusses at length the explicit agreements allegedly struck by FT to permit market timing in some of its funds in exchange for the deposit of long-term money ("sticky assets") in other funds. (*See* Pl.'s Mem. at 7-8, 11-15, 20-23.) This is "arranged market timing" and therefore not directly relevant to the motions currently before the court, which focus exclusively on "non-arranged timing." (*See* Defs.' Opp'n, Addendum A [letter agreement between counsel for Plaintiff and FT limiting the scope of these motions to non-arranged market timing].) Indeed, Plaintiff concedes in a footnote, "this timing . . . would fall under the 'arranged timing' umbrella, and thus is not a direct subject of [this] Motion." (*Id.* at 12 n.33.) Plaintiff argues, however, that the existence of arranged timing agreements undercuts FT's contention that it was trying in good faith to stamp out market timing. (*Id.*) Such an argument is unpersuasive. As I previously found in the Janus subtrack of this litigation, the alleged existence of arranged

an across the board statement against market timing,'" (Pl.'s Mem. at 36), that FT issued only a small number of warning letters during this early stage of the class period, (Pl.'s Reply at 14), that the number of suspected timing accounts restricted by stop codes was "statistically nil" compared to the total number of active timing accounts, (*id.* at 17), and that FT rejected only a small number of purchase orders, (*id.* at 18.) These protests all boil down to essentially the same argument: that FT should have been more aggressive in stopping market timing. Yet even if this were true, it would be insufficient to establish scienter because a defendant's "failure to act as aggressively as [it] could have, or should have, does not establish intentionality or recklessness." *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 534; *see also Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 314 (4th Cir. 2009) ("In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more."). In light of the undisputed facts in the record, a reasonable jury could not find that FT acted with scienter in trying (but failing) to prevent market timing during this stage of the class period. Accordingly, Plaintiff's cross-motion for summary judgment is denied.

B.

Although Plaintiff limits its own motion for partial summary judgment to the early part of the class period, it also asserts that FT is not entitled to summary judgment as to non-arranged market timing from the Fall of 2000 until the end of the class period in February 2004. Despite the reams of evidence presented by FT chronicling the steps it took in its campaign against market timing, Plaintiff argues that the record presents a factual issue as to whether FT's efforts

---

market timing agreements does not prevent a defendant from prevailing on a partial summary judgment motion as to non-arranged market timing. *See In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 537. This is because explicit market timing agreements merely show that a defendant "did want timed assets in its funds—*but only if the timed assets came with long-term money (so-called 'sticky assets')*." *Id.* at 535 n.4 (emphasis added).

7

were made in good faith or were reckless in allowing market timing to continue. (Pl.'s Mem. at 3.) Although Plaintiff concedes that FT "actually tried to stop" and "began to control" non-arranged market timing by Fall 2000, it argues that summary judgment is inappropriate because "its efforts were half-hearted and halting." (*Id.* at 12 n.33, 16; *see also id.* at 17 ["FT sought to *control* market timing, rather than stop it. Thus, while the FT Defendants took some steps to prevent certain timing in order to control it, those steps were belated, limited, and inconsistently applied."].) Additionally, Plaintiff contends that "even if [FT's] efforts to control timing eventually rose to 'good faith' levels . . . substantial factual issues exist concerning when this may have occurred." (*Id.* at 4.)

Plaintiff's arguments, which can be summed up as accusing FT of doing "too little, too late," are unpersuasive. The record provides ample evidence that FT acted in good faith in attempting to prevent non-arranged market timing in its funds. First, as stated above, FT took efforts to track market timing and use its findings to tighten its prospectus language in the early stages of the class period. Additionally, it is undisputed that FT took progressively aggressive steps throughout the class period to combat market timing, and the crux of Plaintiff's argument—that FT's anti-timing policies were not as aggressive as they could have been—I have rejected in a substantially similar companion case. *See In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 534 ("[F]ailure to act as aggressively as [a defendant] could have, or should have, does not establish intentionality or recklessness.").[4]

    1.    Redemption Fees

---

[4] The independent findings of a 2004 SEC investigation corroborate FT's assertion that it made good faith efforts to stop market timing. Specifically, the SEC found that despite some evidence of timing activity, "FT has generally tried in good faith to stop market timing" and that "FT began to increase its efforts to control market timing in 1999, at a time when other mutual fund complexes were encouraging timers." Investment Company Act of 1940, Release No. 26253, ¶ 30 (Aug. 2, 2004).

