## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION _____ | MDL 1586 |
| IN RE ALLIANCE, FRANKLIN/TEMPLETON, BANK OF AMERICA/NATIONS FUNDS, and PILGRIM BAXTER _____ | Case No. 04-md-15862 (Judge Motz) |
| [Franklin Templeton Sub-Track] _____ | |
| Sharkey IRO/IRA v. Franklin Resources, *et al.* _____ | Case No. 04-md-1310 |

**CLASS LEAD PLAINTIFF'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF STIPULATION AND RELEASES AND THIRD PARTY SETTLEMENTS, PLAN OF ALLOCATION, CLASS CERTIFICATION, AND AWARD OF ATTORNEYS' FEES, LEAD PLAINTIFF AWARD, AND REIMBURSEMENT OF EXPENSES**

Robert M. Kornreich
Chet B. Waldman
Andrew E. Lencyk
WOLF POPPER LLP
845 Third Avenue
New York, NY  10022
Tel.:    (212) 759-4600

*Attorneys for Class Lead Plaintiff*

John B. Isbister, Fed Bar No. 00639
TYDINGS & ROSENBERG LLP
100 East Pratt Street, 26th Floor
Baltimore, MD 21202
Tel:    (410) 752-9700

*Plaintiff's Liaison Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iv

INTRODUCTION ......................................................................................................1

PRELIMINARY STATEMENT ..................................................................................2

FACTUAL BACKGROUND .......................................................................................7

    The Commencement Of This Litigation ................................................................7

    The Prosecution Of The Actions.........................................................................9

ARGUMENT ...........................................................................................................15

I.      THE COURT SHOULD GRANT FINAL APPROVAL OF THE
      STIPULATION AND RELEASES, THE THIRD PARTY SETTLEMENTS
      AND THE PLAN OF ALLOCATION .............................................................15

    A.     Principles Applicable To Judicial Approval Of Class Action And
          Derivative Settlements ............................................................................15

    B.     Fairness Considerations Support Final Approval In Light Of The Posture
          Of The Case At The Time The Stipulation And Settlements Were
          Proposed And Experienced Counsel's Careful Analysis And
          Arm's-Length Negotiations ....................................................................16

          1.    Stage of Litigation and Extent of Discovery Conducted ................16

          2.    Circumstances Surrounding the Negotiations.................................18

          3.    Experience of Class Counsel ........................................................19

    C.     Adequacy Considerations Support Final Approval Due To The
          Significant Risks, Challenges And Expenses Involved In Continued
          Litigation, The Likelihood Of Recovery On A Litigated Judgment,
          And The Class's Reaction To The Settlements And The Stipulation......20

          1.    Significant Risks, Challenges and Expenses Involved in
              Continued Litigation ....................................................................20

          2.    Anticipated Duration and Expenses of Continued Litigation ..........22

          3.    Likelihood of Recovery on a Litigation Judgment ..........................23

4.     Degree of Opposition to the Resolution...........................................23

D.    Consideration Of Lead Counsel's Recommendations And Lead
Plaintiffs' Recommendations Support Final Approval............................25

II.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ..............26

III.   THE COURT SHOULD CERTIFY THE CLASS FOR PURPOSES OF
THE THIRD PARTY SETTLEMENTS AND THE STIPULATION ................27

A.    The Proposed Class Satisfies the Requirements of Rule 23(a)................27

B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ...........29

IV.   THE REQUESTED FEE AWARD IS REASONABLE AND SHOULD BE
GRANTED ........................................................................................................31

A.    Plaintiffs' Counsel Are Entitled To A Fee From The Common Fund
They Created ...........................................................................................32

B.    Attorneys' Fees Should Be Set As A Percentage Of The Common Fund
Recovery, Using The Lodestar Method As A Cross-Check ....................33

C.    The Requested Fee Is Reasonable ...........................................................34

1.    Lead Counsel's Efforts Conferred Substantial Benefits Upon
Class Members............................................................................35

2.    Lead Counsel Successfully Prosecuted Plaintiffs' Claims Against
Vigorous Opposition and Highly Experienced Counsel................37

3.    The Complexity and Duration of the Case ....................................39

4.    Plaintiffs' Counsel Assumed the Risk of Nonpayment .................40

5.    Awards in Similar Cases Support Approval of the Fee
Requested....................................................................................40

6.    The Absence of Objections to the Requested Award of Attorneys'
Fees and Approval of the Fee Percentage by Lead Plaintiff Also
Weigh in Favor of Approval of the Fees Sought ...........................41

7.    Public Policy Concerns Support Approval of the Fee
Requested....................................................................................42

      D.     Endorsement Of The Fee Request By Lead Plaintiffs Supports
             Its Reasonableness ................................................................................42

      E.     The Fee Requested Is Also Supported By The Lodestar Cross-Check ...43

V.     COUNSEL SHOULD BE REIMBURSED FOR THEIR REASONABLY
       INCURRED LITIGATION EXPENSES ..........................................................45

VI.    THE REQUESTED PLAINTIFFS' AWARD SHOULD BE GRANTED .......46

CONCLUSION..............................................................................................................49

TABLE OF AUTHORITIES

CASES

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)..........................................................................................................30

*Barber v. Kimbrell's, Inc.*,
    577 F.2d 216 (4th Cir.1978) .........................................................................................35

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980).......................................................................................................33

*Boyer v. Wilmington Materials, Inc.*,
    No. 12549, 1999 WL 342326 (Del. Ch. May 17, 1999).....................................................34

*Braun v. Culp, Inc.*,
    No. C-84-455-G,1985 WL 5857 (M.D.N.C. Apr. 26, 1985).............................................40

*Denney v. Jenkens & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005), *aff'd in part, vacated in part on other grounds*,
    443 F.3d 253 (2d Cir. 2006)...........................................................................................48

*In re Charter Comm., Inc., Sec. Litig.*,
    Nos. MDL 1506, 4:02-CV-1186, 2005 WL 4045741 (E.D. Mo. June 30, 2005)..............48

*In re CV Therapeutics, Inc., Sec. Litig.*,
    No. C 03-3709, 2007 WL 1033478 (N.D. Cal. Apr. 4, 2007)..........................................48

*In re Dun & Bradstreet Credit Serv. Cust. Litig.*,
    130 F.R.D. 366 (S.D. Ohio 1990)...................................................................................48

*Flinn v. F.M.C. Corp.*,
    528 F.2d 1169 (4th Cir. 1974) .......................................................................................25

*In re Gilat Satellite Networks, Ltd. Sec. Litig.*,
    No. CV-02-1510, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ....................................47

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................................25

*Helmick v. Columbia Gas Transmission*,
    No. 2:07-cv-00743, 2010 WL 2671506 (S.D. W. Va. July 1, 2010)... 32-33, 34, 35, 42, 44

*Hensley v. Eckerhart*,
        461 U.S. 424 (1983)................................................................................................35

*In re Ikon Office Solutions, Inc.*,
        194 F.R.D. 166 (E.D. Pa. 2000)............................................................................41

*In re Immune Response Sec. Litig.*,
        497 F. Supp. 2d 1166 (S.D. Cal. 2007)................................................................48

*Internal Improvement Fund Trustees v. Greenough*,
        105 U.S. 527 (1881)..............................................................................................45

*In re Jiffy Lube Sec. Litig.*,
        927 F.2d 155 (4th Cir. 1991) ...................................................................16, 20, 22, 23

*Jones v. Dominion Res. Servs.*,
        601 F. Supp. 2d 756 (S.D. W. Va. 2009)..............................................................35

*Kidrick v. ABC Television & Appliance Rental, Inc.*,
        No. 3:97CV69, 1999 WL 1027050 (N.D. W. Va. May 12, 1999) ....................41

*In re Lucent Techs., Inc. Sec. Litig.*,
        327 F. Supp. 2d 426 (D.N.J. 2004) ......................................................................43

*Mills v. Electric Auto-Lite Co.*,
        396 U.S. 375 (1970)..............................................................................................33

*In re The Mills Corp. Sec. Litig.*,
        257 F.R.D. 101 (E.D. Va. 2009) ..........................................................................31

*In re The Mills Corp. Sec. Litig.*,
        265 F.R.D. 246 (E.D. Va. 2009) .................................................................. passim

*Muhammad v. Nat'l City Mortgage, Inc.*,
        No. 2:07-0423, 2008 WL 5377783 (S.D.W. Va. Dec. 19, 2008) ............. passim

*In re Mut. Funds Inv. Litig. v. Franklin Res.*,
        767 F. Supp. 2d 531 (D. Md. 2010)......................................................................12

*In re Mut. Funds Inv. Litig. v. Janus Capital Mgmt. LLC*,
        681 F. Supp. 2d 622 (D. Md. 2010)......................................................................14

*In re Rite Aid Corp. Sec. Litig.*,
        396 F.3d 294 (3d Cir. 2005)..................................................................................42

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,

461 F. Supp. 2d 383 (D. Md. 2006) ...............................................................33, 39, 40, 41

*In re Top Tankers, Inc. Sec. Litig.*,
    No. 06 Civ. 13761(CM), 2008 WL 2944620 (S.D.N.Y. July 31, 2008)...........................48

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ........................43

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)...........................................................................................23

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986)..........................................................................................16

## OTHER AUTHORITIES

1 Alba Conte, *Attorney Fee Awards* § 2.19 (3d ed. 2006)...........................................................45

*Manual for Complex Litigation* (Fourth) § 14.121 .....................................................................41

## STATUTES AND RULES

H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 35 (Nov. 28, 1995) ..........................................47

S. Rep. No. 104-98 (Jun. 19, 1995) ..............................................................................................47

Fed. R. Civ. P. 23 .............................................................................................1, 15, 27, 28, 30

Investment Company Act of 1940 ..............................................................................................9, 38

Securities Act of 1933....................................................................................................................37

Securities Exchange Act of 1934...............................................................................................28, 37

Private Securities Litigation Reform Act of 1995 ...................................................................25, 47

## INTRODUCTION

Class Lead Plaintiff in the Franklin Templeton Sub-Track of this litigation, the Deferred Compensation Plan for Employees of Nassau County ("Lead Plaintiff" or "Plaintiff"), files this memorandum in support of its motion, pursuant to Fed. R. Civ. P. 23 and 23.1, for (a) final approval of (i) the Stipulation and Releases reached with the Franklin Defendants,[1] and certain "Third Party Settlements" with the Third Party Settling Defendants (defined below),[2] (ii) the plan of allocation; (iii) an award of attorneys' fees and reimbursement of expenses, and (iv) an award to the Lead Plaintiff for its time and expenses in contributing to the result in this litigation ("Plaintiff's Award"), as well as (b) the certification of this Action as a class action for settlement purposes only, and Class Lead Plaintiff as Class Representative, and Wolf Popper LLP, as Lead Class Counsel ("Lead Counsel").

In accordance with an extensive program approved by this Court in its Preliminary Approval Order dated June 9, 2011, notice, constituting the best notice practicable under the circumstances, was widely disseminated and published to the members of the Class,[3] as well as

---

[1] The "Franklin Defendants" include Franklin Resources, Inc., Franklin Advisers, Inc., Franklin/Templeton Distributors, Inc., Franklin Strategic Series and Franklin Templeton Alternative Strategies, Inc. (f/k/a Franklin Templeton Asset Strategies, LLC and Franklin Templeton Alternative Strategies, LLC and since merged into Templeton Worldwide, Inc.). Capitalized terms not defined herein shall have the meanings as set forth in the Stipulation and Releases (a copy of which was submitted as Exhibit 1 to the Appendix to Class Lead Plaintiffs' Memorandum in Support of Motion for an Order Preliminarily Approving Stipulation and Releases and Third Party Settlements and Establishing Notice Procedures, Dkt. #1413(8) ("Franklin Preliminary Approval Mem.")).

[2] In addition, the plaintiffs in the parallel derivative action in the Franklin Sub-Track (the "Derivative Action") ("Derivative Plaintiffs") are signatories to the BAS and Canary Master Agreement and Severed Agreements, and the Derivative Action, with regard to those partial settlements only, is also being resolved. The Derivative Plaintiffs are not signatories to the Stipulation and Releases with the Franklin Defendants, or the Bear Stearns Master Agreement, the Bear Stearns Severed Agreement, or the Security Brokerage MOU, and those agreements thus do not apply to the Derivative Action. Derivative Plaintiffs join Lead Plaintiffs' Motion insofar as it concerns the joint class/derivative settlements with Canary and BAS.