FT imposed a two percent redemption fee[5] in twenty-one of its funds in September 2001, (Pl.'s Ex. 11), and added the fee to six more funds in September 2003, (Defs.' Ex. 139.) Plaintiff contends, however, that FT intentionally or recklessly delayed imposing these redemption fees. (Pl.'s Mem. at 41-42.) The record belies this claim. Plaintiff charges that the September 2001 adoption of redemption fees was unreasonably delayed because (according to Plaintiff) Alison Baumann, the former head of FT's Marketing Research and Development Group, recommended that FT adopt a redemption fee in late 1999. (Pl.'s Mem. at 41-42 (citing Pl.'s Ex. 253 at FT-MIL 18912).) Yet a fair reading of the record shows no such recommendation from Baumann. Indeed, the document relied on by Plaintiff is a memo sent *to* Baumann from a junior FT employee with several recommendations for controlling market timing, none of which involve imposing a redemption fee.[6] (Pl.'s Ex. 253 at 18909-10.) Instead, FT senior management proposed adding a two percent redemption fee (and requested approval of the funds' boards) in June 2001 after determining that some market timers had begun to discover ways of avoiding the market timing restrictions previously adopted by FT:

> While implementing these policies has reduced market timing activity in the funds, some investment representatives have found ways to get around our procedures, such as trading under various rep codes. We believe that adding a 2% redemption fee will serve as a further deterrent to market timing activity in our funds as well as deter new market timers from initially investing in the funds. We are setting the fee at 2% of redemption proceeds, the maximum allowed under current SEC rules, to act as a strong deterrent to market timing activity.

---

[5] A redemption fee is a fee assessed on the proceeds of a transaction involving a fund's shares. The fee is designed to offset the costs incurred by the fund, and ultimately borne by long-term investors, caused by the short-term trading of fund shares.

[6] The memo does refer in passing to redemption fees in a separate section under the heading "Action Items to Investigate," but this is far from a recommendation. (Pl.'s Ex. 253 at FT-18912.)

9

(Defs.' Ex. 134 at FT-MIL 10928 [June 2001 proposal seeking board approval of plan to impose redemption fees].)  The proposal was swiftly approved by the funds' boards in mid-June and was implemented in September 2001, the earliest possible date given SEC requirements to provide shareholder notice and a 60-day waiting period thereafter.  (*Id.*)

The fact that FT did not impose a redemption fee until 2001 is insufficient to demonstrate scienter.  As an initial matter, nothing in the evidence suggests that FT intentionally or recklessly delayed imposing redemption fees.  Because approval was needed from the boards of the various funds and the SEC required a 60-day notice period, some delay in implementing redemption fees was inevitable.  Also, immediately imposing redemption fees on a fund without trying other less drastic measures may well have been unreasonable in light of the numerous costs and difficulties associated with enforcing redemption fees.  *Cf. In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 533 (holding that redemption fees were timely implemented "given that approval from the Fund Trustees was required before redemption fees could be implemented, redemption fees could be costly, and some intermediaries could not support redemption fees").  Moreover, even if Plaintiff is correct that FT should have imposed the redemption fee earlier, this "would only prove a case of negligence or corporate mismanagement—not a fraud claim." *Id.* at 534.[7]