[3] In its Order Preliminarily Approving the Stipulation and Releases and Settlements of Class Action and Settlement of Derivative Action With Respect to the Canary and BAS Defendants and Establishing Notice Procedures, dated June 9, 2011 (the "Preliminary Approval Order"), the Court certified, for settlement purposes only, a "Class" consisting of:

every Person who, during the Class Period, purchased, owned or held shares in any Class Funds. Excluded

current shareholders of the Franklin Funds, setting forth in great detail the terms and

circumstances of the Stipulation and Third Party Settlements (defined below), and the amount of

the attorneys' fees, reimbursement of expenses, and Plaintiff's Award that would be requested.

As set forth below, as part of that notice program, over 4,206,404 individual notices have been

mailed to potential Class members, in addition to publication and other notice.  To date, there is

no pending objection by any Class member to the Stipulation or Third Party Settlements,[4] and no

Class member has objected to the fee and expense request, the plan of allocation, class

certification, or the Plaintiff's Award, which strongly indicates their fairness, reasonableness,

and adequacy.

## PRELIMINARY STATEMENT

This litigation arises out of alleged violations of the federal securities and other laws by

the Franklin Defendants and the Third Party Settling Defendants.  Specifically, the Court-

appointed Class Lead Plaintiff filed a consolidated Complaint alleging that the Franklin

Defendants made misleading statements and/or omitted material information in prospectuses

relating to their policies regarding market timing by certain shareholders in the approximately

140 open-end mutual funds in the Franklin fund family ("Franklin Funds") for which certain of

the Franklin Defendants acted as investment adviser, sub-adviser or distributor.  Plaintiff also

---

from the Class are: (i) the Franklin Defendants and any individual named in the Class Complaint as a defendant; (ii) any and all defendants in the Franklin Sub-Track other than the Franklin Defendants ("Other Defendants"); (iii) members of the immediate families (i.e., parents, spouses, siblings, and children), officers, directors, parents, subsidiaries, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the foregoing excluded parties, and any entity in which any of the foregoing excluded parties has, or had during the Class Period, a controlling interest; and (iv) all trustees and portfolio managers of the Class Funds.  Also excluded from the Class are any Persons who timely and validly exclude themselves by filing a request for exclusion from the Class.

[4] As set forth *infra*, Mr. Peter J. Smith sent a letter stating, *inter alia*, that he "object[s] to the settlement notice and claims procedure", finding it confusing.  However, as explained below, after Plaintiff's counsel reached out to Mr. Smith and explained the circumstances of the resolution of this Action and the notice and claims procedure, Mr. Smith indicated his satisfaction with the explanation and that he did not intend to pursue an objection.

alleged that certain other third party defendants engaged in the wrongful trading activities themselves, or acted as clearing platforms for market timing, for their own economic benefit.

The proposed Third Party Settlements collectively provide for payment to the Class of $4,437,368 in cash (the "Settlement Fund").  The Settlement Fund is comprised of (i) $4,074,000 in cash paid on behalf of Bear Stearns & Co. Inc. and certain of its affiliates and successor entities ("Bear Stearns"); (ii) $185,783 in cash, plus $37,700 contributed toward the costs of notice and administration of the Settlement Fund, paid on behalf of Banc of America Securities LLC ("BAS"); (iii) $45,000 paid on behalf of Canary Capital Partners, LLC and certain affiliated entities and Edward Stern (collectively, "Canary"), and (iv) $94,885 paid on behalf of Security Brokerage, Inc., DCIP, L.P., RCIP, L.P., the Security Brokerage, Inc. Profit Sharing Trust, now known as the Calugar Corporation Profit Sharing Trust, and any successors thereto, and Daniel G. Calugar ("Calugar") (collectively, "Security Brokerage") (together with Bear Stearns, BAS, and Canary, the "Third Party Settling Defendants").  The Class (and to the extent applicable, as provided below, the Class Funds, as defined *infra*) will also receive interest accrued on the Settlement Fund (the Settlement Fund and the interest thereon are together referred to as the "Gross Settlement Fund").

In addition, the Franklin Defendants have agreed to contribute the sum of $2.75 million in cash toward the costs of distribution (including costs of notice and settlement administration) of the Settlements (the "Franklin Contribution"), pursuant to the Stipulation and Releases dated March 14, 2011 (the "Stipulation") entered in this Action.  Because the Franklin Contribution will pay for all or most of the notice and administration costs, a substantially higher percentage of the Gross Settlement Fund will be disbursed to Class Members with valid claims.[5]  The

---

[5] Plaintiff has entered into settlement agreements with the Third Party Settling Defendants (the "Third Party Stipulations"), which were filed with the Court as Exhibits 2-6 to the Appendix to the Franklin Preliminary

$4,437,368 total amount paid by the Third Party Settling Defendants, plus the $2.75 million Franklin Contribution, yield a total benefit to the Class of $7,187,368, plus applicable interest (the "Class Benefit").  As detailed in the notice to the Class and current shareholders, any settlement funds remaining following an initial distribution to eligible members of the Class, due to uncashed distributions or otherwise, will be distributed to the Class Funds themselves, or their successor funds.

The Stipulation with the Franklin Defendants, and the Third Party Settlements with Bear Stearns, Canary, BAS and Security Brokerage, were achieved after over six years of hard-fought litigation, the completion of fact discovery, and litigation through summary judgment motions. During the course of this litigation, Lead Counsel, among other things, after extensive research, prepared and filed a comprehensive, 139-page consolidated amended class action complaint, and ultimately a 152-page second amended class action complaint; briefed and conducted legal research in connection with multiple parties' motions to dismiss, renewed motions to dismiss based on standing, and a contested motion to amend the consolidated amended complaint; conducted an extensive review of over two million pages of documents produced by the Franklin Defendants alone, as well as other defendants' substantial documents to production; engaged in extensive deposition discovery of some 23 current or former employees of the Franklin Defendants and certain other parties and non-parties; negotiated production of, and analyzed trading data in, the Franklin Funds produced by the Franklin Defendants, followed by numerous oral and written exchanges with Plaintiff's damages consultant, as well as Franklin's counsel, regarding various aspects of the Plaintiff's analyses on alleged damages; analyzed related

---

Approval Mem., Dkt. #1413(9)-(14).  Additionally, pursuant to the terms of their settlement with the Office of the New York State Attorney General ("OAG"), Canary paid thirty million dollars ($30,000,000) into an interest bearing escrow account.  A total of $90,000 plus interest (the "OAG Amount") has been allocated to Class Members of this litigation.

regulatory settlements and their impact on recoverable alleged damages in this Action; fully

briefed an opposition to the Franklin Defendants' motion for partial summary judgment, and

Plaintiff's cross-motion for partial summary judgment; and engaged in extensive, prolonged

settlement discussions, which ultimately resulted in the Third Party Settlements of the Class

Action, and Derivative Action (with respect to BAS and Canary) (collectively, the "Actions");

negotiated the Third Party Settlements on terms which harmonized the varied interests of all

parties to the Stipulation and Settlements; and negotiated the terms of the Aide Memoire and the

Stipulation under which the Franklin Defendants agreed to pay most of the significant notice and

administration costs of the Settlements, which presented a substantial additional benefit in this

Sub-Track.

The Stipulation and Third Party Settlements obtained were hard-won and represent an

excellent recovery under the circumstances.  Notwithstanding the strength of Plaintiff's case-in-

chief, Plaintiff faced several significant obstacles.  Of these, two merit special mention.  First,

during Summer of 2010, the Franklin Defendants' counsel informed Lead Counsel that certain

regulatory settlements of market timing allegations brought by the U.S. Securities and Exchange

Commission ("SEC") and other regulators against the Franklin Defendants and certain third

party entities would provide shareholders in Franklin Funds with an allocation aggregating well

over $100 million, an amount likely to substantially offset any alleged damages claims in this

Action.  Second, the Court's granting of the Franklin Defendants' motion for partial summary

judgment on December 9, 2010 (in part on the basis of its earlier decisions in the *Janus* and

*Putnam* sub-tracks, over Plaintiff's arguments that those cases involved distinguishable facts),

and its denial of Plaintiff's cross-motion for partial summary judgment, effectively disposed of a

substantial portion of the case.  This significant narrowing of the case, combined with the

substantial offset to alleged damages from the regulatory settlements allocated to Franklin Fund

shareholders, dealt a heavy blow to Plaintiff's ability to prove recoverable damages in excess of

what Franklin Fund shareholders would already receive, which, under the Court's prior *Janus*

and *Putnam* decisions, could result in a finding of little or no damages, even if Plaintiff proved

its case at trial.  Indeed, the offset from the regulatory settlements severely hampered Plaintiff's

ability to show recoverable damages even if Plaintiff had won a reversal of the Court's

December 9, 2010 Order on the motion and cross-motion for partial summary judgment.

Further, significant additional risks existed regarding, for example, whether the Court would

decide hotly contested standing issues in favor of Plaintiff and the Class, and proving *scienter*,

that only added to the other substantial obstacles.

Thus, the total Class Benefit here of approximately $7.2 million, represents a laudable

achievement for the Class.  Derivative Counsel also believe that the Canary and BAS settlements

represent an excellent result for the Franklin Funds and their current shareholders with respect to

those defendants.  Moreover, to the extent that any uncashed distributions after an initial

distribution from the Settlement Fund, will be distributed to the Class Funds themselves.

The Stipulation with the Franklin Defendants itself was reached through on-and-off

negotiations regarding a possible resolution of the Class Action for a period of well over a year.

Taking into account the strengths and risks of the case, Lead Plaintiff and Lead Counsel – Wolf

Popper LLP, a firm with extensive experience in prosecuting securities claims (including the

Allianz Sub-Track in these MDL Actions) – as well as Derivative Lead Counsel (defined below),

which is highly experienced in derivative litigation, agreed to the proposed Stipulation, and the

Third Party Settlements, respectively, because they collectively provide the Class, and current

shareholders, with a substantial benefit now, instead of an uncertain result after potentially years

of further litigation, including interlocutory appeals, a contested trial, and likely further appeals, all of which presented the real possibility of no recovery at all for the Class and current shareholders.

Lead Counsel alone devoted over 12,000 hours of time in prosecuting this Action on behalf of the Class for a total lodestar of $7,406,027.[6]  For their extensive efforts over a period of almost seven years, Plaintiff's Counsel merit the requested fee of 25% of the Class Benefit, a fee which was agreed to with Lead Plaintiff following its agreement to the Settlements and Stipulation, and which falls well within the range of reasonableness of fees awarded by courts in this jurisdiction and throughout the country in similar cases, and represents a substantial *negative* multiple to their total combined lodestar.  The requested reimbursement of expenses and the requested Plaintiff's Award are also modest and merit approval, as set forth further below.

## FACTUAL BACKGROUND

### The Commencement Of This Litigation

Over approximately the last seven years, Lead Plaintiff, the Deferred Compensation Plan for Employees of Nassau County, and Lead Counsel have undertaken an enormous effort to prosecute the Class Action.[7]  Derivative Plaintiffs and Derivative Counsel have simultaneously prosecuted the Derivative Action on behalf of the Franklin Funds and their current shareholders.

---

[6] Additional counsel for the Plaintiffs, including for the Class, the law firms of (i) Tydings & Rosenberg LLP, (ii) Straus & Boies LLP/Kirby McInerney LLP, and (iii) Napoli Bern & Ripka ("Class Counsel"); and for Derivative Plaintiffs, the law firms of (i) Wolf Haldenstein Adler Freeman & Herz LLP, and (ii) Faruqi & Faruqui LLP ("Derivative Counsel"), collectively expended substantial additional time in the litigation of the Actions not included in the numbers above.  Class Counsel and Derivative Counsel may be collectively referred to herein as "Plaintiffs' Counsel."

[7] *See* Declaration of Chet B. Waldman dated September 23, 2011, submitted herewith, in Support of Plaintiffs' Motion for Final Approval of Stipulation and Releases and Third Party Settlements, Plan of Allocation, Class Certification, and Award of Attorneys' Fees, Lead Plaintiff Award, and Reimbursement of Expenses (the "Waldman Decl.").  Attestation as to the factual matter set forth throughout this Memorandum is contained in the Waldman Decl.

Beginning on or about November 19, 2003, a series of putative securities class action complaints were filed against Franklin Resources, Inc., certain of its affiliates, and certain non-Franklin-related entities, in several federal district courts throughout the country, alleging market-timing and/or late trading in the Funds in violation of the federal securities laws.  A series of derivative cases were also filed arising out of the same alleged underlying wrongdoing. These cases were similar to cases filed against other mutual fund families, alleging market-timing and/or late trading practices.  These actions, along with others filed in district courts throughout the country against other mutual fund families, were centralized in this District Court by the Judicial Panel on Multi-District Litigation (the "MDL Actions") on February 20, 2004, and the Court assigned each of four Judges a separate track of the MDL Actions, with multiple mutual fund families assigned to sub-tracks within each track.  The Franklin Sub-Track was assigned to the Honorable Andre M. Davis, and, in September 2009, reassigned to this Court, *i.e.*, the Honorable J. Frederick Motz.