---

[7] Plaintiff also faults FT because its initial imposition of redemption fees in 2001 did not apply to omnibus investment accounts.  (Pl.'s Mem. at 42; Pl.'s Ex. 11.)  Omnibus accounts are discussed in greater detail later in this opinion, but for now it should be noted that FT had good reasons for not initially applying the redemption fee to omnibus accounts.  As Plaintiff's own exhibits highlight, FT decided that "[s]ince omnibus accounts have multiple shareholders, we're unable to apply the fee to the individual shareholder identified as a Market Timer and therefore [it] would be unfair to assess the fee."  (Pl.'s Ex. 12.)  Yet FT made clear at the time that it would continue to "actively monitor all accounts and request the assistance of the dealer if there appears to be excessive trading."  (*Id.*)  Moreover, Plaintiff's argument suffers from a logical flaw.  Plaintiff's own briefings declare that "trading through omnibus accounts did not become a serious issue at FT until 2002."  (Pl.'s Mem. at 46; *see also* Pl.'s Ex. 61.)  But the redemption fees were proposed, approved, and implemented *in 2001* (prior to the advent of omnibus trading at FT).  (Defs.' Ex. 134.)  Thus, the argument that FT's redemption fees policy failed to address

      2.      Screening Thresholds

FT required its market timing task force to manually review each trade worth more than a set threshold amount for hints of market timing activity. Initially, this threshold was set at $1 million, but FT repeatedly lowered it throughout the class period. (*See* Defs.' Ex. 224 [noting that the threshold had been reduced to $25,000 by 2003].) Nevertheless, Plaintiff complains that FT set unreasonably high screening thresholds and failed to monitor trades below those thresholds. Plaintiff seizes on the fact that until 2000, FT's market timing policy only required it to monitor trades of $1 million or more and as a result ignored market timing in smaller trades. (*See* Pl.'s Ex. 174.) But the record reflects that most of the market timing that took place in 1999 and 2000 occurred through large exchanges, making FT's $1 million threshold for monitoring market timing activity a reasonable figure. (*See* Defs.' Ex. 40, T. Johnson Depo. at 98 ["In '99 and 2000, you didn't have many $200,000 exchanges, you had $1 million exchanges."].) Additionally, FT conducted an automated ad hoc review on a monthly basis that "had much lower thresholds" for the size of trades it monitored. (*Id.*)

But as FT began to identify and prevent the investment of timed assets in its funds, market timers adjusted and began trading in smaller increments so as to avoid detection. (Defs.' Ex. 40, T. Johnson Depo. at 96-97 ["It was an evolutionary process. . . . [A]s we became successful in blocking, preventing [market timing], we -- advisors would start sending in smaller transactions. Instead of one million, five $200,000 transactions."].) To keep pace with these timers, FT repeatedly lowered its screening threshold to target market timing in smaller and smaller trades. (*See* Defs.' Ex. 224 [showing that the screening threshold was lowered to $500,000 in late 2000; to $100,000 in 2001; to $50,000 in 2002; and to $25,000 in 2003]; *see*

---

market timing in omnibus accounts is tantamount to blaming FT for failing to address a problem which had not yet arisen.

11

*also* Defs.' Ex. 40, T. Johnson Depo. at 97 ["As they evolved, we evolved."].) In light of these facts, a reasonable jury could not find that the thresholds established by FT for screening trades constituted the type of intentional or reckless conduct necessary to prove scienter.

        3.      Warnings to Timers, Terminations of Accounts, and Rejections of Trades

FT's MTD warned numerous suspected market timers that they must cease their activity, (*see* Defs.' Exs. 44-53), and it rejected trades and closed the accounts of those who refused to comply with FT's anti-timing policies, (*see* Defs. Exs. 82-102). Yet Plaintiff criticizes FT for failing to adequately warn and restrict accounts engaged in market timing. Specifically, plaintiff asserts that FT's MTD issued warning letters only "sporadically," (Pl.'s Mem. at 38), that FT's claims of issuing oral warnings to market timers are "wholly unsupported" and unreliable, (Pl.'s Reply at 13), that the number of accounts restricted by the MTD was relatively small, (Pl.'s Mem. at 39), and that FT knew that its monitoring and restricting policies were "not perfect yet," (*id.*) These objections are all either irrelevant or contradicted by undisputed facts in the record.