On May 25, 2004, the Court issued a case management order, *inter alia*, appointing the Deferred Compensation Plan for Employees of Nassau County as "Lead Plaintiff" for the consolidated class claims, and its counsel Wolf Popper LLP as Lead Counsel for the investor Class in the Franklin Templeton Sub-Track.  Chimicles & Tikellis LLP, was appointed as Derivative Lead Counsel in the Derivative Action.

Certain of the Franklin Defendants were the subject of a Consent Order entered into with the SEC, dated August 2, 2004 ("SEC Consent Order"), pursuant to which they were ordered to pay a total of $50 million, and to comply with certain internal governance reforms.  The total payment of $50 million consisted of disgorgement in the amount of $30 million, and civil money penalties in the amount of $20 million.  In addition, certain of the Franklin Defendants were the

subject of a Consent Order entered into with the Enforcement Section of the Massachusetts

Securities Division (Office of the Secretary of the Commonwealth of Massachusetts) on

September 20, 2004 (the "Massachusetts Consent Order"), pursuant to which they paid an

administrative fine of $5 million.

### The Prosecution Of The Actions

On September 29, 2004, Lead Counsel, on behalf of Plaintiff and the putative Class, filed

an amended complaint ("Complaint") in the Class Action against persons affiliated with the

Funds, including the investment advisor to the Funds, as well as certain unaffiliated entities,

including alleged market-timers and other parties alleged to have participated in, or facilitated,

the market timers' trading of the Funds.[8]  An amended complaint was also filed by plaintiffs in

the Derivative Action.  On February 25, 2005, certain defendants moved to dismiss the

Complaint, and on March 7, 2005, most of the Franklin Defendants, the Third Party Defendants,

and certain other defendants filed supplemental memoranda in support of their motions to

dismiss the Complaint.

On August 25, 2005, the Court issued an opinion and order addressing common

("omnibus") issues presented in the class actions in the MDL Actions.  In light of this order,

then-presiding Judge Davis permitted the parties in the Franklin Sub-Track to engage in formal

discovery.  In addition, as requested by Judge Davis, the parties submitted proposed forms of

order on the motions to dismiss, and objections thereto.  Plaintiff attempted to negotiate

acceptable terms for such orders and resolve various disputes, which included Plaintiff's drafting

of several letters to Judge Davis on the issue, who ultimately adopted Plaintiff's version of the

---

[8] Plaintiff asserted claims in the Complaint under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934
("Exchange Act"), Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), Sections 34(b),
36(a), 36(b) and 48(a) of the Investment Company Act of 1940 ("ICA"), and state law.

order.  On July 3, 2007, several fund company defendants in the MDL Actions, including

Franklin, filed another joint motion to dismiss certain claims, this time on the ground that

Plaintiff lacked standing to assert its claims against all of the Franklin Funds.  On October 19,

2007, Judge Motz denied that motion in part.  On June 27, 2008, Judge Davis entered the

Investor Class Order, denying in part and granting in part the initial motions to dismiss the

Complaint.

    In the meantime, as directed by Judge Davis, the parties continued to pursue formal

discovery.  Among other things, the parties served document requests, interrogatories, and

responses thereto, and engaged in meet-and-confer efforts regarding document production and

other discovery items.  In particular, Plaintiff engaged in extensive document discovery and

deposition discovery of the Franklin Defendants, and certain other parties and non-parties (some

obtained by contested subpoenas).  Plaintiff reviewed over 2 million pages of documents

produced, on a rolling basis, by Franklin alone, as well as substantial amounts of documents

produced by other parties and non-parties.  Plaintiff also engaged in deposition discovery of

some 23 current or former employees of the Franklin Defendants, and other parties and non-

parties.  Concurrently, Plaintiff also negotiated and obtained the production of trading data in the

Franklin Funds for analysis, with the assistance of an expert consultant retained in these MDL

1586 Actions, to determine potential damages alleged in this Action.

    On October 22, 2009, after the case was reassigned to Judge Motz, Plaintiff moved to

amend the consolidated amended class action complaint to amplify and support its claims with

additional detail gleaned through discovery, which was opposed by Franklin, in part on the

ground that the new complaint introduced an additional theory of liability.  Following briefing by

the parties, the Court granted in part and denied in part Plaintiff's request to amend, and on

January 11, 2010, Plaintiff filed the Second Consolidated Amended Class Action Complaint ("Second Amended Complaint").  In its October 22, 2009 Order, the Court ruled, among other things, that Plaintiff could not assert claims for the Franklin Defendants' alleged knowing or reckless failure to disclose that they were unable to prevent market timing where they made "good faith" efforts to prevent it.  However, the Court permitted the amendment and amplification of Plaintiff's claims regarding so-called "arranged" market timing, or timing allegedly permitted to occur by the Franklin Defendants other than in good faith.

Plaintiff initially brought claims regarding all of the mutual funds in the Franklin Family of Funds.  After further investigation and discovery during the course of this litigation, as well as analysis of alleged damages by Plaintiff's consultant, Plaintiff concluded that the evidence indicated that only those Class members who purchased or held the Class Funds[9] had potentially suffered any significant damages from market-timing, and that there had not been any late trading which had taken place in the Franklin Funds.

Franklin also sought discovery of the Lead Plaintiff, which responded to interrogatories, and to discovery requests with a substantial production of documents and trading data, and had two of its representatives deposed by Franklin.  Franklin also sought discovery from certain of the Lead Plaintiff's non-party contractors.

While discovery was ongoing, Plaintiff and the Franklin Defendants began to discuss a possible resolution of the Action.  Initial discussions between counsel for Plaintiff and the

---

[9] The Class Funds are:  Templeton Foreign Fund; Templeton Developing Markets Trust; Templeton Global Smaller Companies Fund; Templeton Global Opportunities Trust; Franklin California Growth Fund (effective 9/1/02, name changed to Franklin Flex Cap Growth Fund); Templeton Greater European Fund (effective 8/1/99, name changed to Templeton International Fund; effective 8/1/01, name changed to Templeton International (Ex EM) Fund; and effective 4/25/07, merged into Templeton Foreign Fund); Franklin Small Cap Growth Fund (effective 9/1/01, name changed to Franklin Small-Mid Cap Growth Fund); Templeton World Fund; Templeton Growth Fund, Inc.; Franklin California Tax-Free Income Fund; Franklin Federal Tax-Free Income Fund; and Templeton Pacific Growth Fund (effective 5/8/03, merged into Templeton Foreign Fund).

Franklin Defendants focused on an analysis of alleged damages stemming from the trading data produced by Franklin, in addition to merits issues, and did not result in settlement.  However, around this time, Plaintiff also entered into discussions and negotiations for settlements with the Third Party Defendants of the claims in the Franklin Sub-Track, which led to memoranda of understanding with the respective Third Party Defendants.  Ultimately, Plaintiff entered into the Third Party Settlements, by stipulations dated on or about January 15, 2010, and January 26, 2010.[10]  The amounts contributed to the Gross Settlement Fund by these settlements are being held in escrow and have been earning interest.  Plaintiffs in the Derivative Action entered into the Third Party Settlements with Canary and BAS only.[11]

On March 24, 2010, following completion of fact discovery, the Franklin Defendants moved for partial summary judgment of Plaintiff's claims, and on June 24, 2010, Plaintiff filed a cross-motion for partial summary judgment against the Franklin Defendants.  Following full briefing of these motions, on December 9, 2010, the Court issued an opinion and order granting the Franklin Defendants' partial summary judgment of the claims in the Second Amended Complaint, and denying Plaintiff's cross-motion.  The result was that the only claims left in the Class Action were those related to "arranged timing," while claims related to all other "non-arranged timing" were dismissed, even if, as Plaintiff argued, Franklin knew about it and could have taken further steps to prevent it.  *In re Mut. Funds Inv. Litig. v. Franklin Res.*, 767 F. Supp. 2d 531 (D. Md. 2010).

Although a portion of the claims survived the summary judgment motion by Franklin,

---

[10] Plaintiffs in the MFS, Alliance, Columbia and Franklin sub-tracks had previously entered into a Memorandum of Understanding with Security Brokerage, and with BAS.  The BAS settlement agreement was also reached in principle during the January 2010 time period, but certain details were left for later resolution, such that the BAS severed settlement stipulation was executed in May 2011.

[11] The remainder of the Derivative Action is currently stayed.

during the Summer of 2010, Lead Counsel learned that the allocations of the SEC's settlements

with certain third parties (Bear Stearns and Prudential Securities[12]) to Franklin Fund shareholders

were approximately $38.75 million from Bear Stearns and $31.7 million from Prudential.  These

payments to Franklin Fund shareholders, together with Franklin's regulatory settlement and the

several million dollars of interest thereon, amounted to over $100 million that would be

distributed to mostly members of the Class.  This sum would likely substantially offset any

alleged damages claims in this Action (and, after the claims were substantially narrowed on

summary judgment, could have offset the remaining potential damages completely).  These sums

have been separately distributed by administrators retained by the SEC and are not part of these

Settlements or the Stipulation.  The Class Benefit from the Gross Settlement Fund and Franklin

Contribution is in addition to the amounts recovered in the regulatory proceedings.

In light of these factors, and considering again the estimates of alleged damages in this

case prepared by their damage consultants, Plaintiff and Lead Counsel concluded that the

compensation from the regulatory settlements, as well as the Settlements with the Third Party

Defendants already secured by Plaintiff and Lead Counsel flowing to Class Members, could,

indeed, have offset any amount of additional alleged Class damages stemming from those

remaining claims that the Court had not dismissed.  The Franklin Defendants made known that

their next step was to move for summary judgment on the remaining claims in the Action on the

ground that any alleged damages related to those claims had been more than compensated by

Franklin and other defendants in the regulatory settlements and Plaintiff's Settlements with the

Third Party Defendants.  Under the terms of the regulatory settlements and applicable law, it was

---

[12] Plaintiff had originally asserted state law claims against Prudential, which claims were dismissed (*see* Investor
Class Order, Dkt. # 1140, ¶ 8) along with similar state law claims against Prudential and many similarly situated
defendants in all of these MDL Actions.

highly likely that Franklin would be entitled to an offset against any alleged damages owed by the Franklin Defendants in this Action, at least by the amount these defendants had paid to resolve the regulatory actions, meaning that the remaining claims could be dismissed outright by the Court for lack of any damages not already paid by Franklin, as had occurred in certain other sub-tracks in this MDL litigation.  *See, e.g., In re Mut. Funds Inv. Litig. v. Janus Capital Mgmt. LLC*, 681 F. Supp. 2d 622 (D. Md. 2010).

Following ongoing and extensive discussions and arm's-length negotiations, Plaintiff entered into an "Aide Memoire" setting forth the principal terms of the resolution of the remaining claims in this Action with the Franklin Defendants on December 21, 2010.  The Court thereafter ordered a stay of the Action against the Franklin Defendants.  Lead Counsel subsequently negotiated the detailed terms of the Stipulation with the Franklin Defendants.[13]

Lead Counsel consulted with the Lead Plaintiff at every significant interval in the litigation, from beginning through the various settlement negotiations and the ultimate decision to reach the proposed resolution of the Action, which Class Counsel believes is a very good result under the circumstances, as set forth further below, and which the Lead Plaintiff endorses. Derivative Plaintiffs and their counsel also believe that the settlement of the Derivative Action with respect to Canary and BAS are in the best interests of the Franklin Funds and their current shareholders.

---

[13] The Stipulation with the Franklin Defendants, and the stipulations of settlement reached with the Third Party Settling Defendants, are collectively referred to as the "Stipulations."