First, as is clear from voluminous exhibits submitted by FT, the MTD sent out hundreds, and possibly thousands, of warning letters to suspected market timers. (*See* Defs.' Exs. 44-53.) Additionally, the record shows that these warning letters were often accompanied or preceded by oral warnings. Contrary to Plaintiff's contention, both documentary and testimonial evidence support FT's assertion that it regularly issued oral warnings to suspected market timers. (*See* Pl.'s Ex. 199 at FT-SEC 1858968 ["Verbal warnings are generally given to shareholders and brokers who have excessive exchange activity."]; *see also* Defs.' Ex. 234, T. Johnson Depo. at 65-66 ["I would see flows that I thought were excessive, so I would call the respective investment advisor . . . . And if I did not get a satisfactory response, I'd ask [FT] to block the respective investment advisor from purchasing Franklin Templeton Funds."].) The mere fact

that these warnings were issued orally cannot be held against FT in the scienter analysis. *See In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 536 ("While ideally Janus would have documented warnings and restrictions for each account in which it identified market timing, the lack of this evidence does not create an inference of recklessness. Warnings and restrictions may have been requested over the phone or in person.").

In addition to these warnings, the record is replete with evidence of FT shutting down accounts suspected of market timing and rejecting trades involving suspected timing assets. (*See, e.g.*, Defs.' Ex. 92 ["I can't emphasize enough how strongly we frown upon timing business.  Please forward this message to the appropriate people in your compliance and operations areas to ensure that [several named timers] no longer do any business with Franklin Templeton."]; *see also* Defs. Exs. 82-91, 93-102.)  Indeed, Tom Johnson, a member of FT's market timing task force, testified that "we shut down hundreds, maybe even thousands of accounts."  (Defs.' Ex. 42, T. Johnson Depo. at 196.)  And in addition to restricting accounts, the record also shows that FT rejected outright at least $3 billion worth of suspected market timing trades during the class period.  (Defs.' Ex. 174.)  Nevertheless, Plaintiff argues that the amount of trading rejected by FT pales in comparison to the total amount of market timing assets accepted by its funds, and it points out that an FT employee admitted in an e-mail that the market timing policy was "not perfect."  (Pl.'s Mem. at 39 (quoting Pl.'s Ex. 129).)  Yet merely showing that FT's efforts were "not perfect" falls far short of demonstrating that FT intentionally or recklessly allowed market timing to continue.

        4.        Number of Employees

FT established its MTD to serve as the nerve center of its campaign to prevent market timing and required MTD members to report to high-level FT executives about their progress.

Plaintiff, however, maintains that FT's staffing of its market timing task force was "woefully inadequate in number" and that this personnel shortage is "[r]eflective of its ambivalence" about stopping non-arranged market timing. (Pl.'s Mem. at 16-17.) Specifically, Plaintiff claims that FT initially dedicated only one employee (part-time) to stopping market timing, and that it did not hire another employee specifically to combat market timing until late in 2002. (*Id.* at 32; Pl.'s Ex. 61.) This argument can be quickly dismissed. As a fundamental matter, the proposition that intentionality or recklessness can be inferred from the number of employees specifically devoted to stopping market timing reflects an unduly narrow understanding of the scienter inquiry. Further, Plaintiff itself admits that Alison Baumann, Peter Jones, and Dan O'Lear, all high-ranking FT executives, were involved in "observing, studying or policing market timing" and were people "[to] whom Tom Johnson, [a member of FT's market timing task force,] reported regarding market timing." (Pl.'s Mem. at 33.) Additionally, Plaintiff's own exhibits show that in 2001, the MTD was staffed by "3 phone associates and 1 specialist," as well as "3 DMOS associates that have been trained on the function and are taking calls during the early hours." (Pl.'s Ex. 240 at FT-MIL 04771); *see also* Defs.' Ex. 25 [listing Alexandra Banks, Stuart Bateman, Alison Baumann, George Calamari, David Goss, Tom Johnson, Douglas Lempereur, Ken Lewis, Robert Marrone, Dan O'Lear, Clem Sanfilippo, and Aili Taber as being in attendance for a "Market Timing Policy Meeting" in August of 2000].) In light of these facts, a reasonable jury could not find that the number of employees assigned by FT to combat market timing provides any evidence of scienter.