## ARGUMENT

I.  **THE COURT SHOULD GRANT FINAL APPROVAL OF THE STIPULATION AND RELEASES, THE THIRD PARTY SETTLEMENTS AND THE PLAN OF ALLOCATION**

### A.   Principles Applicable To Judicial Approval Of Class Action And Derivative Settlements

Although the final approval of proposed class action and derivative settlements is "committed to the sound discretion of the district courts," the "voluntary resolution of litigation through settlement is strongly favored by the courts," especially in class actions and other complex litigation.  *See* Plaintiffs' Omnibus Memorandum of Law in Support of Final Approval of the Proposed Settlements and Plans of Allocation, filed September 14, 2010 in all Sub-Tracks, *see, e.g.*,  No. 04-15862, Dkt. # 1341 ("Plaintiffs' Omnibus Mem.") at 2, 4-5, 16-17.[14]

In determining whether a settlement warrants final approval, the Court must avoid transforming the hearing on the settlement into a trial on the merits, and approve the proposed settlement so long as it is "fair, reasonable and adequate."  Plaintiffs' Omnibus Mem. at 3-4. The Fourth Circuit has bifurcated this analysis into two principal components – considerations of fairness, and considerations of adequacy.  The "fairness" consideration focuses on whether the proposed settlement is the result of good-faith, arm's-length negotiations, taking into account: (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation.  Plaintiffs' Omnibus Mem. at 4.  These

---

[14] Plaintiffs respectfully refer the Court to Plaintiffs' Omnibus Mem., previously filed in these MDL Actions, which sets forth in detail the legal standards applicable to the final approval of the proposed Stipulation and Settlements, the plan of allocation, the form and method of notice to Class Members and current shareholders, and the certification of a settlement class under Rules 23(a) and (b)(3) of the Fed. R. Civ. P. (hereinafter referred to as "Rule 23(a)" and "Rule 23(b)(3)"), and incorporate such discussion herein, rather than repeating it.  Citations to Plaintiffs' Omnibus Mem. refer both to the pages specifically referenced, as well as the legal authorities cited therein.  While Plaintiffs' Omnibus Mem. was filed some time ago, it is equally applicable to this Sub-Track.  The law set forth therein is likewise still applicable, and is updated as necessary herein.

factors, enunciated by the Court in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991),

will be referred to herein as the "*Jiffy Lube*" factors. *See also Zimmerman v. Bell*, 800 F.2d 386,

391-92 (4th Cir. 1986) (similar factors applied to derivative settlements). The "adequacy"

inquiry focuses on the substantive terms of the settlement and, in particular, whether the

settlement consideration is sufficient in light of the risks of continued litigation, and is

determined based on an assessment of the following factors:  (1) the relative strength of the

plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the

plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense

of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a

litigated judgment, and (5) the degree of opposition to the settlement. Plaintiffs' Omnibus Mem.

at 4-5.[15]

    As detailed below, the proposed Stipulation and Settlements are the product of serious,

informed, and non-collusive negotiations among counsel with extensive experience in securities

class action and derivative litigation, following a thorough analysis of the strengths and

weaknesses of the legal and factual issues in the Actions and the risks associated with continued

litigation.

**B.     Fairness Considerations Support Final Approval In Light Of The Posture Of
        The Case At The Time The Stipulation And Settlements Were Proposed And
        Experienced Counsel's Careful Analysis And Arm's-Length Negotiations**

**1.     Stage of Litigation and Extent of Discovery Conducted**

    The first and second *Jiffy Lube* "fairness" factors direct the Court to consider the stage of

the litigation at the time settlement was reached, and the extent of discovery conducted in the

case. Plaintiffs' Omnibus Mem. at 5-6. These factors weigh strongly in favor of approval.

---

[15] These factors were also enunciated in *Jiffy Lube*, 927 F.2d at 158, and will likewise be referred to as the "*Jiffy Lube*" factors.

The Stipulation and Settlements proposed in the Actions (the "Resolution") were reached after more than six years of contested litigation, and only after substantial briefing on the various parties' motions to dismiss, a motion to amend, a renewed motion to dismiss based on standing, the production and review of over 2 million pages of documents by Franklin alone, in addition to trading data discovery, some 23 depositions of fact witnesses and the completion of fact discovery, extensive vetting of Plaintiff's consultant's analyses of alleged damages, and full briefing of both sides' motions and cross-motions for partial summary judgment. *See* Waldman Decl. ¶¶ 5-18. The parties thus knew the strengths and weaknesses of each other's case extremely well.

Moreover, the Resolution is the result of lengthy and hard-fought negotiations, which lasted on an on-and-off basis for well over a year between Plaintiff and the Franklin Defendants, and longer as to certain of the third-party defendants, encompassing various complex issues such as the negotiation of the Franklin Defendants' payment for most of the notice and administration costs, and harmonizing the various parties' interests. Waldman Decl. ¶¶ 13, 17. Further, Plaintiff reached the Resolution well after certain of the Franklin Defendants, Bear Stearns, BAS, and Canary settled claims brought against them relating to market timing by government regulators, and obtained a significant total recovery beyond those regulatory settlements. *See supra* at pp. 8-9, 12-13. As explained in Plaintiffs' Omnibus Mem. at 5, where the case has been developed through motion practice, briefing and argument on legal issues, and informal or formal discovery, the Court should be more inclined to favor approval of the settlement.

Because there can be no question that the parties and their counsel have "sufficiently developed the case such that they can appreciate the merits of the claims," these factors weigh in favor of a finding of fairness. *Muhammad v. Nat'l City Mortgage, Inc.*, No. 2:07-0423, 2008

WL 5377783, at *3 (S.D.W. Va. Dec. 19, 2008) (citation omitted).

## 2.    Circumstances Surrounding the Negotiations

The next *Jiffy Lube* "fairness" factor directs the Court to consider the circumstances surrounding the settlement negotiations and focuses on whether the negotiations were free from fraud or collusion. Plaintiffs' Omnibus Mem. at 6. This factor also weighs heavily in support of approval. Discussions to resolve the Action were first broached in or around late July 2006, after the rulings on the motions to dismiss, with the notion that the Franklin Defendants might provide trading data that could serve as a basis for further discussion as to the scope of alleged damages in the Action, which was done. Discussions continued sporadically during 2007, 2008 and 2009, and intensified in early and mid-2010. However, the parties could not reach agreement. Talks resumed in December 2010 after the Court's rulings on summary judgment. The discussions were impacted by, among other things, (i) the various rulings by the Court in these Actions, as well as rulings in the other MDL market timing actions, (ii) Plaintiff's consultant's analyses of alleged damages, (iii) a comparison to settlements which had already been reached in other MDL market timing cases of varying strengths, and (iv) settlements by certain of the Franklin Defendants and others with government regulators arising out of the alleged  conduct giving rise to the Actions, including the revelation of the allocation of those settlements to Franklin Fund shareholders.

The Resolution was reached only after the claims and issues in the Action were narrowed by the Court's August 25, 2005 Order addressing common issues presented in the MDL Actions; the June 27, 2008 Investor Class Order of Judge Davis on the motions to dismiss in the Franklin Sub-Track; the Court's October 22, 2009 Order granting in part and denying in part Plaintiff's motion to file a second amended complaint; and the Court's December 9, 2010 Order granting

the Franklin Defendants' motion for partial summary judgment, and denying Plaintiff's cross-motion for partial summary judgment.

In addition, Plaintiff's willingness to enter into the Resolution was greatly influenced by the fact that the settlements by certain of the Defendants with government regulators, primarily the SEC, returned such a substantial portion of the potential alleged damages calculated by Plaintiff's damage consultant, ERS Group ("ERS") (now Financial Scholars Group), that the resulting offset from such government settlements would have substantially lessened, if not entirely eradicated, any further recoverable damages for the Class in the Class Action had the case proceeded through a trial.[16]

As explained in Plaintiffs' Omnibus Mem., in the absence of any evidence to the contrary, the court "may presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion," especially where, as here, the Settlements and Stipulation have been negotiated, over a great length of time, at arm's length by capable and experienced counsel. *See* Plaintiffs' Omnibus Mem. at 6-7 (quoting *Muhammad*, 2008 WL 5377783, at *3).

### 3.    Experience of Class Counsel

The final *Jiffy Lube* "fairness" factor addresses the experience of class counsel in the particular field of law involved in the case. Plaintiffs' Omnibus Mem. at 7. Because both Plaintiff's and Defendants' counsel have extensive experience in securities class action (and derivative litigation), it is appropriate for the Court to give significant weight to counsel's judgment in negotiating, approving and recommending the Settlements and Stipulation. *See id.* at 7-8; *see also* Firm Resume of Wolf Popper LLP, attached to the Waldman Decl. as Exhibit 6.

---

[16] ERS was also retained by class plaintiffs in each of the MDL market timing cases, and was, therefore, intimately familiar with these market timing cases and the issues involved.

**C.** **Adequacy Considerations Support Final Approval Due To The Significant Risks, Challenges And Expenses Involved In Continued Litigation, The Likelihood Of Recovery On A Litigated Judgment, And The Class's Reaction To The Settlements And The Stipulation**

**1.** **Significant Risks, Challenges and Expenses Involved in Continued Litigation**

The first *Jiffy Lube* "adequacy" factor requires the Court to consider the relative strength of the Plaintiff's case and the existence of any defenses or difficulties of proof.  As explained in Plaintiffs' Omnibus Mem. at 8, "[a]lthough a court is not to decide the merits of the case or to attempt to resolve unsettled factual or legal questions … it is nonetheless necessary … to assess the relative strengths and weaknesses of the settling parties' positions."  While Plaintiff has always remained confident in its ability to successfully establish Defendants' liability at trial, at least relating to so-called "arranged" market timing, the complex issues, significant risks, and uncertainties that are involved in securities class actions in general, and this Class Action specifically, strongly favor approval of the proposed Resolution.

As discovery in the Class Action progressed over the course of several years, many significant litigation risks became apparent.  As an initial matter, especially after the Court's partial summary judgment ruling, this Class Action is not as large as many of the other MDL market timing cases.  Moreover, at the time the Stipulation was entered into, Plaintiff was aware that in each market timing sub-track case that had proceeded to a summary judgment adjudication, like this one, the plaintiff(s) had lost.  Further, as stated, Plaintiff was well aware of the fact that Franklin Fund shareholders had recovered in excess of $100 million through the regulatory settlements, which would substantially, if not entirely, offset a damages recovery for the Class.  These factors shed light on the result Plaintiff could realistically expect to achieve in this litigation.

In reaching the Resolution, Plaintiff considered the additional risk that it would not be able to overturn on any eventual appeal this Court's December 9, 2010 Order granting the Franklin Defendants' partial summary judgment motion and denying Plaintiff's cross-motion for partial summary judgment.  In addition, even regarding the "arranged" market timing allegations remaining in the case after the Court's summary judgment ruling, Plaintiff faced significant challenges regarding *scienter*, issues of standing (which have been hotly contested between the Parties), and it remained uncertain whether the Court would decide these issues in Plaintiff's favor.

Based on Plaintiff's analysis of the legal and factual issues pertaining to proof of damages (after this Court's recent rulings, and considering the monies already recovered by the Class through the regulatory settlements), including discussions and analyses provided by damages consultant ERS, the proposed Resolution, which provides a benefit to the Class of $7,187,368 plus interest, represents an immediate recovery of a material percentage of the alleged potentially recoverable alleged damages suffered by the Class.  In light of the fact that Plaintiff's estimate of provable alleged damages assumes Plaintiff's claims would survive (i) another anticipated summary judgment motion by the Franklin Defendants claiming that the offsets from the governmental settlements would be greater than the potentially recoverable alleged damages remaining after the partial summary judgment decision, and (ii) the significant defenses as to *scienter* and standing, among other issues, not to mention the considerable additional expenses and duration of continued litigation, there can be no question as to the adequacy of the Resolution.

Given the significant challenges and risks the Class would face in continued litigation, the approximate Class Benefit of approximately $7.2 million from the present and former

Defendants is well within the range of reasonableness and merits final approval.

### 2.     Anticipated Duration and Expenses of Continued Litigation

The second *Jiffy Lube* "adequacy" factor asks the Court to consider the additional time and expenses that would be required if a resolution was not reached and the litigation proceeded to trial. *See* Plaintiffs' Omnibus Mem. at 10. This factor weighs heavily in favor of approval as well. Contesting the Court's December 9, 2010 Order on summary judgment would have meant either seeking reconsideration, or an interlocutory appeal, or both. Further, the Class Action had not yet proceeded through the resolution of litigated motions for class certification, or gone through expert depositions, and the Franklin Defendants had already indicated they would be moving for summary judgment anew on the ground that the offsets from the governmental settlements would be greater than the potentially recoverable alleged damages. Moreover, under the MDL structure of this litigation, each action would have to be returned to its originating district for trial, undoubtedly resulting in additional delays as new judges become familiar with the complex issues involved in the Actions in preparation for trial. *See* Plaintiffs' Omnibus Mem. at 10-11. As the courts have repeatedly recognized, in large, complex and hotly contested cases such as these, the additional time necessary to achieve a litigated judgment at trial would be substantial and the additional costs would likely be enormous. *See* Plaintiffs' Omnibus Mem. at 11.

While Lead Plaintiff has already expended substantial amounts of time and money to prosecute the Class Action, further significant time and expenses would be spent to continue the litigation, both on the merits and with respect to damages, including substantial further expert fees. In addition, concerns about the effects of any further delays are particularly heightened here because litigation of the claims to this point has already taken approximately seven years.

Were it not for the Resolution, the inevitable additional expenses and delays of continued litigation would have substantially reduced the value of any potential judgments ultimately achieved against Defendants.  Approval of the Resolution now avoids the additional delays that would be required for the completion of pre-trial proceedings, the remand of the Action to its initiating district for trial, and the resolution of any appeals.  *See* Plaintiffs' Omnibus Mem. at 11-12.