        5.      Elimination of Bonuses and Commissions for Market Timing; Termination of Dealer Agreements

In addition to the aforementioned efforts, FT also took a number of other steps to control non-arranged market timing in its funds. For example, it is undisputed that FT eliminated or

14

reduced bonuses and commissions arising from suspected market timing transactions. (*See* Defs.' Ex. 117 [June 2000 approval of a policy allowing FT to stop paying pre-paid commissions to dealers on suspected market timing purchases over $1 million]; Defs.' Exs. 107-08 [June 2002 internal e-mail to FT salespersons announcing that any "commissions paid [on suspected market timing transactions] will be deducted from an upcoming check"]; Pl.'s Mem. at 45 [acknowledging that FT suspended marketing support payments to CIBC Oppenheimer for the final quarter of 2001 in response to suspected market timing activity]; Defs.' Exs. 177-79 [August 2002 e-mails indicating that FT again would be suspending marketing support payments to CIBC Oppenheimer for the rest of the calendar year in response to continued market timing]). Additionally, FT "terminated four Dealer Agreements" because of continued market timing activity by those companies. (Pl.'s Mem. at 44; Defs.' Exs. 164-66, 168.)

      Plaintiff attempts to downplay these efforts, but its arguments are unconvincing. First, Plaintiff argues that the elimination of dealer and wholesaler commissions should have been done earlier in the class period. (*See* Pl.'s Mem. at 39-40, 44-45.) As mentioned several times above, this type of "too little, too late" argument is ineffective to demonstrate scienter. *See In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 534 ("[F]ailure to act as aggressively as [defendant] could have, or should have, does not establish intentionality or recklessness."). Plaintiff also complains that the four dealers who had their agreements revoked by FT "were tiny broker-dealers who did little business with FT." (Pl.'s Mem. at 44.) According to Plaintiff, the fact that FT did not terminate dealer agreements with "large broker-dealers such as Prudential, Bear Stearns, CIBC Oppenheimer, Merrill Lynch, and Salomon Smith Barney" proves that FT's attempts to stop market timing were not in good faith. (*Id.*) But as the record indicates, terminating broker-dealer agreements with such large firms was not a realistic solution because

such a drastic step "would be highly disruptive to the servicing of the majority of the shareholders that are not having any timing issues." (Defs.' Ex. 234, G. Johnson Depo. at 127-28.) Given this risk, "it would be unrealistic and unfair to ascribe intentional or reckless wrongdoing to [FT] executives in failing to take measures they reasonably could have concluded would adversely affect all investors in the funds." *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 753 (D. Md. 2008).

### 6. Omnibus Accounts

"An omnibus account is a pooled account, meaning that multiple trades are bundled and submitted together under a single account number." *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 534. Omnibus accounts are "controlled by external broker-dealers" and therefore were "opaque to Franklin Templeton." (Defs.' Mem. at 6; *see also* Defs.' Ex. 192, [explaining that in an omnibus account, FT "sees nothing but one big shareholder account"].) This opacity made targeting specific market timing assets difficult and required FT to "count[] on [investment] firms to monitor timing." (Defs.' Ex. 192.) FT argues that because market timing in omnibus accounts is "beyond the ability of fund complexes, like Franklin Templeton, to control," no inference of scienter arises from the inability to eliminate omnibus market timing. (Defs.' Mem. at 6.)

Plaintiff acknowledges the difficulty of controlling market timing in omnibus accounts, but it argues that scienter nonetheless can be inferred because FT "did not even attempt to stop such trading for much of the class period." (Pl.'s Mem. at 46.) Once again, this assertion is flatly contradicted by undisputed evidence in the record. The evidence shows that FT worked closely with large external broker-dealer firms to combat timing behavior in omnibus accounts. (*See, e.g.*, Defs.' Ex. 57 ["On the omnibus side, we monitor Schwab accounts—but the support

we get from our MOS team and their Schwab counterparts have [sic] been extremely helpful."]; *see also* Defs.' Ex. 195, T. Johnson Depo. at 220 ["[W]e were able to say, okay, it looks like there's some timing here, and work with Prudential to block these guys."].)  And while having to rely on external firms to ferret out omnibus market timing meant that it remained difficult to completely eliminate, (*see* Defs.' Ex. 191), the facts in the record belie any suggestion that FT intentionally or recklessly allowed market timing to continue.