### 3.      Likelihood of Recovery on a Litigated Judgment

The third *Jiffy Lube* "adequacy" factor assesses the reasonableness of a proposed settlement in light of the defendants' ability to pay a greater judgment and the likelihood of recovery on a litigated judgment.  *See* Plaintiffs' Omnibus Mem. at 12.  While there is no evidence here that Franklin could not withstand a judgment (although, notably, the Bear Stearns entities collapsed into the arms of JP Morgan Chase, and the Canary entities and Security Brokerage were put out of business), even if the Franklin Defendants could afford to contribute an amount greater than $2,750,000 in cash and the other Defendants could afford to pay more than $4,437,368, this, by itself, does not militate for or against approval of the Stipulation and the Third Party Settlements in this case.  *See* Plaintiffs' Omnibus Mem. at 12-13 (citing, for example, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004), where the Third Circuit affirmed the district court's conclusion that a defendant's "ability to pay a higher amount was irrelevant to determining the fairness of the settlement").

### 4.      Degree of Opposition to the Resolution

The fourth *Jiffy Lube* "adequacy" factor looks to the Class Members' reaction to the proposed settlement "as expressed directly or by failure to object."  *See* Plaintiffs' Omnibus Mem. at 13.  In this case, notices were mailed directly to Class Members, including current

shareholders of the Funds, setting forth in summary fashion the terms of the Resolution.  The

more detailed "Long Form Notice" was posted on www.mutualfundsettlements.com/franklin (the

"Website"), established for the Franklin Sub-Track, to which all potential Class Members and

current shareholders were referred.  The Long Form Notice sets forth in greater detail the terms

of the Settlements and Stipulation in the Franklin Sub-Track.  In addition to the aforementioned

notices, a "Publication Notice" disseminated in accordance with the Notice Program was

published in *The Wall Street Journal*, *Investor's Business Daily*, and over a national, business-

oriented wire service, summarizing the Resolution and directing potential Class Members and

current investors to the Website to obtain the Long Form Notice and Proof of Claim (needed

only for Class Members who held mutual fund shares through Financial Intermediaries/Omnibus

Accounts).[17]  *See* Affidavit of Julie Swanson of Rust Consulting, Inc. (the Court-approved

Claims Administrator) (the "Swanson Aff."), attached to the Waldman Decl. as Ex. 1.

Although Class Members and Fund investors have until October 1, 2010 to file objections

to the Resolution, there are no pending objections as of the filing of this brief (*see* Waldman

Decl. ¶¶ 20, 40, 42; *see also* Swanson Aff. ¶ 16),[18] which provides a strong endorsement of the

fairness, reasonableness, and adequacy of the Resolution.  Additionally, the fact that no

objections have been filed by the many institutional investors who are Class Members and who

have large financial stakes in the litigation, bolsters the conclusion that the proposed Resolution

is fair, reasonable and adequate.  *See* Plaintiffs' Omnibus Mem. at 14.

---

[17] As detailed *infra* at pp. 26-27, Class Members who held shares in Franklin Funds directly with Franklin do not have to submit proofs of claim.  These Class Members will be directly mailed checks assuming they have a damages allocation of over $10.

[18] As related in the Waldman Decl., a Mr. Peter J. Smith sent a letter stating that he "object[s] to the settlement notice and claims procedure".  *See* 04-md-15862-JFM, Dkt. # 1427.  The basis of that complaint was that the notice and claims procedure was complex.  However, after Plaintiff's counsel reached out to Mr. Smith and explained the circumstances of the notice and claims procedure, and that Mr. Smith himself did not have to file a proof of claim form as the Claims Administrator already had received his data from Franklin, Mr. Smith indicated his satisfaction with the explanation and stated he did not intend to pursue an objection.  Waldman Decl. ¶¶ 20, 40.

**D.      Consideration Of Lead Counsel's Recommendations And
Lead Plaintiff's Recommendations Support Final Approval**

As explained by the Fourth Circuit, "while the opinion and recommendation of experienced counsel is not to be blindly followed … such opinion should be given weight in evaluating the proposed settlement." *Flinn v. F.M.C. Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1974) (citations omitted).  The opinion of counsel should be given particularly significant weight where, as here, Plaintiff's counsel who have recommended the Resolution are intimately familiar with the pertinent factual and legal issues in the case, and the "decision to settle the case is the product of thorough exploration and deliberation."  *See* Plaintiffs' Omnibus Mem. at 15 (quoting *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009)).  Lead Counsel further have the benefit of evaluating the Resolution within the context of the resolutions in the other Sub-Tracks in these MDL Actions, including another one in which they were class lead counsel before this Court (Allianz Dresdner).

The recommendation of Lead Plaintiff, the Deferred Compensation Plan for Employees of Nassau County, which was appointed as such by the Court pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") as the most adequate representative of the Class, also supports approval of the Resolution.[19]  *See* Plaintiffs' Omnibus Mem. at 16; *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (the participation of a sophisticated institutional investor lead plaintiff in the settlement process supported approval of the settlement).  The Court-appointed Lead Plaintiff has maintained involvement in all material decisions of this litigation, and its judgment that the Resolution is "a laudable result for the class," Conkling Decl. ¶ 8, enhances the views of Lead Class Counsel, and counsels in favor of

---

[19] The Declaration of Steven Conkling, of the Deferred Compensation Plan for Employees of Nassau County, in Support of Plaintiffs' Motion for Final Approval of Stipulation and Releases and Third Party Settlements and Plan of Allocation, Class Certification, and Award of Attorneys' Fees, Plaintiff's Award, and Reimbursement of Expenses, dated September 22, 2011 (the "Conkling Decl."), is annexed to the Waldman Decl. as Exhibit 2.

approval of the Resolution.

## II.     THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

In approving the plan of allocation of the Settlements (the "Plan of Allocation" or the "Plan"), the Court must likewise determine whether the Plan is "fair, reasonable and adequate." *See* Plaintiffs' Omnibus Mem. at 16.  Courts examining this question have accorded substantial deference to the opinions of experienced counsel who are well-versed in dealing with these issues.  *See id.* at 17.  Where, as here, Lead Counsel are highly qualified and experienced in securities litigation of this nature, the Plan "need only have a reasonable and rational basis." *See id.* at 16.

Here, the Plan of Allocation, set forth in the Long Form Notice, is eminently fair.  The Plan of Allocation includes a Recognized Claim formula, created by an expert damages consultant, which is intended to equitably apportion the Net Settlement Funds among Class Members.  Waldman Decl. ¶¶ 21-25.  In general, the Plan of Allocation reflects the estimated strengths and weaknesses of claims based on when Class Members purchased or sold shares of the Net Settlement Funds, and creates a structure for calculating recognized losses using the Recognized Claim formula.

Pursuant to the Plan of Allocation, Omnibus Sub-Account Holders are required to submit a Proof of Claim establishing their membership in the Class, in order to be eligible for a payment from the Settlement Fund.  The Summary Postcard Notice mailed directly to members of the Settlement Class, and the Publication Notice, direct Class Members to the Long Form Notice, available on the Website, which includes a copy of the Proof of Claim form.  The Proof of Claim form may also be downloaded directly from the Website or requested from the Claims Administrator.

Class Members who held shares directly through Franklin, meaning they received account statements directly from Franklin, need not submit a Proof of Claim in order to receive payment from the Settlement Fund, but may receive a *pro rata* share of their Recognized Claim under the same formula as the Omnibus Sub-Account Holders who submit timely and valid Proofs of Claim.[20] Any settlement funds remaining following an initial distribution to eligible members of the Class will be distributed to the Franklin Funds themselves, or their successor funds. No Class member has objected to the Plan of Allocation to date.

## III.   THE COURT SHOULD CERTIFY THE CLASS FOR PURPOSES OF THE THIRD PARTY SETTLEMENTS AND THE STIPULATION

As set forth in Plaintiffs' Omnibus Memorandum of Law in Support of Preliminary Approval of Proposed Settlements, dated April 21, 2010 (filed in all sub-tracks, *see, e.g.*, No. 04-15862, Dkt. # 1275) ("Pl. Omnibus Preliminary Approval Mem."), courts in the Fourth Circuit liberally construe Rule 23 in order to certify classes for purposes of settlement. *Id.* at 8. Because the proposed Class satisfies all the prerequisites of Rule 23(a) – numerosity, commonality, typicality, and adequacy – and one of the subdivisions of Rule 23(b),[21] this Court should certify the Class for purposes of settlement and pursuant to the Stipulation.

### A.   The Proposed Class Satisfies the Requirements of Rule 23(a)

First, the Class easily satisfies Rule 23(a)'s numerosity requirement. The damages consultant retained to formulate the Plan of Allocation estimates that over 5 billion shares in the Class Funds were held during the Class Period. These shares were held by approximately 7 million Class Members and represent an amount that is certainly adequate to demonstrate

---

[20] The Court has substantial flexibility in approving methods for the submission and processing of claims under the Plan of Allocation, which it has preliminarily approved, including requiring Class Members to file claims forms to provide information needed to administer a settlement and providing forms and instructions on the Internet. *See* Plaintiffs' Omnibus Mem. at 18.

[21] The requirements of Rule 23(a) and (b)(3) are detailed in Pl. Omnibus Preliminary Approval Mem. at 8-14.

numerosity.[22]  Although there is no specific minimum number of Class Members required to satisfy this requirement, courts in this Circuit have repeatedly found that significantly smaller classes than the Class proposed here satisfied the numerosity requirement.  *See id.* at 8-9 (citing cases where classes of 25 to 30 and 46 to 60 members were held to satisfy the numerosity requirement).  Here, it is clear that the Class is so numerous that joinder of all Class Members is impracticable.

Second, the Second Amended Class Action Complaint recites a number of central legal and factual questions that are common to all Class Members.  *See* Second Amended Class Action Complaint at ¶ 266.  Those common questions include:  (1) whether certain defendants violated Sections 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, and whether certain defendants were control persons who are further liable for violations of Section 10(b) by their controlled persons under Section 20(a) of the Exchange Act; (2) whether certain defendants violated Section 36(b) of the ICA; (3) whether the prospectuses at issue omitted and/or misrepresented material facts about the Class Funds; (4) whether certain defendants knew of and permitted, or recklessly disregarded in permitting, or failed in good faith to stop, market timing in Franklin Funds, including any market timing arrangements; and (5) whether Plaintiff and the other members of the Class sustained damages because of Defendants' conduct, and the appropriate measure of damages.  Thus, Rule 23(a)(2)'s commonality requirement is plainly satisfied.

Third, the Class also satisfies Rule 23(a)'s typicality requirement, which focuses on whether the class representatives' claims arise from the same event or course of conduct leading

---

[22] The exact number of Class Members is unknown, because Franklin does not have full information as to how many persons or entities indirectly held shares in the Class Funds during the Class Period through Omnibus Account Providers.

to the class claims, and whether the claims are based on the same legal theories. *See* Pl. Omnibus Preliminary Approval Mem. at 10-11. As explained in the Pl. Omnibus Preliminary Approval Mem., it is no bar to typicality that a class representative may have held shares in one specific mutual fund while absent Class Members owned shares in different funds, as long as all the funds were affected by the same alleged common course of conduct by defendants. *See id.* Here, Plaintiff alleges that certain Defendants disseminated misleading statements omitting material information concerning the Funds' policies regarding market timing by shareholders. *See* Second Amended Class Action Complaint at ¶¶ 97-115. Plaintiff alleges that as a result of Defendants' wrongful conduct, Plaintiff and other purchasers may have been damaged in various, similar ways during the Class Period. *See, e.g.*, i*d.* at ¶¶ 74-77. As the claims of Plaintiff and Class Members arise from the same alleged course of conduct and rise or fall on the same legal theories, the typicality requirement has been satisfied here.

Fourth, Plaintiff satisfies Rule 23(a)'s adequacy requirement because its counsel is experienced and able to vigorously litigate the Action – as it has – and Plaintiff's interests do not conflict with the interests of other Class Members. As with absent Class Members, Plaintiff either purchased or held shares of Class Funds it alleges to have been damaged by Defendants' misleading statements and omissions concerning the Funds' policies regarding market timing. Lead Plaintiff has had no disabling relationship with any of the Defendants. Furthermore, as the firm resume of Lead Counsel reflects (*see* Waldman Decl. Ex. 6), Wolf Popper LLP is eminently qualified, and Lead Counsel has further demonstrated its adequacy by successfully prosecuting and resolving this matter on favorable terms given the circumstances.