       7.       Actual Effect of FT's Policies on Volume of Market Timing

A theme running throughout Plaintiff's opposition to FT's motion is that FT's efforts to control market timing cannot have been made in good faith because they had little or no impact on the actual amount of market timing occurring in FT funds. (*See, e.g.*, Pl.'s Mem. at 16 [claiming that "billions of dollars of market timing occurred post-Fall 2000" due to FT's reluctance to combat market timing.)  The focus of this argument is misplaced.  As mentioned, "the relevant scienter inquiry is whether [FT's] efforts in attempting (but failing) to control non-arranged market timing were . . . in good faith." *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 532.  Because of the complexity of the market timing problem, the actual results achieved by each of FT's policy changes might not necessarily reflect the sincerity of FT's efforts.  For example, if FT negligently, but in good faith, attempted (and failed) to prevent market timing, the actual volume of timed assets in FT funds might not decrease, but there nonetheless would be a clear absence of scienter.  Thus, Plaintiff's narrow focus on the amount of purported market timing occurring during the class period is misguided.

Moreover, Plaintiff's argument based on the results achieved by FT's market timing policies also fails as a factual matter because the record clearly reflects the effectiveness of FT's anti-timing measures.  (*See* Defs.' Ex. 218 [reporting that market timing "activity dropped

17

sharply from August to September [2000] due to [FT's] efforts of enforcing prospectus language September 15. In addition, timing activity was minimal for October as well as November."]; *see also* Defs.' Ex. 158 [noting that "market timing activity in the Franklin Templeton Funds continued to decline during the first eight months of 2002"].) And even though the raw figures still indicate significant timing activity later in the class period, the sharp decrease in the amount of market timing is unmistakable. (*See* Pl.'s Ex. 61 [e-mail from FT executive noting that although the estimated $100 million in daily market timing activity was "still too high," it at least was "down from probably $750 million or more a couple years ago"].)

III.

In a securities suit brought pursuant to Rule 10b-5, "the relevant scienter inquiry is whether defendants' efforts in attempting (but failing) to control non-arranged market timing were intentional or reckless, or whether their efforts were in good faith or, at worst, negligent." *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 532. In this case, FT took numerous steps to combat market timing, including tightening prospectus language, imposing redemption fees on short-term exchanges, scrutinizing every trade over certain reasonably set thresholds, warning investors to cease market timing and terminating accounts or rejecting trades when they did not comply, eliminating bonuses and commissions based on market timing transactions, terminating dealer agreements with uncooperative broker-dealers, and working with large external broker-dealers to address market timing in omnibus accounts. These efforts, as evidenced by undisputed facts in the record, clearly indicate a good faith commitment to controlling non-arranged market timing. Moreover, in light of these serious efforts to restrict market timing, it is nonsensical for Plaintiff to posit that FT intentionally or recklessly permitted non-arranged market timing in order to reap the benefits of increased management fees. "If [FT] had hoped to enhance its

revenue, specifically its management fees, by turning a blind eye to market timing, it would not have gone to these lengths to stop market timers." *In re Mut. Funds Inv. Litig.*, 626 F. Supp. 2d at 537.

## CONCLUSION

In short, no rational trier of fact could find that FT acted with scienter because the record, taken as a whole, plainly demonstrates FT's good faith efforts to prevent market timing throughout the class period.  Furthermore, even if FT could have acted more aggressively in some instances, this does not negate the finding that FT lacked scienter because the undisputed facts give rise to a clear inference that FT was, at the very worst, merely negligent.  Accordingly, summary judgment is granted for Franklin Templeton as to non-arranged market timing, and Plaintiff's motion for partial summary judgment is denied.  A separate order implementing this ruling follows.


Date:  December 9, 2010                              /s/
                                                J. Frederick Motz
                                                United States District Judge