### B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

In addition to satisfying the four requirements of Rule 23(a), the proposed Class is

certifiable under Rule 23(b)(3) because "the questions of law or fact common to Class Members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3).[23]

The Class satisfies the predominance requirement because it is difficult to discern any alleged liability issues not shared by all Class Members. Notably, the U.S. Supreme Court has emphasized that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). In this case, Defendants' alleged liability principally arises from their dissemination of the same misleading statements to all Class Members concerning the Funds' policies regarding market timing by shareholders. These are the central issues in the case and predominate over any individual issues that may exist.

Finally, the Class satisfies Rule 23(b)(3)'s superiority requirement because a class action is the only effective way to litigate the claims in this Action. As a result of the significant costs associated with prosecuting the Class Action, no Class Member in the approximately seven years this case has been pending has expressed an interest in prosecuting claims individually. Additionally, all of the initial actions brought against the Defendants have been consolidated and are pending before this Court. Further, although manageability of this Action is not at issue as Plaintiff is seeking certification of a Class for purposes of the Settlements and the Stipulation, this litigation would present no apparent management issues that weigh against the certification of the Class. Indeed, as the courts in the Fourth Circuit have noted, "[s]ecurities fraud actions typically meet the Rule 23(b)(3) requirement because the claims relate to the acts or omissions of

---

[23] The predominance and superiority requirements of Rule 23(b)(3) are discussed in depth in Pl. Omnibus Preliminary Approval Mem. at 13-14.

the same defendants and damages of individual Class Members might be too small to provide incentive for the individuals to sue." *See* Pl. Omnibus Preliminary Approval Mem. at 14, *quoting In re The Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 109 (E.D. Va. 2009), and discussing additional authority.

Accordingly, the Court should finally certify, for purposes of the Settlements and the Stipulation, the Class Action as a class action on behalf of the Class as set forth in note 3 above, and appoint the Lead Plaintiff, the Deferred Compensation Plan for Employees of Nassau County, as Class representative and its counsel, Wolf Popper LLP, as Lead Counsel on behalf of the Class.

## IV.     THE REQUESTED FEE AWARD IS REASONABLE AND SHOULD BE GRANTED

Plaintiff and Lead Counsel contributed an enormous effort, and undertook all of the risk, to prosecute the Class Action and ultimately achieve the Settlements and Stipulation for the benefit of the Class.  This is not a case where a resolution was achieved at an early stage.  To reach a point where this favorable Resolution could be negotiated, Plaintiff had to file multiple complaints, brief and argue motions to dismiss by multiple parties, renewed motions to dismiss based on standing, and a contested motion to amend the consolidated amended complaint; conduct extensive discovery, including reviewing over two million pages of documents and deposing some 23 witnesses; analyze and engage in probing debate with the Franklin Defendants over voluminous trading data, and the related regulatory settlements; brief an opposition to the Franklin Defendants' motion for partial summary judgment, and Plaintiff's cross-motion for partial summary judgment; and partake in extensive on-going discussions about resolving the Action, with multiple parties.  *See* Waldman Decl., ¶¶ 5-18, 28.

In order to resolve the Action for the sum of $4,437,368 in cash, together with any income or interest earned thereon, plus the Franklin Defendants' agreement to contribute $2.75 million toward the costs of notice and administration, for a total Class Benefit of approximately $7.2 million, a very favorable result under the circumstances, Lead Counsel alone expended 12,551.80 hours of total time to prosecute the Action for a lodestar of $7,406,027, on a wholly contingent basis with no guarantee of payment.  This lodestar figure does not include work done by other Class Counsel, who primarily participated in the review of documents produced by Defendants, or work performed by Liaison Counsel (Tydings & Rosenberg LLP), or Derivative Counsel.  *See* Waldman Decl. ¶¶ 27, 29, 37-39 and Ex. 3 thereto.[24]

In light of the magnitude of the total recovery, particularly given that it may have, in actuality, exceeded the likely recoverable damages, and the time, effort, perseverance and financial risk required to obtain it, the requested fee award of 25% of the Class Benefit of approximately $7,200,000 (*i.e.*, a fee of approximately $1,800,000) – or a substantial 76% ***negative*** multiple to Lead Counsel's lodestar alone, not counting the lodestar of other Plaintiffs' Counsel – is justified here.  The requested fee award also falls well within the range of reasonable fees awarded by courts in complex securities class action litigations such as this case.

### A.      Plaintiffs' Counsel Are Entitled To A Fee From The Common Fund They Created

Under the "common fund" doctrine, "[w]hen a class settlement results in the creation of a common fund for the benefit of Class Members, as it does here, 'reasonable attorneys' fees may be awarded from the fund as a whole.'"  *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-

---

[24] Class Counsel and Derivative Counsel, who, on behalf on the Derivative Plaintiffs, have entered in partial settlements of the Derivative Action as to Canary and BAS only, are applying for a joint fee in this fee application (the "Fee Application").  As explained in the Long Form Notice (p. 20), "[t]he portion of fees sought by Derivative Counsel will come only from the amounts paid by Canary and BAS."  By agreement among the parties, the fees to be allocated to Class Counsel and Derivative Counsel out of the joint award will be negotiated by Lead Class Counsel and Derivative Lead Counsel and, if they are unable to agree, will be submitted to the Court to decide.

00743, 2010 WL 2671506, at *4 (S.D. W. Va. July 1, 2010) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).  The common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."  *Boeing Co.*, 444 U.S. at 478.  Even in the absence of a specific monetary fund, where the litigation has conferred a substantial benefit on the members of an ascertainable class, an award of fees will be made to spread the cost of counsel proportionally among such members.  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970).[25]

Plaintiff and Lead Counsel have clearly bestowed a substantial common benefit upon the Class Members here.  Through their efforts, Class Members will share substantial monetary relief, which satisfies the requirements of the common fund doctrine and entitles Lead Counsel to an award of attorneys' fees from the Resolution.

**B.      Attorneys' Fees Should Be Set As A Percentage Of The Common Fund Recovery, Using The Lodestar Method As A Cross-Check**

Generally, there are two methods for calculating fees in the class action context:  the "percentage fund method," when the value of the settlement is subject to reasonably clear estimation; and the lodestar method, which calculates fees by multiplying the number of hours expended by an appropriate hourly rate.  *See* Pl. Omnibus Fee Mem. at 2-3.  "While the Fourth Circuit has not yet definitively [ruled on the proper method of calculating fees in class actions], other district judges in this circuit have suggested a flexible analysis that uses the percentage of recovery method but applies the lodestar method as a cross-check, recognizing that both are useful tools for trial courts to use to inform and calibrate a judgment as to a fair and reasonable PSLRA fee award."  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D.

---

[25] *See also* Plaintiffs' Omnibus Memorandum of Law in Support of Applications for Attorneys' Fees and Reimbursement of Expenses, filed in all these Sub-Tracks on September 14, 2010, *see, e.g.*, No. 04-15862, Dkt. # 1342 ("Pl. Omnibus Fee Mem.") at 1-2, 12-14.  Plaintiff respectfully refers the Court to Pl. Omnibus Fee Mem., which sets forth in detail the legal standards applicable to the Fee Application, rather than reiterating them here.

Md. 2006) (internal citation omitted); *see also Helmick*, 2010 WL 2671506, at *4-5 (S.D. W. Va. July 1, 2010); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 260-61; *Muhammad*, 2008 WL 5377783, at *6-8.  In addition, courts at all levels of the federal system and within the Fourth Circuit have endorsed the use of the percentage-of-recovery method in common fund class and derivative cases.  *See* Pl. Omnibus Fee Mem. at 3; *see also Boyer v. Wilmington Materials, Inc.*, No. 12549, 1999 WL 342326 (Del. Ch. May 17, 1999).

"By using the percentage of fund method and supplementing it with the lodestar cross-check, a court can take advantage of the benefits of both methods."  *Helmick*, 2010 WL 2671506, at *5.  Percentage-based attorney's fees:

> (1) align the interests of claimants and lawyers by rewarding superior performance and punishing failure;
> (2) minimize the need to evaluate the reasonableness of attorneys' efforts ex post, which is both time consuming and often hard to do; and
> (3) transfer the burden of financing lawsuits and other risks from claimants to attorneys who are better able to bear them.

*Muhammad*, 2008 WL 5377783, at *7; *see also* Pl. Omnibus Fee Mem. at 4-5 (discussing advantages of the percentage of recovery method).

### C.    The Requested Fee Is Reasonable

Because the Fourth Circuit has not announced a preferred method for determining the reasonableness of attorneys' fees in common fund cases, or identified factors for the district courts to apply when using the percentage of recovery method, this Court has much discretion in determining the reasonableness of the fee award sought in the Fee Application.  However, several district courts in this Circuit undergoing this analysis have considered the following factors:

> (1) the results obtained for the class, (2) the quality, skill, and efficiency of the attorneys involved, (3) the complexity and duration of the case, (4) the risk of nonpayment, (5) awards in similar cases, (6) objections, and (7) public policy.

*Helmick*, 2010 WL 2671506, at *5 (citing *Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 760 (S.D. W. Va. 2009)); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 261; *see also* Pl. Omnibus Fee Mem. at 7-8.[26]

### 1. Lead Counsel's Efforts Conferred Substantial Benefits Upon Class Members

"A central advantage of the percentage of the fund method is that it looks to the results actually obtained by Lead Counsel rather than just the number of hours they expended, which should be an important point in awarding fees." *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 261 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)); *see also* Pl. Omnibus Fee Mem. at 8-9.  Here, the Settlement comprised of $4,437,368 million in cash, together with any income or interest earned thereon, plus the Franklin Defendants' agreement to contribute $2.75 million toward the costs of notice and administration, for a total Class Benefit of approximately $7.2 million, is a very favorable result for the Class under the circumstances.[27]  The Resolution is the result of nearly seven years of hard-fought litigation, including the filing of class complaints, amended complaints, and a second amended class action complaint; briefing and argument of

---

[26] "'These factors are substantially similar to the factors mandated in this Circuit when employing the lodestar method.  *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.1978) (the factors to be considered are: (1) time and labor expended; (2) novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services; (4) attorney's opportunity costs in pressing the litigation; (5) customary fee for like work; (6) attorney's expectation at the outset of litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) experience, reputation and ability of the attorney; (10) undesirability of the case within the legal community in which the suit arose; (11) nature and length of the professional relationship between the attorney and client; and (12) fee awards in similar cases).  Because the lodestar is employed as a 'cross-check' and because these factors are so similar to the seven factors analyzed within, each of the twelve *Barber* factors will not be laid out and analyzed separately." *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 261 n.6.  In addition, these twelve factors were developed to evaluate the reasonableness of attorneys' fees awarded under fee-shifting statutes, and thus, some of these factors are not directly applicable to awards of attorneys' fees under the percentage of the fund method.  *See* Pl. Omnibus Fee Mem. at 7-8.  Recognizing that fact, some district courts in the Fourth Circuit adopted the seven factors listed above specifically tailored for considering the reasonableness of fees awarded under the percentage method.  *Id.*

[27] Indeed, only a tiny fraction of the settlements in the various *In Re Mutual Funds Investment Litigation* Sub-Tracks provided that defendants, as opposed to the settlement funds themselves, would bear the substantial costs of notice and settlement administration.

motions to dismiss, renewed motions to dismiss based on standing, and a contested motion to amend the consolidated amended complaint; extensive document and deposition discovery; analysis of voluminous trading data and rigorous vetting of the damages estimates, including analysis of the impact of related regulatory settlements; briefing an opposition to the Franklin Defendants' motion for partial summary judgment, and Plaintiff's cross-motion for partial summary judgment; and extensive discussions about resolving the Action.  Indeed, as set forth below, the reaction of the Class and current shareholders in this Sub-Track thus far strongly indicates that the result achieved in this case is a desired one.

In addition, with the exception of the market timing arrangements with the Calugar entities (Security Brokerage), and a limited group of timers who were allegedly permitted to time mainly during a six-month "experimental" period in 2001 when Franklin was "studying" the impact of market timing in its Funds -- as to which certain Franklin Defendants paid a $30 million settlement to the SEC (distributed primarily to certain Class Members) and $20 million in fines, and a $5 million fine pursuant to the Massachusetts Consent Order -- the government regulators found no additional violations by these defendants.

The approximate $7.2 million Class Benefit, given the significant challenges and risks Plaintiff and the Class would face in continued litigation – including the reality that little or no recovery may have been the reward for Plaintiff's prevailing on their claims given the offsets from the regulatory settlement allocations already made to Franklin Funds shareholders, and the substantial narrowing of the claims on summary judgment, even assuming the Plaintiff's damages consultant's methodologies were deemed appropriate – leave no doubt that that the Resolution provides a very favorable result for the Class here.

That the Settlements and the Stipulation confer a substantial benefit on Class Members is

even more apparent considering the fact that this Action had far less potential recoverable

damages than many of the other MDL market timing cases, especially after the allocation of the

third-party regulatory settlements, but is being resolved for a higher total Class benefit than

many of the other sub-tracks, and well within the range of those other settlements, which have

generally fallen in the low single-digit to $15 million range, notwithstanding that this Action is

no less, and perhaps far more, risky for Plaintiff and the Class than such other cases.

### 2.   Lead Counsel Successfully Prosecuted Plaintiff's Claims Against Vigorous Opposition and Highly Experienced Counsel

Lead Counsel is highly experienced and skilled in the field of securities litigation and

have achieved a very favorable result for the Class.  *See* Pl. Omnibus Fee Mem. at 9 (noting that

it has been recognized by courts in this Circuit that "prosecution and management of a complex

national class action requires unique legal skills and abilities").  Lead Counsel engaged in

substantial briefing on motions to dismiss and summary judgment, extensive document and

deposition discovery, and dealt with sophisticated damages issues in conjunction with the top

experts in their field.  The Resolution was also reached well after certain of the Franklin

Defendants, Bear Stearns, BAS, Canary and Security Brokerage settled claims brought against

them relating to shareholder market timing by various government regulators, and Plaintiff and

Lead Counsel were able to obtain a significant total recovery beyond those regulatory

settlements.

The Resolution was reached only after (i) the claims and issues in the Action were

narrowed by the Court's August 25, 2005 Order addressing common issues presented in the

MDL Actions, and the June 27, 2008 Investor Class Order on the separate motions to dismiss in

the Franklin Sub-Track, wherein Plaintiff prevailed on its key Sections 10(b) and 20(a) 1934

Securities and Exchange Act claims (but lost as to the Section 11 of the 1933 Securities Act and

state law claims) and claims under Section 36(b) of the ICA; (ii) Plaintiff beat back Defendants' renewed motion to dismiss certain claims for lack of standing; (iii) Plaintiff believes it was able to amass substantial factual evidence supporting many of its allegations, unearthed through extensive document and deposition testimony, much of which was reflected in a 152-page Second Amended Complaint; and (iv) Plaintiff's claims were narrowed substantially by the Court's December 9, 2010 Order on the summary judgment motions and cross-motions, which, among other things, dismissed claims based on market timing that was allegedly "permitted" by Franklin to occur, but was not specifically "arranged".

In addition, Plaintiff's willingness to enter into the Settlements and Stipulation was influenced by damages analyses by ERS (now Financial Scholars Group), which was also retained by class plaintiffs in each of the MDL market timing cases, and was, therefore, intimately familiar with these market timing cases and the issues involved.  Plaintiff's analysis of alleged damages in this case was sophisticated.  Plaintiff's consultant's analyses of alleged damages were shared with counsel for the Franklin Defendants, and issues related thereto, including the set-off that the Franklin Defendants would have claimed from its regulatory settlement and recoveries received from third party regulatory settlements, were discussed between the parties to the Stipulation over many months.  This process played a significant role in enabling Plaintiff to assess the value of the case, which, together with an assessment of the relative merits and considering the additional set-off that certain of the other Defendants would have claimed from their settlements with governmental regulators for distribution to Class Members or the Funds, and the summary judgment decision of the Court, shaped the negotiations between the parties culminating in the Resolution.  Lead Counsel's ability to navigate toward a successful Resolution of the Action, obtaining a very favorable percentage of its estimate of

recoverable damages, under such circumstances – indeed, potentially more than the amount of recoverable damages -- further confirms the exceptional value created for the Class here.

The skill required by Plaintiff's Counsel to achieve the significant benefits for the Class under the Settlements and Stipulation is also reflected in the quality of opposing counsel. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d at 387; Pl. Omnibus Fee Mem. at 9. The Franklin Defendants were represented by McCarter & English, LLP (previously Pollack & Kaminsky), and other Defendants were represented by firms including Wachtell, Lipton, Rosen & Katz; Cleary Gottlieb Steen & Hamilton LLP; Kramer Levin Naftalis & Frankel LLP; and McDermott Will & Emery -- highly reputed firms with extensive resources and exceptionally knowledgeable and vigorous counsel.  It required a great deal of skill and zeal to withstand their defense of the claims asserted.

### 3.     The Complexity and Duration of the Case

As indicated by the novelty and scope of the claims, damage theories, number and breadth of investors affected, and even some of the innovative mechanisms of notice and settlement administration, the litigation of the claims in the Action was highly complex, playing out over the course of more than half a decade.  As explained by the court in *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 263, "[t]he very nature of a securities fraud case demands a difficult level of proof to establish liability.  Elements such as *scienter*, reliance, and materiality of misrepresentation are notoriously difficult to establish.  Proving damages further implicated complex economic modeling at the hands of sophisticated experts ...."  (Internal citation omitted).  *See also* Pl. Omnibus Fee Mem. at 9-10.

This Action in particular was unique even as securities fraud actions go (*e.g.*, no "fraud-on-the-market" reliance presumption, and no stock price drop following revelation of the truth

revealing defendants' former misstatements); and overcoming the Franklin Defendants' stringent

challenges to some of the unique aspects of this case -- such as "under-the-radar" timing, or

timing that Franklin allegedly knew or should have known about, but "in good faith" did not

successfully stop, legal standing, and the regulatory settlement set-off issue -- was, and, in the

future would be, no easy feat.

### 4.       Plaintiffs' Counsel Assumed the Risk of Nonpayment

The risk of nonpayment incurred by Plaintiffs' Counsel is evident in the fact that the

Actions were undertaken on an entirely contingent fee basis.  As noted by the court in

*Muhammad*, 2008 WL 5377783, at *8, "counsel bore a substantial risk of nonpayment…. [t]he

outcome of the case was hardly a foregone conclusion, but nonetheless counsel accepted

representation of the plaintiff and the class on a contingent fee basis, fronting the costs of

litigation."  *See also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d at 387

(approving attorneys' fee award where "lead counsel was required to and did devote exceptional

resources to the prosecution, facing some risk of non-recovery as the fee was entirely contingent

under the retainer agreement … and [Defendant's] financial position was unclear"); Pl. Omnibus

Fee Mem. at 10.

### 5.       Awards in Similar Cases Support Approval of the Fee Requested

While "the reasonableness inquiry is necessarily case-specific, and thus the percentage

actually awarded varies from case to case," numerous courts within the Fourth Circuit and

elsewhere have awarded fees in excess of the 25% of the Class Benefit requested here.  *See, e.g.*,

*In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 264 (citing *Braun v. Culp, Inc.*, No. C-84-455-

G,1985 WL 5857, at *3 (M.D.N.C. Apr. 26, 1985) ("in matters in which fees are contingent upon

recovery, the fee is sometimes expressed as a percentage of the recovery and ranges from 25% to

40%") and *Manual For Complex Litigation* (Fourth) § 14.121 at 188 (percentage awards are

"often between 25% and 30% of the fund"); *see also Muhammad*, 2008 WL 5377783, at *9

(approving requested award of 33.3% of the amount of the common fund established for the

class); *Hackworth v. Telespectrum Worldwide, Inc.*, Civil Action No. 3:04-1271 (S.D. W. Va.

2004) (awarding fees of 33-1/3% of the amount of the settlement); *Kidrick v. ABC Television &*

*Appliance Rental, Inc.*, No. 3:97CV69, 1999 WL 1027050 (N.D. W. Va. May 12,1999)

(awarding a 30.6% fee award); *Adams v. Advanced Mgmt., Inc.*, No. 3:94-042 (N.D. W. Va.

1994) (awarding class counsel 35% of the total settlement); *In re Ikon Office Solutions, Inc.*, 194

F.R.D. 166, 197 (E.D. Pa. 2000) (awarding attorneys' fees equivalent to 30% of the net

settlement fund).[28]   Indeed, as noted above, according to the *Manual For Complex Litigation* and

recent precedent from District Courts in the Fourth Circuit, the 25% requested fee is at the *lower*

*end* of the range for normally approved fees in similar securities class action cases.   Such a

percentage has also been awarded in other sub-tracks in these MDL Actions where fees were not

capped by a client agreement, including in the Allianz Dresdner sub-track, where Wolf Popper

was also Lead Counsel and this Court awarded plaintiffs' counsel a 25% fee.

> **6.     The Absence of Objections to the Requested Award of Attorneys'**
> **Fees and Approval of the Fee Percentage by Lead Plaintiff Also**
> **Weigh in Favor of Approval of the Fees Sought**

Lead Counsel here was not subject to any prior cap on fees negotiated at the inception of

this litigation with the Lead Plaintiff.   However, following the Resolution, Lead Plaintiff agreed

to and approved the 25% fee percentage being sought in this Fee Application.   *See, e.g.,*

Conkling Decl. ¶¶ 9, 15.   Plaintiff's intent to request a fee of 25% of the Class Benefit was

---

[28] *Cf. In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d at 385 (noting that an "important principle is that
the percentage awarded ordinarily should decrease as the amount of the recovery rises, particularly in 'mega-fund'
cases where the recovery is above $100 million"; awarding 12% of a total settlement of $1.1 billion as a reasonable
fee, representing a 2.57 multiplier over counsel's lodestar).

prominently detailed in the notices directly sent to approximately 4,206,404 Class Members (many of whom were current shareholders). *See* Swanson Aff. at ¶ 8. Although the deadline to file objections is October 1, 2010, one week away, no objections to the Fee Application have been lodged thus far. While not dispositive, the lack of objections tends to confirm the reasonableness of the joint Fee Application under the circumstances of this case. *See Mills Corp.*, 265 F.R.D. at 262, *citing In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (affirming fee award and stating that district court "did not abuse its discretion in finding the absence of substantial objections by Class Members to the fee requests weighed in favor of approving the fee request").

### 7.    Public Policy Concerns Support Approval of the Fee Requested

Although a frequent complaint surrounding class action fees is that they are artificially high, "[c]ompeting with this perception, however, 'is the policy encouraging counsel to accept worthy engagements.'" *Helmick*, 2010 WL 2671506, at *7 (citation omitted). "At the heart of the class action lies the belief that the interests of justice are well served by class actions that vindicate rights that might otherwise go unprotected and that spare courts the burden of handling numerous lawsuits, some small and some not so small, arising from a common set of facts. Therefore, public policy generally favors attorneys' fees that will induce attorneys to act and protect individuals who may not be able to act for themselves but also will not create an incentive to bring unmeritorious actions." *Helmick*, 2010 WL 2671506, at *7 (internal citation omitted); *see also* Pl. Omnibus Fee Mem. at 10-11.

### D.    Endorsement Of The Fee Request By Lead Plaintiff Supports Its Reasonableness

In enacting the PSLRA, Congress intended to encourage sophisticated institutional investors with substantial financial stakes in the litigation to serve as lead plaintiffs and play an

active role in supervising and directing the litigation, including selecting and monitoring class

counsel.  *See* Pl. Omnibus Fee Mem. at 11.  Accordingly, while courts retain an obligation to

review the reasonableness of fee requests, fee requests that have been reviewed and endorsed by

a properly selected PSLRA lead plaintiff are entitled to some deference.  *See Mills*, 265 F.R.D. at

261 ("in a PSLRA case . . . a fee request that has been approved and endorsed by properly-

appointed lead plaintiffs . . . enjoys a presumption of reasonableness"); *In re Veeco Instruments

Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007)

(same); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 442 (D.N.J. 2004)

("Significantly, the Lead Plaintiffs, both of whom are institutional investors with great financial

stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and

expenses request.").  Here, the review and approval of the fees requested by Plaintiff supports the

reasonableness of the requested fees.  *See* Conkling Decl., ¶¶ 9, 15.

Finally, unlike the cases in other sub-tracks where lower fee percentages were negotiated

with the lead plaintiff at the inception of the case when it appeared that very substantial

settlements could be reached without extensive litigation, here the fee percentage was agreed to

by Plaintiff following the Settlements and Stipulation at a time when the effort involved and the

result achieved in light of the risks could be actually evaluated.  Thus, the agreement and

approval of the Lead Plaintiff should be a significant factor in considering the percentage

requested in this case.

### E.     The Fee Requested Is Also Supported By The Lodestar Cross-Check

As noted above, many district courts in the Fourth Circuit choose to "cross-check" the

results of a percentage-fee award against counsel's "lodestar."  *See* Pl. Omnibus Fee Mem. at 5.

"Where a court uses the lodestar cross-check method, the hours documented by counsel need not

be exhaustively scrutinized by the district court.  Instead, the reasonableness of the claimed

lodestar can be tested by the court's familiarity with the case." *Helmick*, 2010 WL 2671506, at

*7; *Mills Corp.*, 265 F.R.D. at 264.  To calculate the lodestar amount, counsels' reasonable hours

expended on the litigation are multiplied by counsel's reasonable rates.  *See Mills Corp.*, 265

F.R.D. at 264; Pl. Omnibus Fee Mem. at 5-6.

 Here, the lodestar method confirms the reasonableness of the percentage fee being

sought.  Lead Counsel's efforts alone have required in excess of 12,000 hours on this case.

Waldman Decl. at ¶¶ 27, 29.  On a straight-time basis (*i.e.*, assuming that Lead Counsel was

charging standard hourly rates and had reasonable assurance of timely payment), this time has a

market value of $7,406,027.  *Id*.  The 25% fee award requested here thus constitutes a substantial

(76%) *negative* multiplier to Lead Counsel's lodestar alone.  Lead Counsel also anticipates that

significant additional hours of professional time may be required to complete diligent

representation of the Class, in the settlement administration context, going forward.  *Id*.

 When adding the lodestars of other Class Counsel who aided Lead Counsel in

prosecuting the Class Action (primarily by performing non-duplicative review in document

discovery), as well as the lodestar of Liaison Counsel (*i.e.*, Tydings & Rosenberg LLP), and

acknowledging that whatever fee is awarded will also be partially shared with Derivative

Counsel (to the extent it comes from the amounts paid by Canary and BAS, as explained in the

notices to Class Members), even with 25% fee award, Plaintiffs' Counsel will receive

substantially less than their lodestars.  Given the effort expended and the complexity of the legal

and factual issues involved, the hours incurred are entirely reasonable.  Thus, using the lodestar

as a cross-check on the percentage amount of the Fee Application, the 25% of the Class Benefit

requested fee award is eminently reasonable.

## V.      COUNSEL SHOULD BE REIMBURSED FOR THEIR REASONABLY INCURRED LITIGATION EXPENSES

Plaintiffs' Counsel and Derivative Counsel are also entitled to recover litigation expenses. *See Mills Corp.*, 265 F.R.D. at 265 (explaining that "[t]he Court is authorized to award costs that are 'reasonable in nature … from the common fund,'" and approving reimbursement for expert fees, reproduction costs, mediation costs, and court costs) (citation omitted).  As one commentator has written:

> [A]n attorney who creates or preserves a common fund by judgment or settlement for the benefit of a class is entitled to receive reimbursement of reasonable fees and expenses involved.  The equitable principle that all reasonable expenses incurred in the creation of a fund for the benefit of a class are reimbursable proportionately by those who accept benefits from the fund authorizes reimbursement of full reasonable litigation expenses as costs of the suit.

1 Alba Conte, *Attorney Fee Awards* § 2.19, at 73-74 (3d ed. 2006), citing *Internal Improvement Fund Trustees v. Greenough*, 105 U.S. 527 (1881); Pl. Omnibus Fee Mem. at 12-13.

Plaintiffs' Counsel have collectively advanced or incurred $341,892.21 in net expenses to date for which they are seeking reimbursement, which reflects their actual expenses, as reduced by a small credit received back from the Litigation Fund established by investor class counsel in the MDL Actions.[29]  Waldman Decl. ¶ 34, Ex. 4.  Because these expenses were advanced with no guarantee of recovery, Plaintiffs and their Counsel had a strong incentive to keep them to a reasonable level.  Waldman Decl. ¶ 36.  The major categories of expenses are for investigator's fees, Plaintiff's damages consultant's fees, fees in connection with obtaining discovery from certain non-parties, and deposition and travel related costs.  Those expenses are detailed in the accompanying Waldman Decl. and were reasonably and necessarily incurred.  Waldman Decl. ¶¶

---

[29] Each investor class plaintiffs' firm contributed to a Litigation Fund to pay certain common expenses -- primarily expert witness expenses.  There was a small residual amount in the Litigation Fund that was allocated back among the plaintiffs' firms.  This allocation has been received by Lead Counsel in this Sub-Track and totals $4,969.31, and reduces the expense request in this sub-track by that amount.

34, 37, 39.[30]  All of these expenses fall within the categories of expenses that have been found

reasonable and reimbursed in past cases of this nature.  *See* Pl. Omnibus Fee Mem. at 13.

The Notice disseminated to Class Members and current investors stated that Plaintiffs

would seek reimbursement of their out-of-pocket expenses in an amount not to exceed $445,000.

*See, e.g.*, Summary Postcard Notice; Long Form Notice, p. 3.  No Class Member or current

investor has objected to the request for expense reimbursement.

## VI.    THE REQUESTED PLAINTIFF'S AWARD SHOULD BE GRANTED

Lead Plaintiff, the Deferred Compensation Plan for Employees of Nassau County,

respectfully moves for reimbursement for its time and expenses spent to prosecute the Action.

Over the course of this litigation, Plaintiff devoted substantial time to overseeing the prosecution

of this case, including submitting to document and electronic trading data discovery, and having

its representatives sit for multiple depositions.  Plaintiff expended 176.9 hours to fulfill its duties

as a representative of, and fiduciary for, the class it sought to represent, and incurred $350 in

expenses.  *See* Conkling Decl. ¶¶ 12-14.  Accordingly, Plaintiff requests an award of $26,885 as

reasonable compensation for making that contribution to the Class.  *Id.*  *See* Waldman Decl. ¶¶

41-42.

The PSLRA permits "the award of reasonable costs and expenses (including lost wages)

directly relating to the representation of the class to any representative party serving on behalf of

---

[30] A chart summarizing the expenses borne by each Plaintiffs' Counsel in prosecuting these Actions, excluding the expenses of Tydings & Rosenberg LLP (which has previously submitted its own declaration in connection with the approval of the settlements in the other sub-tracks, e.g., Dkt. # 1332, and has continued to provide liaison counsel services in the Franklin Sub-Track as well as the other cases that have been pending in the court), is attached to the Waldman Decl. as Ex. 4.

As set forth in the Waldman Declaration and Exhibit 7 thereto, Derivative Counsel state that they have incurred $31,149.97 in expenses in the prosecution of the Derivative Action.  However, Derivative Counsel is limiting their request for reimbursement of expenses herein to $17,000, reflecting that Derivative Plaintiffs' settlement currently before the Court is with Canary and BAS only.  Waldman Decl., ¶ 39.  Accordingly, the total expenses requested to be reimbursed by all of Plaintiffs' Counsel of $341,892.21 reflects only $17,000 for all of Derivative Counsel.

a class." 15 U.S.C. § 78u-4(a)(4).  Congress, in fact, intended to grant courts discretion to

approve awards in appropriate cases.  *See* H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 35

(Nov. 18, 1995) ("[L]ead plaintiffs should be reimbursed for reasonable costs and expenses

associated with service as lead plaintiff, including lost wages, and [the committee] grants the

courts discretion to award fees accordingly."); S. Rep. No. 104-98 (June 19, 1995) ("[T]he

Committee grants courts discretion to award the lead plaintiff reimbursement for 'reasonable

costs and expenses' (including lost wages) directly relating to representation of the class.").

As a result, "[c]ourts around the country have allowed such awards to named plaintiffs or

class representatives," in order to "encourage socially beneficial litigation by compensating

named plaintiffs for their expenses on travel and other incidental costs, as well as their personal

time spent advancing the litigation on behalf of the class and for any personal risk they

undertook." *Muhammad*, 2008 WL 5377783, at *9 (citations omitted); *see also In re Gilat*

*Satellite Networks, Ltd. Sec. Litig.*, No. CV-02-1510, 2007 WL 2743675, at *19 (E.D.N.Y. Sept.

18, 2007) (awarding lead plaintiffs, *inter alia*, $300 per hour for their time spent managing the

case).[31]

In this case, Plaintiff unquestionably deserves the modest reimbursement award

requested.  For example, as part of its oversight of the litigation, Plaintiff regularly conferred

with counsel and reviewed multiple filings in the Action, including without limitation,

complaints, briefing on Defendants' motions to dismiss, Court decisions, numerous status

reports, including several in-person meetings of Lead Counsel with its Board, litigation strategy

discussions, and reviewing settlement-related documents. *See* Conkling Decl. ¶¶ 6-8, 10, 12(a)-

(j).  The Lead Plaintiff was also actively involved with its counsel in all material aspects of

---

[31] Plaintiff seeks reimbursement of only $150 per hour for its time spent managing the case (*i.e.* 176.9 hours x $150 = $26,535) plus its out-of-pocket expenses.

negotiations with each of the various Defendants in this Action, responded to Defendants' discovery requests, including gathering and producing documents and electronic trading data, and prepared for and submitted its representatives to multiple depositions noticed and taken by Franklin's counsel. *See id.*

Likewise, courts should "consider the relationship between the requested incentive award and the amounts recovered by absent Class Members under the settlement." *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 355 (S.D.N.Y. 2005), *aff'd in part, vacated in part on other grounds*, 443 F.3d 253 (2d Cir. 2006) (granting application and finding $10,000 to each lead plaintiff to be "modest" and "comparable" amount when compared to other incentive awards) (footnote omitted).  The requested compensatory award requested here is incredibly modest, constituting only about 0.3% (or one-third of a percent) of the Class Benefit.  Courts routinely approve similar or much larger awards in PSLRA cases.  *See, e.g., In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761(CM), 2008 WL 2944620 (S.D.N.Y. July 31, 2008) (granting reimbursement award of approximately 0.3% of settlement fund to lead plaintiffs); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173 (S.D. Cal. 2007) ($40,000.00 award to single plaintiff under § 78u-4(a)(4)); *In re CV Therapeutics, Inc., Sec. Litig.*, No. C 03-3709, 2007 WL 1033478, at *2 (N.D. Cal. Apr. 4, 2007) ($26,000.00 award to one plaintiff); *In re Charter Comm., Inc., Sec. Litig.*, Nos. MDL 1506, 4:02-CV-1186, 2005 WL 4045741, at *25 (E.D. Mo. June 30, 2005) ($26,625 award to lead plaintiff) (citing *In re Dun & Bradstreet Credit Serv. Cust. Litig.*, 130 F.R.D. 366, 376 (S.D. Ohio 1990) (awarding two class representatives $55,000.00 each and three class representatives $35,000.000 each)); *see also Muhammad*, 2008 WL 5377783, at *9 (granting incentive award of approximately 0.7% of the settlement proceeds to the class representative who "attended numerous meetings with counsel and counsel's staff . . .

assisted in drafting discovery responses, and consulted with counsel regarding critical aspects of the settlement").  In the Allianz Dresdner sub-track, this Court approved a similar plaintiff's award valuing the time spent by the lead plaintiff at $150 per hour, plus out-of-pocket expenses incurred, just as requested in this case.  *See* 04-md-15863-JFM, Dkt. #3590; Dkt. #3457(2)(2).

The notice program approved by the Court also prominently informed Class Members that Plaintiff may ask for up to $50,000 for the reasonable cost of its time and expenses and that these expenses will be paid directly from the Settlement Fund.  *See* Summary Postcard Notice; Long Form Notice, pp. 3, 20.  No one has objected to the Plaintiff's Award.

Accordingly, Plaintiff's request for a reimbursement award is well within the bounds of reasonableness and should be granted.

## **CONCLUSION**

For the reasons stated herein, (i) the Settlements and Stipulation, and the Plan of Allocation, should be approved as fair, reasonable, and adequate to the Class; (ii) the Class should be certified for purposes of the Settlements and Stipulation, and Lead Plaintiff, the Deferred Compensation Plan for Employees of Nassau County, should be certified as Class representative and Lead Counsel should be finally approved as Lead Class Counsel; (iii) Plaintiffs' Counsel should be awarded fees of 25% of the Class Benefit; (iv) Plaintiffs' Counsel should be reimbursed their expenses of $341,892.21; and (v) the Plaintiff's Award of $26,885

should be granted.

Dated:  September 23, 2011

**WOLF POPPER LLP**

By: ___/s/ Chet B. Waldman___
Robert M. Kornreich
Chet B. Waldman
Andrew E. Lencyk
845 Third Avenue
New York, NY  10022
Tel:  (212) 759-4600
Fax: (212) 486-2093

*Lead Class Counsel in the Franklin Templeton*
*Sub-Track, on behalf of Class Lead Plaintiff,*
*the Deferred Compensation Plan for Employees*
*of Nassau County, and the Class*

**CHIMICLES & TIKELLIS LLP**

By: __/s/  Timothy N. Mathews__
Nicholas E. Chimicles
Timothy N. Mathews
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA  19041
Telephone: 610-642-8500

*Lead Counsel for Fund Derivative Plaintiffs*
*in the Franklin Sub-Track*

**TYDINGS & ROSENBERG LLP**

By: ___/s/ John B. Isbister___
John B. Isbister, Fed Bar No. 00639
100 East Pratt Street, 26th Floor
Baltimore, MD 21202
Tel:  (410) 752-9700
Fax:  (410) 727-5460

*Liaison Counsel*